UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

E*TRADE FINANCIAL CORPORATION and
E*TRADE BANK

              Plaintiffs,              05 Civ. 0902 (RWS)

     - against -               O P I N I O N

DEUTSCHE BANK AG,

              Defendant.

------------------------------------x

A P P E A R A N C E S:

    H. PETER HAVELES, JR.
    ANTHONY D. BOCCANFUSO
    Attorneys for Plaintiffs
    Arnold & Porter LLP
    399 Park Avenue
    New York, NY 10022

    DOUGLAS P. LOBEL
    Attorney for Plaintiffs
    Arnold & Porter LLP
    1600 Tysons Boulevard
    McLean, VA 22102



    WILLIAM P. FRANK
    SCOTT D. MUSOFF
    Attorneys for Defendant
    Skadden, Arps, Slate, Meagher & Flom LLP
    Four Times Square
    New York, NY 10036

**Sweet, D.J.,**

Defendant Deutsche Bank AG ("Defendant" or "Deutsche Bank") has moved pursuant to Rule 12(c), Fed. R. Civ. P., for judgment on the pleadings to dismiss the complaint filed by plaintiffs E*Trade Financial Corporation ("E*Trade Financial") and E*Trade Bank ("E*Trade Bank") (collectively, "Plaintiffs"). The Plaintiffs have moved pursuant to Rule 15(a), Fed. R. Civ. P., for leave to file its first amended complaint ("FAC"). For the reasons set forth below, the motion of Deutsche Bank is denied, and the motion of Plaintiffs is granted.

These sophisticated, well-advised parties have developed a dispute over transactions which occurred in 2002 and 2003 by which E*Trade Bank acquired from Deutsche Bank the common stock of Ganis Credit Corporation ("Ganis") and Deutsche Recreational Asset Funding Corporation ("DRAFCO"), a subsidiary of Ganis. The Plaintiffs claim damages of over $25.3 million, and Deutsche Bank seeks dismissal on the pleadings. An early resolution of the dispute would be welcome, but a more cautious approach is warranted.

## The Parties

E*Trade Financial is a Delaware corporation with its principal place of business in New York, New York. (Compl. ¶ 1.)

1

E*Trade Bank is a federally-chartered savings bank with its principal place of business in Arlington, Virginia. (Id. ¶ 2.) E*Trade Bank is "a second tier, wholly-owned subsidiary of E*Trade Financial." (Id.)

Deutsche Bank is a German corporation with its principal place of business in Frankfurt/Main, Germany. (Id. ¶ 3.)

## Prior Proceedings

On January 26, 2005, Plaintiffs filed the complaint asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment, in which they alleged that Deutsche Bank breached its obligations and representations under a stock purchase agreement ("SPA") between the parties by overstating the value of the deferred tax asset on the closing balance sheet, resulting in an overpayment in the purchase price paid by E*Trade Bank.

Deutsche Bank answered the complaint on April 18, 2005, and then moved for judgment on the pleadings on June 20, 2005. On August 15, 2005, the Plaintiffs moved for leave to file their FAC.

Deutsche Bank requested that the two motions, its motion to dismiss and the Plaintiffs' motion to amend, be heard together,

2

and on September 6, 2005 that request was granted. On November 23, 2005, both motions were heard and marked fully submitted.

Appropriately in this procedural setting, the parties have focused on the FAC, Deutsche Bank renewing its positions urged against the initial complaint and contending that, for those reasons and others, the amendments would be futile.

**The FAC**

The FAC describes the parties (FAC ¶¶ 1-3), the diversity jurisdiction of the Court (FAC ¶¶ 4-7), the background of the transactions between the parties (FAC ¶¶ 8-12), including a transaction involving the sale of the common stock of Ganis under the SPA (FAC ¶¶ 13-17),¹ the sale of DRAFCO, a Nevada corporation (FAC ¶¶ 18-65), the events following the DRAFCO transaction (FAC ¶¶ 66-91), and the damage to E*Trade of over $10 million (FAC ¶¶ 92-94).

The FAC then alleges eleven causes of action arising out of these events. Count I, Fraud (FAC ¶¶ 95-104), Count II, Fraud in the Inducement (FAC ¶¶ 105-113), Count III, Fraudulent Inducement (FAC ¶¶ 114-124), Count IV, Constructive Fraud (FAC ¶¶ 125-135), Count V, Negligent Misrepresentation (FAC ¶¶ 136-145),

---

¹ It is worth noting that the SPA is 60 pages of not uncomplicated provisions.

Count VI, Unjust Enrichment as to the Deferred Tax Asset (FAC ¶¶ 146-150), Count VII, Unjust Enrichment as to the $10 Million Tax Credit (FAC ¶¶ 151-156), Count VIII, Violation of California Unfair Competition Law (FAC ¶¶ 157-164), Count IX, Breach of Contract (FAC ¶¶ 165-170), Count X, Breach of Implied Covenant of Good Faith and Fair Dealing (FAC ¶¶ 171-175) and Count XI, Quantum Meruit (FAC ¶¶ 176-181). These allegations are described in greater detail in the FAC.

E*Trade provides a range of online consumer financial services from securities trading to banking services, mortgages and loans. In 2002, E*trade, to broaden its range of consumer services, sought to acquire Ganis, a wholly-owned subsidiary of Deutsche Bank. Deutsche Bank was auctioning off Ganis, which provided online consumer loans used to purchase recreational vehicles ("RVs") and marine vehicles. (FAC ¶¶ 8-10.)

Ganis consisted of the parent entity, Ganis, and some related affiliates. One of the affiliates was DRAFCO, a wholly-owned subsidiary. DRAFCO holds receivables and securitized interests for consumer loans for RVs, boats and musical equipment. (FAC ¶ 11.)

On November 25, 2002, E*Trade and Deutsche Bank consummated the sale of Ganis to E*Trade through a contract called the SPA. That sale, however, did not transfer Ganis's subsidiary

4

DRAFCO to E*Trade. (FAC ¶¶ 13-14.) Instead, E*Trade and Deutsche Bank agreed that E*Trade could acquire DRAFCO at a later time, if certain conditions precedent were met. One important condition was that the three major ratings agencies (Moody's, Standard & Poor's, and Fitch) would not reduce their ratings of Ganis's notes if E*Trade acquired DRAFCO. Accordingly, the SPA provided that Deutsche Bank would transfer Ganis to E*Trade and DRAFCO to a holding company awaiting satisfaction of the conditions precedent. The sale of Ganis (not including DRAFCO) to E*Trade closed on December 23, 2002. (FAC ¶¶ 17-20.)

While E*Trade conducted its "due diligence" of Ganis's value and assets in January 2003, Deutsche Bank personnel prohibited E*Trade from reviewing materials specific to DRAFCO, on the grounds that the parties did not have an agreement to transfer DRAFCO. On March 18, 2003, before finalizing the purchase price of Ganis, and as required by SPA § 2.06, Deutsche Bank provided E*Trade with a "Closing Balance Sheet" for Ganis (the "Ganis Closing Balance Sheet"). The Ganis Closing Balance Sheet showed Ganis's assets, but did not mention DRAFCO or include any of DRAFCO's assets. (FAC ¶¶ 14-16.)

The last of the approvals of the three ratings agencies came on July 18, 2003.

5

On July 18, 2003, Deutsche Bank provided E*Trade with a new, different closing balance sheet listing just DRAFCO's value and assets (the "DRAFCO Balance Sheet"). The DRAFCO Balance Sheet showed a total value for DRAFCO of $65.2 million. One of the assets Deutsche Bank listed on the balance sheet was a "Deferred Tax Asset" valued at $15.3 million. (FAC ¶¶ 23-23.)

The Deferred Tax Asset is alleged to be the present value of future tax credits that DRAFCO could obtain as a result of its "booked" revenues being slightly higher from its revenues reported on past tax returns. This occurs when, for example, DRAFCO has revenue losses that it does not report to the IRS in order to carry them forward into future tax periods. Future tax returns for DRAFCO (to be filed by E*Trade) would report these losses, and thus show less taxable revenue than what E*Trade actually would book in those future years, resulting in a net decrease in taxes owed in those future periods. (FAC ¶ 24.)

E*Trade requested information from Deutsche Bank to support the figures contained in the DRAFCO Balance Sheet, including the Deferred Tax Asset. (FAC ¶ 26.) Deutsche Bank provided an audit report from the independent audit firm KPMG, dated July 2, 2003, which concluded that the Deferred Tax Asset was worth $15.3 million. (FAC ¶ 32.)

6

On August 21, 2003, Dr. Ulrich Gaertner, Deutsche Bank's director, sent E*Trade a computer file breaking down the elements of the Deferred Tax Assets, which comprised the $15.3 million total. (FAC ¶ 33.)

On September 2, 2003, E*Trade personnel discussed the Deferred Tax Asset in a phone call with Deutsche Bank personnel, including Harry Montgomery ("Montgomery"), who managed Deutsche Bank's tax department. Montgomery affirmed the accuracy of the $15.3 million value of the Deferred Tax Asset. (FAC ¶ 35.)

On September 11, 2003, Anthony Ferino ("Ferino"), who worked in Deutsche Bank's tax department, sent E*trade a one-page spreadsheet that also showed various constituent elements of the Deferred Tax Asset, with the net effect of these elements totaling $15.3 million. (FAC ¶ 37.)

Deutsche Bank also agreed that E*Trade could review work papers of Deutsche Bank's outside auditor, KPMG, that supported its audit of the Deferred Tax Asset. Deutsche Bank required an E*Trade representative to travel to KPMG offices in New York where E*Trade could review them but could not copy them or leave with them. On September 15, 2003, E*Trade sent as its representative to KPMG an experienced accountant from the outside audit firm Ernst & Young. KPMG provided this auditor with about two to three inches of paper, which purportedly represented the audit work papers supporting the

7

$15.3 million value for the DRAFCO Deferred Tax Asset. Relying on what he was shown, E*Trade's representative found nothing in these work papers that raised questions about any aspect of the $15.3 million value of DRAFCO's Deferred Tax Asset. (FAC ¶¶ 50-54.)

Based on numerous representations that the Deferred Tax Asset was worth $15.3 million, and having no contrary information to question this figure, E*Trade accepted Deutsche Bank's valuation of the Deferred Tax Asset. E*Trade's due diligence did turn up three other adjustments to the values of other DRAFCO assets. One change affected DRAFCO's booked revenues, and thus this change affected the net value of the Deferred Tax Asset, increasing it by $2.7 million. However, E*Trade had no information to adjust the initial $15.3 million value of the Deferred Tax Asset. (FAC ¶¶ 55-57.)

E*Trade and Deutsche Bank closed the DRAFCO transactions on October 20, 2003. On that date, the parties signed a two-page letter agreement (the "Letter Agreement"), drafted by Deutsche Bank, stating that the E*Trade purchase is made pursuant to Section 2.07 of the SPA. (FAC ¶¶ 58-59.) The Letter Agreement incorporated by reference the meaning of the capitalized terms assigned to those terms in the SPA. The Letter Agreement also listed the "final" sales price of DRAFCO as $59.7 million, which consisted of the value of DRAFCO assets on the DRAFCO Balance Sheet (including the $15.3 million Deferred Tax Asset) plus E*Trade's

8

specific adjustments (including the $2.7 million adjustment to the Deferred Tax Asset). The Letter Agreement attached the specific list of adjustments, stating that the parties "mutually agreed to resolve their differences with respect [to] the [DRAFCO Balance Sheet] by agreeing to make the adjustments set forth on Schedule A hereof . . . for the purposes of adjusting the Purchase Price [of DRAFCO]." (FAC ¶¶ 61-63.)

Nothing in the Letter Agreement addressed or resolved claims unknown to E*Trade at that time. Confirming this fact, upon receiving Deutsche Bank's draft of the Letter Agreement, E*Trade's in-house counsel, Kristopher Simpson ("Simpson"), commented to Peter Rooney ("Rooney"), Deutsche Bank's outside counsel, that the letter did not waive any claims other than those specifically identified. Rooney did not disagree, and at no point did Deutsche Bank ever disagree with Simpson's interpretation of the Letter Agreement. (FAC ¶ 60.)

In November 2003, E*Trade's outside auditor Deloitte & Touche ("Deloitte") began preparing year-end tax papers which, for the first time, included DRAFCO. Deloitte began looking into DRAFCO's tax status and as part of that inquiry Deloitte sought to independently verify the $15.3 million value of the Deferred Tax Asset. (FAC ¶¶ 66-67.)

9

While the documents about the Deferred Tax Asset that Deutsche Bank had provided to E*Trade before the DRAFCO closing all seemed to separately confirm the $15.3 million value of the Deferred Tax Asset, none of them provided a detailed "build-up" of that value. At Deloitte's request, E*Trade contacted Deutsche Bank again, asking for more backup materials to support the valuation of DRAFCO's Deferred Tax Asset. (FAC ¶¶ 68-69.)

On November 24 and December 8, 2003, E*Trade asked Montgomery and Ferino (who had been involved in the DRAFCO transaction) to provide additional documents. Initially, they merely re-sent the one-page spreadsheet they had previously provided and claimed that this was the only information Deutsche Bank had about the Deferred Tax Agreement. E*Trade escalated the issue to higher levels of Deutsche Bank management, ultimately asking Deutsche Bank's national management to direct their tax department to cooperate. (FAC ¶¶ 69-71.)

On December 12, 2003, Deutsche Bank provided documents E*Trade had never seen before. These documents appeared to be an auditor's work papers analyzing the Deferred Tax Asset. E*Trade found a gross irregularity in the work papers: the $15.3 million contained at least $3.7 million of "cushion," meaning an admittedly unsupported figure not based on any actual revenues or tax documents. This irregularity was not contained in any of the

10

materials Deutsche Bank provided to E*Trade before the DRAFCO closing. (FAC ¶¶ 72-73.)

E*Trade and its auditor Deloitte worked intensely in December 2003 and January 2004 to determine the true value of the Deferred Tax Asset. In addition to the work papers first obtained on December 12, 2003, E*Trade obtained voluminous security certificates from Deutsche Bank which E*Trade used to rebuild DRAFCO's booked revenues over numerous years and to calculate the true value of these booked revenues. By recalculating the booked revenues over time, E*Trade was able to recalculate the Deferred Tax Asset (by comparing the difference of the booked revenues with the revenues reported on tax returns). (FAC ¶¶ 74-76.)

E*Trade concluded that the Deferred Tax Asset was not worth $15.3 million and that it was a Deferred Tax Liability, with a negative value of about $500,000 and that it had paid $15.3 million for an "asset" that required E*Trade to pay the IRS another $500,000. (FAC ¶ 77.)

E*Trade also discovered that Deutsche Bank had failed to capture over $10 million in tax credits. Deutsche Bank had failed to take more than $30 million in available deductions related to DRAFCO, all of which would have reduced DRAFCO's tax obligations by more than $10 million (that is, $30 million times the tax rate). When E*Trade informed Deutsche Bank in 2004 that E*Trade knew about

11

the missed tax credit, Deutsche Bank responded that it was going to amend its prior tax returns to claim the $10 million for itself. (FAC ¶¶ 78-80.)

In late January 2004, E*Trade reported its conclusions about the Deferred Tax Asset to Deutsche Bank and asked Deutsche Bank to justify its pre-close valuation of the Deferred Tax Asset at $15.3 million. E*Trade also provided Deutsche Bank with Deloitte's detailed calculations showing that the Deferred Tax Asset was worthless. (FAC ¶ 82.)

Communications on this subject lasted from early to late 2004. Deutsche Bank consistently maintained that the $15.3 million value was correct; however, Deutsche Bank never provided paperwork to back it up and never explained why Deloitte's analysis was incorrect. Instead, Deutsche Bank repeatedly postponed conference calls, claiming that they were still looking for information and deferring to KPMG, its auditors. KPMG, however, did not back up Deutsche Bank's claim that the Deferred Tax Asset was worth $15.3 million. One senior auditor at KPMG's national headquarters said in a phone call in December 2004 that KPMG's July 2003 audit of the Deferred Tax Asset was "garbage in, garbage out," meaning, Deutsche Bank had supplied "garbage" to KPMG about the alleged Deferred Tax Asset so that KPMG's conclusion about it was also "garbage." (FAC ¶¶ 83-86.)

12

On numerous phone calls in 2004, Deutsche Bank representatives repeatedly informed E*Trade that a former Deutsche Bank office in St. Louis, Missouri, had performed the audits of DRAFCO and calculated the Deferred Tax Asset. Deutsche Bank admitted that it no longer had access to this St. Louis facility or its employees because it had sold the facility to a third party (GE Capital) so that Deutsche Bank was unable to produce any back-up documents for the Deferred Tax Asset. Deutsche Bank neglected to preserve the books and papers relating to DRAFCO which were available at the St. Louis facility in January 2003. (FAC ¶¶ 87-90.)

To date, Deutsche Bank has never provided any information supporting the validity of its fraudulent $15.3 million valuation of the Deferred Tax Asset, and Deutsche Bank has never rebutted E*Trade's detailed analysis that the actual value of the Deferred Tax Asset is actually a net liability. (FAC ¶ 91.)

If before closing Deutsche Bank had disclosed the information E*Trade learned from December 2003 into early 2004, E*Trade either would have not purchased DRAFCO at all or would have done so at a substantially lower price. For every dollar by which Deutsche Bank fraudulently inflated the value of the Deferred Tax Asset, E*Trade paid an additional dollar for DRAFCO and had the deduction and tax credit been revealed, the sales price of DRAFCO would have been reduced by more than $10 million. (FAC ¶¶ 92-94.)

13

## Discussion

### The Standard For Granting Leave To Amend

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a complaint "shall be freely given when justice so requires." The federal courts, however, have interpreted Rule 15 to permit such amendments only when (1) the party seeking the amendment has not unduly delayed, (2) when that party is not acting in bad faith or with a dilatory motive, (3) when the opposing party will not be unduly prejudiced by the amendment, and (4) when the amendment is not futile. See Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); see Mackensworth v. S .S. Am. Merchant, 28 F.3d 246, 251 (2d Cir.1994); Prudential Ins. Co. v. BMC Indus., Inc., 655 F.Supp. 710, 711 (S.D.N.Y.1987).

"[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile." Ellis v. Chao, 336 F.3d 114, 126 (2d Cir.2003) (citing Foman, 371 U.S. at 182). See Nowakowski v. Kohlberg, No. 89 Civ. 5621, 1991 U.S. Dist. LEXIS 107, at *5 (S.D.N.Y. Jan. 8, 1991). An amendment is considered futile if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis. See, e.g., S.S. Silberblatt, Inc. v. East Harlem Pilot

14

Block, 608 F.2d 28, 42 (2d Cir.1979); Freeman v. Marine Midland Bank-New York, 494 F.2d 1334, 1338 (2d Cir.1974).

More specifically, a proposed amendment to a pleading is deemed to be futile if "it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." Oneida Indian Nation of New York v. City of Sherrill, 337 F.3d 139, 168 (2d Cir. 2003) (citing Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)). See Aniero Concrete Co. v. New York City Construction Auth., Nos. 84 Civ. 9111, 95 Civ. 3506, 1998 WL 148324, at *7 (S.D .N.Y. Mar. 30, 1998); Finlay v. Simonovich, No. 97 Civ. 1455(AJP) (DAB), 1997 WL 746460, at *4 (S.D.N.Y. Dec. 2, 1997). For the purposes of evaluating futility, the 12(b)(6) standard is applied: all well pleaded allegations are accepted as true, and all inferences are drawn in favor of the pleader. See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir.1993).

Where an answer has been filed, Rule 15(a) states that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." This mandate to give leave freely "is to be heeded." Foman, 371 U.S. at 182. Courts permit amendment when it is requested at this early stage of a case. E.g., Pina v. Wetzel, 2004 WL 2270874, at *2 (W.D.N.Y. Sept. 30, ;2004) ("Considering the relatively early stage of this litigation and the lack of prejudice to the defendants that will result from

15

the amendment, and in light of the requirement that leave to amend be given freely, it is the decision and order of this Court that plaintiff's motion to amend is granted.").

To avoid the proposed amendment, Deutsche Bank would have to demonstrate "undue delay, bad faith, futility of the amendment, [or] . . . resulting prejudice." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 603 (2d Cir. 2005). Deutsche Bank has not claimed that E*Trade has not "unduly" delayed the amendment or that E*Trade has acted in "bad faith" by seeking to amend.

Where, as here, a Rule 15(a) motion for leave to amend is filed in response to a dispositive motion under Rule 12(b) or 12(c) based solely on the pleadings, the motion for leave to amend will be granted unless the amendment would be "futile." Goldberg v. Cablevision Sys. Corp., 193 F. Supp. 2d 588, 599 (E.D.N.Y. 2002), citing Milanese v. Rust-Oleum, 244 F.3d 104, 110 (2d Cir. 2001). As stated earlier, "futility" means that "the proposed new claim cannot withstand a 12(b)(6) . . . if it appears beyond doubt that plaintiff can plead no set of facts that would entitle him to relief." Id.

## The Standard For Granting Judgment On The Pleadings

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 126 (2d Cir. 2001); see also Fed. R. Civ. P. 12(h)(2) ("[a] defense of failure to state a claim upon which relief can be granted . . . may be made . . . by motion for judgment on the pleadings"). "[T]he district court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." Patel, 259 F.3d at 126. However, "'conclusions of law or unwarranted deductions of fact are not admitted.'" First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994) (quoting 2A Moore & Lucas, Moore's Federal Practice ¶ 12.08, at 2266-69 (2d ed. 1984)). The motion should be granted if the court is satisfied that the complaint cannot state any set of facts that would entitle the plaintiff to relief. Patel, 259 F.3d at 126.

In deciding such a motion, a court may consider, in addition to the factual allegations of the complaint, "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000); see also Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) (even though they were not attached to complaint or incorporated by reference, court could

17

consider stock purchase agreement, offering memorandum, and warrant on motion to dismiss because plaintiff had documents either in their possession or had knowledge of them and relied upon them in bringing suit); Citadel Mgmt. Inc. v. Telesis Trust, Inc., 123 F. Supp. 2d 133, 147 n.3 (S.D.N.Y. 2000) (although plaintiffs could not submit materials that were not attached or incorporated in complaint in opposing motion, "the contract submitted by the defendants in support of the motion to dismiss may be considered, as Citadel had notice of the document's existence and in fact relied on it in the Amended Complaint").

## The Action Is Not Barred By The SPA

According to Deutsche Bank, in entering into the Closing Balance Sheet Adjustment, Deutsche Bank and E*Trade "agreed to resolve their differences with respect to the final Close Balance Sheet of DRAFCO." (Letter Agreement, p.1.) Defendant argues that under New York law, the Closing Balance Sheet Adjustment represents a valid and binding compromise of the parties' disputes over the Closing Balance Sheet. See N.Y. Protective Covering Indus., Inc. v. Stevens Technical Servs., Inc., No. 96 CV 0418, 1997 WL 104767, at *2 (E.D.N.Y. Feb. 18, 1997); Plant City Steel Corp. v. Nat'l Mach. Exch., Inc., 23 N.Y.2d 472, 477, 297 N.Y.S.2d 559, 562 (1969); Ermco Erectors, Inc. v. Grand Iron Works, Inc., 93 A.D.2d 878, 878, 461 N.Y.S.2d 423, 424 (2d Dep't), aff'd, 60 N.Y.2d 634, 467 N.Y.S.2d 355 (1983).

18

Deutsche Bank further argues that, regardless of the binding nature of the Closing Balance Sheet Adjustment, the claims for breach of implied covenant of good faith and fair dealing and unjust enrichment are redundant, derivative of or subsumed by the breach of contract claims and must be dismissed. See Kamfar v. New World Rest. Group, Inc., 347 F. Supp. 2d 38, 52 (S.D.N.Y. 2004); Foxley v. Sotheby's Inc., 893 F. Supp. 1224, 1234 (S.D.N.Y. 1995).

Finally, Deutsche Bank contends that the SPA's purchase price adjustment procedure is controlling, see Luxottica Group, S.p.A. v. Bausch & Lomb Inc., 160 F. Supp. 2d 552 (S.D.N.Y. 2001), and asserts that arbitration clauses in stock purchase agreements are applicable under circumstances involving disputes over closing balance sheets.

Deutsche Bank also relies on Section 9.01 of the SPA which provides that "[t]he representations and warranties set forth in this Agreement or any certificate delivered pursuant hereto shall survive for a period of 18 months following the Closing Date," arguing that the complaint was not filed until some 25 months after the closing date.

## No General Release

Because E*Trade has alleged that in October 2003 it was unaware of the facts giving rise to its claims here, E*Trade did

19

not and could not release any of its tort or statutory claims. This is true with respect to the common-law fraud claims E\*Trade raises in its first amended complaint, whether judged under New York law (the law selected by the SPA) or California law (where E\*Trade was located when Deutsche Bank committed the fraud). Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 354 F. Supp. 2d 293, 299 (S.D.N.Y. 2004) ("A release that employs general terms will not bar claims outside the parties' contemplation at the time the release was executed. New York law does not construe a general release to bar claims for injuries unknown at the time the release was executed, even when the release contains broad language") (internal citations omitted); Cal. Civ. Code § 1542 (West 2005) ("A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.").

Relying upon DIMON Inc. v. Folium, Inc., 48 F. Supp. 2d 359 (S.D.N.Y. 1999), E\*Trade has alleged in the FAC that Deutsche Bank repeatedly misrepresented the value of the Deferred Tax Asset in numerous communications other than the DRAFCO balance sheet and that Deutsche Bank also breached the SPA's representations and covenants unrelated to the DRAFCO balance sheet, including SPA §§ 3.06, 3.07, 3.08, 3.14, 5.01, 5.02, 5.08, 7.01, and 7.05. (FAC ¶¶ 160 & 167.) Finally, E\*trade asserts causes of action about the \$10 million tax credit that Deutsche Bank hid from E\*Trade and then

20

applied to its books in 2004 after E*Trade discovered it.  <u>See</u>
Counts III & IV.

The Letter Agreement does not contain any general release
of "all claims" or "known or unknown claims." It states that the
parties should "resolve their differences with respect to the final
closing balance sheet of DRAFCO by agreeing to make the adjustments
as set forth on Schedule A hereof." It is the Plaintiffs' position
that the intent of the Letter Agreement was to resolve the three
specific issues identified by the parties -- not to release claims
unknown at the time. <u>Cf.</u> <u>Neuman v. Harmon</u>, 965 F. Supp. 503, 509
(S.D.N.Y. 1997) (under New York law, dispositive factor in
determining scope of release is parties' intent); <u>Kaminsky v.
Gamache</u>, 298 A.D.2d 361, 362-62 (N.Y. App. Div. 2d Dept. 2002) (if
language shows "release is to be limited to any particular claims,
demands or obligations, the instrument will be operative as to
those matters alone") (citation omitted). E*Trade communicated
this interpretation of the letter to Deutsche Bank, without
objection. (FAC ¶ 60.) In view of the brevity of the Letter
Agreement, this dispute about the parties' subjective intent is a
triable issue. <u>E.g.</u>, <u>Information Superhighway, Inc. v. Talk Am.,
Inc.</u>, 274 F. Supp. 2d 466, 471 (S.D.N.Y. 2003) ("Both parties have
offered reasonable interpretations regarding the scope of the
release, and these interpretations cannot be resolved on a motion
to dismiss."); <u>DKR Capital, Inc. v. AIG Int'l West Broadway Fund,
Ltd.</u>, No. 03 Civ. 1568, 2003 WL 22283836, at *4 (S.D.N.Y. Oct. 2,

21

2003) (disputed interpretations of contract is triable question of fact).

## Arbitration Is Not Required

The Deutsche Bank's contention with respect to arbitration fails to accommodate the SPA's general dispute-resolution provision in § 11.12, which permits litigation in the U.S. District Court for the Southern District of New York over E*Trade's claims arising under the SPA:

> All actions and proceedings arising out of or relating to this Agreement may be heard and determined in any New York state or federal court sitting in the City of New York. The parties hereto unconditionally and irrevocably agree and consent to the exclusive jurisdiction of, and service of process and venue in, the United States District Court for the Southern District of New York ... and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

SPA § 11.12.

Deutsche Bank's contention is based on § 2.06. Section 2.06 relates only to the "Closing Balance Sheet," and provides for adjustments that are identified within 30 days of its delivery to E*Trade. E*Trade's claims under the SPA, however, involve numerous breaches unrelated to preparation of the DRAFCO Balance Sheet, including breaches with respect to the Reference Balance Sheet and

22

other financial statements (§ 3.06), failure to disclose existing liabilities (§ 3.07), failure to eliminate liabilities (§ 5.08), failure to retain a reserve for tax liabilities (§ 3.14), and failure to retain its records for seven or eight years and make them available to E*Trade (§§ 5.02 & 7.05). These claims do not fall within the scope of § 2.06.

Section 3.12 of the SPA identifies the "Residual Interest" as the only asset of DRAFCO, and nowhere identifies the Deferred Tax Asset. In addition, the FAC alleges that the fraudulent representations about the value of the Deferred Tax Asset were an "inducement" to E*Trade to purchase the Deferred Tax Asset for $15.3 million (¶¶ 47, 99), which this Court has held means that the fraud was "collateral" to the contract. See EED Holdings v. Palmer Johnson Acq. Corp., No. 04-0505, 2004 WL 2348093, at *11 (S.D.N.Y. Oct. 20, 2004) (fraud claim was not duplicative of breach of contract claim, where alleged fraudulent statements induced plaintiff to enter contract).

When a contract contains both a broad disputes provision permitting lawsuits and also an arbitration requirement set forth in one narrow context, courts routinely limit the arbitration requirement to disputes arising squarely in that narrow context. See Cummings v. FedEx Ground Package, Inc., 404 F.3d 1258, 1262 (10th Cir. 2005) (arbitration clause did not refer to "all disputes," but instead was "narrowly limit[ed] . . . to specific

23

disputes"); New Hampshire Ins. Co. v. Canali Reinsurance Co., Ltd., No. 03 CIV 8889, 2004 WL 769775, at *3 (S.D.N.Y. April 12, 2004) (contract's express permission that party could file lawsuit required arbitration clause to be limited to specific type of dispute); Faabry's SRL v. IFT Int'l, Inc., No. 02 CIV 9855, 2003 WL 21203405, at *6 (S.D.N.Y. May 21, 2003) (arbitration clause was narrow in scope, given contract's more sweeping disputes clause). Because certain of E*Trade's fraud, statutory, and breach of contract claims are outside the scope of § 2.06, the private disputes provision in § 2.06 is entirely inapplicable.

The Plaintiffs also contend that even if Deutsche Bank had a right under the SPA to demand "arbitration" of E*Trade's claims here, it has waived that right. Defendants are free to waive arbitration requirements. See In re Currency Conversion Fee Antitrust Litig., 361 F. Supp. 2d 237, 257 (S.D.N.Y. 2005). Waiver occurs where a defendant avails itself of the court's jurisdiction by taking advantage of the court's procedures, especially where those procedures are not available in arbitration. See Manos v. Geissler, 321 F. Supp. 2d 588, 593 (S.D.N.Y. 2004) (Factors for court to consider in determining whether party has waived right to arbitrate includes "taking advantage of pre-trial discovery not available in arbitration, delay and expense"); see also Dembitzer v. Chera, 761 N.Y.S.2d 60, 62 (N.Y. App.Div. 2d Dept. 2003) (defendants' participation in discovery waived right to arbitral forum).

24

In reply Deutsche Bank has noted the factors relating to the application of arbitration procedures, (1) whether the parties agreed to arbitrate; (2) whether the claims fall within the scope of the arbitration clause; (3) whether Congress intended such claims to be non-arbitrable; and (4) if only some of the claims are arbitrable, whether to stay the balance of the proceedings pending arbitration. Sinnett v. Friendly Ice Cream Corp., 319 F. Supp. 2d 439, 443 (S.D.N.Y. 2004). The resolution of these issues in the posture of these motions is premature. In addition, even if the value of the Deferred Tax Asset issue were resolved by the arbitration process, the Plaintiffs' claims based upon $10 million tax credits would remain.

E*Trade has relied on Westmoreland Coal Co. v. Entech, Inc., 100 N.Y.2d 352 (2003) ("Westmoreland"). There, the parties executed a stock purchase agreement for the sale of several coal mining subsidiaries. Any disputes not amicably resolved had to be submitted to an independent accountant, whose decisions would be final and binding on the parties. Separately, the contract provided that disputes over representations and warranties had to be "resolved by litigation in a court of competent jurisdiction." Westmoreland, 100 N.Y.2d at 357. The buyer submitted objections, contending that the entire value of the subsidiaries was misstated. The court rejected the buyer's demand for arbitration because its claims asserted breaches of representations, and not merely as

requests to adjust the closing certificate. The "claims may only be pursued in a court of law, with its attendant protections of discovery, rules of evidence, burden of proof, and full appellate review." Id. at 360.

In addition, Deutsche Bank fails to give appropriate weight to SPA § 11.12. In the same provision, Deutsche Bank "unconditionally and irrevocably agree[d] and consent[ed] to the exclusive jurisdiction of . . . the United States District Court for the Southern District of New York," and Deutsche Bank "waive[d] any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to [the SPA]." Id. Deutsche Bank does not overcome the SPA provisions that:   (1) permit E*Trade to raise fraud claims (§ 9.01); (2) require Deutsche Bank to indemnify E*Trade for breaches of any representation, warranty, covenant or agreement (§ 9.01(b)); and (3) to indemnify E*trade for breaches of tax representations (§ 7.01).   The indemnification provisions are similar in nature to those in Westmoreland, where the seller represented that its financial statements were prepared in accordance with GAAP. See 100 N.Y.2d 356-59.

Using the analysis in Westmoreland, the breach of the representations in SPA §§ 3.06, 3.07 and 3.14 would have to be litigated in court in accordance with SPA § 11.12. Id. at 359-60. The same can be said for all of Deutsche Bank's breaches of other

26

covenants and representations, as well as E*Trade's fraud claims
and its claim under California unfair competition law.

## No Time Bar Applies

In contending that E*Trade's claims are time-barred,
Deutsche Bank has sought to invoke SPA § 9.01, which provides that
certain representations would "expire" after 18 months. This
section states that certain "representations and warranties" by
Deutsche Bank expired 18 months after the "closing date." Deutsche
Bank argues that since the closing date was December 23, 2002, (see
Deutsche Bank Memo in Support, p.4), the representations expired 18
months later, on June 18, 2004.

The Appellate Division has considered and rejected
Deutsche Bank's attempt to turn this language into a shortening of
the statute of limitations. In Hurlbut v. Cristiano, 63 A.D.2d
1116 (4th Dep't 1978), the court interpreted a contract like the
parties have here that said representations would "survive the
closing for a period of three (3) years." Id. at 1117-18. The
court stated:

> The language of the agreement is clear and unambiguous
> and suggests nothing from which a shortened period of
> limitations can be inferred ... The language of the
> escrow agreement rendered the sellers liable for existing
> deficiencies which would be formally noticed during a
> three-year period after closing. The parties neither
> expressly nor impliedly shortened the applicable six-year
> Statute of Limitations.

27

Id. Under Hurlbut, the "expiration" of representations means that E*Trade had 18 months after closing to identify the breach and/or to notify Deutsche Bank of any breach.

E*Trade has alleged that it both realized the breach that had occurred and notified Deutsche Bank of the breach within the 18-month period that Deutsche Bank proffers. (FAC ¶ 82.) Specifically, the closing date of the DRAFCO transaction was October 20, 2003, the date of the Letter Agreement. (FAC ¶ 58.) As such, representations concerning DRAFCO would have expired 18 months later on April 20, 2005. Therefore, even if § 9.01 had the effect Deutsche Bank has ascribed to it, Deutsche Bank's representations concerning DRAFCO had not expired when E*Trade filed this action on January 26, 2005.

For the foregoing reasons, taking E*Trade's allegations to be true, SPA § 9.01 is no bar to E*Trade's amended claims.

## The Amendments Are Not Futile

Plaintiff's fraud claims have been properly plead. Under New York law, the elements of a fraud claim are: (1) that the defendant made a material false representation, (2) that the defendant intended to defraud the plaintiff thereby, (3) that the plaintiff reasonably relied upon the representation, and (4) that the plaintiff suffered damage as a result of such reliance. See

28

<u>Manning v. Utils. Mut. Ins. Co.</u>, 254 F.3d 387, 400 (2d Cir.2001)
(quoting <u>Bridgestone/Firestone, Inc. v. Recovery Credit Servs.</u>, 98
F.3d 13, 19 (2d Cir.1996)); <u>see Lama Holding Co. v. Smith Barney,</u>
<u>Inc.</u>, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80, 668 N.E.2d 1370,
1373 (1996); 60A William H. Danne, Jr., N.Y. Jur. § 14.

Pursuant to Fed.R.Civ.P. 9(b), a fraud claim must be
stated with particularity. The Second Circuit "has read Rule 9(b)
to require that a complaint `(1) specify the statements that the
plaintiff contends were fraudulent, (2) identify the speaker, (3)
state where and when the statements were made, and (4) explain why
the statements were fraudulent.'" <u>Rombach v. Chang</u>, 355 F.3d 164,
170 (2d Cir. 2004) (quoting <u>Mills v. Polar Molecular Corp.</u>, 12 F.3d
1170, 1175 (2d Cir. 1993)).

Rule 9(b) requires that to allege a claim for fraud
adequately, a complaint must contain particularized facts that
"give rise to a strong inference" of scienter on the part of the
defendant. <u>Campaniello Imports, Ltd. v. Saporiti Italia S.P.A.</u>,
117 F.3d 655, 663-64 (2d Cir.1997) (affirming dismissal of fraud
claims where "allegations, even taken together, [were] insufficient
to raise a strong inference of fraudulent intent").

The requisite "strong inference" of scienter may be
established "(a) by alleging facts to show that defendants had both
motive and opportunity to commit fraud, or (b) by alleging facts

29

that constitute strong circumstantial evidence of conscious misbehavior or recklessness." See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994).

## 1.  **Specificity**

Deutsche Bank has contended that "it is not clear what, precisely, they [E*Trade] claim they were defrauded into doing and what remedy is available. The complaint is utterly vague on this point. (Memo in Opposition at 16.)  However, E*Trade has identified 17 separate communications from Deutsche Bank that furthered  or  concealed  Deutsche  Bank's  fraudulent misrepresentations about the value of DRAFCO. These allegations expressly identify the "who, what, when, where and how" of the fraud. Ouaknine v. MacFarlane, 897 F.2d 75, 79 (2d Cir. 1990). E*Trade has satisfied Rule 9(b).

## 2.  **Reliance**

One party reasonably relies on another party's documentation if the documents "would not, on their face, have alerted [plaintiffs] to potential fraud." JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 409 (S.D.N.Y. 2004).  The only time a party's reliance is not "reasonable" is if it "has been put on notice of the existence of material facts which have not been documented." Lazard Freres & Co. v. Protective Life Ins. Co., 108

F.3d 1531, 1542 (2d Cir. 1997); see also JP Morgan, 350 F. Supp. 2d at 408 (only "direct" evidence of mistake or fraud or "arouse[d] suspicion" would make reliance unreasonable). No authority holds reliance to be unreasonable unless the plaintiff saw "red flags" or "other circumstances" existed that made reliance "unquestionably unreasonable." Doehla v. Wathne Ltd., Inc., 1999 WL 566311 at *12 (S.D.N.Y. Aug. 3, 1999).[2]

Drawing all inferences in E*Trade's favor, it has not been established as a matter of law from the allegations in the FAC that E*Trade's reliance was unreasonable. E*Trade has alleged that it asked Deutsche Bank for documentary support and that all of the documents Deutsche Bank provided before closing on their face supported Deutsche Bank's representation of DRAFCO's value. (FAC ¶¶ 27-54.) For example, E*Trade alleges that:

- Deutsche Bank provided what it purported was a report from outside auditor KPMG that supported the value of DRAFCO. (FAC ¶ 32.) E*Trade only learned much later, well after closing, that the outside auditor was provided "garbage" by Deutsche Bank so that the report was worthless. (FAC ¶ 86.)

- Deutsche Bank provided E*Trade's outside auditor from Ernst & Young with materials which the auditor reviewed closely and from which he confirmed the alleged value of DRAFCO. (FAC ¶ 53.) E*Trade learned well after closing that Deutsche Bank

[2] E*Trade argued that California law governs E*Trade's fraud claims. ( See E*Trade Opposition to Deutsche Bank's Motion for Judgment on the Pleadings ("E*Trade Opp.") at 15 n.2). Deutsche Bank ignores the argument and concludes without analysis that only New York law applies. (See Deutsche Bank Opp. at 15-16).

> withheld information from E*Trade's auditor that
> revealed the false value of DRAFCO. (FAC ¶ 68.)

Beyond this, E*Trade alleges that it received over a dozen
communications from Deutsche Bank that purported to support the
false value of DRAFCO. E*Trade also specifically alleges that it
had no information before closing that would have raised a "red
flag." (FAC ¶ 55.)

In light of the FAC's allegations, the reasonableness of
E*Trade's reliance is a fact-specific inquiry that survives under
the Rule 12 standard applicable here. See Keywell Corp. v.
Weinstein, 33 F.3d 159, 164 (2d Cir. 1994) (dismissal under Rule 12
for lack of reasonable reliance is permissible only where plaintiff
"was placed on guard or practically faced with the facts"); accord
Doehla, 1999 WL 566311, at *10.

## 3. **Scienter**

Deutsche Bank has contended that E*Trade never alleged
scienter: E*trade "ha[s] not asserted that [Deutsche Bank] had
knowledge of the Deferred Tax Asset's status as a 'liability' prior
to the parties' execution of the DRAFCO sale, or that there was any
motive for overstating the value of a deferred tax asset.

However, in Count I, E*Trade alleges:

32

98. Deutsche Bank knew its representations were false and/or Deutsche Bank acted with recklessness as to the lack of truthfulness of its representations.

99. Deutsche bank intended to defraud E*Trade through the material false representations Deutsche Bank made to E*Trade. Deutsche Bank intended to induce E*Trade to pay a purchase price for DRAFCO inflated by over $15 million to reflect the value of the Deferred Tax Asset, when in fact the true value of the Deferred Tax Asset was less than zero.

(FAC ¶¶ 98-99.)[3] E*Trade similarly alleges Deutsche Bank's scienter for Count II (FAC ¶¶ 108-09) and Count III (FAC ¶¶ 117-19.)

## The California § 17200 Claim

Deutsche Bank also has contended that § 17200 cannot apply because SPA § 11.12 selects New York law as governing. But SPA § 11.12 applies New York law for disputes only about the construction or enforcement of the SPA: "This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, applicable to contracts executed in and to be performed entirely within that state." This language is narrow and purposefully does not apply New York law to any actions "related to" the transaction, such as tort or other claims. See Finance One

---

[3] Reckless indifference to the truth -- as well as intentional deception -- is sufficient scienter to constitute fraud. In re Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194, 217 (S.D.N.Y. 1999) (recklessness sufficient scienter); Fidelity & Deposit Co. of Md. v. Arthur Andersen & Co., 131 A.D.2d 308, 311 (1st Dep't 1987) (same).

Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 335 (2d Cir. 2005) (contractual choice of law will not apply to torts where the choice of law is limited to contract claims, even if parties consent to jurisdiction of New York courts for tort claims); see also Krock v. Lipsay, 97 F.3d 640, 645 (2d Cir. 1996) (tort claims did not fall within selection of law clause). Consequently, the choice of law in SPA § 11.12 does not apply to E*Trade's non-contract claims, including its § 17200 claim. See Medical Instrument Dev. Labs. v. Alcon Labs., 2005 WL 1926673, at *3 (N.D. Cal. Aug. 10, 2005) (§ 17200 applies even though contract selected Texas law for contract claims). The FAC states a claim under § 17200.

## E*Trade Did Not Agree To Waive Its Amended Claims Of Which It Was Unaware

Deutsche Bank argues that E*Trade's amended claims were "waived" because they were not made during the "one-time limited opportunity to challenge" the value of DRAFCO. (Deutsche Bank Opp. at 11.) But the parties' October 20 Letter Agreement, on which Deutsche Bank's argument is based, does not state that unknown claims would be waived, and courts consistently refuse to read an implied waiver into a contract. See Information Superhighway, Inc. v. Talk Am., Inc., 274 F. Supp. 2d 466, 474 (S.D.N.Y. 2003), (quoting Abramowitz v. New York Univ. Dental Ctr. Coll. of Dentistry, 494 N.Y.S.2d 721, 723 (2d Dep't 1985)).

## Constructive Fraud

E*Trade has pled facts that constitute constructive fraud. Under the "special facts doctrine," Deutsche Bank had a duty to disclose information if Deutsche Bank knew E*Trade was mistaken about DRAFCO's value because Deutsche Bank was not providing the information it solely possessed proving otherwise. See Banque Arabe et Internationale d'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 155 (2d Cir. 1995) (setting out test). The FAC alleges all of the facts that, if true, meet the special facts doctrine. (FAC ¶¶ 126-132.) Therefore, E*Trade has adequately pled constructive fraud.

## Negligent Misrepresentation

Deutsche Bank has contended that E*Trade fails to allege the elements required for a negligent misrepresentation claim. However, E*Trade has alleged Deutsche Bank held unique knowledge about the value of the Deferred Tax Asset, was aware of how E*Trade would put such information to use, and supplied it for that purpose. (FAC ¶¶ 137-142.) In light of these allegations, pleading the existence of a special relationship between parties may not be necessary. See, e.g., Suez Equity Investors, L.P. v. Toronto-Dominion Bank , 250 F.3d 87, 103-04 (2d Cir. 2001). However, E*Trade has alleged the existence of a special relationship, the existence of which has been held to be a factual

35

question not to be resolved under a Rule 12 standard, see Wells Fargo Bank N.W., N.A. v. Taca Int'l Airlines, S.A., 247 F. Supp. 2d 352, 366-67 (S.D.N.Y. 2002), and which may coexist with contract between sophisticated parties. Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 2005 WL 1631144, at *15 (S.D.N.Y. July 6, 2005); Fresh Direct LLC v. Blue Martini Software, Inc., 7 A.D.3d 487, 489 (2d Dep't 2004).

## Quantum Meruit And Unjust Enrichment

Quasi-contract claims are permitted if they arise from services not covered by a contract. Fieger v. PitneyBowes Credit Corp., 251 F.3d 386, 403 (2d Cir. 2001); U.S. East Telecomms., Inc. v. US West Communications Servs., Inc., 38 F.3d 1289, 1298 (2d Cir. 1994). E*Trade can plead these alongside contract claims. Curtis Props. Corp. v. Greif Cos., 236 A.D.2d 237, 239 (1st Dep't 1997). E*Trade is alleging in the alternative that, after the DRAFCO sale closed, E*Trade undertook great efforts at its expense to recalculate DRAFCO's books, from which E*Trade determined that Deutsche Bank should have taken a $10 million tax credit. (FAC ¶ 178.) E*Trade communicated this conclusion to Deutsche Bank. Id. E*Trade alleges that Deutsche Bank acted on this information and took the $10 million tax credit. (FAC ¶ 80.) None of these events are governed by the SPA. Therefore, these facts state a claim for quantum meruit or unjust enrichment under New York law.

36

**Conclusion**

For the reasons set forth above, Deutsche's motion for judgment on the pleadings is denied, and E*Trade's motion for leave to file its FAC is granted.

It is so ordered.

New York, NY
March **6** , 2006

ROBERT W. SWEET
U.S.D.J.