UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

E*TRADE FINANCIAL CORPORATION and
E*TRADE BANK, a Federally Chartered          05 Civ. 0902
Savings Bank,

                          Plaintiffs,          OPINION

     -against-

DEUTSCHE BANK AG,

                          Defendant.

------------------------------------X

A P P E A R A N C E S:



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6|13|08

Attorneys for Plaintiffs

COOLEY GODWARD KRONISH LLP
1114 Avenue of the Americas
New York, NY 10036
By: Celia Goldwag Barenholtz

DOUGLAS P. LOBEL
ROBERT T. CAHILL
11951 Freedom Drive
Reston, Virginia 20190

Attorneys for Defendants

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
By: Scott D. Musoff
    Jeremy A. Berman

**Sweet, D.J.**

## I. INTRODUCTION

Defendant Deutsche Bank AG ("Deutsche Bank" or the "Defendant") has moved under Fed. R. Civ. P. 56 for summary judgment dismissing all the claims brought against it by plaintiffs E\*TRADE Bank and E\*TRADE Financial Corporation ("E\*Trade Financial") (collectively "E\*Trade" or the "Plaintiffs"). Upon the findings and conclusions set forth below, the motion is granted in part and denied in part.[1]

This action has resulted from a sale by Deutsche Bank to E\*Trade in 2002 of Ganis Credit Corporation ("Ganis") and its subsidiary, Deutsche Recreational Assets Funding Corporation ("DRAFCO") in 2003. At issue are the acts and understanding of the parties with respect to a DRAFCO Deferred Tax Asset ("DTA"), and its tax and accounting treatment.

---

[1] Deutsche Bank has also moved to strike the declaration of Robert W. Berliner, submitted in opposition to the motion for summary judgment, as an untimely expert opinion. Because the declaration is consistent with Berliner's expert report, defends the damages theories set forth in that report, and does not offer any new damages theories, Deutsche Bank's motion is denied. "[T]he submission of a declaration from an expert that is consistent with his or her timely-disclosed expert report is perfectly proper when offered in support of or opposition to a motion for summary judgment." Cornell Research Found., Inc. v. Hewlett-Packard Co., 2007 WL 4349135 at \*20 (N.D.N.Y. Jan. 31, 2007). See also Allgood v. Gen. Motors Corp., 2006 WL 2669337 at \*5 (S.D. Ind. Sept. 18, 2006).

1

## II. **BACKGROUND**

### A. **Prior Proceedings**

The proceedings in this action prior to March 2006 were described in E*TRADE Fin. Corp. v. Deutsche Bank AG, 420 F. Supp.2d 273 (S.D.N.Y. 2006) (the "March 6 Opinion") which dealt with Deutsche Bank's motion to dismiss on the pleadings.

Since that time the parties have engaged in discovery. The instant motion was heard and marked fully submitted on January 23, 2008.

### B. **Facts**

The facts have been set forth by skilled counsel in the Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1, the Plaintiffs' Response to Defendant's Statement of Undisputed Facts, the Plaintiffs' Statement of Material Facts in Dispute and Additional Material Facts, Defendant's Responses to Plaintiffs' Statement of Material Facts in Dispute and Additional Material Facts, and supporting affidavits. The facts are not in dispute except as noted below.

Plaintiff E\*TRADE Financial is a Delaware corporation with its principal place of business at 135 East 57th Street, New York, New York 10022. E\*Trade Financial, by and through its subsidiaries, provides a variety of online consumer financial services, from securities trading to banking services, mortgages, and other loans. Although E\*Trade claims that until January 1, 2004, E\*Trade Financial was a California based company with its headquarters in Menlo Park, California, E\*Trade Financial's SEC Form 10-K for the year ended December 31, 2003 (page 1) states as follows:

> E\*TRADE Financial's corporate offices are located at 135 East 57th Street, New York 10022. We also maintain significant corporate and operational offices in Arlington, Virginia, Menlo Park, California, Irvine, California, Chicago, Illinois and major administrative and operational facilities in Ranch Cordova, California and Alpharetta, Georgia.

Affidavit of Jeremy A. Berman ("Berman Aff."), Ex. 15.

Plaintiff E\*Trade Bank is a federally chartered savings association with its principal place of business at 671 North Glebe Road, Ballston Tower, Arlington, Virginia 22203. E\*Trade Bank is a second tier, wholly-owned subsidiary of E\*Trade Financial.

Defendant Deutsche Bank is a German corporation with its principal place of business at Taunusanlage 12, D-60325 Frankfurt, Germany.

In 2002, Deutsche Bank was auctioning off Ganis, which provided consumer loans used to purchase recreational vehicles ("RVs") and marine vehicles. Ganis consisted of the parent entity, Ganis, and several subsidiaries, including DRAFCO. DRAFCO held residual interests in consumer loans for RVs, boats and musical equipment that had been securitized.

In 2002, E*Trade Bank sought to purchase Ganis and its subsidiaries in order to diversify its balance sheet to include non-mortgage assets.

Representatives of E*Trade Bank conducted due diligence on Ganis and its subsidiaries at Ganis's offices in Costa Mesa, California, on August 15 and 16, 2002.

E*Trade Bank purchased Ganis and DRAFCO pursuant to a Stock Purchase Agreement between E*Trade Bank and Deutsche Bank, dated November 25, 2002 and amended on December 23, 2002 (the "SPA").

Sections 2.06 and 2.07 of the SPA set forth certain post-closing dispute procedures relating to the purchase prices of Ganis and DRAFCO and the DRAFCO "Closing Balance Sheet," and provide for adjustments that are identified within 30 days of delivery to E*Trade. March 6 Opinion at 285-86.

E*Trade Bank's acquisition of Ganis and DRAFCO was effected in two stages to allay concern that the purchase of DRAFCO would negatively affect the ratings of notes issued by four trusts to investors in connection with four securitizations of Ganis-initiated loans (the "Notes"). The first stage was the transfer of Ganis stock to E*Trade Bank and the second stage was the transfer of DRAFCO stock to E*Trade Bank. The parties agreed they needed to obtain assurance from the credit rating agencies that they would not downgrade the credit ratings of the Notes. The parties determined, however, that it was unlikely they would get these assurances from the ratings agencies before the close of 2002.

To acquire DRAFCO, E*Trade Bank paid $10.5 million to Deutsche Bank as the first installment, but its payment of the balance of the purchase price (to be determined based on the DRAFCO Closing Balance Sheet) was conditioned on the three major bond rating agencies (Moody's, Standard & Poors and Fitch) each

5

confirming that E*Trade Bank's acquisition of DRAFCO would not result in a downgrade of the Notes. E*Trade Bank was required to pay the balance of the purchase price for DRAFCO within five business days of receiving the no-downgrade letters from the rating agencies. The agreement by the last of the rating agencies to not downgrade the Notes occurred on July 18, 2003 according to Deutsche Bank, on September 15, 2003 according to E*Trade.

The SPA specified that the "Closing Date" was the first Friday following the satisfaction of all the closing conditions specified in Article VIII of the SPA, provided that occurred after December 20, 2002. The parties agreed on a December 23, 2002 Closing Date. The parties agreed that the DRAFCO sale would close October 20, 2003, and it did.

E*Trade Bank was required to pay the balance of the purchase price for DRAFCO within five business days after receiving the no-downgrade letters from the rating agencies subject to the parties reaching an agreement on the content of the DRAFCO Closing Balance Sheet. The parties reached this agreement on October 20, 2003, the date that the DRAFCO sale closed.

Obtaining agreement from the last of the rating agencies to not downgrade the Notes was the final condition precedent for the transfer of shares of DRAFCO to E*Trade Bank.

The DRAFCO Closing Balance Sheet listed a deferred tax asset of $15.345 million (the "DTA") as one of three assets, the others being "Cash deposits held by trustee" and "Retained interest in securitized finance receivables," (the "Residuals"). Declaration of Robert T. Cahill ("Cahill Decl."), Ex. 29.

A deferred tax asset is a complex accounting concept, and deferred tax assets arising from securitizations raise complicated accounting and tax issues. According to E*Trade, the DTA is the product of the tax rate and the amount of temporary differences resulting in an upward adjustment to deferred taxes, not as a negotiated amount, but a fixed number dictated by the accounting rules.

KPMG, LLP ("KPMG") audited the closing balance sheets of both Ganis and DRAFCO. According to E*Trade, the SPA granted it the right to rely upon, and did in fact rely upon, the KPMG Audit Opinion certifying that KPMG conducted its audit in accordance with U.S. GAAS and that the DTA complied with US

GAAP. E*Trade also claims that it relied on numerous Deutsche Bank documents and statements supporting the DTA.

Prior to the closing of the DRAFCO sale, the parties exchanged extensive communications. The principal negotiators for E*Trade Bank in connection with the Ganis/DRAFCO acquisition were Todd Mackay, who headed E*Trade Financial's corporate development, and Rob Snow, E*Trade's Vice President of Consumer Finance. In-house E*Trade Bank lawyer Kristopher Simpson also participated in the negotiations. Dan Keating of Hogan & Hartson participated as outside counsel for E*Trade Bank in certain of the negotiations.

Belinda Montgomery ("Ms. Montgomery"), a tax generalist and Head of Tax at E*Trade, was responsible for tax due diligence on behalf of E*Trade Bank with respect to the acquisition of DRAFCO. Ms. Montgomery testified that she never formed an opinion on the validity of the DTA because she did not have the expertise to do so. Her responsibility and expertise with respect to the intricacies of the DTA are in dispute.

Matthew Audette, then Assistant Controller of E*Trade Bank, was responsible for accounting due diligence on behalf of E*Trade Bank with respect to the acquisition of DRAFCO. His

8

expertise to understand the intricacies of the DTA or render an opinion on the validity of the DTA is in dispute.

The principal negotiators for Deutsche Bank in connection with the Ganis/DRAFCO sale were Ulrich Gaertner and Till Staffeldt. Gaertner worked in Deutsche Bank's corporate investment bank, and Staffeldt worked in corporate development at Deutsche Bank. Peter Rooney, outside counsel for Deutsche Bank, also took part in the negotiations. Gaertner and Staffeldt were based in Germany, and Rooney was based in New York at the time of these 2002-2003 negotiations.

Face-to-face negotiations related to the transaction occurred mostly in New York and once in Virginia.

On August 26, 2002, Deutsche Bank sent a letter to Mackay setting forth guidelines for submitting a detailed final bid for Ganis and its subsidiaries, including DRAFCO. Attached to this letter was a Reference Balance Sheet (dated as of July 31, 2002) listing the value of "Other Assets" in Ganis as $30,005,000. According to E*Trade, the net value of these "Other Assets" was inflated by the value attributed to the DTA.

On August 27, 2002, investment bankers for Deutsche Bank sent an e-mail to E*Trade that attached a "copy of the Final Bid Instruction Letter, the Reference Balance Sheet (July 31, 2002) and the Stock Purchase Agreement." This Reference Balance Sheet listed the value of "Other Assets" in Ganis as $30,005,000. E*Trade asserts that the value of these "Other Assets" was fraudulently inflated by the false value of the DTA.

On December 21, 2002, Deutsche Bank provided E*Trade with a "Reference Balance Sheet" showing that DRAFCO had "Other Assets" equal to $6,302,000. E*Trade asserts that "Other Assets" referred to the DTA and the value assigned was knowingly false as of the date of the Reference Balance Sheet.

On January 14, 2003, Ms. Montgomery, E*Trade's Head of Tax, sought to obtain from Deutsche Bank's St. Louis facility a copy of the tax returns and supporting tax work papers for Ganis and DRAFCO. Ms. Montgomery e-mailed Harry Montgomery, Deutsche Bank's Director of U.S. Tax, and asked him for authorization to copy these tax materials. Mr. Montgomery tried to forward this e-mail to Teresa Hickam (a Deutsche Bank employee that worked in the St. Louis tax department), and wrote that Hickam should treat his e-mail "as authorization to provide E*TRADE with the tax information relating to DRAFCO." Cahill Decl., Ex. 20.

10

Hickam, however, never received this e-mail because Mr. Montgomery sent it to two invalid e-mail addresses.

On February 20, 2003, Gaertner notified Mr. Montgomery and others at Deutsche Bank that he was going to "delay the completion of the audit though tomorrow is the deadline according to the contract with ET" because the Ganis closing balance sheet, and thus the Ganis purchase price, was $4 million less than he anticipated. Id., Ex. 21. Gaertner undertook to investigate the reasons for this decrease in equity so that he could try to convince KPMG to change its mind and increase Ganis' equity.

On March 11, 2003, Staffeldt replied to an e-mail from Mackay and blamed KPMG for the delay, stating that Deutsche Bank was "breathing down KPMG's neck" but that Deutsche Bank could "not order them to get things done." Id., Ex. 23.

On March 16, 2003, Deutsche Bank provided the Ganis Closing Balance Sheet E*Trade Bank. E*Trade Bank sent a letter to Deutsche Bank disputing a number of items on the Ganis Closing Balance Sheet.

On April 11, 2003, Staffeldt reported to others at Deutsche Bank that Deutsche Bank was "having trouble to convince KPMG of the present value" of DRAFCO's "residual interest." Id., Ex. 27. By April 28, Deutsche Bank valued the Residuals at "around $72 million." Id., Ex. 25. Because the Residuals were an estimate of future cash flows associated with the Loans, their valuation was based on numerous assumptions about how the Loans would perform in the future. Thus, any changes to these assumptions caused the value of the Residuals to change.

KPMG determined that Deutsche Bank's $72 million valuation of the Residuals was too high, and refused to certify the accuracy of this valuation. A decrease in the value of the Residuals resulted in a dollar-for-dollar decrease in the DRAFCO purchase price.

On June 16, Gaertner e-mailed Jeffrey Bierman and Andrew Davidson, the KPMG partners supervising the DRAFCO audit, with a copy to Staffeldt:

> As time is elapsing we have the feeling that all kinds of arguments re the issue of the DRAFCO valuation have been exchanged and the prospects of success of more expert discussions are exhausted. Hence, the four of us should come to an agreement on the valuation variables. It goes without saying that we continue to aim at numbers which you can just about defend from an auditing

12

> perspective. We would therefore appreciate
> if your structuring people could bear in
> mind (i) who is on same side and who is on
> the other side re the Ganis transaction, and
> (ii) that DB will incur a sizable impairment
> anyway based upon those parameters already
> agreed upon. Let's crack it, preferably
> first thing tomorrow morning by phone if
> this is also convenient for you.

Id., Ex. 24.


On June 24, 2003, KPMG agreed to certify Deutsche

Bank's valuation of the Residuals. KPMG certified the accuracy

of DRAFCO's Closing Balance Sheet, including the $15,345,000

value assigned to the DTA, in an Independent Auditors' Report

("Audit Opinion") attached to the Closing Balance Sheet. The

Audit Opinion provided that KPMG "conducted [its] audit in

accordance with auditing standards generally accepted in the

United States of America" ("US GAAS"), that in KPMG's opinion,

the DRAFCO closing balance sheet "presents fairly, in all

material respects, the financial position of [DRAFCO] as of

December 23, 2002, in conformity with accounting principles

generally accepted in the United States of America," and that

this calculation complied with accounting principles generally

accepted in the United States of America ("US GAAP"). Id., Ex.

29.

On June 25, 2003, Gaertner thanked KPMG "for putting an end to the residual valuation." Id., Ex. 28.

On July 18, 2003, Gaertner e-mailed Mackay at E*Trade the audited Closing Balance Sheet of DRAFCO stating that the DTA had a value of $15,345,000.

In an e-mail accompanying Deutsche Bank's July 18, 2003 delivery of the DRAFCO Closing Balance Sheet to Mackay and Snow with a copy to Staffeldt, Gaertner wrote: "If you have any questions relating to any of the documents, please do not hesitate to get in touch with us. We look forward to agreeing on the next steps pursuant to section 2.06 of the purchase agreement once you have reviewed the information." Berman Aff., Ex. 19.

On August 18, 2003, Gaertner e-mailed Mackay and Snow, copying Staffeldt, a "brief summary of what the open issues and the bid/ask spreads are based on the exchange of letters available" relating to the Ganis and DRAFCO Closing Balance Sheets and expressed Deutsche Bank's desire to "agree on that list asap and subsequently meet in person to hammer out the purchase price adjustment . . . ." Id., Ex. 20.

On August 19, Snow e-mailed Gaertner and Staffeldt, stating that E*Trade Bank too sought a meeting to "resolve any remaining issues" and also noting, "We look forward [to] finalizing this transaction." Berman Aff., Ex. 21. Snow also wrote: "In advance of the meeting it would be helpful if you provide some additional detail regarding the new items that appeared on the DRAFCO balance sheet. Specifically, I would like to better understand the Deferred Tax Asset, and all of the Liabilities." Id.

On August 19, 2003 Gaertner replied to Snow and Mackay (copying Staffeldt, Rooney, Emily Rome ("Rome") and Judith Klahn ("Klahn")), stating: "We will instantly ask our auditing team to provide you and your auditing team with ancillary information regarding the requested items. As to the transaction finale we could meet in NYC at short notice for instance on August 27th. Please let us know whether this date is convenient for you. We look forward to meeting you." Id.

On August 19, 2003, Snow responded to Gaertner and Mackay with copies to Staffeldt, Rooney, Rome and Klahn: "Unfortunately Todd is traveling all of next week. Are you available the following week?" Id.

15

On August 21, 2003, Gaertner e-mailed Snow and Mackay, attaching "a file which breaks out the deferred tax asset." Id. The file stated the value of the DTA as $15,345,000.

On August 21, 2003, Snow asked Ms. Montgomery to work with Audette to examine the temporary differences comprising the DTA to determine whether they were supportable. Audette, a certified public accountant, was the then Controller of E*Trade Bank. According to E*Trade, Ms. Montgomery and Audette did not have the expertise or experience to understand the intricacies of the DTA.

On August 22, 2003, Ms. Montgomery told Audette and others at E*Trade that she did not have the expertise to examine the DTA and thus someone familiar with tax securitization issues from Ernst & Young should look at the issue.

Snow sent an e-mail to Staffeldt and Mackay on August 25, 2003 with copies to Rome, Klahn, Rooney and Gaertner, stating: "After looking at our schedules here, we can meet in NY on Wednesday September 3rd. Would you like to meet at our offices or did you have an alternate location in mind." Id., Ex. 22.

16

On or about August 25, 2003, E*Trade Bank retained Ernst & Young LLP ("E&Y") to help E*Trade understand the book/tax timing differences that gave rise to the DTA.

According to E*Trade, E&Y was retained for a limited engagement in connection with the DRAFCO Closing Balance Sheet. E&Y was engaged to (1) explain the nature of the temporary differences that comprised the DTA, and (2) confirm that the amount of each temporary difference was the same amount listed in KPMG's work papers. Snow testified that he did not recall what E&Y's "specific assignment was" other than "to look at the balance sheet." Cahill Decl., Ex. 15.

The engagement letter governing E&Y's work on DRAFCO provided that "[t]his engagement does not anticipate the compilation, review, or audit of financial records or financial statements." Id., Ex. 31. The term "review" is an accounting term of art that means the accountant has certified the accuracy of the figures being reviewed. No-one at E&Y was engaged or asked to do "any work to verify the accuracy" of the DTA. Alan Munro ("Munro"), a partner at E&Y, testified:

> [A]ll I did was look to see whether the numbers we had been told were the same numbers reflected in the tax audit work papers. When we were talking about types of components, for example, bad debts, I was

17

not explaining the numbers specifically. I
was explaining why there might be a
difference from when financials might
recognize a bad debt to when tax recognizes
a bad debt.

Id., Ex. 8.

According to E*Trade, it did not engage E&Y to audit
or review the DTA because E*Trade was relying in part on KPMG's
recently issued Audit Opinion certifying that (1) the audit was
conducted in accordance with US GAAS and (2) the DTA complied
with US GAAP. E*Trade wanted to get E&Y's opinion on the DTA so
that E*Trade could have an extra layer of scrutiny on the DTA.

The parties agreed that E&Y would be given access to
the KPMG's work papers relating to the DTA.

On August 26, 2003, Gaertner sent an e-mail to Snow
and Mackay with copies to Staffeldt, Rome, Klahn and Rooney
stating: "Would you mind if we meet on the premises of Shearman
& Sterling on the 3rd?" Berman Aff., Ex. 23.

On August 29, Ms. Montgomery queried: "Is there
someone in the DB Tax Dept. familiar with these owner trusts
that can discuss generally how they work, and where the timing
difference come from?" Ferino of Deutsche Bank's tax department

18

responded: "I don't know if anyone here has expert knowledge of these trusts but we can certainly discuss them on [September 2, 2003.]" Id., Ex. 30.

On August 29, 2003, Ferino, at the time a VP in DB's U.S. tax group, e-mailed Ms. Montgomery. Attached to the e-mail were, in Ferino's words, "a sample of the files that we've used to support the DRAFCO securitization adjustments." Id., Ex. 29. The attachment included Servicer Certificates for 2003.

The reliance of E*Trade is in dispute. According to E*Trade, it relied upon (a) KPMG's Audit Opinion certifying that the DTA complied with US GAAP, (b) information and representations from Deutsche Bank and KPMG, and (c) E&Y's explanation of the nature of the temporary differences and confirmation that the amount of each temporary difference tied to the work papers. E*Trade argues that it was on those basis that it accepted Deutsche Bank's false $15,345,000 valuation and paid Deutsche Bank that amount. According to E*Trade, it did not know or suspect that Deutsche Bank had misrepresented (a) the tax rate used to calculate the DTA, and (b) the amount of temporary differences comprising the DTA, and thus did not know that Deutsche Bank had inflated the value of the DTA.

19

In early September 2003, Ms. Montgomery initially determined that E*Trade should not assign any value to the DTA based on her determination that Deutsche Bank had not yet provided sufficient documentation to allow E&Y to explain the nature of the temporary differences and confirm that the numbers listed for each temporary difference were the same numbers in the work papers. Ms. Montgomery decided that E*Trade should not assign a value to the DTA until Deutsche Bank provided this documentary support. Ms. Montgomery warned E*Trade management "in very strong language," that they should "assign zero value to the DTA until Deutsche Bank provided us with supporting work papers" because Deutsche Bank "could not explain [the DTA] to us, how it would turn, how we'd realize the benefit, how we could support it." Id., Ex. 7.

Ms. Montgomery testified that she did not rely on what Deutsche Bank's Mr. Montgomery told her concerning the DTA, because Mr. Montgomery "wasn't saying anything we could rely upon." Id. According to Ms. Montgomery, "we asked [Deutsche Bank] to explain the timing differences to us . . . and they could not explain it. They didn't understand it." Id.

On September 2, 2003, Ms. Montgomery wrote to Mark Munro and O'Mara, another partner at E&Y, that E*Trade wanted

"to see how much of the Deferred Tax Asset is currently left as a negotiation point with DB next week." Id., Ex. 28. On September 2, 2003, Ms. Montgomery and E&Y on behalf of E*Trade Bank conferred about the DTA with Mr. Montgomery and Ferino.

On September 3, 2003, Ms. Montgomery wrote the following to Munro and O'Mara:

> Hopefully, DB's Tax Director will be able to get his arms around the book/tax differences and tax position of DRAFCO securitizations by tomorrow, but I am concerned that he may not.
>
> As such, we need to be as prepared as possible to advise E*TRADE's business folks as to our views of the transaction, and advise them that DB does not understand their securitizations from a tax perspective and can not explain the deferred tax accounts to us.

Id., Ex. 33.

On September 4, 2003, Staffeldt wrote to Snow with a copy to Gaertner, "[M]ay we ask you to instruct your auditors to get in touch with KPMG St. Louis, Andrew Davison, to start the process of getting access to the working papers?" Berman Aff., Ex. 32.

On September 5, 2003, Snow sent an e-mail to Staffeldt and Gaertner: "The issue that [the Deutsche Bank tax

department] appear[s] to be facing is that all of the work was done in St. Louis, and they do not have the source information." Id. Snow also wrote: "I am confident that with both sides being motivated we should get all of the questions answered." Id.

According to E*Trade, no later than early September 2003, Ferino knew how Deutsche Bank had calculated the DTA and knew that: (a) the DTA should have been calculated at the 35% federal rate (and not the 39.55% blended tax rate), and (b) Deutsche Bank failed to deduct a "Servicing Fee Expense," which meant the DTA's value was inflated by $11 million.

On September 6, 2003 Gaertner wrote to Snow with a copy to Staffeldt regarding the timing of the final negotiations: "To the extent your tax and residual review results in an insight to your satisfaction one day of negotiations to draw the line ought to be sufficient." Id., Ex. 27.

Gaertner wrote Snow on September 9, 2003, with a copy to Staffeldt, "As to the timing of the envisaged NYC meeting on the 24th we would appreciate if you could let us know asap (i)

22

if you share the view that one day of negotiations to draw the line is sufficient . . . ." Id.

Snow replied to Gaertner with a copy to Staffeldt on September 10, 2003, writing that he was "optimistic that we can resolve all of the issues at this meeting," and agreed to meet on September 23-24 in New York. Id.

According to E*Trade, by mid-September 2003, Deutsche Bank had provided what appeared at the time to be sufficient documentation to enable E&Y to explain the nature of the temporary differences and confirm the value assigned to the DTA including (1) KPMG's Auditors' Report and the audited Closing Balance Sheet; (2) a spreadsheet from Deutsche Bank purporting to break out the components of the DTA; (3) trust certificates; (4) DRAFCO tax materials maintained by Deutsche Bank in St. Louis; (5) additional DTA spreadsheets provided on September 11, 2003; and (6) KPMG's DRAFCO tax accrual and audit work papers. Based on these documents, Ms. Montgomery determined that Deutsche Bank had provided what appeared to be sufficient documentation supporting the DTA.

On September 9, 2003, Mr. Montgomery advised Ms. Montgomery by e-mail that he was "talking to KPMG to ensure we

understand the nature of the item giving rise to the DTA." Cahill Decl., Ex. 33. According to E*Trade, by so doing, Mr. Montgomery falsely and fraudulently affirmed the $15,345,000 value of the DTA.

According to E*Trade, on the morning of September 10, 2003, Ferino and Brian Forschino, the KPMG tax manager responsible for the DRAFCO tax review, determined that Deutsche Bank should have used the 35% federal tax rate, and not the 39.55% blended tax rate (which blended the federal and state/local tax rates), to calculate the DTA. E*Trade asserts that they reached this conclusion because DRAFCO had never paid any state or local tax.

Later that day, Ferino sent Forschino (with a copy to Mr. Montgomery) an e-mail entitled "RE: DRAFCO Deferred Tax Assets." The e-mail contained a spreadsheet listing the temporary differences and using an effective rate of 35%. Ferino wrote:

> I've attached the DRAFCO deferred tax schedule we discussed this morning. As expected, the DTA (calculated at 35%) @ 12/23/02 is $13.6 million.

Id., Ex. 34.

On September 11, 2003, Ferino sent Ms. Montgomery an e-mail entitled "RE: DRAFCO Deferred Tax Assets." The e-mail attached the same spreadsheet referenced in the paragraph above except that Ferino changed the 35% federal tax rate to a 39.55% blended federal and state tax rate ("Spreadsheet"). The Spreadsheet also provided that the total amount of the fourteen listed temporary differences was $38,800,037, which, when multiplied by the 39.55% tax rate, assigned the DTA a value of $15,345,000. According to E*Trade, the Spreadsheet was a false representation because Deutsche Bank knew that the actual effective tax rate was 35% and the amount of temporary differences was not more than $10,795,930, and thus the DTA was worth no more than $3,778,575.

On September 11, 2003, KPMG's Forschino e-mailed E&Y partners Munro and O'Mara, attaching "an excel spreadsheet that should help you trace line items from the DTA summary to the servicer certificates. The references in red point to a specific line of the servicer certificates. Each value should be able to be traced back to the certificates." Id., Ex. 38. The excel spreadsheet stated that the DTA had a value of $15,345,000.

Also on September 11, 2003, E&Y looked at certain KPMG audit work papers and after doing so wrote a detailed e-mail to E*Trade explaining the nature of all but three of the temporary differences listed on the Spreadsheet and confirming that these amounts "tied" to the work papers. E&Y also wrote that Munro should be able to address the remaining temporary differences after his review of KPMG tax accrual work papers.

Also on September 11, 2003, following the transmittal from Forschino to Munro and O'Mara, O'Mara e-mailed Ms. Montgomery: "We just received this — which is very helpful. We will quickly tie the December month numbers from this schedule to the December servicer certificates you sent Alan and I. We cannot tie the other months during 2002 to the schedule since we don't have those servicer certificates." Berman Aff., Ex. 35.

That same day, Ms. Montgomery replied to E&Y: "In order that we can provide the E*TRADE Internal Team an update, would you mind preparing a quick, bullet-point summary of items you still require to sign off on the DTAsset of $15.3M? Include the fact the workpapers will be reviewed in Washington DC on Monday." Id., Ex. 39.

On September 13, 2003, Gaertner wrote to Snow with copies to Staffeldt and Mr. Montgomery: "Any further time E&Y may spend to really understand the transactions would be appreciated. Also, E&Y is going to review KPMG's workpapers on Monday and come back with any problems then." Id., Ex. 37.

For approximately three hours on September 15, 2003, Munro from E&Y reviewed KPMG's DTA work papers.

On September 15, 2003, following his review of KPMG's audit work papers related to the DTA, Munro sent an e-mail to Ms. Montgomery and O'Mara, which in part stated: "My initial conclusion is that the numbers are reasonable from what I have seen," although Munro also wrote that certain of the numbers could not be reconciled. Id., Ex. 38.

On September 16, 2003, in an e-mail to Snow, Alastair Merrick, Simpson, Audette and O'Mara, Ms. Montgomery transmitted Munro's September 15 e-mail, stating:

> Thank you for your patience in us reaching a conclusion on the validity of the $15.3M Deferred Tax Asset of DRAFCO at December 23, 2002 for purposes of computing the purchase price. All timing differences comprising the net $15.3M Tax Asset have either been confirmed with supporting documentation provided by Deutsche Bank Corporate Tax or agreed to schedules in the KPMG 2002 tax

27

> work papers. There were immaterial
> differences in tying out the Residual Income
> and Amortization of Underwriting and
> Issuance Costs. The material overall amount
> of the Deferred Tax Asset of $15.3M and the
> tax methodology employed in treating the
> underlying securitization as a debt for tax
> (rather than a sale) is fine.

Id., Ex. 39.

According to E*Trade, this e-mail did not reflect Ms.
Montgomery's own opinion on the DTA. E*Trade argues that Ms.
Montgomery never opined or reached a conclusion on the validity
of the DTA because she did not have the expertise to do so. Per
E*Trade, this e-mail forwarded to E*Trade's management was an
"executive summary" of the lengthy e-mail from E&Y containing
E&Y's explanation of the temporary differences, and stated that
E&Y had explained the nature of all of the temporary
differences, that the amount of each temporary difference was
the same amount listed in the work papers, and thus the DTA
appeared to be "fine."

On or about September 17, 2003, Audette, who was
responsible for E*Trade Bank's accounting due diligence with
respect to the Ganis/DRAFCO acquisition, sought additional
assurances from Ms. Montgomery and E&Y about the DTA. On

September 17, 2003, E&Y provided written assurance about the DTA

to Audette.

> Gaertner wrote to Snow on September 17, 2003:
>
> We are glad to hear that the Moody's letter
> issues have been resolved as a result of
> Monday's conference call. That's good news.
>
> In order to make next week's negotiations a
> targeted meeting it would be very helpful if
> E*TRADE's and Deutsche Bank's positions on
> the open items are mutually known.
> Otherwise, we might spend a lot of time
> understanding and considering any position
> posted only in the course of the meeting.
> Attached is therefore a brief summary of
> what the open issues and the bid/ask spreads
> were based on the exchange of letters
> available. We would appreciate if we could
> agree on the open items and complete the
> list with respect to E*TRADE's position on
> (i) GANIS premium, (ii) GANIS intercompany
> debt, (iii) DRAFCO equity and liabilities,
> and (iv) excess spread/reserve account
> releases currently residing at GANIS by
> Friday afternoon. Is it fair to say in this
> regard that the questions on the DRAFCO
> Deferred Tax Asset have been answered to
> your satisfaction as Deutsche Bank's tax
> team has not heard anything from Belinda
> Montgomery or E&Y since last Thursday?

Id., Ex. 42.

E&Y confirmed to Audette on September 19, 2003, that

the DTA appeared properly stated. Id., Ex. 40.

29

Deutsche Bank has asserted that Ms. Montgomery on September 17, 2003 told Audette that "we were comfortable with the DTA of \$15mm." Id. This is a disputed fact.

E*Trade and Deutsche Bank representatives met at the New York offices of Deutsche Bank's counsel on September 23-24. Attending were Gaertner, Staffeldt and Rooney on behalf of Deutsche Bank and Mackay, Snow and Simpson on behalf of E*Trade Bank.

Whether the Meeting was intended to resolve all issues between the parties, known or unknown, concerning DRAFCO or the DTA, is disputed. Simpson (E*Trade's in-house counsel) and Rooney (Deutsche Bank's outside counsel) spoke by telephone and agreed the purpose of the Meeting "was to resolve outstanding issues that had come to either party's attention so that the transaction could be finalized." Id., Ex. 12. Mackay testified: "I think the purpose of the meeting was to finalize the transaction." Id., Ex. 6. According to E*Trade, what Mackay meant was that the purpose of the Meeting was to close the Ganis and DRAFCO sales.

The list of issues that the parties were to address at the Meeting did not address or mention the DTA but referenced

30

two issues concerning DRAFCO: (a) the value of the Residuals, and (b) how the parties should handle certain liabilities. The amount of the DTA was not discussed or negotiated at the September 23-24 meeting. However, there was no expressed intention on the part of either party to exclude any of the balance sheet issues relating to either DRAFCO or Ganis from the resolution reached at the September 23-24 meeting.

E*Trade Bank had proposed a $10,120,967 reduction in the book value of the DRAFCO Residuals, and Deutsche Bank compromised and agreed at the September 23-24 meeting to a balance sheet reduction equal to 75 percent of that amount ($7,590,725). Another issue discussed at the September 23-24 meeting was the Ganis bonus accrual, and Deutsche Bank agreed to include the $1,670,659 bonus accrual proposed by E*Trade Bank on the Ganis closing balance sheet, thereby reducing the purchase price for Ganis. Also discussed during the September 23-24 meeting were capitalization of IT cost and deferred tax asset items relating to Ganis.

Because of the interplay of the tax and accounting rules, a write down of the Residuals for book purposes that is not allowable for tax purposes gives rise to a deferred tax asset, as there would be a temporary difference between book and

tax income, and an expectation that the same write down ultimately would be realized for tax purposes. The parties agreed at the September 23-24 meeting to increase the amount of the DTA to reflect the agreed upon write down of the Residuals.

According to E*Trade, there was no discussion about the DTA at the Meeting, nor was there an agreement by the parties that E*Trade released all claims, known and unknown, about the DTA. E*Trade asserts that the parties' agreement that the accounting rules dictated a fixed, non-negotiable increase in deferred taxes due to the write down of the Residuals did not constitute an agreement to release all known and unknown claims concerning the DTA.

A September 29 e-mail from Snow to Gaertner stated:

"Thank you for taking the time to travel to New York last week. In an attempt to meet our aggressive timeframe of October 17th, I was hoping to receive the letter from you that confirms our agreement. Can you let me know when this will be prepared."

Id., Ex. 43.

Gaertner responded to Snow in a September 30 e-mail:

Attached is a document summarizing the understanding as to the resolution of the open items and outlining the steps necessary to complete the sale and purchase of DRAFCO

32

and the final adjustments to the closing
balance sheets:

. . . .

As a matter of fact, we have definitely
turned into the finishing line and are
literally only one step away from completing
the sale and purchase of DRAFCO and the
final adjustments to the closing balance
sheets.

Id.

The attachment to Gaertner's September 30 e-mail to
Snow was headed, "FINAL ADJUSTMENTS TO CLOSING BALANCE SHEETS,"
followed by the notation, "E*Trade Bank and Deutsche Bank AG
have agreed to the following final adjustments to the Closing
Balance Sheets of Ganis Credit Corporation and Deutsche
Recreational Asset Funding Corporation, each dated as of
December 23, 2002." It also stated: "The parties are in
agreement that the final adjustments to the closing balance
sheets will also result in corresponding adjustments to the
deferred tax assets." Id., Ex. 43.

On September 30, 2003, Rooney sent Simpson drafts of
the letters reflecting the agreements reached at the Meeting, on
of which was the letter agreement pertaining to DRAFCO ("Letter
Agreement").

33

The DTA and the $15,345,000 value assigned to it are not contained, mentioned, or referenced anywhere in the Letter Agreement, including Schedule A. Schedule A noted agreements as to three specific issues: (a) the write-down of the Residuals, (b) that E*Trade would retain certain DRAFCO liabilities, and (c) the amount of the automatic adjustment to deferred taxes resulting from the write-down of the Residuals.

E*Trade's Simpson testified that when he received the Letter Agreement, it appeared to him that it only resolved the specific issues contained on Schedule A. Simpson called Rooney to confirm this understanding, and Rooney did so:

> Q: Did you provide any comments to Peter Rooney on the letter?
>
> A: I did. I called Peter and asked him to confirm that this was just a resolution of the specific issues that were noted on the schedules to the letters.
>
> Q. What did Peter Rooney say?
>
> A: He agreed.

Cahill Decl., Ex. 14.

Simpson also told Rooney that the Letter Agreement did not "constitute a waiver of any other rights" of E*Trade. Id. No Deutsche Bank witness controverted these facts.

34

Before entering into the Letter Agreement, neither party sought to have any disputes resolved by the independent expert, PricewaterhouseCoopers LLP.

On October 2, 2003, Deutsche Bank was calculating the adjustments to the DRAFCO Closing Balance Sheet. This led to discussions between Deutsche Bank and KPMG about which effective tax rate -- 35% or 39.55% -- Deutsche Bank should use to calculate the automatic adjustment to deferred taxes caused by the write down of the Residuals.

Between 1999 and December 23, 2002, DRAFCO never filed any state or local tax returns or paid any state or local taxes.

On October 2, 2003, Mr. Montgomery e-mailed Andrew Davidson, a KPMG audit partner, copying KPMG partners Forschino and Jeffrey Bierman and Deutsche Bank's Ferino: "I think the tax benefit to DRAFCo [sic] should be at 35% with no State Tax but will ask Tony Ferino and Brian [Forschino] to confirm tomorrow." Id., Ex. 46. Ferino replied to this e-mail, writing that he and Forschino had determined that DRAFCO should not accrue the state tax benefit and thus the federal tax rate of 35% was the correct rate at which to calculate the DTA.

On October 6, 2003, internally at Deutsche Bank, Gaertner replied to Mr. Montgomery's October 2, 2003 e-mail (with a copy to Staffeldt): "Harry: Whatever you can support in respect of a larger Deferred Tax Asset and thus a smaller equity reduction would be welcome." Id.

Two days later, Ferino e-mailed Gaertner, copying Staffeldt, Mr. Montgomery, Forschino, and Davidson:

> There appears to have been some confusion with regard to the effective tax rates of DRAFCO & Ganis. DRAFCO has never paid state taxes and therefore any DTA should be calculated at the 35% federal rate. . . . KPMG is aware of this and is making the appropriate adjustments to the respective balance sheets.

Id., Ex. 37.

KPMG called Don Haisch, Ganis's Head of Financial Planning Analysis, at E*Trade and told him the automatic adjustment to deferred taxes should be calculated without the state tax benefit (i.e., at the 35% federal rate), but KPMG did not explain why it was doing so. Neither Deutsche Bank nor its agent KPMG ever told E*Trade that the DTA also should be calculated at the 35% federal tax rate. According to E*Trade,

Deutsche Bank failed to state and thereby fraudulently concealed that the $15,345,000 value of the DTA was inflated and false.

On October 13, 2003, Gaertner e-mailed Snow at E*Trade a "special adjustment sheet" that included the automatic upward adjustment to deferred taxes which was calculated at the 35% federal tax rate. Gaertner did not state, and, according to E*Trade, fraudulently concealed, that the DTA also should have been calculated according to the federal tax rate and that the $15,345,000 value of the DTA was inflated and false.

On October 15 and 16, 2003, Staffeldt e-mailed Snow at E*Trade asking whether Snow had any questions about the "special adjustment sheet" that included the automatic adjustment to deferred taxes calculated at the 35% federal tax rate, which Gaertner had e-mailed on October 13, 2003.

On October 20, 2003, Deutsche Bank and E*Trade Bank entered into two letter agreements, one relating to DRAFCO and the other to Ganis, which memorialized agreements reached on September 23-24.

According to E*Trade, it did not know until after the DRAFCO closing that the DTA was not accurately stated.

DRAFCO's stock was transferred to E*Trade Bank on October 20, 2003. Within a few weeks of entering into the October 20 letter agreements, E*Trade Bank paid Deutsche Bank $59,706,704.93 with respect to DRAFCO, and Deutsche Bank paid $11,407,235.09 to E*Trade Bank as an adjustment to the purchase price for Ganis. An Equity Premium Receipt and DRAFCO Cross-Receipt were exchanged between the parties to reflect this transfer of funds. These respective payments included interest accrued between December 23, 2002 and October 19, 2003.

After acquiring DRAFCO, in connection with analyzing a potential sale of DRAFCO by E*Trade Bank to E*Trade Financial, E*Trade Bank considered whether to relocate DRAFCO in order to maximize the state and local tax benefits of the DTA.

In November 2003, Ms. Montgomery suggested that for tax purposes E*Trade might want to transfer DRAFCO to an E*Trade subsidiary (Converging Arrow) based in Nevada. This led E*Trade to examine the tax and accounting issues associated with DRAFCO, including the circumstances under which E*Trade would realize the tax deductions associated with the DTA.

At the same time, E*Trade was preparing year-end tax papers which, for the first time, including DRAFCO. E*Trade's tax papers were being prepared by its regular outside auditors at Deloitte.

Later in November 2003, Ms. Montgomery asked Terry Meyers, a tax securitization specialist at Deloitte and a member of the E*Trade audit team, to independently verify the $15,345,000 value of the DTA as part of his review of E*Trade's financial statements. Meyers suspected that Deutsche Bank may have failed to deduct from its 1999-2002 tax returns the approximately $27.5 million Servicing Fee Expense that DRAFCO had incurred. If Deutsche Bank failed to take this tax deduction, Meyers believed it would reduce the value of the DTA by approximately $11 million. Meyers was not certain, however, that Deutsche Bank had failed to take the deduction.

On December 1, 2003, Steve Robertson (part of E*Trade's tax group) e-mailed Ferino at Deutsche Bank and wrote that it did not appear that Deutsche Bank had taken a deduction for the Service Fee Expense, and asked whether the Servicing Fee Expense "was included with another expense on the tax return . . . ." Cahill Decl., Ex. 52. The next day, Ferino responded to the e-mail, but did not answer this question.

On December 1, 2003, Ms. Montgomery asked Mr. Montgomery for additional support for the DTA. The next day at Deutsche Bank, Mr. Montgomery telephoned Forschino to discuss E*Trade's request for additional information. Forschino sent three sets of documents concerning the DTA to Ferino and Mr. Montgomery so they "could discuss what level of detail we wanted to give [Ms. Montgomery]." Id., Ex. 53. Forschino noted that the second set of documents to the e-mail "was not given to either Belinda or E&Y." Id., Ex. 54.

On December 3, 2003, Ferino e-mailed Ms. Montgomery the same one-page Spreadsheet he had sent her on September 11, 2003. Ms. Montgomery then e-mailed Ferino and Mr. Montgomery, stating that Deutsche Bank previously provided E*Trade with this summary schedule, and asked them to provide E*Trade with a copy of KPMG's tax work papers.

On December 8, 2003, Robertson e-mailed Ferino, stating that E*Trade had asked Deutsche Bank for additional information about the DTA but that Deutsche Bank had not provided it. Robertson repeated his request that Ferino provide E*Trade with, among other things, (a) an explanation of how

Deutsche Bank treated the Servicing Fee Expense for tax purposes, and (b) a copy of KPMG's audit work papers for DRAFCO.

On December 8, 2003, Ferino replied to Robertson, stating: "There is no additional support other than the schedules we've already provided," and that he would call KPMG to inquire about the work papers. Id., Ex. 58. Ferino did not explain how Deutsche Bank treated the Servicing Fee Expense for tax purposes. According to E*Trade, Ferino had known that Deutsche Bank had not deducted the Servicing Fee Expense since at least the summer of 2003. Deutsche Bank ultimately provided E*Trade with a copy of some of KPMG's tax work papers. By the close of 2003, however, neither Ferino nor anyone from Deutsche Bank or KPMG had informed E*Trade that Deutsche Bank had failed to deduct the Servicing Fee Expense.

Deloitte requested that E*Trade contact Deutsche Bank and KPMG for more detailed information about the DTA. According to E*Trade, it spent December, 2003, asking Deutsche Bank whether it had failed to deduct the Servicing Fee Expense. Deutsche Bank did not provide information on this subject to E*Trade. While analyzing this issue, E*Trade Bank's tax department found that they could not determine when such tax benefits would be realized.

On December 30, 2003, E\*Trade Bank sold DRAFCO to E\*Trade Financial at cost, with no gain or loss realized. No write down of the DTA was taken before the sale. The \$15.345 million value on the DRAFCO Closing Balance Sheet was used to calculate the sales price between E\*Trade Bank and E\*Trade Financial.

On December 30, 2003, Deloitte e-mailed to E\*Trade Meyers' preliminary memorandum concerning the DTA ("Preliminary Memo"). The Preliminary Memo was "a work in progress" that Deloitte circulated for "Discussion Purposes Only." The document stated Deloitte's preliminary belief that Deutsche Bank had "substantially overstated" the DTA. Cahill Decl., Ex. 51. Deloitte, however, had not finalized this belief because it needed additional information from Deutsche Bank before it could reach a final conclusion.

After consulting with Deloitte, E\*Trade decided not to change the accounting treatment of the DTA for year-end 2003 because Deloitte only "had been looking at this for a few weeks, maybe a month," and the "best information" E\*Trade had at the time came from "the representations of Deutsche Bank [and] the audit opinion of KPMG." Id., Ex. 1. E\*Trade decided that it

would revisit the accounting treatment of the DTA after Deloitte further analyzed the issue and E*Trade had given Deutsche Bank a reasonable opportunity to justify its valuation of the DTA.

Deutsche Bank never amended any tax return to receive a tax benefit from the alleged missed Servicing Fee Expense.

On January 2, 2004, Mr. Montgomery told Gaertner and Staffeldt that he was "[s]till getting questions from E Trade re the DTA - we have spent a fair amount of time going over details but questions still come back." Id., Ex. 100.

On January 6, 2004, Deutsche Bank (Mr. Montgomery), E*Trade (Ms. Montgomery and Robertson), and Deloitte (Meyers) participated in a telephone conference call. KPMG did not attend the call. During the call, Ms. Montgomery and Meyers stated that the DTA seemed substantially overstated because it appeared that Deutsche Bank failed to deduct the $27.5 million Servicing Fee Expense.

After the parties' January 6, 2004 conference call, Mr. Montgomery e-mailed Gaertner that Ms. Montgomery was "indicating disagreement with the DTA balance — we are reviewing her questions and will let you know if there is an issue." Id.

Gaertner responded that he did not "understand what ET wants us to do given that we have finished with ET since the end of October," and claimed that "ET is not permitted to raise any claims other than indemnity claims at this point. And as we pointed out in the preceding mail there is no contractual must to spend a lot of time getting lost in DTA details." Id.

On February 6, 2004, Mr. Montgomery conceded in an e-mail to Ms. Montgomery that Deutsche Bank missed the Service Fee Expense deduction on it tax returns, and stated that Deutsche Bank would amend its tax returns to take the deduction. He also claimed that the missed deduction had no impact on the DTA. After receiving this e-mail, Ms. Montgomery asked Mr. Montgomery to set up a call between (a) Deutsche Bank and KPMG and (b) E*Trade and Deloitte because the conclusion reached in the e-mail did not make sense from a tax perspective.

On February 10, 2004, Deutsche Bank (Mr. Montgomery and Ferino), E*Trade (Ms. Montgomery, Robertson, Snow, and Simpson), and Deloitte (Meyers and Irv Bisnov, a Deloitte audit partner) held a conference call. No-one from KPMG participated on the call. During the call, Mr. Montgomery (a) agreed that Deutsche Bank missed the Service Fee Expense deduction on its 1999-2002 tax returns, (b) advised E*Trade that Deutsche Bank

44

was going to amend its tax returns to take the deduction, which would net Deutsche Bank about $11 million in tax savings, and (c) stated that the missed deduction had no impact on the DTA.

On February 11, 2004, Ms. Montgomery e-mailed Meyers and Mary Bolke (a Deloitte tax partner) and asked for Deloitte's permission to send Meyers' Preliminary Memo to Deutsche Bank. According to E*Trade, Deloitte did not authorize E*Trade to provide the Preliminary Memo to Deutsche Bank.

On March 1, 2004, E*Trade sent Deutsche Bank a detailed letter entitled "Overstatement of the DRAFCO Deferred Tax Assets" that notified Deutsche Bank that Deutsche Bank had breached the SPA and defrauded E*Trade. The letter contained an accounting analysis explaining Deloitte's preliminary belief that Deutsche Bank failed to calculate the DTA in accordance with US GAAP because, among other reasons, it failed to deduct the Servicing Fee Expense, and a demand that Deutsche Bank reimburse E*Trade under the indemnification provision of the SPA, which mandates that Deutsche Bank reimburse E*Trade for "any breach by the Seller of any covenant or agreement set forth in [the SPA]." Cahill Aff., Ex. 67.

By March 11, 2004, Deutsche Bank responded in detail to E*Trade's March 1, 2004 letter.

By March 11, 2004, Deutsche Bank and its lawyers were aware of E*Trade's claims.

On April 19, 2004, E*Trade sent Deutsche Bank another letter titled "Overstatement of the value of the DRAFCO Deferred Tax Assets," which again notified Deutsche Bank of Deloitte's analysis of the impact that Deutsche Bank's missed deduction had on the DTA.

On April 26, 2004, Staffeldt wrote that Deutsche Bank did not have "sufficient insight into the nature of [E*Trade's] query" and that Deutsche Bank was unwilling to meet with E*Trade until E*Trade provided Deutsche Bank with "detailed back up explanations on the various items referenced in the D&T spreadsheet . . . ." Id., Ex. 71.

On June 17, 2004, E*Trade and Deutsche Bank held a conference call during which E*Trade again explained why the DTA was substantially overstated.

In response, Deutsche Bank requested that E*Trade provide Deutsche Bank with additional information about the DTA.

By letter of July 1, 2004, E*Trade noted that before the DRAFCO closing date, Deutsche Bank erroneously deducted $1,644,983 for state income taxes on its federal tax return. On July 20, 2004, Deutsche Bank responded to this letter. Deutsche Bank "acknowledged" that its state tax deduction was "not appropriate" and stated that Deutsche Bank would file an amended tax return. Id., Ex. 73.

On an October 1, 2004 conference call, E*Trade (Ms. Montgomery), Deloitte (Meyers and Bisnov), Deutsche Bank (Mr. Montgomery, Ferino, and Staffeldt), and KPMG (Forschino) discussed the details of Deloitte's belief that the DTA was overstated and how to reconcile this belief with KPMG's conclusion in its Audit Opinion that the DTA complied with US GAAP.

By early October, a KMPG securitization specialist (Carol Schwartz) and tax partner (Barry Ruddell) were analyzing the accounting and tax materials to determine whether the DTA was properly stated as certified in the Audit Opinion. By mid-October, Schwartz's analysis of the documents had led. her to

back off the conclusions in the Audit Opinion, and she began to believe that "the DTA in Drafco was overstated as E*TRADE claims." Id., Ex. 77. Schwartz and Ruddell, however, could not state with certainty whether the DTA was overstated so they continued their analysis over the next several months.

Deutsche Bank asked KPMG to finish its analysis of the DTA before a scheduled December 22, 2004 call between the parties and the auditors. On December 15, 2004, Ruddell told Schwartz that "I think I agree with you if you are saying the DTA seems to have been overstated." Id., Ex. 78.

On December 21, 2004, Schwartz and Ruddell issued a memorandum on the DTA stating that KPMG could not conclude that the DTA was properly stated as certified in the Audit Opinion and that KPMG did not know whether or not the DTA was overstated.

On December 22, 2004, the parties and KPMG held a conference call. The call was "contentious" and "very stressed." When pressed on of KPMG's Audit Opinion, Schwartz made a comment in reference to KPMG's audit of the DTA to the effect of "garbage in, garbage out." Id., Exs. 5, 80.

Under the accounting rules, E*Trade had until September 30, 2004, to finalize its accounting of the DRAFCO purchase. After discussions with Deloitte, E*Trade concluded that it should write off the entire DTA, with the offset to goodwill.

At the end of the third quarter of 2004, E*Trade Financial wrote down the DTA and increased goodwill by a corresponding amount, without reporting any loss on its income statement.

According to E*Trade, this was the proper accounting treatment because the accounting rules require that, when recording an acquisition, the excess of purchase price over the fair value of identifiable assets (less liabilities) be recorded as goodwill, an intangible asset that provides no monetary value or cash flow. According to E*Trade, the DTA, if properly stated, would have had value because it would have represented a future dollar-for-dollar reduction in taxes to be paid, reducing E*Trade's future tax liability by $15,345,000.

As these facts demonstrate there are relatively few disputes as to the events which took place in this complicated commercial transaction between sophisticated parties. Issues of

reliance, intent, and knowledge remain unresolved. The
conclusions drawn from the facts established are vigorously
contested.

## III. **LEGAL STANDARD**

Summary judgment is granted only if there is no
genuine issue of material fact and the moving party is entitled
to judgment as a matter of law.    Fed. R. Civ. P. 56(c); see
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); SCS
Commc'ns, Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004).
The courts do not try issues of fact on a motion for summary
judgment, but, rather, determine "whether the evidence presents
a sufficient disagreement to require submission to a jury or
whether it is so one-sided that one party must prevail as a
matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
251-52 (1986).

"The party seeking summary judgment bears the burden
of establishing that no genuine issue of material fact exists
and that the undisputed facts establish [its] right to judgment
as a matter of law." Rodriguez v. City of New York, 72 F.3d
1051, 1060-61 (2d Cir. 1995).   Summary judgment is appropriate
where the moving party has shown that "little or no evidence may

be found in support of the nonmoving party's case.    When no
rational jury could find in favor of the nonmoving party because
the evidence to support its case is so slight, there is no
genuine issue of material fact and a grant of summary judgment
is proper."    Gallo v. Prudential Resid. Servs., L.P., 22 F.3d
1219, 1223-24 (2d Cir. 1994) (citations omitted).

            In determining whether a genuine issue of material
fact exists, a court must resolve all ambiguities and draw all
reasonable inferences against the moving party.    See Matsushita
Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587
(1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002).
However, "the non-moving party may not rely simply on conclusory
allegations  or  speculation  to  avoid  summary  judgment,  but
instead must offer evidence to show that its version of the
events is not wholly fanciful."    Morris v. Lindau, 196 F.3d 102,
109 (2d Cir. 1999) (quotation omitted).

## IV.  **THE MOTION FOR SUMMARY JUDGMENT IS GRANTED IN PART AND DENIED IN PART**

            Deutsche Bank argues that it is entitled to summary
judgment as to all or some of E*Trade's claims on nine distinct
bases:    (1) E*Trade's claims are barred, as SPA §§ 2.06 and 2.07
provided the exclusive mechanism for E*Trade to challenge items

51

on the closing balance sheet, and § 9.01 limited the time period during which Deutsche Bank would be responsible for its representations and warranties related to DRAFCO; (2) the parties' October 20, 2003 Letter Agreement bars this action because it resolved issues concerning the DTA; (3) E*Trade's fraud claims (Counts I through IV) should be dismissed because there is no evidence of reasonable reliance or material misstatement or omission; (4) E*Trade's constructive fraud claim (Count IV) should be dismissed because E*Trade has produced no evidence of any "special facts"; (5) E*Trade's negligent misrepresentation claim (Count V) should be dismissed because there was no "special relationship"; (6) E*Trade's claims for unjust enrichment and quantum meruit (Counts VI, VII and XI) should be dismissed because the parties' relationship was governed by contract and no unjust enrichment occurred; (7) because New York law applies, the California statutory claim (Count VIII) should be dismissed; (8) E*Trade's claim for breach of implied covenant of good faith and fair dealing (Count X) should be dismissed because it is duplicative of the breach of express contract claim; and (9) neither plaintiff has suffered any damages.

Finally, Deutsche Bank also argues that the SPA provides that "[u]nder no circumstances shall any party be

52

liable to the other for consequential, incidental or punitive damages," and that summary judgment should therefore be granted denying such damages.

For the reasons discussed below, Counts VI, VII, VIII and XI are dismissed. Deutsche Bank's motion is otherwise denied.

## A.    The SPA Does Not Bar E*Trade's Claims

### 1.    Section 2.06 of the SPA Does Not Bar E*Trade's Claims

Deutsche Bank has contended that E*Trade's claims relating to the DTA are barred because section 2.06 of the SPA was intended to provide the sole dispute resolution procedures as to disputes over the purchase price and, under those provisions, E*Trade's claims expired because they were not raised by August 17, 2003 (30 days from delivery of the DRAFCO closing balance sheet).

It has already been held that E*Trade's contract claims do not fall within the scope of section 2.06:

> Section 2.06 relates only to the 'Closing Balance Sheet,' and provides for adjustments

that are identified within 30 days of its delivery to E*Trade. E*Trade's claims under the SPA, however, involve numerous breaches unrelated to preparation of the DRAFCO Balance Sheet, including breaches with respect to the Reference Balance Sheet and other financial statements (§ 3.06), failure to disclose existing liabilities (§ 3.07), failure to eliminate liabilities (§ 5.08), failure to retain a reserve for tax liabilities (§ 3.14), and failure to retain its records for seven or eight years and make them available to E*Trade (§§ 5.02 & 7.05). These claims do not fall within the scope of § 2.06.

March 6 Opinion at 285. None of the facts established on this record require a different conclusion.

It also has been concluded that E*Trade's fraud claims are outside the scope of any duties created by the SPA, including section 2.06, because (1) the SPA identifies the "Residual Interest" as the only asset of DRAFCO, nowhere referencing the DTA, and (2) the FAC alleges that the fraudulent representations about the value of the DTA were an "inducement" to E*Trade to purchase the DTA for $15.3 million, and the alleged fraud is thus collateral to the SPA. Id. at 285 (citation omitted).

Notwithstanding the above, Deutsche Bank contends that a misrepresentation on the DRAFCO Closing Balance Sheet must be resolved pursuant to the post-closing adjustment provisions of

section 2.06. The language of section 2.06 does not indicate that it was intended to preclude claims for breach of contract arising from Deutsche Bank's duties under other sections of the SPA or section 2.06 itself. By its terms, the dispute resolution provision of section 2.06 applies only to disputes as to amounts reflected in the Closing Balance Sheet:

> The Purchaser may dispute any amounts reflected on the Closing Balance Sheet to the extent the net effect of such disputed amounts in the aggregate would affect the Tangible Stockholders' Equity reflected on the Closing Balance Sheet . . . . In the event of such a dispute, the Sellers' Accountants and the Purchaser's Accountants shall attempt to reconcile their differences, and any resolution by them as to any disputed amounts shall be final, binding and conclusive on the parties hereto.

This language does not preclude E*Trade's claims that Deutsche Bank breached various contractual duties implicating the reliability of the value assigned to the DTA on the DRAFCO Closing Balance Sheet. Nor does E*Trade's right to dispute amounts on the balance sheet negate Deutsche Bank's other duties pursuant to the contract. Deutsche Bank has failed to demonstrate that parties understood section 2.06 to provide the sole means of resolution (and impose a statute of limitations of 30 days) for E*Trade's breach of contract claims.

Deutsche Bank's reliance on Borkan v. Quest Med., Inc., 1996 WL 445361 (S.D.N.Y. Aug. 7, 1996) is unavailing. In Borkan, the court granted plaintiff's motion to compel arbitration of a dispute over the exclusion of an item from a "closing date report" made in connection with a stock purchase agreement. Although the contractual provision requiring arbitration was arguably similar to clause at issue here, the claim at issue in Borkan was simply that an item was excluded from the report. Here, E*Trade claims that Deutsche Bank breached independent contractual duties.

Deutsche Bank also relies on Chleck v. Gen. Elec. Co., 2004 U.S. Dist. LEXIS 21213 at *6 (S.D.N.Y. Oct. 22, 2004) ("Chleck II") for the proposition that E*Trade's exclusive remedy is the post-closing price adjustment procedure. Chleck II recounts that plaintiffs had previously been required to arbitrate their contract claims arising from a contract of sale, but reveals nothing about the nature of those claims. Chleck v. Gen. Elec. Co., 287 F. Supp. 2d 457 (S.D.N.Y. 2003) ("Chleck I"), not cited by defendant, does not discuss plaintiffs' claims in detail either, but seems to indicate that they relied on the mere allegation that defendant did not intend to perform in good faith. Id. at 458-60. Neither case provides any support for

the reading of section 2.06 to bar E*Trade's breach of contract claims.

## 2. **The Breach of Contract Claims Are Not Time-Barred**

Deutsche Bank also maintains that under Section 9.01 of the SPA, its representations and warranties related to DRAFCO survived for 18 months after the Ganis closing date, and that E*Trade failed to identify breaches and/or to notify Deutsche Bank of any such breach before the expiration of this 18 months on June 18, 2004.

It has already been held that the 18-month notice period began to run on the DRAFCO closing date (October 20, 2003), not the Ganis closing date (December 22, 2002). March 6 Opinion at 287. E*Trade filed its complaint on January 26, 2005, well within that 18-month notice period. Id.

Even if the 18-month notice period ran only until June 22, 2004, E*Trade notified Deutsche Bank of its breaches of the SPA before that date. Between January and June 22, 2004, the facts establish that E*Trade notified Deutsche Bank in telephone conference calls, e-mails, and two detailed letter of the claims E*Trade raises in this case. Deutsche Bank's March 11, 2004

Letter establishes that Deutsche Bank and its counsel had a clear understanding of E*Trade's claims by no later than mid-March 2004.

Finally, E*Trade seeks to hold Deutsche Bank liable for the breach of SPA provisions that do not expire in 18 months, including tax representations (§§ 3.14, 7.01, and 7.05) and covenants (§§ 5.01, 5.02(a), 5.02(c), 5.08(b) and 5.08(c)).

For these reasons, E*Trade's claims are not subject to dismissal on summary judgment.

## B. The Effect of the Letter Agreement Is Limited to Its Terms

Deutsche Bank argues that the parties' October 20, 2003 Letter Agreement bars this action because it dealt with and resolved issues concerning the DTA.

It has already been held that the Letter Agreement is ambiguous:

> The Letter Agreement does not contain any general release of "all claims" or "known and unknown claims." It states that the parties should "resolve their differences with respect to the final closing balance sheet of DRAFCO by agreeing to make the

> adjustments as set forth on Schedule A
> hereof." It is the Plaintiffs' position
> that the intent of the Letter Agreement was
> to resolve the three specific issues
> identified by the parties -- not to release
> claims unknown at the time . . . . In view
> of the brevity of the Letter Agreement, this
> dispute about the parties' subjective intent
> is a triable issue.

March 6 Opinion at 284-85 (citations omitted).

It has also been held that claims unknown to E*Trade

could not be waived:

> Because E*Trade has alleged that in October
> 2003 it was unaware of the facts giving rise
> to its claims here, E*Trade did not and
> could not release any of its tort or
> statutory claims.
>
> . . . .
>
> [T]he parties' October 20 Letter Agreement,
> on which Deutsche Bank's argument is based,
> does not state that unknown claims would be
> waived, and courts consistently refuse to
> read an implied waiver into a contract.

Id. at 284, 290. The facts set forth above indicate that
E*Trade was unaware of the facts underlying its claims in this
case before the DRAFCO closing, a position not challenged by
Deutsche Bank.

Neither the DTA nor the $15,345,000 value assigned to
the DTA was referenced in the Letter Agreement. While the
Letter Agreement does refer to the $2.7 million adjustment to

deferred taxes that resulted from the write-down of the Residuals, this adjustment is not part of E*Trade's claims that relate to the DTA valuation.

The parties' intent with respect to the Letter Agreement is the subject of a factual dispute. According to E*Trade, there was no consideration of the DTA valuation. According to Deutsche Bank, the Letter Agreement resolved all claims between the parties.

There is a factual dispute over what the extrinsic evidence shows about the parties' intent, and thus summary judgment is inappropriate. Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 598 (2d Cir. 2005) ("Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate . . . ." (quoting Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992)).

**C.   Factual Disputes With Respect to
      Misrepresentation and Reliance
      Preclude Summary Judgment**

Deutsche Bank argues that E*Trade's fraud claims should be dismissed because there is no evidence of reasonable reliance or a material misstatement or omission. Specifically, Deutsche Bank asserts that Ms. Montgomery's testimony indicates that E*Trade did not rely on Deutsche Bank's representations, and that E*Trade has failed to offer any proof of facts relating to the computation of the DTA that they did not know or could not have known before entering into the SPA on November 25, 2002.

## 1. **Reasonable Reliance**

The legal standard for determining whether E*Trade has satisfied the element of reasonable reliance has already been stated:

> The only time a party's reliance is not "reasonable" is if it "has been put on notice of the existence of material facts which have not been documented." Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1542 (2d Cir. 1997); see also JP Morgan, 350 F. Supp.2d at 408 (only "direct" evidence of mistake or fraud or "arouse[d] suspicion" would make reliance unreasonable). No authority holds reliance to be unreasonable unless the plaintiff saw "red flags" or "other circumstances" existed that made reliance "unquestionably unreasonable." Doehla v. Wathne Ltd., Inc.,

1999 WL 566311 at *12 (S.D.N.Y. Aug. 3, 1999).

March 6 Opinion at 288.

Deutsche Bank contends that E*Trade's reliance was not reasonable because Ms. Montgomery testified that she thought E*Trade should assign no value to the DTA and that she could not rely upon statements made by Mr. Montgomery and Ferino about the DTA.

Deutsche Bank's contentions raise factual issues with respect to Ms. Montgomery's knowledge and conduct. According to E*Trade, she initially decided not to assign any value to the DTA in early September 2003 because Deutsche Bank had not provided sufficient documentation to allow E&Y to explain the nature of the temporary differences, not because she believed that the DTA was invalid or that Mr. Montgomery or Ferino were unreliable. Further, E*Trade asserts that Ms. Montgomery did not render an opinion as to the validity of the DTA because she did not have the expertise to do so. By mid-September 2003, Deutsche Bank and KPMG had provided additional documentation that purported to support the DTA and allowed E&Y to explain the nature of the temporary differences. Ms. Montgomery's reliance

on this additional information provided by Deutsche Bank and KPMG is at issue.

According to E*Trade, there were not "any red flags" or other circumstances before the DRAFCO closing that suggested that the DTA had been overstated. Whether E*Trade's reliance was reasonable is thus a disputed question of fact. See JP Morgan Chase Bank v. Winnick, 350 F. Supp.2d 393, 413 (S.D.N.Y. 2004) (holding that where question of what sophisticated business entity should have done faced with available information was one about which reasonable people could differ, the question of whether reliance was unreasonable was a factual question inappropriate for summary judgment).

Furthermore, E*Trade asserts that it reasonably relied upon KPMG's Audit Opinion and Deutsche Bank's representation that the DTA complied with US GAAP. Again, this alleged reliance creates a factual dispute over whether E*Trade's reliance was reasonable. See Sterling Nat'l Bank v. Ernst & Young, LLP, 2005 WL 3076341, at *5 (N.Y. Sup. Ct. Jan. 7, 2005) (holding that plaintiff could reasonably rely on an audit performed by an accounting firm on the financials of a company to which plaintiff extended credit, and rejecting argument that plaintiff had to conduct its own audit).

## 2. Material Statement or Omission

According to Deutsche Bank, there is no evidence of a material misstatement or omission because Plaintiffs have offered no proof of any facts relating to the computation of the DTA that they did not know and could not have known before E*Trade Bank entered into the SPA. This argument is essentially a reiteration of Deutsche Bank's reliance argument, and fails for the same reasons. According to E*Trade, Deutsche Bank made no fewer than 15 fraudulent statements or omissions.

## D. Factual Disputes With Respect to the Constructive Fraud Claim Preclude Summary Judgment

Deutsche Bank has also contended that the constructive fraud claim fails because E*Trade has not shown "special facts" to support this claim.

The test to show "special facts" has been stated: "Deutsche Bank had a duty to disclose information if Deutsche Bank knew E*Trade was mistaken about DRAFCO'S value because Deutsche Bank was not providing the information it solely possessed proving otherwise." March 6 Opinion at 290.

E*Trade has submitted that there is at least a factual question about whether Deutsche Bank knew that E*Trade mistakenly believed (1) that the effective tax rate for the DTA was 39.55% and (2) that Deutsche Bank had deducted the Servicing Fee Expense, and failed to provide E*Trade with the documents showing that (1) the 35% rate was the proper tax rate and that (2) Deutsche Bank failed to take the deduction -- documents that Deutsche Bank or its agent KPMG solely possessed. The timing and scope of Deutsche Bank's knowledge of facts relevant to the true value of the DTA have not been established on this record and are the subject of dispute.

## E. Factual Disputes With Respect to the Negligent Misrepresentation Claim Preclude Summary Judgment

Deutsche Bank has asserted that a claim for negligent misrepresentation requires a "special relationship" between the plaintiff and the defendant that imposes on the defendant a duty to provide correct information. A special relationship can arise where the defendant either (1) possesses "unique or specialized expertise" or (2) occupies a "special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." Kimmell v.

Schaefer, 675 N.E.2d 450, 454 (N.Y. 1996); see also Henneberry
v. Sumitomo Corp. of Am., 532 F. Supp. 2d 523, 539 (S.D.N.Y.
2007).

According to Deutsche Bank, Ferino informed Ms.
Montgomery that Deutsche Bank did not have unique knowledge
regarding the DTA. However, according to E*Trade, Deutsche Bank
calculated the DTA and its agent KPMG audited it and therefore
each possessed "unique or specialized expertise" about the DTA
that they knew E*Trade did not possess, including the correct
tax rate and amount of temporary differences. There is
therefore a factual dispute over whether there is a special
relationship and summary judgment in inappropriate. See
Kimmell, 675 N.E.2d at 454 ("Whether the nature and caliber of
the relationship between the parties is such that the injured
party's reliance on a negligent misrepresentation is justified
generally raises an issue of fact."); see also Polycast Tech.
Corp. v. Uniroyal, Inc., 792 F. Supp. 244, 269 (S.D.N.Y. 1992)
(noting that the New York courts generally leave the question of
whether there exists a "special relationship" sufficient to
state a cause of action for negligent misrepresentation to the
finder of fact).

## F. The Unjust Enrichment and Quantum Meruit Claims are Dismissed

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc., 448 F.3d 573, 586 (2d Cir. 2006) (quoting Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)). Unjust enrichment and quantum meruit claims are analyzed together "as a single quasi contract claim." Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005); Seiden Assocs., Inc. v. ANC Holdings, Inc., 768 F. Supp. 89, 96 (S.D.N.Y. 1991) (explaining that "quantum meruit and unjust enrichment are not separate causes of action" and that "unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit, meaning 'as much as he deserves,' is one measure of liability for the breach of such a contract"), rev'd on other grounds, 959 F.2d 425 (2d Cir. 1992). An enforceable contract governing the particular subject matter ordinarily precludes claims for unjust enrichment and quantum meruit. Mid-Hudson, 418 F.3d at 175.

67

Although E*Trade is correct that contract and quasi-contract claims may be pled in the alternative, see Orange County Choppers, Inc. v. Olaes Enters., Inc., 497 F. Supp.2d 541, 557 (S.D.N.Y. 2007), here the elements of unjust enrichment have not been established.

E*Trade's claim that the value of the DTA was overstated is the subject of a contract claim discussed above. Although E*Trade has also contended that Deutsche Bank amended its tax returns subsequent to the DRAFCO sale in order to take the $27 million servicing expense deductions and received tax benefits from those deductions, the facts establish that Deutsche Bank never obtained any tax benefit from the supposed "tax credit." Since Deutsche Bank did not realize any tax benefit, it could not have been unjustly enriched at the expense of E*Trade.

Because E*Trade has not provided a basis for imposing quasi-contractual obligations on Deutsche Bank, Counts VI, VII and XI are dismissed.

## G.    The California Law Claim is Dismissed

E*Trade has contended that its non-contractual claims
are governed by California law § 17200, principally on the basis
that the place of injury was California.    However, E*Trade has
shown an insufficient nexus between the wrongful acts alleged
and the state of California, and the claim is therefore
dismissed.

California law embodies a presumption against the
extraterritorial application of its statutes.    Churchill Vill.
L.L.C. v. Gen. Elec. Co., 169 F. Supp. 2d 1119, 1127 (N.D. Cal.
2000) (citing Diamond Multimedia Sys., Inc. v. Superior Court,
968 P.2d 539, (Cal. 1999)).    "With respect to the UCL
specifically, section 17200 does not support claims by non-
California residents where none of the alleged misconduct or
injuries occurred in California."    Id.

E*Trade does not dispute that none of the alleged
misconduct took place in California.    Nor does E*Trade assert
that either plaintiff was a California resident at the time of
the alleged fraud.    E*Trade does argue, however, that the harm
from Deutsche Bank's alleged fraud occurred in California
because    Deutsche    Bank    directed    the    numerous    fraudulent

statements and documents concerning the DTA to E*Trade's tax personnel in California, E*Trade Financial and Ganis were headquartered in California, and E*Trade conducted its due diligence on the sale in California.

E*Trade Financial is a Delaware corporation with its principal place of business in New York. E*Trade Bank is a federally chartered savings association with its principal place of business in Virginia. Although the Court may draw an inference that any alleged harm took place in a company's place of incorporation, see Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005), at least one court has recognized in dicta that "presumably an out-of-state corporation could suffer injury in California." Id. (holding that the plaintiff had not alleged facts to establish injury in California).

Here, however, the facts cited by E*Trade to support California as the place of injury are outweighed by the undisputed facts that plaintiffs are incorporated elsewhere, the negotiating sessions between the parties took place only in New York and Virginia, and the SPA's venue provision specified a New York forum.

## H. Factual Issues Preclude Dismissal of the Claim of Breach of the Covenant of Good Faith and Fair Dealing

Deutsche Bank summarily argues that E*Trade's claim for breach of the implied covenant of good faith and fair dealing is duplicative of its claim for breach of contract, relying on Orange Co. Choppers, Inc. v. Vending Supply, Inc., 497 F. Supp. 2d 541, 560 (S.D.N.Y. 2007). "In most circumstances, claims for breach of contract and the covenant of good faith and fair dealing are duplicative; however, in some cases, a party may be in breach of its implied duty of good faith and fair dealing even if it is not in breach of its express contractual obligations." Echostar DBS Corp. v. Gemstar-TV Guide Int'l, Inc., 2007 WL 438088 at *7 (S.D.N.Y. Feb. 8, 2007) (quotation omitted). Here, because the meaning of the parties' contract has yet to be determined, it is too soon to address whether the plaintiffs' claim of breach of the covenant of good faith and fair dealing is duplicative.

## I. Summary Judgment Is Denied on the Issue of Damages

Deutsche Bank argues that neither plaintiff has suffered damages. According to Deutsche Bank, E*Trade Bank has suffered no damages because it sold DRAFCO to E*Trade Financial

71

at the end of 2003 with the DTA valued at E*Trade Bank's cost, $15.345 million. And, per Deutsche Bank, E*Trade Financial has no claim against Deutsche Bank because, when it wrote down the DTA after purchasing DRAFCO from E*Trade Bank, it increased goodwill by a corresponding amount. Furthermore, Deutsche Bank was not a party to E*Trade Bank's sale of Ganis and DRAFCO to E*Trade Financial.

However, E*Trade Bank and E*Trade Financial are members of a group of affiliated entities that file a consolidated tax return. E*Trade Bank, as a member of the consolidated group, is eligible to share the tax benefits of each member of the group and is severally liable for the group's tax. Cf. Centex Corp. v. United States, 395 F.3d 1283, 1291 (Fed. Cir. 2005). According to E*Trade, E*Trade Bank was damaged by Deutsche Bank's wrongful conduct because (a) E*Trade Bank cannot obtain the tax benefit the DTA was supposed to provide, a dollar-for-dollar reduction in future taxes paid, and (b) E*Trade Bank's future tax liability is $15,345,000 higher than it would have been had the DTA been properly stated. E*Trade Bank retains a legal stake in any claims bearing on the value of the DTA. See id. (holding that a member of a consolidated tax group was damaged by the government's denial of tax deductions to another member of the group because the

deductions reduced the consolidated group's taxable income and
the member's tax liability).

     With respect to E*Trade Financial, section 9.02 of the
SPA specifically allows E*Trade Financial, an "Affiliate" of
E*Trade Bank, to recover its losses from Deutsche Bank.
Deutsche Bank's contention that E*Trade Financial was not
damaged because, when it wrote down the DTA, it increased
goodwill without taking a loss on its income statement, is also
unavailing.  This goodwill is an intangible asset that provides
no monetary value to E*Trade, whereas the DTA (if properly
stated) would have given E*Trade over $15 million in reduced tax
liability.    According to E*Trade, Deutsche Bank's conduct
required E*Trade to write down the DTA, thus eliminating the tax
savings and significantly reducing E*Trade's profits.    An
adequate damages claim has been stated.

## J.   **E*Trade May Recover Consequential, Incidental**
        **and Punitive Damages on a Showing of Willful**
        **or Grossly Negligent Misconduct**

     The SPA provides that, "[u]nder no circumstances shall
any party be liable to the other for consequential, incidental
or punitive damages."  SPA § 9.01.  "[C]lauses limiting the
amount of damages are treated the same as exculpatory clauses in

general: that is, both are enforceable against ordinary negligence claims, but are unenforceable against claims of gross negligence or intentional misconduct." Cirillo v. Slomin's Inc., 768 N.Y.S.2d 759, 772-73 (N.Y. Sup. 2003). See Gross v. Sweet, 400 N.E.2d 306, 308 (N.Y. 1979) ("To the extent that agreements purport to grant exemption for liability for willful or grossly negligent acts they have been viewed as wholly void."). See also Sommer v. Fed. Signal Corp., 593 N.E.2d 1365, 1370-71 (N.Y. 1992). Thus, E*Trade may still recover consequential, incidental and punitive damages to the extent that it demonstrates Deutsche Bank's liability for willful or grossly negligent misconduct. E*Trade may not, however, recover such damages pursuant to its contract claims or pursuant to its negligence claims without a showing of gross negligence.

## V.   CONCLUSION

For the reasons stated above, the unjust enrichment, quantum meruit, and California statutory claims are dismissed. Deutsche Bank's motion for summary judgment is otherwise denied.

The parties will meet and confer upon a schedule for submission of the pretrial order to be submitted to the Court in anticipation of trial commencing October 13, 2008.

It is so ordered.

**New York, N.Y.**
**June**  $/3$  **, 2008**

**ROBERT W. SWEET**
**U.S.D.J.**