UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

E*TRADE FINANCIAL CORPORATION and
E*TRADE BANK, a Federally Chartered      05 Civ. 902
Savings Bank,

                Plaintiffs,            OPINION

   -against-

DEUTSCHE BANK AG,

                Defendant.

------------------------------------X

A P P E A R A N C E S:

   Attorneys for Plaintiffs

   COOLEY GODWARD, LLP
   11951 Freedom Drive
   Reston, Virginia 20190
   By: Douglas P. Lobel, Esq.

   Attorneys for Defendants

   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   Four Times Square
   New York, NY 10036
   By: Scott D. Musoff, Esq.
      Jeremy A. Berman, Esq.

   Attorneys for Third Party Courtroom View Network

   BOIES, SCHILLER & FLEXNER LLP
   5301 Wisconsin Avenue, N.W.
   Washington, D.C. 20015-2015
   By: Jonathan Sherman, Esq.

**Sweet, D.J.**

Third Party Courtroom View Network ("CVN") has requested that the Court issue an order pursuant to Local Civil Rule 1.8 permitting CVN to record and provide audio-visual coverage of the trial in this action. CVN intends to record the trial proceedings for dissemination to CVN subscribers. The application is opposed by Defendant, Deutsche Bank AG ("Deutsche Bank"). Plaintiffs E*Trade Financial Corporation and E*Trade Bank (collectively, "E*Trade") have indicated that they have no objection to the application. For the reasons set forth below, the request is granted.

## I. PRIOR PROCEEDINGS

This action has resulted from a sale by Deutsche Bank to E*Trade in 2002 of Ganis Credit Corporation ("Ganis") and its subsidiary, Deutsche Recreational Assets Funding Corporation ("DRAFCO") in 2003. At issue are the acts and understanding of the parties with respect to a DRAFCO Deferred Tax Asset ("DTA"), and its tax and accounting treatment. E*Trade filed its original complaint on January 26, 2005, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. On March 6, 2006, the

1

Court granted E*Trade's motion to file an amended complaint asserting eleven causes of action including the original claims, and denied Deutsche Bank's motion for judgment on the pleadings. See E*Trade Fin. Corp. v. Deutsche Bank AG, 420 F. Supp. 2d 273 (S.D.N.Y. 2006). On June 13, 2008, the Court granted in part and denied in part Deutsche Bank's motion for summary judgment. See E*Trade Fin. Corp. v. Deutsche Bank AG, 2008 WL 2428225 (S.D.N.Y. June 13, 2008). Trial on E*Trade's remaining claims is scheduled to begin October 14, 2008.

## II. THE NATURE OF THE APPLICATION

CVN describes itself as "a newsgathering division of Courtroom Connect," which focuses on providing video coverage of legal proceedings to lawyers, educators, students and judges. CVN provides audio-visual coverage of proceedings by placing a single "unobtrusive" camera that requires no additional lighting. CVN seeks to both record and "narrowcast" the proceedings over a secure Internet connection to authorized viewers.

CVN subscribers pay a fee to CVN in order to obtain either recordings of proceedings or watch them as they occur live in court. Although CVN membership is available to any

member of the public, most subscribers are members of the legal community, and use CVN's coverage for professional and educational reasons.

CVN asserts that it has covered over 200 courtroom proceedings throughout the country, and has never had a judge terminate its coverage or remove any of its personnel from the courtroom because of any concern that the presence of its "small video camera" or CVN staff interfered with the proceedings or the parties' ability to obtain a fair trial.

## III. DISCUSSION

### A. The Question Is Committed to the Court's Discretion

CVN and Deutsche Bank agree that CVN's request is governed by Local Civil Rule 1.8. Local Civil Rule 1.8 (formerly Local Civil Rule 7) provides that "[n]o one other than court officials engaged in the conduct of court business shall bring any camera, transmitter, receiver, portable telephone or recording device into any courthouse or its environs without written permission of a judge of that court." The parties agree that this rule commits the decision to allow or deny audio-visual coverage of court proceedings to the Court's discretion.

3

See In re Zyprexa Prods. Liab. Lit., 04 MD 1596 (JBW), 2008 WL 1809659, at *1 (E.D.N.Y. Mar. 4, 2008); Williams v. New York City Police Department, 94 Civ. 6234 (LAP), 1997 WL 361974, at *1 (S.D.N.Y. June 27, 1997); Sigmon v. Parker Chapin Flattau & Klimpl, 937 F. Supp. 335, 336 (S.D.N.Y. 1996). This discretion is not limitless, however, and must be exercised within the bounds defined by the Constitution.

### B. Constitutional Framework

In Richmond Newspapers, Inc. v. Virginia, the Supreme Court held that the right of the public and press to attend criminal trials is guaranteed by the First Amendment. 448 U.S. 555 (1980). Chief Justice Burger's plurality opinion discussed at length the tradition of open courts that he characterized as "an indispensable attribute of an Anglo-American trial." Id. at 569; see also id. at 573 ("[W]e are bound to conclude that a presumption of openness inheres in the very nature of a criminal trial under our system of justice."). The philosophical underpinnings of this tradition include the providing of assurance that proceedings are conducted fairly to all concerned, id. at 569, the discouraging of perjury, misconduct and decisions based on secret bias or partiality, id., increased public confidence in the administration of justice, id. at 570,

4

providing a cathartic mechanism for the community to move past social disruption, id. at 571-72, and educating the public and thereby promoting familiarity with the methods of government, increasing respect for the law and building confidence in judicial remedies. Id. at 572.

Although "[w]hether the public has a right to attend trials of civil cases [was] a question not raised by this case," Chief Justice Burger noted that "historically both civil and criminal trials have been presumptively open." Id. at 580 n. 17; see also id. at 599 (Stewart, J., concurring) ("[T]he First and Fourteenth Amendments clearly give the press and the public a right of access to trials themselves, civil as well as criminal."). The Court of Appeals for the Second Circuit subsequently confirmed that the right recognized by Richmond Newspapers extends to civil trials. See Westmoreland v. Columbia Broad. Sys., Inc., 752 F.2d 16, 23 (2d Cir. 1984). See also Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1071 (3d Cir. 1984) (holding that right recognized by Richmond Newspapers extends to civil trials); In re Cont'l Ill. Sec. Lit., 732 F.2d 1302, 1308-09 (7th Cir. 1984) (same); Brown & Williamson Tobacco Corp. v. FTC, 710 F.2d 1165, 1178-79 (6th Cir. 1983) (same).

However, the right to attend trial has been held not to extend so far as the right to record or broadcast trial proceedings. The Supreme Court first addressed the issue in Estes v. Texas, 381 U.S. 532 (1965), which held that a criminal defendant was deprived of his right to due process by the broadcasting of his trial. Justice Clark's plurality opinion quickly disposed of the question of whether First Amendment interests were implicated, noting that neither the First nor Sixth Amendment "speaks of an unlimited right of access to the courtroom on the part of the broadcast media." Id. at 539-40 (quoting Br. of Nat'l Assoc. of Broadcasters and the Radio Television News Directors Assoc. at 7); see also id. at 587 (Harlan, J., concurring) ("My conclusion is that there is no constitutional requirement that television be allowed in the courtroom . . . ."). However, Justice Clark did note that "[t]he law . . . favors publicity in legal proceedings, so far as that object can be attained without injustice to the persons immediately concerned," id. at 542 (quoting 2 Cooley's Constitutional Limitations 931-32 (Carrington ed. 1927), and stated that "[w]hen the advances in these arts permit reporting by printing press or by television without their present hazards to a fair trial we will have another case." Id. at 540.

The Court revisited the issue in Chandler v. Florida, 449 U.S. 560 (1980), in which it expressed a favorable opinion of the State of Florida's experimentation with television broadcasts of court proceedings, and held that televising of criminal proceedings without defendant's consent did not constitute a violation of the Fourteenth Amendment absent a showing of prejudice. The Court stressed that Estes did not "stand as an absolute ban on state experimentation with an evolving technology, which, in terms of modes of mass communication, was in its relative infancy in 1964, and is, even now, in a state of continuing change." Id. at 573-74.

In Westmoreland v. Columbia Broad. Sys., Inc., 752 F.2d 16 (2d Cir. 1984), Cable News Network ("CNN") petitioned for permission to record and distribute live comprehensive televised coverage of a libel trial against a television network. Both parties had consented to the presence of television cameras in the courtroom but the applicable local rule at the time forbid such coverage. Though he believed the petition should be granted, the Honorable Judge Leval, then a member of this Court, had therefore denied the application because "'the rules of the Judicial Conference and of this court are to the contrary,' and because he believed that the rule was not subject to waiver." Id. at 18 (quoting Westmoreland v.

7

Columbia Broad. Sys., Inc., 596 F. Supp. 1166, 1170 (S.D.N.Y. 1984). CNN appealed, arguing that the local rule prohibiting television coverage of the trial violated the First Amendment rights of the network and the public. The Court of Appeals for the Second Circuit relied on Estes, holding that "CNN's status as a member of the press does not entitle it to claim a First Amendment right to televise federal trials." Id. at 21. "[T]he evils of television coverage" convinced the court that recognizing a First Amendment right to see a given trial televised was "a leap we are not yet prepared to take." Id. The court relied on a Report of the Ad Hoc Committee on Cameras in the Courtroom to the Judicial Conference of the United States, Sept. 6, 1984, which concluded that the alleged public benefits of a change to the rules governing media coverage of courtroom proceedings were outweighed by the risks to the administration of justice, including "distractions and diversions of judicial time; psychological effects on jurors, witnesses, judges, and lawyers; jeopardizing 'the required sense of solemnity, dignity and the search for truth.'" Westmoreland, 752 F.2d at 23, n.10 (quoting Ad Hoc Committee Report at 7). The Court of Appeals did note, however, citing Chandler, that there might come a time when the experimentation with television coverage establishes that such concerns are "considered secondary or basically irrelevant as impediments to the search

for truth when a given case is televised." Id. at 23.
Ultimately, the Court of Appeals held that "until the First
Amendment expands to include television access to the courtroom
as a protected interest, television coverage of federal trials
is a right created by consent of the judiciary, which has always
had control over the courtrooms, a consent which the federal
courts, including the Southern District of New York, have not
given." Id. at 24. Judge Winter concurred in the result, but
would have held that "access to the courts for the purpose of
conveying information to the public about judicial proceedings
falls within the area of protected speech under the First
Amendment." Id.

The trend has been toward increasing openness – in
this district and other federal and state courts.[1] Local Rule 7

---

[1] In 1990, the Judicial Conference of the United States adopted the report of
its Ad Hoc Committee on Cameras in the Courtroom, which recommended a pilot
program permitting electronic media coverage of civil proceedings in six
district courts and two courts of appeal. The Federal Judicial Center
evaluated the program as applied from July 1, 1991 to June 30, 1993. The
report found that "[o]verall, attitudes of judges toward electronic media
coverage of civil proceedings were initially neutral and became more
favorable after experience under the pilot program," "[j]udges and attorneys
who had experience with electronic media coverage under the program generally
reported observing small or no effect of camera presence on participants in
the proceedings, courtroom decorum, or the administration of justice," and
"[r]esults from state court evaluations of the effects of electronic media on
jurors and witnesses indicate that most participants believe electronic media
presence has minimal or no detrimental effects on jurors or witnesses."
Federal Judicial Center, Electronic Media Coverage of Federal Civil
Proceedings: An Evaluation of the Pilot Program in Six District Courts and
Two Courts of Appeals, July 1994, at 7. The research project staff
recommended that the Judicial Conference authorize federal courts of appeals
and district courts nationwide to provide camera access to civil proceedings

9

was amended effective June 30, 1988, to give a presiding judge discretion to permit the recording and broadcast of court proceedings. See Marisol A. v. Giuliani, 929 F. Supp. 660, 661 (S.D.N.Y. 1996).

The inquiry into whether permission should be granted in a given case must begin with Richmond Newspapers' "presumption of openness." See also Maryland v. Baltimore Radio Show, Inc., 338 U.S. 912, 920 (1950) (Frankfurter, J.,

---

in their courtrooms, subject to certain guidelines. Id. at 43. This recommendation was rejected by the Judicial Conference.
See also New York State Committee to Review Audio Visual Coverage of Court Proceedings, An Open Courtroom: Cameras in New York Courts, 1995-1997, April 4, 1997 ("Feerick Committee Report"), at 5 ("In the final analysis, we observe that New York opted in 1987 to open its courts to cameras in both civil and criminal proceedings. Almost 10 years of experience argue in favor of allowing cameras in the courts on a permanent basis so long as a law allowing camera coverage is grounded on judicial discretion, contains all the safeguards in place during the experimental period and recommended by this Committee, and directs the Office of Court Administration to monitor camera-covered proceedings . . . . It is this Committee's judgment that such an approach, in the context of New York's experiment, respects the public value of openness, the public nature of a trial, and the constitutional principle of a fair trial."); Judicial Council of California, Report from the Task Force on Photographing, Recording and Broadcasting in the Courtroom, May 10, 1996 (advising that the O.J. Simpson trial should not outweigh the California courts' years of positive experience with cameras in the courtrooms). See generally Katzman v. Victoria's Secret Catalogue, 923 F. Supp. 580, 585 (S.D.N.Y. 1996) ("During the last thirty years, studies conducted by state and federal jurisdictions to evaluate the effect on the judicial process of the presence of cameras in courtrooms have demonstrated that televised coverage of trial court proceedings does not impede the fair administration of justice, does not compromise the dignity of the court, and does not impair the orderly conduct of proceedings."); Testimony of the Honorable Nancy Gertner, of the United States District Court for the District of Massachusetts Re: H.R./2128 the "Sunshine in the Courtroom Act of 2007", September 27, 2007 ("Judge Gertner Testimony"), at 4 ("There are cameras in the courtrooms of forty-eight states. Numerous studies have been conducted by these jurisdictions to test the impact of the cameras on the proceedings. The results have been favorable -- that televised coverage does not impede the fair administration of justice, does not compromise the dignity of the court, and does not impair the orderly conduct of proceedings. Indeed, the opposite is the case . . . .").

dissenting from denial of certiorari) ("One of the demands of a democratic society is that the public should know what goes on in courts by being told by the press what happens there, to the end that the public may judge whether our system of criminal justice is fair and right."); Craig v. Harney, 331 U.S. 367, 374 (1947) ("A trial is a public event. What transpires in the court room is public property."). Due process concerns may ultimately counsel against such access. However, there does not seem to be a reason to treat the question of cameras in the courtroom as different in kind from the long history of "conflicts between publicity and a defendant's right to a fair trial," which, as Chief Justice Burger remarked, are "almost as old as the Republic." Richmond Newspapers, 448 U.S. at 564. See id. at 572-73 ("Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media. In a sense, this validates the media claim of functioning as surrogates for the public."); Chandler, 449 U.S. at 811 n.11 ("[I]t is noteworthy that the data now available do not support the proposition that, in every case and in all circumstances, electronic coverage creates a significant adverse effect upon the participants in trials - at least not one uniquely associated with electronic coverage as opposed to more traditional forms of coverage."); see also Judge Gertner

11

Testimony at 3 ("In high-profile cases, with the sketch artist present, the courtroom filled to the rafters with people, the question is whether the presence of cameras materially changes the atmosphere, and in my experience, it does not. This is particularly the case with the change in technology; cameras are less physically obtrusive. . . . Lawyers may grandstand, judges may pontificate under the public's gaze, whether it is through the print media or cameras. And the reverse is just as likely -- the public will see why our judicial system is one of the most respected in the world.").

### C. CVN's Request to Record and Provide Audio-Visual Coverage of the Trial Is Granted

Deutsche Bank makes five arguments in opposition to CVN's request: (1) cameras intimidate and infringe the privacy interests of witnesses; (2) in most cases where requests to broadcast have been approved they were unopposed by the parties; (3) confidentiality concerns weigh against broadcasting this case; (4) this is a private dispute without a large number of stakeholders; and (5) a private venture should not profit by broadcasting court proceedings. None of these arguments raise concerns of sufficient seriousness to justify denial of CVN's request.

Deutsche Bank first argues that the privacy interests of witnesses should be respected, arguing that concern for witness privacy is one of the primary reasons that the Judicial Conference objects to use of cameras in courtrooms.

This case concerns a contract dispute between two corporations. Deutsche Bank has not identified any sensitive issues that may arise in questioning that would implicate the witnesses' privacy interests. Cf. In re Zyprexa Prods. Liab. Lit., 2008 WL 2079960, at *1 (E.D.N.Y. May 14, 2008) (denying CVN's request to record and provide audio-visual coverage of a hearing on a motion where argument would reveal medical details of two plaintiffs); Statement of Judge Tunheim on Behalf of the Judicial Conference of the United States, September 27, 2007, at 12-13 ("Witnesses and counsel frequently discuss very sensitive information during the course of a trial. Often this information relates to individuals who are not even parties to the case but about whom personal information may be revealed. The reality is that many of the trials the media would be interested in televising are those that involve testimony of an extremely private nature, revealing family relationships and personal facts, including medical and financial information."). It is difficult to imagine such issues arising in the context of

this lawsuit, but to the extent that sensitive issues such as personal medical or financial information do arise, the Court reserves the authority to order the camera turned off.

Deutsche Bank argues that in most cases where requests to broadcast have been granted, it was with the parties' consent. However, consent has not <u>always</u> been required. <u>See, e.g.</u>, <u>Chandler</u>, 449 U.S. 560; <u>In re Zyprexa Prods. Liab. Lit.</u>, 04 MD 1596 (JBW), 2008 WL 939204, at *1 (E.D.N.Y. Mar. 25, 2008); <u>Katzman</u>, 923 F. Supp. 580; <u>Marisol A.</u>, 929 F. Supp. at 661. These cases make clear that the relevant question is whether the objecting party has shown any prejudice that would result from the request to record and broadcast the proceedings. Deutsche Bank has failed to make such a showing.

Deutsche Bank's confidentiality concerns were resolved at argument on CVN's request on October 8. CVN agreed that it would not publish exhibits unless and until they are used at trial. The parties are also, of course, free to file exhibits containing sensitive information under seal.

Deutsche Bank also argues that this is a private dispute with few stakeholders and of limited interest to the public, but it is not for the Court to decide what is or is not

14

of interest to the public.  Deutsche Bank's final argument is that a private venture should not make a profit from broadcasting court proceedings.  Deutsche Bank fails to explain why, or draw any distinction between a profit reaped through broadcast of proceedings as opposed to reporting on proceedings in the newspaper or on network television (both of which has been permitted for quite some time, and are presumably lucrative).

The Court notes that webcasting (CVN's preferred term seems to be "narrowcasting") of court proceedings, at least in this case, is free of a number of the problems that the courts have identified with regard to television broadcasts.  First, this is a bench trial.  Cf. Estes, 381 U.S. at 545 ("The potential impact of television on the jurors is perhaps of the greatest significance.").  Further, this is not a high-profile case, and will not be broadcast for a general audience.  Thus, the "impact upon a witness of the knowledge that he is being viewed by a vast audience" is not an issue.  Id. at 547.  Nor will the recording and "narrowcasting" of the trial place a significant additional burden upon the Court.  Cf. id.  CVN will utilize a single stationary camera, and has agreed to place a light indicating whether the camera is on in the common view of counsel and the Court.  The camera will be turned off if and

15

when proceedings are closed to the public. Finally, CVN's coverage will be gavel-to-gavel, ameliorating concerns with regard to sensationalized or selective coverage. See generally Daniel Stepniak, A Comparative Analysis of First Amendment Rights and the Televising of Court Proceedings, 40 Idaho L. Rev. 315, 348-49 (2004) ("[C]oncerns regarding the media's selectivity of cases, and tendency to broadcast mere clips of recordings may be assuaged by the ready availablility of gavel-to-gavel footage of proceedings through court's websites."). As new technologies develop, it seems likely that other of the critics' concerns may be addressed.

**IV. CONCLUSION**

For the above-stated reasons, the request of CVN is granted.

It is so ordered.

**New York, NY**
**October 14, 2008**

                                        ROBERT W. SWEET
                                                 U.S.D.J.