UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

E*TRADE FINANCIAL CORPORATION and
E*TRADE BANK, a Federally Chartered          05 Civ. 0902
Savings Bank,

                        Plaintiffs,          OPINION

     -against-

DEUTSCHE BANK AG,

                        Defendant.

-------------------------------------X

A P P E A R A N C E S:

          Attorneys for Plaintiffs

          COOLEY GODWARD KRONISH LLP
          1114 Avenue of the Americas
          New York, NY  10036
          By:  Celia Goldwag Barenholtz

          DOUGLAS P. LOBEL
          ROBERT T. CAHILL
          11951 Freedom Drive
          Reston, Virginia  20190

          Attorneys for Defendants

          SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
          Four Times Square
          New York, NY  10036
          By:  Scott D. Musoff
               Jeremy A. Berman

## TABLE OF CONTENTS

I.     PRIOR PROCEEDINGS ...................................................................................4
II.    FINDINGS OF FACT...................................................................................6
  A.    The Parties and Related Entities ...........................................................6
  B.    The Securitizations...................................................................................8
    1.    Accounting Treatment.................................................................13
    2.    Tax Treatment...............................................................................14
    3.    Temporary Differences................................................................14
  C.    The Negotiations Leading to SPA.........................................................21
  D.    The SPA.....................................................................................................30
  E.    The Ganis Closing ...................................................................................41
  F.    The Negotiations Leading to the DRAFCO Closing.........................50
  G.    The DRAFCO Closing.............................................................................83
  H.    The Dispute Following the DRAFCO Closing .....................................95
  I.    The Accounting Treatment of the DTA .............................................139
    1.    The Experts..................................................................................139
    2.    The Servicing Fee Deduction ..................................................144
    3.    State Taxes..................................................................................157
  J.    The Liquidation Expense.....................................................................162
III.   CONCLUSIONS OF LAW.............................................................................163
  A.    Jurisdiction, Venue and the Applicable Law Have Been
        Established..............................................................................................164
  B.    Deutsche Bank Breached the Contract..............................................164
    1.    The Failure To Deduct the Service Fee Expense.....................165
      a.    Breach of §§ 2.06 ...............................................................165
      b.    The Breach of §§ 3.06 and 3.07 Arising...................173
      Out of the Reference Balance Sheet.......................................173
      c.    The Breach of § 3.14 ..........................................................175
    2.    Deutsche Bank Has Not Established an Affirmative Defense
          to the Contract Claims .........................................................177
      a.    Timely Notice........................................................................177
      b.    Compliance with § 2.06 .....................................................178
      c.    Waiver.....................................................................................180
      d.    Application of Article VII..............................................183
      e.    Estoppel, Laches, and Standing ....................................184
    3.    Deutsche Bank Did Not Breach SPA §§ 5.01 and 5.02............185
  C.    Deutsche Bank Did Not Commit Fraud................................................188
    1.    Deutsche Bank Knowingly Misrepresented the Tax Rate
          Applicable to the DTA............................................................188
    2.    E*TRADE reasonably relied upon Deutsche Bank's
          representations .......................................................................191
    3.    Intent to Defraud by Use of the 39.55% State Tax Rate
          Has Not Been Established.......................................................198

4.  Deutsche Bank Did Not Fraudulently Conceal the Failure
to Deduct the Servicing Fee Expenses.........................................202
D.  Deutsche Bank Did Not Breach Its Duty of Good Faith and
Fair Dealing......................................................................................206
E.  E*TRADE Has Proven Its Damages.............................................208
F.  E*TRADE Is Entitled to Prejudgment Interest............................211
G.  E*TRADE Is Not Entitled to Punitive Damages............................212
H.  E*TRADE Is Entitled to Attorneys' Fees........................................214
IV.  CONCLUSION..................................................................................................217

**Sweet, D.J.**

Plaintiffs E\*TRADE Financial Corporation ("E\*Trade Financial") and E\*TRADE Bank ("E\*Trade Bank") (collectively, the "Plaintiffs" or "E\*TRADE") seek to recover over $11.5 million in damages for breach of contract and fraud, as well as prejudgment interest, costs and attorneys' fees, from defendant Deutsche Bank AG ("Deutsche Bank" or the "Defendant") arising from the sale of two Deutsche Bank subsidiaries, Ganis Credit Corporation ("Ganis") and Deutsche Recreational Asset Funding Corporation ("DRAFCO") to E\*TRADE, pursuant to a Stock Purchase Agreement (the "SPA") entered into by the parties on November 25, 2002.

The parties are highly sophisticated entities, very well represented at the time of the transactions at issue and during this litigation. Through the pointillism of facts found below emerges the key issue – the proper accounting treatment for a complicated securitization. The difficulty and uncertainty of tax and accounting treatment for somewhat exotic securities that underlies our present national economic dilemma is presented paradigmatically in this action.[1] Although expert

---

[1] In discussing the complexity of securitized assets, Washington Post columnist Steven Pearlstein observed that "[i]t is in the nature of the new financial order that it's hard to figure out exactly what everyone's role is. All the borrowers are lenders and all the lenders turn out to be borrowers, so nobody -- including regulators -- can quite figure out where the ultimate

accountants, lawyers and executives differ, through diligence
and persistence it is hoped that both the challenge of this
action and of the present economic dilemma can be overcome.

In accordance with the Findings of Fact and
Conclusions of Law set forth below, E*TRADE is entitled to
judgment in its favor in the amount of approximately $18
million, including prejudgment interest, plus costs and
attorneys' fees, Deutsche Bank having breached the SPA as a
result of its failure to take certain significant tax
deductions.

## I. PRIOR PROCEEDINGS

On January 26, 2005, E*TRADE filed a complaint
asserting claims for breach of contract, breach of the implied
covenant of good faith and fair dealing, and unjust enrichment,
alleging that Deutsche Bank breached its obligations under the
SPA by overstating the value of a deferred tax asset on the
DRAFCO closing balance sheet, resulting in an overpayment in the
purchase price paid by E*Trade Bank.

---

risks really lie." Steven Pearlstein, New Order Ushers a World of
Instability, Washington Post, Aug. 10, 2007,
http://www.washingtonpost.com/wp-
dyn/content/article/2007/08/09/AR2007080902192.html.

4

Deutsche Bank answered the complaint on April 18, 2005, and on June 20, 2005, moved for judgment on the pleadings. On August 15, 2005, E*TRADE moved for leave to file the First Amended Complaint ("FAC"). The motions were heard together on November 23, 2005. On March 6, 2006, the motion for judgment on the pleadings was denied, and the motion for leave to amend was granted. See E*Trade Financial Corp. v. Deutsche Bank AG, 420 F. Supp. 2d 273 (S.D.N.Y. 2006) (the "March 6 Opinion"). The FAC was filed March 9, 2006 alleging fraud (Count I), fraudulent inducement (Count II), fraudulent concealment (Count III), constructive fraud (Count IV), negligent misrepresentation (Count V), unjust enrichment (Counts VI and VII), violation of California Unfair Competition law (Count VIII), breach of contract (Count IX), breach of implied covenant of good faith and fair dealing (Count X), and quantum meruit (Count XI).

On November 7, 2007, Deutsche Bank moved for summary judgment, and on June 13, 2008, the Court dismissed the claims in Counts VI, VII, VIII, and XI, but otherwise denied the motion. See E*Trade Financial Corp. v. Deutsche Bank AG, No. 05 Civ. 902 (RWS), 2008 WL 2428225 (S.D.N.Y. June 13, 2008) (the "June 13 Opinion").

In limine motions were filed on September 29, 2008, and a thirteen-day bench trial commenced October 14, 2008. Post-trial briefs were filed on December 23, 2008, and post-trial argument was heard February 19, 2009.

## II. FINDINGS OF FACT

### A. The Parties and Related Entities

Plaintiff E*Trade Financial is a Delaware corporation with its principal place of business in New York, New York. E*Trade Financial provides online consumer financial services including securities trading, banking services, and originating mortgages and loans for retail, corporate, and institutional customers. June 13 Opinion at *1; Tr. 64 (B. Montgomery); Def. Ex. 291, 293.[2]  E*Trade Financial was formerly known as E*TRADE Group ("E*Trade Group"). E*Trade Group changed its name to E*Trade Financial around 2003. Tr. 60 (B. Montgomery), 996 (Mackay). E*Trade Financial is, and E*Trade Group was, the parent company of all E*TRADE entities, including E*Trade Bank. Tr. 60 (B. Montgomery); June 13 Opinion at *1.

---

[2] Page references to the various portions of the record will be preceded by the following abbreviations: Tr. (trial transcript); Pl. Ex. (Plaintiffs' Exhibit); Def. Ex. (Defendant's Exhibit); DB Br. (Deutsche Bank Opening Post-trial Brief). Page citations to depositions incorporated into the record will be preceded by the designation "[deponent name] Dep."

6

Plaintiff E*Trade Bank is a federally chartered savings bank with its principal place of business in Arlington, Virginia. E*Trade Bank offers a full range of consumer banking products and services including online banking and mortgage loans. June 13 Opinion at *1; Def. Ex. 291. E*Trade Bank is a wholly-owned subsidiary of E*Trade Financial. June 13 Opinion at *1.

Defendant Deutsche Bank is a German corporation with its principal place of business in Frankfurt, Germany. June 13 Opinion at *1. Its stock is traded on the New York Stock Exchange. At all relevant times it had approximately 300-400 subsidiaries in the United States. Tr. 1543 (Ferino), 1922 (H. Montgomery).

Before October 31, 2002, Ganis was a wholly-owned subsidiary of Deutsche Financial Services ("DFS"), which itself was a wholly-owned subsidiary of Deutsche Bank. Tr. 553-54 (Staffeldt); Def. Ex. 70 at ET-DB 93241. Ganis originated and serviced consumer loans on recreational vehicles, boats, and trailers sold to consumers (the "Loans"). Between October 31, 2002, and December 23, 2002, Ganis was owned by G Finance Holding Company, another wholly-owned Deutsche Bank subsidiary.

Id. E*Trade Bank owned Ganis between December 23, 2002, and October 31, 2005, when E*Trade Bank sold Ganis to GE Money, a unit of the General Electric Company ("GE"). Haisch Dep. 10, 79-80.

DRAFCO was a subsidiary of Ganis created on May 22, 1998, to securitize and service recreational end-user financing loans originated by Ganis. Def. Ex. 70 at ET-DB 093241. DRAFCO had no employees. Tr. 460 (Berliner). The DRAFCO balance sheet contained only assets and liabilities related to securitizations of the Loans originated by Ganis. Def. Ex. 70. From October 31, 2002, until October 20, 2003, DRAFCO was owned by Ganis Financial Holding Company. Since October 20, 2003, DRAFCO has been owned by E*TRADE. DRAFCO has been renamed E*Trade Financial Asset Funding Corp. Def. Ex. 170 at SS 562.

## B. The Securitizations

Securitizations are complicated transactions and present specialized aspects of tax accounting because of the many cash flows, multiple parties (trusts, borrowers, investors, and companies selling the loans), and substantial amounts of backup and legal documentation. Only persons with expertise in securitizations are able to understand the interplay between

8

these multiple parties and the complicated tax accounting
concepts arising from securitizations, including deferred tax
assets. June 13 Opinion at *3; Tr. 1163 (Audette), 107-108 (B.
Montgomery); Robertson Dep. 21-22, 82; Snow Dep. 126-127.

DRAFCO completed four securitizations before its sale
to E*TRADE, three in 1999 and one in 2001 (the
"Securitizations"). Each Securitization had the same structure,
and involved several parties: borrowers, Ganis, DRAFCO, a trust
and investors. Tr. 400-401 (Berliner).

The accounting for the Securitizations enabled
Deutsche Bank to record a large book gain on the day the
Securitization closed and defer the taxes it had to pay on that
gain. Tr. 410-11 (Berliner); Pl. Ex. 194. Securitization
accounting "inflates income and reduces taxes immediately
payable." Tr. 410 (Berliner).

Ganis provided the Loans to the borrowers, who took on
an obligation to make monthly payments of principal and interest
to Ganis. A portion of this interest payment was allocated to
pay for the cost of servicing the Loans. Tr. 1146-1147
(Audette), 400-401 (Berliner); Meyers Dep. 93; Schwartz Dep.
218; Pl. Ex. 11.

9

Ganis transferred the Loans to DRAFCO so that DRAFCO could securitize them. Ganis also serviced the Loans. Tr. 400-402 (Berliner); Haisch Dep. 73. After receiving the Loans from Ganis, DRAFCO sold them to a trust. Tr. 400 (Berliner).

Each Securitization created a separate trust (collectively, the "Trusts"). The Loans were pooled and then grouped into "Classes" based on their relative risk and subordination levels. The Trust sold "Notes" to outside investors for each of the Classes. The Notes were collateralized by the cash flow on the Loans. While DRAFCO did not hold any of the Notes, it did retain the right to receive the "Residual Interest" generated from the Securitizations. Tr. 400-401 (Berliner); Pl. Exs. 310, 314.

The investors purchased the Notes, which promised the investors a specified rate of interest. When the borrowers made their principal and interest payments on the Loans, the Trust used the proceeds to make payments to the investors. Tr. 400-401 (Berliner); Haisch Dep. 81-82; Snow Dep. 45-46; Pl. Exs. 310, 314.

The Residual Interest reflected on the DRAFCO books was an estimate of the present value of future cash flows that DRAFCO would receive from the "excess interest" generated by each Securitization. "Excess interest" is the difference between (a) the interest rate paid by the borrowers on the Loans and (b) the interest rate paid to holders of the Notes plus expenses associated with the Loans. The interest rate paid on the Loans was intended to generate enough cash to more than cover the interest paid on the Notes and the expenses. Tr. 401 (Berliner); Pl. Exs. 310, 312, 314.

The Residual Interest from the Securitizations was on E*TRADE's books beginning October 20, 2003, the date E*TRADE purchased DRAFCO as set forth below. The Residual Interest from the 2001 Securitization is the only Residual Interest that currently remains on E*TRADE's books. There has been no change in the structure of the Securitizations since October 2003. Tr. 1124, 1150 (Audette).

Ganis serviced the Loans underlying each Securitization. Servicing a loan portfolio involved providing services such as collecting and applying the monthly payments from the borrowers, maintaining records, sending out statements, making collection calls and initiating foreclosure proceedings

11

as necessary. Ganis performed such services for many financial institutions, including Bank of Boston, Citizens Bank, Bank of the Southwest and Bank of America. Haisch Dep. 16-17, 196-201; Snow Dep. 70-71.

Ganis was entitled to receive "Servicing Fees," calculated as a percentage of the amount of the loans, as compensation for servicing the Loans. Tr. 1147 (Audette), 401-02, 494 (Berliner), 73 (B. Montgomery); Haisch Dep. 40, 73; Robertson Dep. 59-60; Pl. Ex. 116. From 1999 through December 23, 2002, Ganis received $27,501,282 in Servicing Fees. Each Trust paid the Servicing Fees directly to Ganis on DRAFCO's behalf from the interest income. Tr. 401-02 (Berliner), 1862 (Mangieri); Schwartz Dep. 79, 218; Pl. Exs. 174, 310 at 104, 314 at 534, 321.

In addition to Servicing Fees, each Trust paid other expenses on DRAFCO's behalf. One of these expenses was the "Liquidation Expense," which reflected the costs to repossess and sell repossessed assets that collateralized the Loans. From 1999 to December 23, 2002, the Trust paid liquidation fees of $502,825 on DRAFCO's behalf. Thus DRAFCO incurred $502,825 in Liquidation Expenses. Tr. 400-402, 416 (Berliner).

12

In securitizations, the accounting for income and expenses is different for financial reporting purposes ("book purposes") and tax reporting purposes ("tax purposes"). Tr. 410-11 (Berliner); Munro Dep. 82.

## 1. Accounting Treatment

For book purposes, U.S. Generally Accepted Accounting Principles ("U.S. GAAP") governs the reporting of income and expenses. Under U.S. GAAP, the Securitizations are considered to be a sale, meaning the Loans were treated as if DRAFCO had sold them to the Trusts. Thus, on the day the Securitizations closed, the Loans came off DRAFCO's books. Tr. 415, 437-38 (Berliner). Also on the day the Securitizations closed, DRAFCO recorded for book purposes all income and expenses (including Servicing Fees and Liquidation Expenses) associated with the Securitizations. The difference between the resulting entry (the Residual Interest) and the up-front cash received is the "Gain on Sale," i.e. the estimated net profit from the Securitization. Tr. 400-401, 415-16, 440 (Berliner); Pl. Ex. 35 at 23907.

13

DRAFCO did not record for book purposes any income or expenses after the date of Securitization. Tr. 417-18 (Berliner).

## 2. Tax Treatment

For tax purposes, Internal Revenue Service ("IRS") rules and regulations govern the reporting of income and expenses. For tax purposes, the Securitizations were deemed to be a borrowing and not a sale. Under the IRS rules, DRAFCO was considered to have borrowed the cash that the Trust paid for the Loans. The Loans remained an asset of DRAFCO, and the Notes remained a liability. Tr. 410 (Berliner); Pl. Ex. 194 at 38714.

Because the cash that the Trust paid was treated as a loan for tax purposes, DRAFCO did not record any taxable income or expense on the day the Securitizations closed. For tax purposes, DRAFCO recorded income from the Loans as it was received from the borrowers. DRAFCO also recorded expenses related to the Securitizations (including the Servicing Fee Expenses and Liquidation Expense) when DRAFCO paid them. Tr. 415 (Berliner).

## 3. Temporary Differences

14

A deferred tax asset ("DTA") resulted from the
accounting treatment of the Securitizations. Deferred taxes are
purely an accounting concept governed by Financial Accounting
Standard 109 ("FAS 109"), a U.S. GAAP rule. Deferred taxes are
not governed by IRS rules. Tr. 69 (B. Montgomery), 403-04
(Berliner), 1792 (Mangieri).

A deferred tax asset arises when an entity's income
for tax purposes is temporarily higher than its income for book
purposes. Taxable income may be temporarily higher than book
income, resulting in a DTA, because either (a) expenses have
been recorded on the books but have not been deducted on the tax
return or (b) income has been reported on the tax return but has
not yet been recorded on the books. Tr. 408 (Berliner).

A deferred tax liability ("DTL") is the opposite of a
DTA and arises when an entity's income for tax purposes is
temporarily lower than its income for book purposes. This
occurs when either (a) expenses have been deducted for tax
purposes but have not yet been recorded on the books or (b)
income has been reported on the books but has not yet been
reported on the tax return. A DTL is a liability because it

15

reflects the amount of future taxes to be paid. Tr. 408
(Berliner).

These differences, which result from a divergence in
timing of when income and expenses are recorded for book
purposes and tax purposes, are called "temporary differences."
Temporary differences also are called "timing differences." Tr.
103 (B. Montgomery), 404 (Berliner), 849-50, 853 (Ruddell).
These differences are temporary because while, during the course
of the securitization, there is a difference between when the
taxpayer can record the income and/or expense, eventually the
amount of each item of income and expense will "turn," i.e. be
the same for both tax purposes and book purposes. Tr. 404, 407
(Berliner), 1143 (Audette), 1724 (Mangieri).

The differences between how the items giving rise to a
securitization Gain on Sale are treated on an entity's financial
statements and how they are treated on an entity's tax returns
are monitored in a "deferred tax account." Tr. 1726, 1733-37
(Mangieri).

The value of a DTA (or DTL) in a securitization is
determined by calculating the difference between the Gain on
Sale-related income and expenses recorded on an entity's books

16

and those recognized on the entity's tax returns (the temporary differences) and then multiplying the differences by the entity's effective tax rate. Tr. 411 (Berliner), 1081 (Ferino), 1733-34 (Mangieri).

In contrast, a "permanent difference" results when there is different treatment of income and expenses for book and tax purposes, but this difference will always exist. Permanent differences are items that typically are not deductible for tax purposes but are deductible for book purposes, such as deductions for meals and entertainment. For book purposes, meals and entertainment are fully deductible. However, for tax purposes, the general rule is that only 50% of the value of business-related meals and entertainment are deductible. This difference in treatment is permanent because the taxpayer never will be able to get the full deduction for tax purpose that it got for book purposes. Tr. 407 (Berliner); Pl. Ex. 13 at 190105, 190108.

The differences between DRAFCO's treatment of income and expenses for book and tax purposes for the Securitizations created temporary differences because they reflected differences in the timing of recording the income and expenses. Tr. 407-08 (Berliner).

17

For book purposes, all income and expenses related to the Securitization were recorded on the day the Securitization closed, and no income and expenses were recorded over the life of the Securitization. For tax purposes, no income and expenses were recorded on the day the Securitization closed, and all income and expenses were recorded as realized over the life of the Securitization. Tr. 407-10 (Berliner).

In particular, the amount of Servicing Fees that would be paid over the life of the Securitization was taken into account for book purposes on the day the Securitization closed, and those fees reduced the amount of the Residual Interest and, as a result, the Gain on Sale. At the end of the Securitization the amount of the Servicing Fees DRAFCO recorded for book and tax purposes should be the same. Tr. 407 (Berliner).

At the time of the Securitizations, a DTL was created because the amount of income for book purposes (the amount of the Gain on Sale) was higher than income for tax purposes (taxable income was zero because as discussed above no income was recognized on the day the Securitization closed for tax purposes). Tr. 410 (Berliner).

18

Each month over the life of the Securitization, DRAFCO recorded for tax purposes the income from, and expenses associated with, the Loans, but for book purposes did not record any income or expenses. As income from the Loans arrived, taxable income increased; book income did not change because all income for book purposes was recorded when each Securitization closed. Taxable income ultimately equaled, and then exceeded, book income. When taxable income exceeded book income, it created the DTA. Tr. 411 (Berliner).

According to E*TRADE, the Servicing Fees should have been deducted as incurred over the life of the Securitization for tax purposes, because they were included in the calculation of the Residual Interest for book purposes. Deutsche Bank did not deduct the Servicing Fees on DRAFCO's tax returns, thereby giving rise to the principal dispute in this case. Tr. 440-41, 444-45 (Berliner); Pl. Ex. 35 at 23907.

The pro forma federal tax returns of DRAFCO and the calculations of its DTA (or DTL) were prepared in St. Louis by DFS employee Teresa Hickam ("Hickam") and persons reporting to her. Tr. 1487-89 (Ferino), 1922-23 (H. Montgomery). Hickam was not a securitization expert, and she relied on DFS's auditor, KPMG LLP ("KPMG"), to create a Microsoft Excel template to

19

calculate the value of DRAFCO's DTA (or DTL) (the "Template").
Tr. 1070-72, 1489 (Ferino), 1923 (H. Montgomery); Pl. Ex. 159 at
KPMG 01383.

From the inception of the Securitizations, Hickam was
responsible for inserting dollar amounts from cash flows related
to the Securitizations into the Template to calculate the DTA.
Tr. 1069-72, 1489, 1543 (Ferino); Pl. Ex. 159.

A note contained in the Template stated "Since
interest income and expense is reported gross, it is not
necessary to include servicing fee income. If the net spread is
the starting point for M-1, service fee income will need to be
added back." Pl. Ex. 159 at 1384. Hickam read this as an
instruction to not deduct the Servicing Fee Expenses paid by
DRAFCO in the monthly calculation of the DTA. From 1999 to
2002, Hickam followed the KPMG Template mechanically, including
what she understood to be an instruction not to deduct the
Servicing Fee Expenses. Tr. 1488-89 (Ferino).

The Template monitored all of the temporary
differences related to the Gain on Sale from the Securitizations
and multiplied them by an effective tax rate of 39.55%. That
tax rate had been used since the inception of the DRAFCO

20

Securitizations in 1999 and represented a "blended" tax rate composed of a 35% federal income tax rate and a 7% state income tax rate. Tr. 1070:24-1074:1 (Ferino), 454:7-15 (Berliner).

In November 2002, after the sale of the St. Louis office to GE, Anthony Ferino ("Ferino"), then a director of Deutsche Bank's New York Tax Office, took over responsibility for the monthly calculation of the DTA. Ferino continued to use the Template in the same way that Hickam had used it since 1999, and did not deduct the Servicing Fee Expenses. Tr. 1072-73 (Ferino). As discussed more fully below, the Servicing Fee Expenses should have been deducted. The failure to deduct the Servicing Fee Expenses in calculating the value of the DTA ultimately led to an overvaluation of the DTA by over $11 million on the date of DRAFCO's sale to E*TRADE.

Ferino provided and explained the operation of the Template to Brian Forschino ("Forschino"), Senior Manager at KPMG responsible for the audit of DRAFCO prior to its sale to E*TRADE. Forschino used the same information to audit the DTA that Hickam used to calculate the DTA. Tr. 1076-77, 1080-81 (Ferino).

## C.   The Negotiations Leading to SPA

21

For strategic reasons, Deutsche Bank decided in 2000 to sell its "non-core businesses," including DFS. Tr. 545-46 (Staffeldt).

GE agreed to purchase DFS's commercial financing operations, but declined to purchase its consumer end-user operations consisting of Ganis and Ganis's subsidiaries. Tr. 553-54, 589 (Staffeldt). In the summer of 2002, Deutsche Bank's investment bankers Goldman Sachs & Co. ("Goldman Sachs") and Deutsche Bank Securities Inc. solicited bids for Ganis and its subsidiaries. Tr. 545-46 (Staffeldt).

E*TRADE became aware of this when an executive at Deutsche Bank told Rob Snow ("Snow"), the director of the consumer finance business for E*Trade Group, that Deutsche Bank wanted to sell Ganis, its consumer finance business. Snow Dep. 26-27.

Snow discussed the opportunity to purchase Ganis with Todd Mackay ("Mackay"), who led E*Trade Group's business development group. Mackay and Snow were interested in purchasing Ganis to diversify E*TRADE's balance sheet into non-

mortgage assets, and E*TRADE believed Ganis would be a good
source of non-mortgage assets. Snow Dep. 27, 40.

In early summer of 2002, Ulrich Gaertner ("Gaertner"),
a Director of Deutsche Bank in the Corporate and Investment Bank
Group, and other Deutsche Bank officials met with E*Trade Group
officers at E*Trade Group's headquarters in Arlington, Virginia.
During the meeting, Deutsche Bank presented a general overview
of Ganis's business to E*TRADE. Tr. 634-35 (Gaertner); Snow
Dep. 28.

In August 2002, Deutsche Bank set up preliminary due
diligence sessions for those entities interested in bidding on
Ganis and its subsidiaries at Ganis's Costa Mesa, California
headquarters. The Costa Mesa due diligence data room contained
copies of "many, many binders, [and] thousands of pieces of
paper" on Ganis's business, including legal, audit, tax,
accounting, operations, technology, and human resources. Tr.
187 (B. Montgomery); Haisch Dep. 37; Pl. Ex. 233.

Snow directed Belinda Montgomery, the head of
E*TRADE's corporate tax department and an employee of E*Trade
Group, to conduct the preliminary due diligence on Ganis's tax
financials. E*TRADE also conducted due diligence on Ganis's

23

corporate structure, operational businesses, contracts and
agreements. Tr. 60 (B. Montgomery); Simpson Dep. 8:24-9:18;
Snow Dep. 30:16-18, 21-31:3.

E*TRADE sought to determine if there were "very large
deal breakers or red flags of why [they] should not" purchase
Ganis. Tr. 72 (B. Montgomery). Deutsche Bank gave E*TRADE two
days to look at the Ganis documents in the data room and
according to Belinda Montgomery, did not allow E*TRADE to copy
or remove any documents from the data room. Tr. 72, 75-76, 78-
79, 169 (B. Montgomery); Snow Dep. 31-32. This review was done
with the understanding that E*TRADE would ultimately have an
independent audit opinion certifying the accuracy of the balance
sheets of Ganis and DRAFCO. Tr. 169 (B. Montgomery).

Although there was a "red flag" with respect to Ganis,
E*TRADE did not identify any "red flags or deal breakers" with
regard to DRAFCO. Tr. 77-78 (B. Montgomery).

On August 27, 2002, Goldman Sachs sent a letter dated
August 26, 2002, to E*Trade Group that set forth the guidelines
for submitting a bid proposal for the acquisition of Ganis and
its subsidiaries. Deutsche Bank attached to the letter a
Reference Balance Sheet and draft SPA, which had been drafted by

24

its outside counsel, Shearman & Sterling LLP ("Shearman & Sterling"). Tr. 586 (Staffeldt), 630 (Gaertner), 999-1000 (Mackay), 1602 (Rooney); Pl. Ex. 1; June 13 Opinion at *4.

The attached Reference Balance Sheet listed the value of Ganis and its subsidiaries (including DRAFCO) as of July 31, 2002. The Reference Balance Sheet listed the value of "Other Assets" in Ganis and its subsidiaries as $30,005,000. These "Other Assets" included the DRAFCO DTA. Pl. Ex. 1.

The Deutsche Bank draft of the SPA provided only for unaudited closing balance sheets of DRAFCO and Ganis because audited closing balance sheets would have been a significant expense to Deutsche Bank. Tr. 645-46 (Gaertner), 1602-03 (Rooney).

E*Trade Group, as the parent company, negotiated the transaction on behalf of E*Trade Bank. Tr. 998-99, 1006 (Mackay). E*TRADE's negotiating team included Mackay, Snow and Kris Simpson ("Simpson"), all of whom were employed by E*Trade Group. Tr. 549 (Staffeldt), 631 (Gaertner), 997 (Mackay), Snow Dep. 14; June 13 Opinion at *3. Simpson was in-house counsel for E*Trade Group and worked with E*TRADE's outside deal counsel, Hogan & Hartson LLP ("Hogan & Hartson") to negotiate

25

and draft the SPA. Simpson was a general corporate lawyer with acquisitions experience, but was neither a tax lawyer nor a tax expert. Simpson Dep. 9-10, 26.

E*Trade Bank received financial advice from Salomon Smith Barney. Snow Dep. 66; Pl. Ex. 2 at ET H_H 07937. The parties negotiated at arm's length.

E*TRADE decided that E*Trade Bank, instead of E*Trade Group, should be the E*TRADE entity that ultimately purchased Ganis because (1) E*Trade Bank had access to a cheaper source of funding than E*Trade Group and (2) Ganis would originate loans that E*Trade Bank would ultimately hold. Tr. 1006 (Mackay).

For Deutsche Bank, Gaertner and Till Staffeldt ("Staffeldt"), a member of Deutsche Bank's Corporate Development Department, were jointly in charge of negotiating and executing the sale. Gaertner focused on the economic terms of the negotiations and deal, while Staffeldt focused on the legal side of the transaction. Gaertner and Staffeldt had full discretion to make decisions about the transaction. Tr. 546 (Staffeldt), 626-27, 640-41 (Gaertner); June 13 Opinion at *3.

Peter Rooney ("Rooney"), a partner at Shearman &
Sterling, represented Deutsche Bank in the transaction and
assisted Deutsche Bank in the structuring, negotiation, and
closing of the deal. Rooney was an experienced deal lawyer who
specialized in complex corporate transactions. Tr. 548-49
(Staffeldt), 639-640 (Gaertner), 1582, 1628-29 (Rooney); June 13
Opinion at *3.

E*TRADE typically insisted on audited closing balance
sheets when it purchased a business. Consistent with this
practice, E*TRADE requested that Deutsche Bank provide E*TRADE
with independently audited closing balance sheets for DRAFCO and
Ganis as a condition of closing. Tr. 587 (Staffeldt), 636-37
(Gaertner), 1000-01 (Mackay).

On September 12, 2002, in response to the Deutsche
Bank August 26, 2002 letter, Mackay, on behalf of E*Trade Group,
submitted a bid proposal to purchase Ganis and its subsidiaries.
E*TRADE modified the draft SPA to require "Deutsche Bank to
deliver an updated balance sheet for [Ganis and its
subsidiaries] at closing and an audited balance sheet post
closing." Tr. 585-87 (Staffeldt), 635 (Gaertner), 1000
(Mackay); Pl. Ex. 2 at 7935.

27

In addition to E*TRADE, several other companies bid on
Ganis and its subsidiaries, including MBNA and Bank of America.
Tr. 547 (Staffeldt).  Deutsche Bank eventually accepted
E*TRADE's bid in the Fall of 2002 because E*TRADE offered the
highest price.  Tr. 630 (Gaertner).

In the early Fall of 2002, after Deutsche Bank had
accepted E*TRADE's bid, the parties began negotiating the SPA
for Ganis and its subsidiaries, including DRAFCO.  During the
parties' negotiations over the SPA, the parties did not have any
discussions about DRAFCO's deferred tax assets.  Tr. 641
(Gaertner).

Both E*TRADE and Deutsche Bank wanted to finalize the
sale of Ganis and its subsidiaries by the end of the year 2002,
but E*TRADE was concerned that because Deutsche Bank's credit
rating was higher than E*TRADE's rating, the sale might cause
the credit rating agencies to downgrade the credit rating of the
Notes.  Tr. 1583:14-1584:1 (Rooney); Simpson Dep. 12:22-14:10,
19:23-20:22; Snow Dep. 57:12-60:1; June 13 Opinion at *2.

To allay E*TRADE's concerns, the parties agreed that
they needed assurance from the three major credit rating
agencies (Moody's, Standard & Poor's and Fitch) that the

28

agencies would not downgrade the Notes. The parties determined, however, that it was unlikely that they would get these assurances before the close of 2002. Tr. 550:1-7, 565:5-15 (Staffeldt); Snow Dep. 58:18-59:12; June 13 Opinion at *2.

To close most of the sale by the end of 2002 and still obtain the required assurances from the credit rating agencies, the parties split the sale into two stages. In the first stage, Deutsche Bank would transfer Ganis's stock to E*TRADE after certain conditions in the SPA unrelated to the Securitizations were met. Tr. 1584:1-10 (Rooney); Snow Dep. 56:7-57:1; Pl. Ex. 4 at 3723; Pl. Ex. 5 § 2.04. In the second stage, if certain additional conditions were met, E*TRADE would acquire DRAFCO's stock after the Ganis closing date. One condition was that the parties obtain "Rating Agency Approval," which meant that the three major credit rating agencies would have to confirm that they would not reduce, withdraw, or qualify the credit ratings assigned to the Notes. E*TRADE would not close on the DRAFCO purchase unless and until the credit rating agencies issued their no-downgrade letters. Tr. 1583:20-1584:10 (Rooney); Pl. Ex. 4 at 3723; Pl. Ex. 5 § 2.07; June 13 Opinion at *2. In the event that the DRAFCO Rating Agency Approval was not obtained before the Ganis closing, E*TRADE would pay Deutsche Bank a $10.5 million deposit. Deutsche Bank would refund E*TRADE this

29

$10.5 million deposit if the Rating Agency Approval was obtained
within twelve months of the Ganis closing.  Tr. 550:8-13
(Staffeldt), 1051:8-10 (Mackay); Pl. Ex. 5 §§ 2.02(a), 2.07.


Before the sale to E*TRADE, the balance sheets of
DRAFCO and Ganis had been consolidated.  Because the parties had
decided to split the sale into two separate sales, one for
DRAFCO and one for Ganis, Deutsche Bank had to create separate
balance sheets for DRAFCO and Ganis, Tr. 642:25-644:6
(Gaertner), 587:10-21 (Staffeldt); Pl. Ex. 18 at 10666, and, as
noted above, Deutsche Bank agreed to provide separate
independently audited closing balance sheets, prepared in
accordance with U.S. GAAP, for DRAFCO and Ganis.  Tr. 1003:4-7,
12-17 (Mackay), 587:10-21 (Staffeldt); Pl. Ex. 5 §§ 2.07, 2.07.


## D.    **The SPA**


The parties signed the SPA on November 25, 2002.  Pl.
Ex. 5.  Arlen Gelbard, the president of E*Trade Bank, signed the
SPA on behalf of E*Trade Bank, and Staffeldt and Gaertner signed
on behalf of Deutsche Bank.  Pl. Ex. 5 at SS 002740.  The SPA
governed both the impending sale of Ganis and the subsequent
sale of DRAFCO.  Pl. Ex. 5; Tr. 1584 (Rooney).

Article II of the SPA related to the purchase and sale
of Ganis and DRAFCO.  Pursuant to § 2.02, the purchase price for
the shares of Ganis and DRAFCO was to be the "Tangible
Stockholders' Equity" of those companies (i.e. the total assets
and total liabilities of the companies), plus a premium based on
the value of Ganis's recreational and marine vehicle
receivables.  Pl. Ex. 5 §§ 1.01, 2.02; Tr. 395-96 (Berliner),
635 (Gaertner), 999, 1004 (Mackay).

Tangible Stockholders' Equity was to be determined,
for the purposes of E*Trade Bank's initial closing payment, by
the total stockholder equity listed on the Ganis Reference
Balance Sheet (adjusted for certain technical matters) less the
value of its goodwill and the items listed in the "DRAFCO"
column of the Reference Balance Sheet.  Pl. Ex. 5 §§ 1.01, 2.02.

The purchase price was to be adjusted as specified in
§ 2.06 of the SPA ("Post-Closing Adjustment of Purchase Price").
Section (a) of the post-closing purchase price adjustment
provision stated:

Closing Balance Sheet.  The Seller shall use its
reasonable best efforts to prepare and deliver to
the Purchaser, within 45 calendar days following
the Closing Date but in no event more than 60
calendar days following the Closing Date, an
audited balance sheet of Ganis and the
Subsidiaries . . . in the form of the [Reference

31

Balance Sheet], together with the report thereon
of the Seller's Accountants. The Closing Balance
Sheet shall be prepared on the basis of the
accounting principles set forth on Exhibit
2.06(a) (the "Accounting Principles") and in any
event in accordance with U.S. GAAP and the terms
of this Agreement . . . . The Purchaser shall
provide the Seller and the Seller's Accountants
reasonable access to the books and records and
personnel of the Business during the period of
the preparation of the Closing Balance Sheet and
during the resolution of any disputes that may
arise under this Section 2.06.

Pl. Ex. 5 § 2.06(a).


Section (b) of the post-closing purchase price

adjustment provision stated:

Disputes. (i) Subject to clause (ii) of this
Section 2.06(b), the Closing Balance Sheet
delivered by the Seller to the Purchaser shall be
deemed to be and shall be final, binding and
conclusive on the parties hereto.

(ii) The Purchaser may dispute any amounts
reflected on the Closing Balance Sheet to the
extent the net effect of such disputed amounts in
the aggregate would affect the Tangible
Stockholders' Equity reflected on the Closing
Balance Sheet; provided, however, that the
Purchaser shall have notified the Seller and the
Seller's Accountants in writing of each disputed
item, specifying the estimated amount thereof in
dispute and setting forth, in reasonable detail,
the basis for such dispute, within 30 days of the
Seller's delivery of the Closing Balance Sheet to
the Purchaser. In the event of such a dispute,
the Seller's Accountants and the Purchaser's
Accountants shall attempt to reconcile their
differences, and any resolution by them as to any
disputed amounts shall be final, binding and
conclusive on the parties hereto. If the
Seller's Accountants and the Purchaser's

Accountants are unable to reach a resolution with
such effect within 20 days after the receipt by
the Seller and the Seller's Accountants of the
Purchaser's written notice of dispute, the
Seller's Accountants and the Purchaser's
Accountants shall submit the items remaining in
dispute for resolution to PricewaterhouseCoopers,
LLP (or, if such firm shall decline or is unable
to act or is not, at the time of such submission,
independent of the Seller and the Purchaser, to
another independent accounting firm of
international reputation mutually acceptable to
the Seller and the Purchaser) (either
PricewaterhouseCoopers, LLP, or such other
accounting firm being referred to herein as the
"Independent Accounting Firm"), which shall,
within 30 days after such submission, determine
and report to the Seller and the Purchaser upon
such remaining disputed items, and such report
shall be final, binding and conclusive on the
Seller and the Purchaser. The fees and
disbursement of the Independent Accounting Firm
shall be allocated between the Seller and the
Purchaser in the same proportion that the
aggregate amount of such remaining disputed items
so submitted to the Independent Accounting Firm
that is unsuccessfully disputed by each such
party (as finally determined by the Independent
Accounting Firm) bears to the total amount of
such remaining disputed items so submitted.

Pl. Ex. 5 § 2.06(b).


Section (c) of the post-closing purchase price

adjustment provision stated:

Purchase Price Adjustment. The Closing Balance
Sheet shall be deemed final for the purposes of
this Section 2.06 upon the earliest of (x) the
failure of the Purchaser to notify the Seller of
a dispute within 30 days of the Seller's delivery
of the Closing Balance Sheet to the Purchaser,
(y) the resolution of all disputes, pursuant to
Section 2.06(b)(ii), by the Seller's Accountants

33

and the Purchaser's Accountants and (z) the
resolution of all disputes, pursuant to Section
2.06(b)(ii), by the Independent Accounting Firm.
Within three Business Days of the Closing Balance
Sheet being deemed final, a Purchase Price
adjustment shall be made as follows:

(i) In the event that the Tangible Stockholders'
Equity reflected on the Reference Balance Sheet
exceeds the Tangible Stockholders' Equity
reflected on the Closing Balance Sheet, then the
Purchase Price shall be adjusted downward in an
amount equal to such excess and the Seller shall
pay the amount of such excess to the Purchaser by
wire transfer in immediately available funds to
the bank account(s) as instructed by the
Purchaser in a written notice to the Seller.

(ii) In the event that the Tangible Stockholders'
Equity reflected on the Closing Balance Sheet
exceeds the Tangible Stockholders' Equity
reflected on the Reference Balance Sheet, then
the Purchase Price shall be adjusted upward in an
amount equal to such excess and the Purchaser
shall pay the amount of such excess to the Seller
by wire transfer in immediately available funds.

Pl. Ex. 5 § 2.06(c).

Section (d) of the post-closing purchase price

adjustment provision stated:

Interest. Any payments required to be made by
the Seller or the Purchaser pursuant to Section
2.06(c) shall bear interest from the Closing Date
through the date of payment at the LIBOR Rate,
calculated on a daily basis.

Pl. Ex. 5 § 2.06(d).

34

Deutsche Bank has contended that § 2.06 is a release
of all possible claims related to the purchase price, the
Closing Balance Sheet or tangible stockholders' equity that are
not raised within the 30-day time period and explicit dispute
resolution procedure set forth in the section. Tr. 620-21
(Staffeldt), 1593-94 (Rooney). Rooney testified that such
provisions rendering closing balance sheets final, binding and
conclusive are typical in stock purchase agreements. Tr. 1589
(Rooney).

Section 2.07 of the SPA, dealing with DRAFCO, stated:

Post-Closing Purchase of DRAFCO Stock. (a) In
the event that the Rating Agency Approval is not
obtained prior to the Closing, but is obtained
within twelve months following the Closing, then
the party receiving such approval shall notify
the other party immediately, and on the fifth
Business Day after the Rating Agency Approval has
been obtained, (i) the Seller shall cause Ganis
Finance Holding Corp. to transfer all common
stock of DRAFCO to the Purchaser and the
Purchaser shall pay to the Seller the line item
"Total Stockholder's Equity" in the column
entitled "DRAFCO" as reflected on the Closing
Balance Sheet, or, if the Closing Balance Sheet
has not yet been prepared, on the Reference
Balance Sheet but in any event subject to the
adjustment pursuant to Section 2.06 . . . .

Pl. Ex. 5 § 2.07.

Article III of the SPA set forth the representations
and warranties made by Deutsche Bank.

35

In § 3.06 of the SPA, Deutsche Bank represented that the Reference Balance Sheet "present[ed] fairly in all material respects the financial condition and results of operations of the Business" and was "in accordance with U.S. GAAP." Pl. Ex. 5 § 3.06; Tr. 1008-09 (Mackay), 1132-33 (Audette).

In § 3.14 of the SPA, Deutsche Bank represented and warranted that it had filed all required tax returns for Ganis and DRAFCO in a timely manner, and that these returns were "true, correct and complete in all material respects." Pl. Ex. 5 § 3.14.

§ 3.25 of the SPA states that Deutsche Bank shall not be understood to have made any representations or warranties other than those listed in Article III:

> None of the Seller, DFS, Ganis or any Subsidiary
> . . . has or have made, or shall be deemed to
> have made, and none of the Seller, DFS, Ganis or
> any Subsidiary is liable for or bound in any
> manner by, any express or implied representations
> or warranties pertaining to DFS, Ganis or any of
> the Subsidiaries or any of their assets or
> businesses except as specifically set forth in
> this Agreement.
>
> Pl. Ex. 5 § 3.25.

Article V dealt with additional agreements.

36

In § 5.01, Deutsche Bank agreed to conduct the

business of Ganis and DRAFCO in the normal course prior to their

sale to E*Trade Bank. Pl. Ex. 5 § 5.01.

§ 5.02(a) stated that Deutsche Bank would provide

E*TRADE Bank access to certain information:

> From the date hereof until the Closing, upon
> reasonable notice, [Deutsche Bank] shall cause
> Ganis and the Subsidiaries . . . to: (i) afford
> the officers, employees and authorized agents . .
> . of [E*TRADE Bank] reasonable access, upon
> reasonable notice and during normal business
> hours, to the offices, properties, plants, other
> facilities, books and records of Ganis and each
> Subsidiary relating primarily to the Business . .
> . and (ii) furnish [E*TRADE Bank] such additional
> financial and operating data and other
> information regarding the assets . . . as
> [E*TRADE Bank] may from time to time reasonably
> request.

Pl. Ex. 5 § 5.02(a).

§ 5.02(c) required Deutsche Bank to retain and make

available to E*TRADE the books and records and operating data of

DRAFCO until at least December 23, 2009:

> In order to facilitate the resolution of any
> claims made by or against or incurred by the
> Purchaser, Ganis or any Subsidiary after the
> Closing or for any other reasonable purpose, for
> a period of seven years following the Closing,
> the Seller shall (i) retain its books and records
> relating to the Business and to periods prior to
> the Closing and that shall not otherwise have

been delivered to the Purchaser, Ganis or any Subsidiary and (ii) upon reasonable notice, afford the officers, employees and authorized agents and representatives of the Purchaser, Ganis or any Subsidiary reasonable access (including the right to make photocopies, at the expense of the Purchaser, Ganis or such Subsidiary), during normal business hours, to such books and records and cause those officers, employees and authorized agents, accountants, counsel and representatives of the Seller who have any knowledge relating to Ganis or any Subsidiary to cooperate with the Purchaser in respect of any claims made by or against the Purchaser.

Pl. Ex. 5 § 5.02(c).

Article VII dealt with tax matters. The parties

agreed that "Article VII shall be the sole provision governing

indemnities for Taxes" under the SPA. Pl. Ex. 5 § 7.08(c).

Notwithstanding anything to the contrary in Section 5.02 hereto, each party shall retain all Tax Returns, work papers and all material records or other documents relating to Tax matters of Ganis or the Subsidiaries for the taxable period that includes the Closing Date and for all prior taxable periods until the later of (i) the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extensions except to the extent notified by the other party in writing of such extensions for the respective Tax periods or (ii) eight years following the date (without extension) for such Tax Returns.

Pl. Ex. 5 § 7.05.

Article VII of the SPA also stated that if DRAFCO received a tax refund related to pre-sale activities, Deutsche Bank would be entitled to receive that refund, but if DRAFCO become subject to a tax liability for such pre-sale activities, Deutsche Bank would be responsible for that liability. Pl. Ex. 5 §§ 7.01, 7.02 ("Any Tax refund, credit or similar benefit . . . relating to taxable periods or portions thereof ending on or before the Closing Date . . . if received by the Purchaser, Ganis or the Subsidiaries shall be paid over promptly to the Seller."); Tr. 1891-92 (Mangieri).

Article VII of the SPA also stated that "[t]he Seller and the Purchaser shall provide each other with such cooperation and information as either of them reasonably may request of the other in filing any Tax Return[.]" Pl. Ex. 5 § 7.05.

The SPA Article IX granted the parties certain indemnification rights. § 9.02 stated:

> SECTION 9.02(a) Indemnification. (a) From and after the Closing, the Purchaser and its Affiliates, officers, directors, employees, agents, successors and assigns (each a "Purchaser Indemnitee") shall be indemnified and held harmless by the Seller from and against all liabilities, costs or expenses (including, without limitation, reasonable attorneys' fees), judgments, fines, losses, claims, damages and amounts paid in settlement actually suffered or incurred by them (collectively, "Losses") arising

39

from or in connection with (i) the breach of any representation or warranty made by the Seller contained in this Agreement, (ii) the breach of any covenant or agreement by the Seller contained in this Agreement or (iii) any and all Excluded Assets or Excluded Liabilities. No claims by a Purchaser Indemnitee shall be asserted, and the Seller shall not be liable for any claim for indemnification, pursuant to Section 9.02(a)(i) or Section 9.03(d) unless and until the aggregate amount of Losses that would otherwise be payable pursuant to Section 9.02(a)(i) and Section 9.03(d) exceeds $3.75 million (the "Threshold Amount"), in which case the Seller shall be liable for the full amount of such Losses. . . . The maximum aggregate liability under Section 9.02(a)(i) . . . and Section 9.03(d) shall not exceed $57.5 million. . . .

. . .

(b) From and after the Closing, the Seller and its Affiliates, officers, directors, employees, agents, successors and assigns (each a "Seller Indemnitee") shall be indemnified and held harmless by the Purchaser from and against all Losses arising from or in connection with (i) the breach of any representation or warranty made by the Purchaser contained in this Agreement or (ii) the breach of any covenant or agreement by the Purchaser contained in this Agreement. No claims by a Seller Indemnitee shall be asserted, and the Purchaser shall not be liable for any claim for indemnification, pursuant to Section 9.02(b)(i) unless and until the aggregate amount of Losses that would otherwise be payable pursuant to Section 9.02(b)(i) exceeds the Threshold Amount (as set forth in Section 9.02(a)), in which case the Purchaser shall be liable for the full amount of such Losses. . . . The maximum aggregate liability under Section 9.02(b)(i) shall not exceed $57.5 million. . . .

§ 9.05 stated:

40

SECTION 9.05:   Third Party Claims.   (a) Upon
receipt by the party seeking to be indemnified
pursuant to Section 9.02 (the "Indemnitee") of
notice of any action, suit, proceedings, audit,
claim, demand or assessment (each, a "Claim")
against it which might give rise to a claim for
Losses, the Indemnitee shall give prompt written
notice thereof (which shall be within ten days of
receipt by the Indemnitee of such Claim) to the
party from which it seeks to be indemnified (the
"Indemnitor") indicating the nature of such Claim
and the basis therefore. . . .

Article IX also stated: "Under no circumstances shall

any party be liable to the other parties for consequential,

incidental or punitive damages." Pl. Ex. 5 § 9.01; Tr. 1598

(Rooney).

Article IX provided that, except for certain

representations and warranties not relevant to the instant case,

the representations and warranties set forth in the SPA survive

for only eighteen months after the "Closing Date," which the

parties agreed was to be December 23, 2002. Pl. Ex. 5 §§ 1.01,

9.01.

## E.   The Ganis Closing

By December 23, 2002, an updated November 30, 2002

reference balance sheet for Ganis and its subsidiaries (the

41

"Reference Balance Sheet") was provided to E*Trade Bank. Pl. Ex. 10 at SS 003913. The Reference Balance Sheet listed "other assets" of $6,302,000 related to DRAFCO. Id. Matthew Audette ("Audette"), E*Trade Bank's former controller and current Chief Financial Officer believed that number primarily represented a deferred tax asset. Tr. 1009 (Mackay), 1135-36 (Audette).

The parties closed the Ganis portion of the transaction on December 23, 2002. Def. Ex. 51. E*Trade Bank paid Deutsche Bank approximately $44.5 million based on the figures included in the Reference Balance Sheet. Pl. Ex. 112; Tr. 1010 (Mackay). Also on December 23, 2002, E*Trade Bank made a $10.5 million installment payment for DRAFCO. Pl. Ex. 112; Tr. 550 (Staffeldt).

According to the SPA, E*Trade Bank also would have paid Deutsche Bank for DRAFCO based on the Reference Balance Sheet and "trued up" the price later based on the audited closing balance sheet. Mackay testified that he would have relied on the Reference Balance Sheet in making this initial payment for DRAFCO. Tr. 1008 (Mackay). However, E*Trade Bank insisted that it make a final payment for DRAFCO based on the Closing Balance Sheet. Tr. 1587 (Rooney). Thus, the Reference Balance Sheet was only used for the Ganis portion of the

42

transaction and not for the initial payment of the DRAFCO

portion of the transaction.  Tr. 1009-10, 1050-51 (Mackay).

E*Trade Bank assumed control of all of Ganis's

functions on December 23, 2002, including its tax functions.

Tr. 81 (B. Montgomery).  From that point forward, E*Trade Bank

prepared the servicer certificates documenting the servicing

activities Ganis performed for DRAFCO.  Haisch Dep. 82; Pechulis

Dep. 35-37.

E*Trade Bank, through Ganis, also continued to perform

accounting services for DRAFCO, including tracking the inputs

for the deferred tax account.  Def. Ex. 67; Haisch Dep. 81-82.

The monthly servicer certificates prepared by Ganis

contained, among other income and expense items related to the

DRAFCO securitizations, detailed information concerning DRAFCO's

servicing expenses.  Pl. Ex. 13, at ET-DB 190179; Tr. 234-35,

248-51 (B. Montgomery), 478-79 (Berliner).  Steven Robertson

("Robertson"), Senior Tax Manager for E*Trade, explained that

"[t]he service certificate has all the information that we

report for tax purposes, like the amount of interest income, the

amount of interest expense, the amount of bad debts, the amount

of expenses."  Robertson Dep. 18, 94.

43

The SPA required that Deutsche Bank make its best
effort to provide E*Trade Bank an audited balance sheet showing
Ganis's assets and liabilities within 45 days of the December
23, 2002 closing, but in no event more than 60 days after the
closing.  Pl. Ex. 5 § 2.06(a); Tr. 1052-53 (Mackay).  E*Trade
Bank, which owned Ganis and therefore possessed information
necessary to prepare the Ganis closing balance sheet, was
contractually obligated to assist Deutsche Bank in preparing
that document.  Pl. Ex. 5 §§ 2.06(a), 5.02(b); Tr. 1033
(Mackay).

KPMG was hired by Deutsche Bank to audit the draft
closing balance sheet prepared by Ganis.  Tr. 550 (Staffeldt),
1927 (H. Montgomery).  A draft of the audited Ganis closing
balance sheet was sent to Deutsche Bank on February 19, 2003.
Tr. 653-54, 656-59, 661 (Gaertner); Pl. Ex. 18, at DB 010661.
The draft was not ready to be sent to E*TRADE Bank, although the
SPA called for it to be delivered February 21, 2003.  Tr. 653-
54, 656-59, 661 (Gaertner); Pl. Ex. 18, at DB 010662.

On February 20, 2003, Gaertner notified Harry
Montgomery, Deutsche Bank's Head of U.S. Tax, and others at
Deutsche Bank that he was going to "delay the completion of the

44

audit though tomorrow is the deadline according to the contract with ET" because the Ganis closing balance sheet, and thus the Ganis purchase price, was $4 million less than he anticipated for reasons he did not know. Pl. Ex. 18 at 10661; June 13 Opinion at *4.

When Harry Montgomery reported that he and KPMG were discussing adjustments to Ganis's value that would "reduce equity" (and thus reduce E*TRADE's purchase price), Gaertner replied by email:

> H., [w]hat is actually the issue? And why would we take an action that is disadvantageous to us?

Pl. Ex. 19.

E*TRADE sought an audited closing balance sheet for Ganis to true-up its own books to account for changes in price between the Reference Balance Sheet and the audited final closing balance sheet for Ganis. Tr. 1011:12-19 (Mackay). Mackay tried on three occasions to telephone Gaertner and Staffeldt about the late balance sheet, but they failed to return his calls. Tr. 1012:13-1013:25, 1015:8-16 (Mackay).

On March 11, 2003, Mackay followed up his unreturned phone calls with an e-mail to Staffeldt and Gaertner:

45

I am deeply concerned by the fact that you have
not delivered the audited closing balance sheet
as agreed upon in our purchase agreement.
Additionally, I am concerned that you are not
returning my phone calls.    Please call me
immediately.

Pl. Ex. 20; June 13 Opinion at *4.

On March 11, 2003, Staffeldt replied to Mackay's e-

mail:

As per our information from KPMG the audited
balance sheet may most likely be available on
Friday close of business New York.  However, as
you certainly know, we only can make pressure on
KPMG but not order them to get things done.
Please be assured that we keep breathing down
KPMG's neck.

Pl. Ex. 21

On March 16, 2003, Deutsche Bank provided E*TRADE with

the Ganis audited closing balance sheet.  KPMG used the time

before it finally delivered the Ganis audit to revise its audit

conclusions about Ganis.  Tr. 656:13-22 (Gaertner); Pl. Exs. 22;

June 13 Opinion at *4.

Audette informed Len Purkis ("Purkis"), the then-chief

financial officer of E*TRADE Group, that, "[a]s part of the

Ganis SPA, we have 30 days to dispute any items on the closing

46

balance sheet . . . . The dispute must be supported by our outside accountants." Def. Ex. 61.

E*Trade Bank hired the Dispute Resolution Group of Ernst & Young, LLP ("E&Y") to assist it in identifying and analyzing issues E*Trade Bank might want to dispute on the Ganis audited closing balance sheet before it became final, binding and conclusive. Def. Ex. 62; Tr. 1200, 1224-25, 1229-30 (Audette).

The E&Y engagement letter (the "Engagement Letter") stated that the firm would "review the facts in this matter and consult with [E*Trade Bank] in areas where you require our assistance" and would employ procedures such as "reviewing books and records, reviewing workpapers prepared by KPMG Peat Marwick in conjunction with its audit of Ganis Credit Corporation, gathering and analyzing available documents relevant to certain accounting issues in the balance sheet of Ganis Credit Corporation, interviewing personnel and performing financial and other analyses." Def. Ex. 62, at EY-EM-MOMA 000009; Tr. 1225-26 (Audette), 1351 (O'Mara).

The Engagement Letter also provided:

47

If necessary, we will be in a position to provide a written report of our procedures and findings. We agree to supply expert testimony at deposition, trial or other hearings if requested. If counsel desires our report, opinion or testimony on a matter, we will need to perform those procedures that we consider necessary to express a professional conclusion.

Def. Ex. 62.


The Engagement Letter stated that E&Y would not perform attestation services such as "the compilation, review, or audit of financial records or financial statements." Id., at EY-EM-MOMA 0000010. An attestation "review" is an auditor's analysis of a client's interim financial statements and verified statement that no GAAP violations came to the auditor's attention. Tr. 1347-50, 1365 (O'Mara).


On April 15, 2003, E&Y sent Simpson a seven-page single-spaced letter (plus multiple pages of attachments) identifying eight alleged errors on the Ganis closing balance sheet and proposing detailed alternative valuations. Def. Ex. 65A. The letter stated that it was based on analysis of Ganis business and accounting records and KPMG work papers, several of which were identified by ledger or work paper number. See e.g., id., at ET-DB 033416, 033417 n.2.

48

Among the items the E&Y letter analyzed in depth were
servicing assets that had been transferred from DRAFCO to Ganis
in November 2002. Id., at ET-DB 033418-19. E&Y explained its
findings:

> The [Ganis] Closing Balance Sheet included $6.443
> million of servicing rights. E&Y's Structured
> Finance Advisory Services ("SFAS") group
> performed an analysis of the servicing assets
> associated with the four Trusts underlying the
> servicing rights reflected on the [Ganis] Closing
> Balance Sheet. The SFAS report is attached as
> Appendix XX.
>
> We read the Prospectus Supplement for each of the
> Trust[s], reviewed the cashflow models employed
> by Ganis for each Trust, considered information
> from comparable transactions, and reviewed actual
> performance of the Trusts. We also examined the
> cashflow distribution schedules described in the
> prospectuses and compared them to Ganis' cashflow
> models.

Def. Ex. 65A at ET-DB 033418-19.

Mackay changed the introduction and signature
portions of the E&Y letter, together with a few topic
sentences, and submitted it to Deutsche Bank on April 15,
2003, as E*Trade Bank's formal objection to the Ganis
closing balance sheet pursuant to "Section 2.06(b)(ii)" of
the SPA. Pl. Ex. 24; Simpson Dep. 40.

E*Trade Bank's § 2.06(b)(ii) disputation letter
was sent to Deutsche Bank 30 days after E*Trade Bank's

receipt of the Ganis closing balance sheet, as required by §
2.06 of the SPA. Pl. Ex. 24.

## F.   The Negotiations Leading to the DRAFCO Closing

Soon after E*TRADE closed on the Ganis purchase, in
accordance with the SPA, Belinda Montgomery, the E*TRADE Tax
Director, sought to obtain copies of tax returns and supporting
work papers for Ganis and DRAFCO from Deutsche Bank.  Tr. 81:18-
82:10 (B. Montgomery).  Belinda Montgomery advised members of
E*TRADE management on October 11, 2002 that "there is much state
tax planning for Ganis and its subsidiaries to minimize the
state taxes once E*TRADE Bank acquires the stock."  Def. Ex. 33;
Tr. 170-71 (B. Montgomery).

Belinda Montgomery was a tax generalist and did not
possess any securitization expertise.  DRAFCO was her first
experience with securitizations at either E*TRADE or any of her
earlier jobs.  Tr. 57:7-15 & 20-23, 61:9-14, 62:20-63:4, 63:9-11
(B. Montgomery); June 13 Opinion at *3.

Throughout 2002 and 2003, E*TRADE Bank's tax
department was understaffed.  Belinda Montgomery repeatedly
asked for additional staff (Def. Ex. 58) and reminded others

50

that she "c[ould] not be in two places at one time." Def. Ex.
216 at ET-DB 034574.

In 2003, Belinda Montgomery hired Robertson as Senior
Tax Manager because the E*TRADE tax department was
"understaffed." Robertson Dep. 18. Robertson was "buried" at
E*TRADE in the summer and fall of 2003 preparing and reviewing
tax returns, some due September 15, some due October 15, some
due November 15, and some due December 15. Robertson Dep.
20:22-25; 21: 25-22:7; 40; 90:14-21.

On January 14, 2003, Belinda Montgomery traveled to
the St. Louis facility to copy tax returns and supporting tax
work papers for Ganis and DRAFCO. Deutsche Bank no longer owned
the St. Louis facility as of January 2003, and Hickam had become
a GE employee. Tr. 1951:14-25, 1952:6-14, 1953:2-6 (H.
Montgomery); Tr. 82:11-17 (B. Montgomery); Tr. 1072:17-23
(Ferino).

In advance of this trip, Belinda Montgomery e-mailed
Harry Montgomery and asked him for authorization to copy
DRAFCO's tax material. Harry Montgomery tried to forward this
e-mail to Hickam, with a copy to Belinda Montgomery, as his
"authorization to provide E*TRADE with the tax information

51

relating to DRAFCO." Hickam never received this e-mail because Harry Montgomery sent it to two invalid e-mail addresses. Tr. 83:14-21, 189:9-19 (B. Montgomery); Pl. Exs. 15, 16; June 13 Opinion at *4.

While in St. Louis, Belinda Montgomery expected to copy all of the tax documents for Ganis and all of "the DRAFCO tax returns and all supporting tax work papers." According to Belinda Montgomery, however, Hickam prohibited her from accessing the file cabinets housing the DRAFCO documents and from copying or reviewing the DRAFCO tax files, stating that Deutsche Bank was limiting E*TRADE's access to Ganis because E*TRADE was buying only Ganis at that time. Tr. 85:24-86:20, 87:2-4 & 10-18, 189:20-25, 190:14-17, 193:9-13 (B. Montgomery).

Belinda Montgomery was allowed to copy materials contained in the files of Ganis and two another Ganis subsidiaries, Keyboard Acceptance Corp. and Signature Leasing. According to Belinda Montgomery, these files contained only a small amount of "scattered DRAFCO documents made part of the Ganis tax work papers." Tr. 86:6-20, 87:2-4 & 10-22, 189:20-25, 193:9-13 (B. Montgomery). Harry Montgomery was informed by Hickam that Belinda Montgomery had copied the DRAFCO tax returns and work papers. Tr. 1925 (H. Montgomery).

52

Deutsche Bank then asked Hickam to transfer the DRAFCO tax materials, including the DRAFCO tax work papers and back-up documents supporting the DTA, from St. Louis to Deutsche Bank's New York office. Instead of being sent to Deutsche Bank in New York, however, the tax documents were delivered to GE. Tr. 114:8-11, 114:16-115:11, 115:18-22, 117:8-10 (B. Montgomery), 1955:22-1956:10, 1956:15-22; 1994:15-21 (H. Montgomery), 914:25-915:3 (Ruddell).

By April 2003, KPMG was in the process of auditing DRAFCO's Residual, which Deutsche Bank had valued at around $72-73 million. There were three assets listed on the Reference Balance Sheet: (1) a $49.4 million "residual interest"; (2) $23.8 million in cash; and (3) a $6.3 million deferred tax asset. When Deutsche Bank and KPMG referred to the $73 million "Residual," they were referring to both the "residual interest" and the cash. Tr. 426:10-25, 428:9-14 (Berliner), 1131:19-1132:11 (Audette); Pl. Ex. 6 at 1798.

KPMG's Asset Backed Securities Group in San Francisco, which was auditing the Residual, determined that Deutsche Bank's valuation of the Residuals was too high and refused to sign off on the value of the Residual. Because the Residual was an

53

estimate of future cash flows associated with the Loans, its valuation was based on numerous assumptions about the Loans' future performance. However, the actual losses on the Loans were higher than anticipated due to a greater than expected number of borrowers defaulting on the Loans. Tr. 638:21-23, 650:2-18, 664:25-665:7 (Gaertner); Pl. Ex. 25; June 13 Opinion at *5.

KPMG told Deutsche Bank that "a lot of work has to be done" for KPMG to examine Deutsche Bank's assumptions and complete the audit of the Residual. Haisch Dep. 63:14-64:4; Snow Dep. 43:22-44:9; Pl. Ex. 25; June 13 Opinion at *4. Any changes to these assumptions would cause the value of the Residual to change. June 13 Opinion at *4.

KPMG proposed a valuation of the residual that was substantially less than Deutsche Bank's $73 million valuation. Gaertner and Staffeldt then requested that Judith Klahn ("Klahn"), a member of Deutsche Bank's Global Securitization Group, help them "convince KPMG" that it should accept Deutsche Bank's valuation of the residual rather than the significantly smaller valuation proposed by KPMG. Tr. 592:8-593:6 (Staffeldt); Pl. Ex. 26 at 17684.

54

By mid-June 2003, Deutsche Bank had revised the value

of the residual downward to about $49.9 million. Klahn,

however, had not convinced the structuring people in KPMG's

Asset Backed Securities Group to sign-off on Deutsche Bank's

revised valuation of the residual. On June 16, 2003, Gaertner

e-mailed Jeffrey Bierman ("Bierman") and Andrew Davidson

("Davidson"), KPMG partners supervising the DRAFCO audit, with a

copy to Staffeldt:

> As time is elapsing we have the feeling that all
> kinds of arguments re the issue of the DRAFCO
> valuation have been exchanged and the prospects
> of success of more expert discussions are
> exhausted. Hence, the four of us should come to
> an agreement on the valuation variables. It goes
> without saying that we continue to aim at numbers
> which you can just about defend from an auditing
> perspective. We would therefore appreciate if
> your structuring people could bear in mind (i)
> who is on same side and who is on the other side
> re the Ganis transaction, and (ii) that Deutsche
> Bank will incur a sizable impairment anyway based
> on those parameters already agreed upon. Let's
> crack it, preferably first thing tomorrow morning
> by phone if this is also convenient for you.

Pl. Ex. 28; Pl. Ex. 31 at 23842; June 13 Opinion at *5. About

five hours after getting Gaertner's e-mail, Davidson forwarded

it to Scott Carnahan and Yuval Ron in KPMG's Asset Backed

Securities Group and wrote that Deutsche Bank was "very anxious

to resolve this issue" and wanted to have a call the next day to

discuss the residual valuation. Pl. Ex. 29.

On June 24, 2003, KPMG agreed to certify Deutsche
Bank's revised $49.9 million valuation of the residual. On June
25, 2003, Gaertner thanked KPMG "for putting an end to the
residual valuation." Pl. Ex. 31 at 23845; June 13 Opinion at
*5.

On July 1, 2003, Gaertner asked Klahn to specify the
value of the DRAFCO residual. Klahn responded that the revised
value was $49.9 million. On July 3, 2003, Gaertner replied that
he thought that Klahn had told him "the other day" that the
revised valuation was "in the $51 million range." Klahn told
him that he was mistaken. Gaertner responded:

> Too bad! That's new [sic] for us. Any
> chance to increase the values?

Pl. Ex. 31.

As a matter of accounting, the $23.3 million write-
down of the residual (from $73.2 million listed on the Reference
Balance Sheet to $49.9 million) increased the value of the DTA
by approximately $9 million. This increase stemmed from the
temporary difference resulting from the way a write-down is
recorded for book and tax purposes. Accounting rules allowed
DRAFCO to take the $23 million book deduction immediately, while
tax rules did not allow DRAFCO to immediately take the

deduction. Tr. 428:15-429:12 (Berliner), 1141:11-17, 1143:14-22
(Audette).

The amount that the write-down of the residual
increased the DTA was a mathematical process, and there were no
management assumptions or negotiations involved in calculating
the adjustment. The DTA was increased by the amount of the
temporary book/tax difference ($23.3 million) multiplied by the
tax rate (Deutsche Bank used 39.55%). The result of this
calculation was an increase to the DTA of approximately $9
million. Audette 1142:19-21, 1144:8-11, 1327:24-1328:5.

This approximately $9 million increase in the DTA was
added to the approximately $6.3 million DTA listed on the
Reference Balance Sheet, which resulted in a $15.345 million DTA
that was ultimately listed on the DRAFCO Audited Closing Balance
Sheet. Tr. 1139:5-8 (Audette); Pl. Ex. 6 at 1798; Pl. Ex. 35 at
23905.

Deutsche Bank prepared the DRAFCO Closing Balance
Sheet and the attached "Notes to the Balance Sheet." KPMG then
audited the Closing Balance Sheet and the attached notes to the
Balance Sheet to ensure their accuracy and compliance with the

accounting rules.  Pl. Ex. 35 at 23904, 23906; June 13 Opinion
at *3.

In addition to auditing the DRAFCO Closing Balance
Sheet, KPMG partners Beirman and Frank Lavadera ("Lavadera"),
and Forschino separately opined in a July 15, 2003 tax opinion
that the $15.345 million DTA was "fairly presented, in all
material respects."  Pl. Ex. 169 at KPMG 01842.

On July 18, 2003 Deutsche Bank delivered to E*TRADE
the DRAFCO Audited Closing Balance Sheet.  Tr. 680:22-25
(Gaertner); Snow Dep. 210:10-16; Pl. Ex. 35 at 23902; June 13
Opinion at *5.

The Audited Closing Balance Sheet represented that
DRAFCO had three assets totaling approximately $65.2 million:
(1) a $25 million Residual; (2) $24.9 million in cash; and
$15.345 million DTA.  Pl. Ex. 35 at 23905.

Also, on July 18, 2003, Deutsche Bank provided E*TRADE
with two of the three required Rating Agency Approvals (from
Fitch and Standard & Poor's).  The parties did not receive a
written "no downgrade" confirmation from Moody's until much
later.  Pl. Ex. 35 at 23913-15; Tr. 565:10-15 (Staffeldt).

58

The Audited Closing Balance Sheet included KPMG's
Independent Auditors' Report ("Audit Opinion").  The accounting
rules require the auditor to certify and attest to the value of
the assets on the balance sheet.  Tr. 1139:17-25, 1140:6-13,
1166:20-24, 1168:8-11 (Audette), 1349:8-20 (O'Mara); Pl. Ex. 35
at 23904; June 13 Opinion at *5.  Among other things, the Audit
Opinion certified that: (a) KPMG "conducted [its] audit in
accordance with auditing standards generally accepted in the
United States of America" ("U.S. GAAS"); and (b) the Audited
Closing Balance Sheet "presents fairly, in all material
respects, the financial position of [DRAFCO] as of December 23,
2002, in conformity with" U.S. GAAP.  Pl. Ex. 35 at 23904; June
13 Opinion at *5.

The same U.S. GAAS and U.S. GAAP standards also
applied to the Notes to the Balance Sheet.  Note 5 to the
Audited Closing Balance Sheet addressed income taxes and
certified that the value of the DTA was $15.3 million.  Tr.
100:4-14 (B. Montgomery); 443:8-13 (Berliner); Pl. Ex. 35 at
23910.

The Audit Opinion provided for in the SPA was an
"independent" Audit Opinion governed by the auditor independence

rules which were and are "extremely" important to KPMG. Tr.
88:18-89:3 (B. Montgomery), 804:19-805:1 (Ruddell), 554:17-21
(Staffeldt).

E*TRADE relied on the audit by KPMG of the Closing
Balance Sheet. "An audited balance sheet, we would place a
hundred percent reliance on that." Tr. 1001:11-12 (Mackay).

Audette was an accounting generalist with no
experience dealing with securitizations. Tr. 1117:13-22,
1122:4-8, 1123:2-14 (Audette); June 13 Opinion at *6. He
advised E*TRADE's senior management on accounting issues
concerning the Audited Closing Balance Sheet, and in doing so
reviewed the Audit Opinion before the DRAFCO closing. He relied
on the Audit Opinion because it was independent and represented
the highest level of scrutiny that could be given to the Closing
Balance Sheet. Tr. 1139:17-25, 1140:4-13 (Audette). He
recommended to his superiors that E*TRADE should purchase
DRAFCO. Tr. 1138:1-5 (Audette).

Similarly, Belinda Montgomery relied on KPMG's Audit
Opinion and believed the $15.3 million DTA was accurate. She
recommended to her superiors that E*TRADE should purchase the

60

DTA.  Tr. 91:9-12, 98:20-99:5, 108:23-25, 127:1-4 (B.
Montgomery).

Mackay also relied on the accuracy of the numbers
presented in the Audited Closing Balance Sheet as he proceeded
in the purchase of DRAFCO.  Tr. 1018:15-21 (Mackay).

Deutsche Bank relied on the Audit Opinion as well.
Tr. 554:22-24, 583:3-17 (Staffeldt), 1668:15-17, 1669:25-1670:3
(Rooney).

E*TRADE first learned of the $15.3 million valuation
of the DTA on July 18, 2003, when it received the Audited
Closing Balance Sheet from Deutsche Bank.  Prior to this,
E*TRADE only knew of a $6.3 million DTA represented on the
Reference Balance Sheet.  Tr. 88:7-12 (B. Montgomery), 1138:13-
15, 1139:1-12 (Audette); compare Pl. Ex. 6 at 1798 with Pl. Ex.
35 at 23905; Pl. Ex. 41 at 837.

When E*TRADE received the Audited Closing Balance
Sheet, no one at E*TRADE believed that it did not present fairly
the financial condition of DRAFCO or that it violated U.S. GAAP.
Tr. 127:1-16 (B. Montgomery), 1145:15-19 (Audette).

61

E\*TRADE understood that under accounting rules, the
$23 million write-down of the value of the residual would
increase the value of the DTA by approximately $9 million.
Because Deutsche Bank represented that the Reference Balance
Sheet accurately listed the value of the DTA as $6.3 million,
E\*TRADE understood that the DTA would increase in value to $15.3
million on the Audited Closing Balance Sheet. Tr. 1142:8-21,
1143:18-1144:11 (Audette).

After receiving the DRAFCO Audited Closing Balance
Sheet, E\*TRADE set about assembling documents and questions
about the DTA so that it could discuss the DTA with Deutsche
Bank. Audette asked Matt Pechulis ("Pechulis"), Comptroller of
Ganis, to help answer E\*TRADE's questions about the DRAFCO
Audited Closing Balance Sheet. Tr. 1242:9-13, 1251:16-1252:13
(Audette). E\*TRADE also conducted a series of meetings to
discuss the Audited Closing Balance Sheet and DTA. One of these
meetings occurred on July 21, 2003, three days after E\*TRADE
received the Audited Closing Balance Sheet. In that meeting,
Snow also instructed Don Haisch ("Haisch") the head of finance
for Ganis, and Pechulis to review and explain the nature of the
DTA. Haisch Dep. 87:17-88:11, 91:4-25; Snow Dep. 223:2-13; Def.
Ex. 74 at ET-DB 152564.

62

On August 18, 2003, Gaertner wrote to Snow and Mackay suggested that the parties meet to "hammer out the purchase price adjustment and the purchase of Drafco." Def. Ex. 76 at ET-DB 093283. Gaertner attached a list of nine open issues he believed E*TRADE Bank was contesting on the closing balance sheets of Ganis and DRAFCO. He asked that the parties try to identify the remaining open issues as soon as possible. Def. Ex. 76.

Snow responded on August 19, 2003: "I appreciate your kind offer to meet and resolve any remaining issues. We look forward [to] finalizing this transaction." Def. Ex. 77 at DB 037474. Snow also requested that Deutsche Bank provide back-up information supporting the DTA, stating that "[i]n advance of the meeting it would be helpful if you could provide some additional detail regarding the new items that appeared on the DRAFCO balance sheet. Specifically, I would like to better understand the Deferred Tax Asset, and all of the Liabilities." Id.; Tr. 704:1-8 (Gaertner).

On the same day, August 19, 2003, Snow sent an e-mail to Audette and Dan Beck ("Beck"), E*TRADE's then-controller, requesting comments on the DRAFCO Closing Balance Sheet because

63

"[w]e are getting close to meeting with Deutsche Bank to finalize the transaction[.]" Def. Ex. 79 at ET-DB 081065.

Between August 19, 2003 and August 26, 2003, Gaertner, Snow, Mackay and Staffeldt exchanged emails to plan a meeting at Shearman Sterling on September 3, 2003. Def. Ex. 99A at SS 011414-15.

Gaertner emailed Davidson of KPMG on August 20, 2003, to provide E*TRADE Bank the ancillary information "to better understand the deferred tax asset and all of the liabilities contained in the balance sheet of Drafco . . . asap[.]" Def. Ex. 80A at DB 024025. Davidson responded by attaching a file "break[ing] out" the components of the DTA. Def. Ex. 80B.

On August 21, 2003, Gaertner replied to Snow's August 19, 2003 e-mail by forwarding Snow and Mackay the file Davidson had sent him "which breaks out the deferred tax asset." Tr. 704:9-25 (Gaertner); Tr. 103:3-18 (B. Montgomery); Pl. Ex. 39 at 5877, 5881; Def. Ex. 81; June 13 Opinion at *6.

Deutsche Bank used the Template to create the spreadsheet it sent E*TRADE on August 21, 2003, and similar spreadsheets it later sent E*TRADE, all of which showed the

64

value of the DTA as of December 23, 2002. The August 21, 2003 spreadsheet listed the fourteen temporary differences and the alleged effective tax rate used to calculate the DTA. These fourteen temporary differences were the temporary differences set forth in the Template created by KPMG which Deutsche Bank had used to calculate the DTA every month. 1070:24-1071:7, 1072:12-16, 1092:21-1093:6 (Ferino).

Because Deutsche Bank employees understood the Template instructions as directing them not to deduct Servicing Fee Expense, a temporary difference for "Servicing Fee Expenses" was not contained on the spreadsheets. Tr. 1071:5-7 & 22-25, 1072:8-11, 1092:21-1093:24, 1485:18-20, 1486:6-8, 1488:10-15, 1511:3-9 (Ferino).

On August 21, 2003, several hours after Snow received the spreadsheet from Gaertner, Snow e-mailed it to Belinda Montgomery, Audette, and others at E*TRADE, stating that "[t]here were a number of items which showed up on the [DRAFCO] auditted [sic] balance sheet that we received in July that are troubling. The most notable is a $15MM + deferred tax asset." Def. Ex. 85 at EY-EM 000120. Snow asked Belinda Montgomery to examine the description of the components of the DTA and to work with Audette "to determine if this is something that looks

familiar and is supportable such that it should be purchased."
Id.

As of late August 2003, E*TRADE did not own any
securitizations, and the DRAFCO Securitizations were the first
exposure that E*TRADE had to securitizations. E*TRADE had no
in-house expertise in its tax or accounting departments
regarding securitizations. Tr. 1123:11-24, 1163:5-8 & 18-22
(Audette). Robertson did not understand how the DRAFCO
Securitizations worked because "they were complicated."
Robertson Dep. 20:22-21:5, 21:25-22:7, 90:14-21.

Audette was aware of this lack of expertise in
securitization and thought that E*TRADE should have E&Y advise
with respect to the DTA. E*TRADE routinely used outside experts
to consult on financial topics unfamiliar to E*TRADE staff. Tr.
1122:9-18, 1163:15-1164:6 (Audette), 62:11-19 (B. Montgomery).

On August 22, 2003, Audette e-mailed Belinda
Montgomery and asked if she wanted "E&Y to spearhead the
research" on the DTA. Pl. Ex. 41 at 836. Later that day,
Belinda Montgomery e-mailed Audette and others at E*TRADE and
told them that she did not have the expertise to reach any
conclusions on the DTA and stated that "the validity of the tax

66

treatment, timing differences, and how much of the Deferred Tax Asset is valid in August 2003, should be reviewed by someone at E&Y familiar with securitization tax laws." Tr. 107:5-108:1 (B. Montgomery); Simpson Dep. 69:13-21; Pl. Ex. 41 at 836; June 13 Opinion at *6.

On August 25, 2003, Audette contacted Mark O'Mara (O'Mara), a partner at E&Y, and asked E&Y to assist E*TRADE with looking at the DTA. O'Mara was a licensed CPA and an attorney, but he was not a tax or securitization expert. Tr. 1163:15-1164:1 (Audette), 1342:16-1343:14 (O'Mara); June 13 Opinion at *6. O'Mara had already worked with E*TRADE on the completed Ganis Closing Balance Sheet. Tr. 1345:7-24 (O'Mara).

Audette and O'Mara agreed that the Engagement Letter with respect to the Ganis closing also would govern E&Y's work on the DRAFCO DTA. The Engagement Letter permitted E*TRADE to revise the scope of E&Y's work, and it was not unusual for E&Y's clients to revise the scope of work without executing a new engagement letter. Tr. 1169:17-1170:23 (Audette), 1352:2-18 (O'Mara); Pl. Ex. 23. The terms "audit," "review" and "compilation" used in the Engagement Letter described above are all terms of art in accounting, and they all describe auditor certification of financial statements. Tr. 1166:17-1167:11,

67

1168:7-17 (Audette), 110:8-23 (B. Montgomery), 1348:20-1350:2
(O'Mara); June 13 Opinion at *6.

E*TRADE made two requests with respect to E&Y's
engagement on the DRAFCO DTA. The first request was to explain
the nature of the temporary differences that comprised the DTA
and the reason each temporary difference existed. E&Y was asked
to examine a snapshot of the DTA as of 2002, not to reconstruct
it from the first Securitization to the present. Tr. 1169:1-7,
1200:7-10 (Audette), 108:14-19, 109:18-25 (B. Montgomery),
1357:2-14 (O'Mara); Munro Dep. 46:19-47:14, 82:1-83:8.

The second request was to confirm that the amount of
each temporary difference was the same amount listed in KPMG's
work papers. This task was called "tying" or "agreeing" the
numbers to the work papers. Tr. 1169:1-7, 1200:7-10 (Audette),
108:20-109:6, 109:18-25 (B. Montgomery), 1358:16-1360:9
(O'Mara). E*TRADE asked E&Y to do these tasks despite the KPMG
Audit Opinion because E*TRADE wanted an extra layer of scrutiny
on the numbers in light of the fact that it had never been
involved in a securitization transaction before. Tr. 1163:2-8,
1169:8-16 (Audette).

68

O'Mara contacted Alan Munro ("Munro"), a tax
securitization expert in E&Y's national tax practice, a lawyer
and a CPA, and asked him to assist E*TRADE in understanding the
nature of the temporary differences. Munro began his work on
the DTA on August 26, 2003. Tr. 1199:19-23 (Audette), 108:2-19
(B. Montgomery), 1358:7-1359:1, 1394:9-18 (O'Mara); Munro Dep.
26-36, 54:10-55:2, 61:4-6.

In early September 2003, Munro and O'Mara informed
Belinda Montgomery "that if we wanted to reconstruct a . . . tax
asset that we would need servicer certificates for the entire
term of the securitization." Munro Dep. 121-22, 24; Def. Ex.
137 at ET-DB 033845. On September 11, 2003, Belinda Montgomery
requested that Munro determine whether or not they could "gain
comfort" that the timing difference was materially correct with
the materials already in their possession before attempting to
tie the remaining months of 2002 to their respective servicer
certificates. Def. Ex. 136; Munro Dep. 121-22, 24. The next
day, Belinda Montgomery also asked O'Mara to identify any "items
you still require to sign off on the DTA asset of $15.3M . . .
." Def. Ex. 137 at ET-DB 033845.

On August 27, 2003, Snow sent an e-mail to Gaertner
that asked Deutsche Bank to answer several "Open Questions"

69

about the DTA and other tax issues. This e-mail requested

Deutsche Bank to tell E*TRADE the states where DRAFCO filed tax

returns so that E*TRADE "may verify the 7% effective tax rate

used to compute the DTA." Pl. Ex. 42 at 76869.

In response, Ferino told Belinda Montgomery that

DRAFCO had filed a state tax return because DRAFCO was included

in Deutsche Bank's California Unitary Tax Return. Belinda

Montgomery relied on Ferino's responses and concluded that

DRAFCO had paid California state income tax and that it was

appropriate for Deutsche Bank to use a 7% state tax rate because

"the corporate tax rate in California is 8.84 percent or 10.84

percent for a bank." Tr. 122:5-123:1 (B. Montgomery).

On August 29, 2003, Ferino sent Belinda Montgomery

certain 2003 servicer certificates he had received from Haisch.

Def. Ex. 101; Tr. 1552 (Ferino). Belinda Montgomery replied,

"You are super!" and expressed her interest in obtaining the

November-December 2002 servicer certificates. Def. Ex. 102.

Later that day, Ferino sent Belinda Montgomery the November-

December 2002 servicer certificates, stating, "I don't know if

anyone here has expert knowledge of these trusts but we

certainly can discuss them." Def. Ex. 102 at DB 011295; Tr. 196

(B. Montgomery), 1552-53 (Ferino).

70

On September 2, 2003, Snow sought Gaertner's
permission for E&Y to review KPMG's DRAFCO audit workpapers
related to the residuals. Def. Ex. 111. Gaertner agreed and
suggested that the parties meet in late September to discuss
closing the transaction, rather than early September as
originally had been contemplated, as the later date would
"provide for a reasonable amount of response and review time."
Id., at ET-DB 093416. Gaertner also stated that E*TRADE's
questions should be "answered to your satisfaction to make [the
upcoming meeting] actually the final negotiations." Id.

On September 2, 2003, Belinda Montgomery, Harry
Montgomery, Ferino, O'Mara, and Munro held a conference call to
discuss the DTA. Tr. 1271:20-1272:5 (Audette), 114:8-l15:11 (B.
Montgomery), 1929:21-1930:11 (H. Montgomery), 1361:20-1363:4
(O'Mara); Munro Dep. 209:7-12; June 13 Opinion at *8. Harry
Montgomery and Ferino did not answer any questions about the DTA
and the temporary differences but stated that after the call
Deutsche Bank would provide documentation sufficient to support
the DTA. Tr. 1271:20-1272:5 (Audette), 114:8-115:11 (B.
Montgomery), 1929:21-1930:11 (B. Montgomery), 1361:20-1363:10
O'Mara); Munro Dep. 209:7-12; June 13 Opinion at *8.

71

Harry Montgomery kept handwritten notes of this telephone conference. In his materials was a spreadsheet calculating the DTA at the 35% tax rate, not the 39.55% rate used to calculate the DTA on the Audited Closing Balance Sheet or the spreadsheet Deutsche Bank sent to E*TRADE on August 21, 2003. The value of the DTA listed the spreadsheet in Harry Montgomery's notes was $13.6 million, less than the $15.3 million DTA on the Audited Closing Balance Sheet. The spreadsheet did not mention or reference any adjustments to the Audited Closing Balance Sheet and was not supplied to E*TRADE. Tr. 1960:7-21, 1962:1-18 (H. Montgomery); Pl. Ex. 238 at 9216. It is inferred that this spreadsheet was related to the September conversation.

On September 2, 2003, Belinda Montgomery forwarded the July 2003 servicer certificates she had received from Ferino to E&Y with a note stating, "as discussed on the call today, we would like to see how much of the Deferred Tax Asset is currently left as a negotiation point with Deutsche Bank next week." Def. Ex. 106 at EY-EM 001319.

On September 2, 2003, Belinda Montgomery sent Ferino "a large package" of DRAFCO tax materials she had collected in her January 2003 visit to the former DFS facility in St. Louis.

Def. Ex. 110. The large package contained work papers, tax returns and numerous DRAFCO-related schedules. Tr. 1551 (Ferino). On September 4, 2003, Ferino acknowledged receipt of the material but informed Belinda Montgomery that he had "been unable to adequately analyze all of it." Pl. Ex. 240 at ET-DB 218903.

On September 4, 2003, Belinda Montgomery e-mailed Audette and others at E*TRADE, with a copy to Munro and O'Mara, stating "I would advise that we give zero value to the $15.3M Deferred Tax Asset until Deutsche Bank can substantiate it is valid." Tr. 116:18-117:6 (B. Montgomery); Pl. Ex. 240 at 218903; June 13 Opinion at *7.

Snow sent an e-mail to Staffeldt on September 5, 2003: "I believe that we are waiting for some answers from your tax people and they are being cooperative. The issue that they appear to be facing was that all of the work was done in St. Louis and they do not have the source information. We sent them copies of all the documents that we collected in due diligence and they are reviewing it." Def. Ex. 119 at ET-DB 093424.

On September 9, 2003, Harry Montgomery advised Belinda Montgomery in an e-mail that he was "talking to KPMG to ensure

73

we understand the nature of the item giving rise to the DTA."
He informed her he would try to schedule a call in the next few
days. Belinda Montgomery forwarded the e-mail to Snow and
Audette, and wrote "Nothing new from Deutsche Bank yet." Pl.
Ex. 52; June 13 Opinion at *9.

On September 10, 2003, Snow e-mailed Gaertner:

I am a little concerned that your tax folks have
not been able to get any answers back to us yet.
They are communicating with our team but seem to
be struggling to get the questions answered. Can
you let me know when we can expect to have the
responses to our questions on the Deferred Tax
Asset.

Gaertner forwarded this e-mail to Harry Montgomery, writing that
"the DTA appears to come to the fore again" and that they should
talk after Harry Montgomery spoke to Belinda Montgomery about
the DTA. Pl. Ex. 54 at 15485.

On the morning of September 10, 2003, Ferino and
Forschino at KPMG discussed the tax rate at which the DTA should
be calculated. They concluded that the DTA should be calculated
at 35% federal tax rate, not the 39.55% blended tax rate set
forth in the Audited Closing Balance Sheet. Ferino then e-
mailed Forschino a spreadsheet that he had compiled from the
KPMG Template that calculated the DTA using the 35% tax rate.
Ferino wrote:

74

Brian, I've attached the DRAFCO deferred tax
schedule we discussed this morning.  As expected,
the DTA (calculated at 35%) @ 12/23/02 is $13.6
million.

Pl. Ex. 53; Tr. 1094:4-1095:5 (Ferino); June 13 Opinion at *9.


Applying the 35% rate to $38,800,037 in temporary

differences, this spreadsheet calculated a DTA of $13,508,013,

approximately $1.5 million less than the DTA set forth on the

DRAFCO Audited Closing Balance Sheet.  Compare Pl. Ex. 53 at

11504 with Pl. Ex. 35 at 23905.


On September 11, 2003, Ferino e-mailed Belinda

Montgomery a spreadsheet calculating the DTA using a 39.55%

blended tax rate and valuing the DTA at $15.3 million.  In his

e-mail attaching the spreadsheet, Ferino wrote:

Belinda, Attached is a schedule which details the
build-up of DRAFCO's deferred tax asset through
12/2002.   The effective rate used is  39.55%
(Federal 35%; State & Local 7%).

Pl. Ex. 55.


The spreadsheet Ferino sent to Belinda Montgomery on

September 11, 2003, was identical to the spreadsheet Ferino sent

to Forschino on September 10, 2003, except for the tax rate and

the resulting changed value of the DTA.  Tr. 1096:10-22

(Ferino); compare Pl. Ex. 53 at 11504 with Pl. Ex. 55 at 11485; June 13 Opinion at *9. Belinda Montgomery relied upon the accuracy of the Ferino spreadsheet. Tr. 121:19-21 (B. Montgomery).

On September 11, 2003, Forschino also sent a spreadsheet to O'Mara and Munro, writing that the spreadsheet "should help you trace line items from the DTA summary to the servicer certificates." This document did not contain a line item for the Servicing Fee Expenses or trace these expenses to the servicer certificates. Ferino forwarded this same spreadsheet to Belinda Montgomery. Tr. 1578:1-10 (Ferino); Pl. Ex. 56.

As described above, the servicer certificates are monthly statements that the trustee of the Securitizations issues that describe in detail the cash flow into the Securitizations and cash payments out, including Servicing Fees. The servicer certificates were not in the KPMG work papers. Tr. 981:7-982:5 (Ruddell); Schwartz Dep. 18:3-15.

On September 11, 2003, E&Y examined KPMG's audit work papers (excluding the tax work papers) in KPMG's New York office. E&Y was able to explain the nature of eleven of the

fourteen temporary differences and to tie the amounts for these eleven differences to the work papers. On September 12, 2003, O'Mara explained this to E*TRADE by e-mail and also stated that Munro should be able to address the remaining three temporary differences after his review of KPMG tax accrual work papers. Tr. 1364:23-1365:11 (O'Mara); Pl. Ex. 58; June 13 Opinion at *10.

On September 15, 2003, Munro reviewed certain KPMG tax audit work papers for three hours in KPMG's offices in Washington, D.C. Deutsche Bank provided Munro a stack of three to four folders two to five inches high to examine, but told him that he could not copy any materials he was reviewing. Munro Dep. 132:8-22, 144:5-11, 145:13-19, 146:3-14; June 13 Opinion at *10. After his examination, Munro was able to explain to E*TRADE the nature of the remaining three temporary differences and confirm that these amounts tied to the work papers. However, Munro never verified the underlying basis for the numbers in the work papers. Munro Dep. 74:11-75:5, 75:14-76:2, 90:17-91:4, 140:23-141:10, 149:13-19; Pl. Ex. 59.

After returning from KPMG's offices, on September 15, 2003, Munro e-mailed Belinda Montgomery a detailed explanation of the remaining three temporary differences and stated that he

was able to tie the numbers to the work papers and that "the numbers are reasonable from what I have seen." Munro testified that he meant the papers he reviewed were not inconsistent with what he had been told earlier by Deutsche Bank or KPMG about the DTA. Tr. 1368:23-1370:20 (O'Mara); Munro Dep. 161:20-24, 178:5-10; Pl. Ex. 59; June 13 Opinion at *10. Munro also discussed the results of his examination and explained the nature of the temporary differences with Belinda Montgomery and Robertson. Munro explained in general terms how the Securitizations were treated as a sale for book purposes but as a financing for tax purposes. Munro Dep. 73:15-74:7, 98:14-24.

On September 16, 2003, Belinda Montgomery forwarded to E*TRADE's management an "executive summary" of (a) O'Mara's detailed September 12 e-mail and (b) Munro's detailed September 15 e-mail, both of which were attached to the executive summary. In her summary, Belinda Montgomery wrote that E&Y had explained the nature of all of the temporary differences and tied the numbers to the work papers, and thus the DTA as represented by Deutsche Bank appeared to be "fine." Pl. Ex. 60; June 13 Opinion at *10.

By September 17, 2003, E*TRADE was "comfortable" with the $15.3 million value assigned to the DTA because of the

78

"independent audit by KPMG." E*TRADE also relied upon the "extra layer of scrutiny through E&Y," and the information and "representations from Deutsche Bank" and KPMG about the DTA, including the spreadsheets Deutsche Bank sent to E*TRADE on August 21 and September 11, 2003. Tr. 1001:9-22, 1018:15-21 (Mackay), 132:14-22 (B. Montgomery), 1172:16-22, 1187:9-15, 1246:6-10 (Audette); Pl. Ex. 39 at 5881; Pl. Ex. 35 at 23904; Pl. Ex. 55 at 11485.

On September 17, 2003, Deutsche Bank e-mailed E*TRADE a list of specific open issues for DRAFCO and Ganis (the "List") that the parties were to address at the parties' meeting set for September 23-24, 2003 (the "September Meeting"). As for DRAFCO, the List did not address or mention the value of the DTA, but instead only referenced two other issues: (i) the value of the Residual; and (ii) how the parties should handle certain liabilities. Rooney drafted the List. In the same e-mail, Gaertner urged E*TRADE to follow the schedule for closing the DRAFCO sale set forth in the SPA. Tr. 717:4-718:18, 726:7-727:3 (Gaertner), 1606:17-18, 1607:3-11 (Rooney), 603:7-13 (Staffeldt); Simpson Dep. 95:11-16; Def. Ex. 144; June 13 Opinion at *11.

Before the September Meeting, Rooney and Simpson spoke by telephone about the List. Simpson and Rooney agreed that (a) the scope and purpose of the Meeting "was to resolve outstanding issues that had come to either party's attention so that the transaction could be finalized" and (b) the parties would "discuss the items that were specifically on the list." Simpson Dep. 87:16-23, 112:18-23.

On September 18, 2003, Gaertner emailed Harry Montgomery and Staffeldt, and wrote that "notwithstanding the trouble ET has been causing," the parties had set the September Meeting to take place on September 23 in New York City. Gaertner asked Harry Montgomery if E*TRADE had raised any tax issues concerning DRAFCO and, if E*TRADE had, what its position was. Harry Montgomery replied to that e-mail that "we still are maintaining that the Tax Asset is correct – ET has not given us any suggestion of any adjustment they believe is necessary." Tr. 720:4-721:6 (Gaertner); Pl. Ex. 63.

The decision by E*TRADE to purchase DRAFCO and its assets, including the DTA, was made by Snow, Simpson and Alastair Merrick. Pl. Ex. 60 at 206593. Snow took the lead in making the decision, but because he had no expertise or experience with deferred tax assets, he directed Belinda

Montgomery and Audette to determine if the DTA "is something that looks familiar and is supportable such that we should purchase it." Pl. Ex. 41 at 837; Tr. 1137:12-1138:5, 1244:12-1246:1 (Audette), 101:19-102:10, 108:8-13, 211:8-20 (B. Montgomery); Snow Dep. 227:3-22. Deutsche Bank knew that Snow was taking the lead on making the decision to purchase the DTA because Gaertner and Staffeldt communicated exclusively with Snow about all of the financial issues for closing the DRAFCO sale. E.g., Pl. Exs. 61, 65, 66, 76, 77; Def. Ex. 165.

Snow relied on Belinda Montgomery to advise him on the tax aspects of the DTA, and he relied on Audette and Beck to tell him "whether we should have comfort or not have comfort with the underlying assets on the balance sheet," including the DTA. Snow Dep. 227:3-22, 245:2-13; Tr. 1246:2-10 (Audette), 101:19-102:10 (B. Montgomery). Snow and the management team determined that E*TRADE would purchase the $15.3 million DTA only if Belinda Montgomery and Audette had no concerns about the accounting relating to the items on the DRAFCO Closing Balance Sheet, including the DTA. Tr. 1137:12-1138:5 (Audette); Snow Dep. 227:3-22, 245:2-13; Pl. Ex. 41 at 837.

In mid-September 2003, Belinda Montgomery and Audette advised the management team that E*TRADE move forward with the

81

DRAFCO closing. Tr. 1137:23-1138:5 (Audette), 131:8-132:22 (B. Montgomery); Pl. Ex. 60.

Audette advised E*TRADE's senior management on accounting issues concerning the Audited Closing Balance Sheet and reviewed the Audit Opinion before the DRAFCO closing. He relied on the Audit Opinion because it was independent and represented the highest level of scrutiny that could be given to the Closing Balance Sheet. Tr. 1139:17-25, 1140:4-13 (Audette).

Audette recommended to his superiors that E*TRADE should purchase DRAFCO. He would not have made this recommendation if he knew or suspected that the Audited Closing Balance Sheet was inaccurate. Tr. 1140:11-17 (Audette).

Belinda Montgomery relied on KPMG's Audit Opinion and believed the $15.3 million DTA was accurate. She would not have recommended to her superiors that E*TRADE purchase DRAFCO if she knew or suspected that the Audited Balance Sheet was inaccurate. Tr. 91:9-12, 98:20-99:5, 108:23-25 (B. Montgomery).

Based upon these recommendations, Snow and the rest of E*TRADE's management team decided to purchase DRAFCO, including the DTA. Snow Dep. 245:2-13; Pl. Ex. 65.

KPMG believed that when E\*TRADE reviewed the Audit Opinion, E\*TRADE would reasonably conclude that that the Audited Closing Balance Sheet was accurate because it had been audited by experienced auditors at KPMG. Tr. 967:3-17 (Ruddell).

E\*TRADE relied upon the KPMG independent Audit Opinion as being accurate. Tr. 1140:1-13 (Audette), 1002:2-10 & 14-17 (Mackay), 88:21-89:3, 91:9-12, 108:23-25 (B. Montgomery), 583:13-17 (Staffeldt).

## G. **The DRAFCO Closing**

The September Meeting commenced in New York on the morning of September 23, 2003, at the office of Shearman and Sterling. It lasted two days. Staffeldt, Gaertner, Rooney, and one or two Shearman & Sterling associates attended for Deutsche Bank. Snow, Mackay, and Simpson attended for E\*TRADE. Tr. 569:5-15 (Staffeldt); Simpson Dep. 89:4-7 & 13-20; Snow Dep. 265:18-266:10; June 13 Opinion at *11. The meeting was structured such that E\*TRADE and Deutsche Bank would meet together to discuss an open issue on the List and then hold separate internal discussions. Tr. 744:13-745:4 (Gaertner), 569:10-15 (Staffeldt); Snow Dep. 266:11-22.

83

The open items contained on the List were the only
items discussed at the September Meeting. Tr. 1607:12-19
(Rooney); Simpson Dep. 99:23-100:8, 105:24-106:5, 112:18-23.
The parties discussed the two DRAFCO issues on the List:  the
value of the Residual and whether E*TRADE would assume certain
liabilities. Snow Dep. 145:13-17; Pl. Ex. 67 at 93516.

For DRAFCO, the parties spent most of their time
negotiating the value of the Residual. Because the Residual was
an estimate of future cash flows associated with the Loans, its
valuation was based on numerous assumptions about how the Loans
would perform in the future. The parties disagreed on most of
the assumptions, including future losses, prepayment rates, and
interest rates which affected the value of the Residual. Snow
Dep. 101:4-9, 143:17-145:7, 193:5-13. The parties ultimately
reached agreement on all open items on the List, including the
two DRAFCO items. The parties agreed that (a) Deutsche Bank
would write-down the value of the Residual by approximately $7.6
million and (b) E*TRADE would assume certain liabilities. Tr.
732:8-11 (Gaertner); Simpson Dep. 100:6-8; Pl. Ex. 67 at 93516;
June 13 Opinion at *12.

84

Deutsche Bank also agreed to accrue as-yet-unpaid bonuses of $1,670,659 for Ganis and to write off a $101,028 note receivable to Ganis (among other things), reducing the price for Ganis as well. Pl. Ex. 80 at DB 040033; Def. Ex. 156; Tr. 552 (Staffeldt), 731 (Gaertner). Deutsche Bank would not have agreed to those reductions (or to any finalization of the sales price) if it believed E*TRADE Bank could seek a further price reduction after the transfer of DRAFCO's stock. Tr. 780, 783 (Gaertner).

Neither party sought to resolve any disputes through the independent expert designated in the SPA, PricewaterhouseCoopers LLP. Tr. 1044-45, 1048-49 (Mackay). Neither party intended to exclude any balance sheet issue relating to DRAFCO or Ganis from the resolution reached at the September 23-24 final purchase price adjustment meeting. Tr. 569-70 (Staffeldt); Snow Dep. 202-04.

As a result of the negotiated Residual write-down, Haisch provided E*TRADE with revised balance sheets at the conclusion of the September Meeting. Haisch Dep. 109:13-22.

On September 30, 2003, Gaertner e-mailed Snow a schedule reflecting the agreements the parties had reached at

85

the September Meeting, including the parties' resolution of the
two DRAFCO issues contained on the List: (a) Deutsche Bank's
write-down of the Residual and (b) E*TRADE's assumption of
certain DRAFCO liabilities. The only mention of deferred taxes
is a reference to the automatic increase to the Deferred Tax
Asset resulting from the write-down of the Residual. Gaertner
734:11-14; Rooney 1608:9-24, 1610:3-10; Haisch Dep. 111:18-
113:6; Simpson Dep. 85:17-86:23, 101:20-24; Pl. Ex. 67; June 13
Opinion at *12.


Also on September 30, 2003, Rooney sent Simpson a
draft of the letters reflecting the agreements reached at the
September Meeting, including the letter agreement pertaining to
DRAFCO (the "Letter Agreement"). Rooney drafted the Letter
Agreement. Rooney 1610:11-18, 1611:3-7; Pl. Ex. 68; June 13
Opinion at *13.


The Letter Agreement provided:

Reference is made to Stock Purchase Agreement
dated as of November 25, 2002 (the "Stock
Purchase Agreement") between Deutsche Bank AG and
E*Trade Bank. Capitalized terms used herein have
the meaning assigned to such terms in the Stock
Purchase Agreement. Pursuant to Section 2.07 of
the Stock Purchase Agreement, E*Trade is
purchasing the stock of Deutsche Recreational
Asset Funding Corporation ("DRAFCO"). Deutsche
Bank and E*Trade Bank have mutually agreed to
resolve their differences with respect the final

86

Closing Balance Sheet of DRAFCO by agreeing to
make the adjustments set forth on Schedule A
hereof to the Closing Balance Sheet of DRAFCO and
DRAFCO's Tangible Stockholders' Equity, for
purposes of adjusting the Purchase Price. As set
forth on Schedule A, the parties have agreed that
the final Tangible Stockholders' Equity of DRAFCO
is $_____.

Pl. Ex. 68 at 38032.

Schedule A contained only three specific issues: (a)
the write-down of the Residual; (b) E*TRADE's retention of
certain DRAFCO liabilities; and (c) the amount of the automatic
adjustment to deferred taxes resulting from the write-down of
the Residual. Tr. 739:13-21 (Gaertner), 1022:5-9 (Mackay); Pl.
Ex. 68 at 38034; June 13 Opinion at *15.

Simpson received the Letter Agreement on September 30,
2003. Within a day or two, Simpson telephoned Rooney to confirm
his understanding that the Letter Agreement only released the
specific issues contained on Schedule A, which Rooney did.
Simpson testified:

Q.   Did you review the draft letter regarding
     the DRAFCO balance sheet that Peter sent to
     you on September 30, 2003?
A.   I did.
Q.   Did you provide any comments to Peter Rooney
     on the letter?
A.   I did. I called Peter and asked him to
     confirm that this was just a resolution of
     the specific issues that were noted on the
     schedules to the letters.

Q.    What did Peter Rooney say?
A.    He agreed.

Simpson Dep. 106:22-107:9, 107:13-25.


Simpson testified that he told Rooney during this
telephone call that the Letter Agreement "did not constitute a
waiver of any other rights" that E*TRADE may have against
Deutsche Bank, that Rooney never objected and the balance sheet
items were not discussed.  Simpson did not suggest that Deutsche
Bank make any changes to the Letter Agreement because he and
Rooney "agreed upon the meaning.  It's a very specific letter
and has a very specific purpose, as is evident by the schedule
citing these specific items."  Simpson Dep. 110:11-17, 111:6-7 &
18-20; June 13 Opinion at *13.


On October 2, 2003, Davidson forwarded to Forschino,
Gaertner, and Harry Montgomery the adjusted balance sheets for
Ganis and DRAFCO that he had received from Haisch earlier that
day.  Pl. Ex. 69.  The balance sheet contained both the amount
of the DTA ($15.3 million) and the amount of the automatic
adjustment to the DTA that resulted from the write-down of the
Residual ($3.2 million using a 42% tax rate).  Pl. Ex. 69
at 7707; Tr. 1937:4-1938:13 (H. Montgomery).

Harry Montgomery replied to Davidson's e-mail with a copy to Forschino, Bierman and Ferino and questioned whether a 35% tax rate should be used instead of Haisch's proposed 42% rate: "I think the tax benefit to DRAFCO should be at 35% with no State Tax but will ask Tony Ferino and Brian [Forschino] to confirm tomorrow." Pl. Ex. 69 at 5521; Tr. 1937:4-1938:13 (H. Montgomery); June 13 Opinion at *13.

On October 6, 2003, Ferino stated in an e-mail to Harry Montgomery:

Brian & I discussed this point last night and agreed that we should not continue to provide the additional 7% State Tax benefit.

Pl. Ex. 70 at 15350.

On October 6, 2003, internally at Deutsche Bank, Gaertner replied to Harry Montgomery's October 2, 2003, e-mail (with a copy to Staffeldt), and wrote:

Harry: Whatever you can support in respect of a larger Deferred Tax Asset and thus a smaller equity reduction would be welcome.

Pl. Ex. 70 at 15350. Harry Montgomery, however, was not in the office on October 6 because he was on vacation. Pl. Ex. 71 at 11578; June 13 Opinion at *13. At trial Gaertner maintained that he was telling Harry Montgomery "to just get the numbers right." Tr. 664:5-7, 671:2-15, 678:7-21, 688:7-25 (Gaertner).

Gaertner was aware that using a lower tax rate would lead to a smaller DTA. He asked Harry Montgomery's assistant to interrupt Harry Montgomery's vacation so that Gaertner could discuss the issue with him immediately. Tr. 689:21-691:12 (Gaertner); Pl. Ex. 71 at 11578.

On October 7, 2003, Gaertner e-mailed Davidson about the Ganis and DRAFCO Closing Balance Sheets and asked for clarification on the state tax issue: "Andrew: They are fine with us. However, why does the state tax not count for deferred tax purposes?" Later that day, Davidson replied: "Because Ganis never paid state taxes, so it is not applicable." This statement was in error because Ganis had paid state taxes. Tr. 695:8-13, 696:22-697:6 (Gaertner); Pl. Ex. 73 at 11564-65; June 13 Opinion at *13.

On October 8, 2003, Gaertner spoke to Harry Montgomery. Gaertner responded to Davidson's October 7 e-mail about Ganis not paying state taxes, and wrote that "Harry just told us the same thing re: DRAFCO." Harry Montgomery stated that "the tax benefit on Ganis, however, should be at a rate of more than 35%." Pl. Ex. 73 at 11564.

90

Later in the day on October 8, 2003, Davidson asked
Forschino to confirm Deutsche Bank's belief that the DRAFCO DTA
should be calculated without the state tax rate: "Brian - Please
advise on Ulrich's comment below. Should the tax rate be higher
than 35%? If so, what should it be, and why?" Pl. Ex. 73 at
11564.

Two hours later, Ferino e-mailed Gaertner stating:

> There appears to have been some confusion with
> regard to the effective tax rates of DRAFCO &
> Ganis. DRAFCO has never paid state taxes and
> therefore any DTA should be calculated at the 35%
> federal rate. . . . KPMG is aware of this and is
> making the appropriate adjustments to the
> respective balance sheets.

Pl. Ex. 73.

From 1999 to December 23, 2002, DRAFCO did not pay
state taxes. Pl. Ex. 73 at 11564; Tr. 1478:23-25 (Ferino); June
13 Opinion at *13.

On October 9, 2003, Davidson called Haisch at E*TRADE
and told him the automatic adjustment to deferred taxes should
be calculated without the state tax benefit, i.e., at the 35%
federal rate. Haisch conveyed Davidson's proposal to Belinda
Montgomery, Audette, Snow, and Pechulis. Tr. 127-28 (B.

91

Montgomery); Haisch Dep. 118-119; Pechulis Dep. 9; Pl. Exs. 72, 74; June 13 Opinion at *14. The E*TRADE representatives agreed to the 35% rate for the adjustment because, as they recognized, it benefited E*TRADE Bank. Def. Ex. 158 at ET-DB 043161; Haisch Dep. 115.

Deutsche Bank's calculation of the underlying DTA at 39.55%, and its calculation of an adjustment to the DTA at 35%, violated U.S. GAAP. Deutsche Bank's expert stated "it does not make logical sense" for Deutsche Bank to calculate the DTA and the adjustment to that same DTA at different tax rates because "if you are going to make an adjustment you should make it at the rate that it went in." Tr. 1848:14-21 (Mangieri).

On October 13, 2003, Gaertner e-mailed Snow a "special adjustment sheet" that set forth the components of the DTA and calculated its value using the 39.55% tax rate but calculated the automatic adjustment at the 35% federal tax rate. The "special adjustment sheet" displays the same $15.3 million DTA value set forth in the Audited Closing Balance Sheet. Tr. 793:25-794:13 (Gaertner); Pl. Ex. 76; June 13 Opinion at *14.

On October 15 and 16, 2003, Staffeldt e-mailed Snow at E*TRADE asking whether Snow had any questions about the "special

92

adjustment sheet" which Gaertner had e-mailed on October 13,
2003. Pl. Ex. 77.

On October 20, 2003, the parties signed the Letter
Agreement and closed the DRAFCO transaction. Gaertner and
Staffeldt signed on behalf of Deutsche Bank, and Steven
Gutterman ("Gutterman"), the chief operating officer of E*Trade
Bank, signed for E*TRADE. The language in the signed Letter
Agreement is identical to the language in the Letter Agreement
sent to E*TRADE on September 30, 2003, except the version
E*TRADE signed lists the amount of DRAFCO's Tangible
Stockholders' Equity at $59,706,704.93. Simpson Dep. 110:11-17;
Pl. Ex. 83.

The body of the DRAFCO Closing Balance Sheet
Adjustment Letter Agreement states:

Reference is made to the Stock Purchase Agreement
dated as of November 25, 2002 (the "Stock
Purchase Agreement") between Deutsche Bank AG and
E*Trade Bank. Capitalized terms used herein have
the meaning assigned to such terms in the Stock
Purchase Agreement. Pursuant to Section 2.07 of
the Stock Purchase Agreement, E*Trade is
purchasing the stock of Deutsche Recreational
Asset Funding Corporation ("DRAFCO"). Deutsche
Bank and E*TRADE Bank have mutually agreed to
resolve their differences with respect [to] the
final Closing Balance Sheet of DRAFCO by agreeing
to make the adjustments set forth on Schedule A
hereof to the Closing Balance Sheet of DRAFCO and
DRAFCO's Tangible Stockholders' Equity, for

93

purposes of adjusting the Purchase Price. As set
forth on Schedule A, the parties have agreed that
the final Tangible Stockholders' Equity of DRAFCO
including accrued interest (12/24/02 - 10/19/03)
is    $59,706,704.93.     Please    indicate    your
agreement to the forgoing by countersigning this
letter and sending a copy to our counsel Peter
Rooney at Shearman & Sterling LLP (fax 646-848-
7871).

Pl. Ex. 83.


On October 20, 2002, E*TRADE Bank paid Deutsche Bank

$59,706,704.93 and in return received all of the stock of

DRAFCO.   Def. Ex. 170 at SS 000562.


At the same time, Deutsche Bank sent E*TRADE Bank a

partial refund on the original Ganis purchase price due to

adjustments made on the Ganis closing balance sheet.   Def. Ex.

170.   Both companies paid each other interest at LIBOR, as

called for in the SPA.   Pl. Ex. 76; Def. Ex. 161.   LIBOR was

used in the SPA because Deutsche Bank and E*TRADE Bank were both

banks, and "LIBOR is in the interbanking financing system the

reference interest rate which banks use in order to lend money

to each other."   Tr. 573 (Staffeldt).


When E*TRADE signed the Letter Agreement on October

20, 2003, it was unaware of any issue involving the DTA arising

out of the failure to deduct the Servicing Fees or use of an

94

inappropriate tax rate to calculate the DTA. Tr. 1138:1-9;
1178:10-14, 1181:1-17 (Audette), 739:13-17 (Gaertner), 139:3-6
(B. Montgomery); Simpson Dep. 146:21-24, 147:3-10, 155:16-25.

The final sale price of DRAFCO was $59,706,704.
Deutsche Bank had expected that the price of DRAFCO would be $72
million. The reduction in price largely resulted from the
adjustments to the value of the Residual. Tr. 738:16-739:7
(Gaertner); Pl. Exs. 25, 83.

Deutsche Bank's internal profit and loss calculations
stated that Deutsche Bank had lost $19.3 million in selling
DRAFCO caused in large part due to adjustments in the value of
the Residual. The Ganis sale was calculated at a gain of almost
$23 million. Tr. 595:21-597:8 (Staffeldt); Pl. Ex. 112.

## H. The Dispute Following the DRAFCO Closing

In November 2003, as part of E*TRADE's regular year-
end preparation of its financial statements, E*TRADE began
conducting its annual review under FAS 109.

Part of E*TRADE's regular year-end preparation of its
financial statements also included having E*TRADE's auditor,

Deloitte, audit E*TRADE's financial statements, including its
tax provisions, pursuant to SEC rules. Tr. 1208:3-20 (Audette);
Tr. 134:8-19, 135:19-136:2, 147:10-18 (B. Montgomery); Simpson
Dep. 155:16-156:6; Snow Dep. 277:19-278:21; June 13 Opinion at
*14. Deloitte began its "normal year-end review of E*TRADE's
financial statements" in November 2003. Tr. 147:17-18 (B.
Montgomery).

Belinda Montgomery and Robertson worked on the FAS 109
analysis. This analysis required calculating when the DTA would
"turn" and allow E*TRADE to realize the tax benefits of the DTA.
E*TRADE sought to obtain income projections from the consulting
firm Bearing Point to assist with this analysis. Tr. 457:24-
458:19 (Berliner); Meyers Dep. 72:11-17; Pl. Ex. 86.

Robertson experienced initial difficulty determining
how the DTA would turn (i.e., when DTA-related tax deductions
could be taken) and asked Munro of E&Y for advice on the
subject. Def. Ex. 181A. Munro responded that

[t]he theory behind the reversal is that we're
assuming that the book basis has been written
down prior to the tax writedown. If the book
writedown was a good prediction of the future,
then there will be a later tax loss that will
"reverse" the difference by decreasing the
unrecovered tax basis. If the book writedown was
wrong (i.e. the debt unexpectedly recovers),
there will be no tax loss but I would expect that

96

at some point that recovery will be recognized as income for financial statements with no corresponding income for tax, again eliminating the difference.

Id.

Munro told both O'Mara and Belinda Montgomery, "I couldn't predict the timing of when they would turn or whether they would actually turn." Munro Dep. 141-42. He advised Belinda Montgomery, "there was no way I could tell when it would reverse or if it would reverse." Munro Dep. 171-72.

After Deloitte started the audit in late November 2003, Belinda Montgomery telephoned Terry Meyers ("Meyers") on the Deloitte audit team and asked him to verify the $15.3 million value of the DTA so that Deloitte could sign off on E\*TRADE's year-end financial statements. Tr. 135:19-136:10, 136:14-16, 147:17-18 (B. Montgomery); Meyers Dep. 72:11-17, 75:16-76:20, 77:9-23, 204:10-21; June 13 Opinion at \*14.

Meyers was Deloitte's top national expert on securitization tax law and is a nationally "well known and well respected" expert in securitization and structured finance. Meyers' professional specializations include securitizations, derivatives and financial products, mortgage banking and related aspects of those activities. Tr. 1179:25-1180:6 (Audette),

97

135:8-18 (B. Montgomery); Meyers Dep. 16:14-21; Schwartz Dep.
73:21-74:5; Simpson Dep. 175:24-176:21.

Meyers began working as a tax accountant in 1976, and
has been a CPA since 1980. Meyers has a law degree and an MBA
from St. John's University in New York City, is a member of the
New York bar, has taught graduate-level tax and accounting
courses focusing on securitizations and derivatives, and
regularly speaks at tax securitization conferences. Tr. 1180:2-
3 (Audette); 135:14-15 (B. Montgomery); Meyers Dep. 9:22-10:16,
11:25-12:2, 17:12-20, 19:23-20:3. He has focused most of his
professional attention on securitizations and the repackaging of
cash flows resulting from them. In his work on securitizations,
Meyers regularly encounters DTAs because there are numerous
differences in the tax treatment and book accounting inherent to
securitizations. Meyers Dep. 21:18-21, 22:25-23:22.

Meyers was a member of Deloitte's audit team for
E*TRADE since at least 2002. His role on the audit team was to
provide advisory support concerning securitizations,
derivatives, and related financial products. Tr. 1179:20-24
(Audette); Meyers Dep. 44:5-20, 45:7-22; Simpson Dep. 158:8-10,
160:16-161:6, 174:23-175:8; June 13 Opinion at *14.

98

After Belinda Montgomery called Meyers to assist with Deloitte's year-end audit of E*TRADE's tax provision, E*TRADE provided Meyers with all of the materials related to the DTA that E*TRADE had received from Deutsche Bank. Meyers reviewed a substantial number of documents concerning DRAFCO during his audit, including: (1) DRAFCO's tax returns for 1999 to 2002 and Schedule M-1s, which listed DRAFCO's temporary differences; (2) tax work papers for DRAFCO's 1998 to 2002 tax returns; (3) spreadsheet listing the "temporary differences" on which the DTA was based; (4) "servicer certificates" for reporting actual cash flow for the four Securitizations for the months ending November 30, 2002, and December 31, 2002; (5) KPMG's tax and audit work papers for DRAFCO; and (6) schedules produced by Bearing Point showing estimated cash flow for the remaining estimated term of all four Securitizations. Tr. 1180:7-10 (Audette), 136:20-22 (B. Montgomery); Meyers Dep. 63:5-9, 63:16-65:4, 65:23-66:25, 69:14-70:10, 79:24-80:25; Pl. Ex. 89.

Meyers interviewed several individuals at E*TRADE, including Kevin Moore, the Controller at E*TRADE, Belinda Montgomery, Audette, Robertson, Haisch, and Pechulis. Meyers thought each might have relevant knowledge because they either participated in the acquisition or bookkeeping of DRAFCO. Tr. 136:23-137:3 (B. Montgomery); Pl. Ex 110 at 82938.

In his review of the DTA, Meyers came to believe that
the DTA on the Audited Closing Balance Sheet was substantially
overstated and that Deutsche Bank may have failed to deduct from
its 1999-2002 tax returns the approximately $27.5 million in
Servicing Fee Expenses that DRAFCO incurred, resulting in a
reduction in the value of the DTA by approximately $11 million.
Meyers Dep. 71:3-20, 72:25-73:18; June 13 Opinion at *14.  Based
on the documents Meyers had reviewed and the interviews he
conducted, it was not clear to him, however, whether Deutsche
Bank had actually failed to take this deduction.  Tr. 137:25-
138:8 (B. Montgomery); Meyers Dep. 127:17-128:2, 131:15-133:12;
Pl. Ex. 110; June 13 Opinion at *14.

On November 21, 2003, Meyers had a telephone
conference with Belinda Montgomery, Audette and others at
E*TRADE.  During the call, Meyers informed E*TRADE for the first
time that it appeared that Deutsche Bank had failed to deduct
the Servicing Fee Expenses and that if this was true, the DTA
would be significantly overstated.  The E*TRADE employees
reacted with shock and surprise.  Tr. 1180:11-18, 1180:23-
1181:10 (Audette), 137:14-138:8 (B. Montgomery); Robertson Dep.
155:2-6.

Meyers was the first person associated with E\*TRADE to suggest that the DTA might be overstated because of Deutsch Bank's failure to deduct the Servicing Fee Expenses. Tr. 138:17-139:6 (B. Montgomery); Robertson Dep. 124:18-126:7, 127:21-128:1. At the time that Meyers informed E\*TRADE of his belief that the DTA was overstated, Meyers and E\*TRADE did not know with certainty whether Deutsche Bank had deducted the Servicing Fee Expenses. Meyers requested that E\*TRADE contact Deutsche Bank and KPMG for more detailed information about the DTA. Tr. 139:7-14 (B. Montgomery); Meyers Dep. 73:10-18, 127:17-128:2; Pl. Ex. 98.

On November 24, 2003, Belinda Montgomery requested an "urgent" meeting with E&Y for the following day. Def. Ex. 189.

On November 25, 2003, there was a call with E&Y which was "tense." Tr. 1182 (Audette), 1417-18 (O'Mara). Belinda Montgomery "attacked" Munro for not having determined when the DRAFCO DTA would become realizable. Def. Ex. 190. Munro recalled that "Belinda wanted us to say more than what we could say based on the work we had done and was upset that we couldn't" and "wanted us to agree that the deferred tax asset was actually there, that it was 15.3 million or perhaps 18 million." Munro Dep. 181-82.

101

On the same day, Audette noted in an e-mail to Moore that Belinda Montgomery had not expressed any concern with the recoverability of the tax benefits before E\*TRADE Bank acquired DRAFCO and sought a telephone call on the subject. Def. Ex. 191.

In November and December 2003, E\*TRADE sought information about the DTA from Deutsche Bank. Tr. 139:23-140:7, 141:1-4 (B. Montgomery); Meyers Dep. 127:17-128:2; June 13 Opinion at \*15.

On early December, Belinda Montgomery asked Harry Montgomery for additional support for the DTA. Following that request, Harry Montgomery discussed E\*TRADE's request for additional information with Forschino. Forschino sent three Excel spreadsheets concerning the DTA to Ferino and Harry Montgomery so that they "could discuss what level of detail we wanted to give her [B. Montgomery]." Forschino noted that the second spreadsheet attached to the e-mail "was not given to either B. or E&Y." Tr. 141:24-142:1 (B. Montgomery); Pl. Exs. 90, 92.

102

Robertson had prepared a series of schedules projecting the DTA into the future and included an entry on those schedules for servicing expenses. Robertson Dep. 80-82, 220; Def. Ex. 196 at ET-DB 101369-71, line 34, ET-DB 101378-79, line 20. Robertson first identified a potential issue concerning the treatment of the Servicing Fee Expenses in a November 25, 2003 e-mail to Audette stating, "Tax Question for Deutsche Bank – Has [servicing expense] been included in interest expense on the tax return (I don't see any book/tax differences recorded in the past)?" Pl. Ex. 88 at ET/DB 028668.

Robertson sent his DTA projection schedules (including the reference to servicing expenses) to Belinda Montgomery on December 1, 2003, and informed her that he still could not determine exactly when the DTA would turn, stating "perhaps we can provide the schedules to the securitization specialists and discuss the open items with them." Def. Ex. 196 at ET-DB 101361. He testified that he could not get his arms around the DTA because he did not understand the associated GAAP accounting. Robertson Dep. 133-34; Def. Ex. 195A.

Belinda Montgomery sent Robertson's schedules to Deloitte on December 1, 2003, and asked for Deloitte's

103

"assistance and review" of the DRAFCO DTA. Def. Ex. 196 at ET-DB 101361.

> Robertson wrote Ferino on December 1, 2003:
>
> In reviewing some future DRAFCO projections regarding interest income, interest expense, bad debts, etc, I noticed a category called "Servicing". It is our understanding that this is the amount of expense to service the loans. Additionally, it is my understanding that the amount is netted against "residual Income" for financial statement purposes. I do not see a separate expense item on the prior year tax returns. Do you know if the amount was included with another expense on the tax return (i.e. interest expense, etc.)?

Def. Ex. 198A.

In his December 2, 2003 e-mail response, Ferino did not answer this question but addressed only Servicing Fee Income, not Servicing Fee Expenses. He wrote that "Interest Income" was reported gross and included the Servicing Fee Income, so there was no "M-1 for service fee income." Tr. 1506:7-12 (Ferino); Pl. Ex. 91 at 11762; June 13 Opinion at *15.

On December 3, 2003, Robertson responded, "Thanks for the quick response," and further inquired, "If DRAFCO is deemed to own the loans and is including gross interest income and gross interest expense in the tax return, it would make sense to

104

me that they could deduct the expenses of servicing the loans. Am I missing something?" Def. Ex. 198A. Robertson noted that a footnote he had read in the prior year's work papers indicated that DRAFCO did not deduct servicing expenses. Def. Ex. 198A; Tr. 1506-07 (Ferino).

On December 3, 2003, Ferino e-mailed Belinda Montgomery the same one page Spreadsheet he previously sent her on September 11, 2003, which showed the amount of temporary differences, tax rate, and $15.3 million DTA. Belinda Montgomery then e-mailed Ferino and Harry Montgomery, stating that Deutsche Bank previously provided E*TRADE with this one page summary schedule, and asked them to provide E*TRADE with a copy of KPMG's tax work papers. Deutsche Bank subsequently provided E*TRADE with a copy of some of KPMG's tax work papers. Tr. 1511:13-15 (Ferino), 144:9-18, 145:5-8 (B. Montgomery); Pl. Exs. 92, 94; June 13 Opinion at *15.

On December 8, 2003, Robertson e-mailed Ferino that E*TRADE had asked Deutsche Bank three questions about the DTA but that Deutsche Bank had not answered these questions and repeated his three questions to Ferino, including the question of how Deutsche Bank treated the Servicing Fee Expenses for tax purposes. Pl. Ex. 95; June 13 Opinion at *15.

On December 8, 2003, Ferino replied to Robertson but did not answer Robertson's question about Deutsche Bank's treatment of the Servicing Fees. Tr. 1510:3-15 (Ferino); Pl. Ex. 96; June 13 Opinion at *15.

On December 22, 2003, Belinda Montgomery telephoned Harry Montgomery and asked whether Deutsche Bank had deducted the Servicing Fee Expenses on its tax returns. Harry Montgomery said he was unsure and would investigate further. Tr. 141:6-21 (B. Montgomery); Pl. Ex. 107.

During December 2003, Meyers drafted a preliminary memorandum setting forth his initial analysis on the validity of the DTA. On December 30, 2003, for "Discussion Purposes Only," Mary Boelke ("Boelke") (Deloitte's Tax Partner) e-mailed to Belinda Montgomery and Moore the preliminary memorandum on the DTA ("Deloitte Memo"). Meyers had written "the Deloitte Memo as part of our normal year end review of E*TRADE's financial statements" and Boelke wrote to Belinda Montgomery and Moore that E*TRADE should not distribute the Deloitte Memo "outside of E*TRADE as it is a work in progress." This analysis was preliminary because Deloitte needed additional information from Deutsche Bank before it could reach a final conclusion. Tr.

1185:8-15 (Audette), 146:19-150:1 (B. Montgomery); Meyers Dep.
70:23-71:14, 117:11-20; 118:7-13, 203:23-204:9, 250:14-19,
254:6-10 & 13-16, 315:8-15, 316:14-317:9; Pl. Ex. 110; June 13
Opinion at *16.

Meyers drafted the Deloitte Memo, but other members of
Deloitte's E*TRADE audit team, including Boelke, Irv Bisnov
("Bisnov"), the Deloitte Partner responsible for E*TRADE's
engagement, and Jeffry Baxter ("Baxter"), Deloitte's lead tax
partner, reviewed the Deloitte Memo before sending it to
E*TRADE. The purpose of this peer review process was to ensure
that the Deloitte Memo was as accurate as possible. Meyers Dep.
41:23-42:10, 42:22-43:25, 120:4-23, 123:10-17.

The Deloitte Memo stated Deloitte's preliminary belief
that Deutsche Bank's failure to deduct the $27.5 million
Servicing Fee Expense had caused the DTA to be "substantially
overstated." Pl. Ex. 110. While Deutsche Bank had not
confirmed that it had failed to deduct the Servicing Fee
Expense, Meyers believed this to be the case because this
expense was not listed on the schedules to DRAFCO's pro forma
tax returns and because the $27.5 million Servicing Fee Expense
was a temporary difference that should have reduced the amount

107

of temporary differences used to calculate the DTA by \$27.5 million. Id.; Meyers Dep. 131:2-14 & 18-25.

For book purposes, the Securitizations had been characterized as a sale, and DRAFCO deducted all of the Servicing Fee Expenses on the day the Securitizations closed because this expense reduced the value of the Residual – "the traditional practice." Meyers Dep. 225:19-226:9; Pl. Ex. 110 at 82939; Pl. Ex. 239.

For tax purposes, the Securitizations were characterized as a borrowing, and DRAFCO should have deducted the Servicing Fee Expenses for tax purposes as they were incurred over the life of the Securitizations, according to Meyers. Meyers Dep. 132:2-10; Pl. 110 at 82939; Pl. Ex. 239.

In his analysis of the DTA, Meyers analyzed the cash flow projections created by Bearing Point and confirmed that a portion of the Interest Income received by DRAFCO was used to pay the Servicing Fee Expenses. Meyers Dep. 225:19-226:9. Meyers did not subsequently learn of any additional facts that caused him to modify the results of his analysis as set forth in the Deloitte Memo. Meyers Dep. 245:15-25.

108

The preliminary Deloitte Memo caused Audette to
consider whether E*TRADE should change the accounting treatment
of the DTA for the year ended December 31, 2003 - namely,
whether E*TRADE should write down the DTA to goodwill.  Tr.
1186:15-1187:5 (Audette); Pl. Ex. 113.

In early January 2004, Audette and Moore at E*TRADE
consulted with Bisnov at Deloitte about whether to write down
the DTA.  After these consultations, E*TRADE decided not to
change the accounting treatment of the DTA for year-end 2003
because "Deloitte and Terry Meyers had only been looking at the
deferred tax asset for a few weeks; their conclusions were
preliminary."  Moreover, the "best information and best
evidence" E*TRADE had at the time - "the independent audit
opinion of KPMG" and "the representations of Deutsche Bank" -
indicated that the DTA was properly stated.  Tr. 1187:6-1189:1
(Audette); Pl. Ex. 113; June 13 Opinion at *16.

E*TRADE determined that it would revisit the issue of
whether it should change the accounting treatment of the DTA
after Deloitte had "more time to complete their analysis" and
E*TRADE had given Deutsche Bank "an opportunity to substantiate
the value they put on the DTA."  E*TRADE hoped that Deloitte
ultimately would conclude that the DTA was properly stated

because E\*TRADE would have preferred to recover the value of the DTA in the ordinary course of business. Tr. 1189:6-21, 1190:1-6 (Audette); June 13 Opinion at \*16.

On December 31, 2003, E\*TRADE Bank transferred DRAFCO to its parent E\*TRADE Financial and recorded this transaction in its books at the sale price paid to Deutsche Bank. Pl. Ex. 142; June 13 Opinion at \*15.

In early January 2004, Harry Montgomery, Ferino, Belinda Montgomery, and Meyers participated in a telephone conference. Meyers stated that the DTA seemed to be substantially overstated because it appeared that Deutsche Bank had failed to deduct the Servicing Fee Expenses. Tr. 1520:7-10 (Ferino), 150:13-150:22 (B. Montgomery); Pl. Ex. 225 at 5582; June 13 Opinion at \*16. Meyers and Belinda Montgomery asked Deutsche Bank on the call to confirm whether or not it had deducted the Servicing Fee Expenses. Ferino and Harry Montgomery did not do so. Tr. 1487:8-18 (Ferino), 150:13-150:22 (B. Montgomery); June 13 Opinion at \*16.

On January 21, 2004, Belinda Montgomery e-mailed Harry Montgomery, and asked him if Deutsche Bank had been able to confirm if "DRAFCO did, or did not, deduct servicing fees prior

110

to 2003." Harry Montgomery responded by stating that he was "still looking at the issue," but that regardless of the answer "we don't think it will have any effect on the DTA." Pl. Ex. 114 at 5613-14.

On February 3, 2004, Belinda Montgomery again e-mailed Harry Montgomery, and wrote "Any luck with the DRAFCO DTA yet." Harry Montgomery wrote that he was still trying to determine the "exact treatment" of the Servicing Fee Expenses, but that regardless of the treatment it should "not effect the DTA." Pl. Ex. 114 at 5613.

On February 6, 2004, Harry Montgomery e-mailed E*TRADE and stated that while Deutsche Bank failed to deduct the Servicing Fee Expenses, this expense was a "permanent difference" that had no effect on the DTA. 1939:20-1940:4 (H. Montgomery); Pl. Ex. 116; June 13 Opinion at *16. Neither Harry Montgomery nor Ferino had any securitization or deferred tax expertise, and Ferino testified at trial that no-one at KPMG or Deloitte ever agreed with this claim. Tr. 1500:17-22, 1544:1-4, 1553:6-8, 1572:21-22 (Ferino), 1941:2-4, 1976:4-5, 1980:2-8 (H. Montgomery).

111

In a February 9, 2004 e-mail, Meyers noted that Harry
Montgomery's February 6, 2004 e-mail indicated that Deutsche
Bank's calculation of the Residual failed to account for the
fact that Servicing Fee Expenses were deducted all at once for
book purposes at the start of the Securitization.   Meyers Dep.
130:17-133:5; Pl. Ex. 239.

On February 10, 2004, the parties held a conference
call.   Harry Montgomery stated that Deutsche Bank had failed to
deduct the Servicing Fee Expenses for DRAFCO.   He also said that
Deutsche Bank would be amending its tax returns to take a
deduction for the missed Servicing Fee Expenses, which would net
Deutsche Bank an $11 million tax refund.   Harry Montgomery also
stated that the missing service fee deduction would have no
impact on the DRAFCO DTA.   Deutsche Bank ultimately did not
amend its returns to take this deduction.   Tr. 1503:12-19
(Ferino), 151:4-13 (B. Montgomery); Meyers Dep. 278:6-19, 280:8-
20; Pl. Ex. 124 at 28497-98; June 13 Opinion at *16.

Following Harry Montgomery's conversations with
Belinda Montgomery, the Deutsche Bank tax department and KPMG
decided DRAFCO could deduct servicing fees from its 2003 "stub
period" tax return.   Pl. Ex. 151.   Ferino had noticed that
DRAFCO was not deducting servicing fees in or about August 2003,

112

but thought such treatment had been dictated by footnote "a" in the Template. Tr. 1487:8-1488:19, 1494:20-1495:5 (Ferino). Members of the Deutsche Bank tax department and KPMG revisited the issue when E*TRADE brought it up after the DRAFCO closing but determined that it would have been inappropriate to take a servicing fee deduction when DRAFCO and Ganis were part of the same consolidated tax group because there was insufficient evidence that Ganis reported any income related to the inter-company transfers. Tr. 1574:4-7 (Ferino), 1940:13-24 (H. Montgomery). That concern no longer applied after Ganis was sold to E*TRADE Bank. Tr. 1492:5-15, 1574:4-7, 1575:22-25 (Ferino), 1942:7-16 (H. Montgomery).

On March 1, 2004, E*TRADE sent Deutsche Bank a letter stating that Deutsche Bank had breached the SPA. This March 1 letter detailed Meyers's preliminary analysis and stated that the DTA did not comply with U.S. GAAP. Pl. Ex. 121; June 13 Opinion at *17.

Deloitte did not permit E*TRADE to send Deutsche Bank the Deloitte Memo because Deloitte thought that it might compromise its obligation of auditor independence. Under the SEC's Sarbanes-Oxley rules, independent auditors are not permitted to provide litigation assistance in disputes between

clients and third parties, and Deloitte was concerned that it would run afoul of these rules if E*TRADE forwarded the Deloitte Memo to Deutsche Bank. Meyers Dep. 137:4-25, 311:17-312:6; Pl. Ex. 119.

On March 11, 2004, Deutsche Bank responded in detail to E*TRADE's March 1, 2004, letter. Pl. Ex. 126; June 13 Opinion at *17.

By March 23, 2004, Simpson told Rooney that E*TRADE was willing to provide Deutsche Bank with additional support for E*TRADE's belief that the DTA was invalid and that E*TRADE wanted to discuss these issues with Deutsche Bank. Pl. Ex. 127. Harry Montgomery observed to Forschino at KPMG that "Deutsche Bank is trying to avoid a sit down" with E*TRADE on the DTA. Pl. Ex. 127.

On April 19, 2004, E*TRADE again notified Deutsche Bank of Deutsche Bank's breaches of the SPA and other wrongful conduct. Attached to the letter was a one-page, detailed spreadsheet reflecting Meyers's analysis of the impact that Deutsche Bank's failure to deduct the $27.5 million in Servicing Fee Expenses had on the DTA. E*TRADE requested that "each of E*TRADE, Deutsche Bank, KPMG, and Deloitte meet in person at a

114

mutually convenient time in the near future to discuss and resolve the noted discrepancies." Pl. Ex. 128 at 191011; June 13 Opinion at *17.

On April 26, 2004, Staffeldt wrote that Deutsche Bank did not have "sufficient insight into the nature of [E*TRADE's] query" and that Deutsche Bank was unwilling to meet with E*TRADE until E*TRADE provided Deutsche Bank with "detailed back up explanations on the various items referenced in the D&T spreadsheet . . . ." Pl. Ex. 130; June 13 Opinion at *17.

On June 17, 2004, E*TRADE and Deutsche Bank held a conference call, during which time Deutsche Bank reiterated its request for additional information about E*TRADE's belief that the DTA was overstated. Pl. Ex. 138 at 16167; June 13 Opinion at *17.

In response, E*TRADE sent Deutsche Bank a letter on July 1, 2004 describing the composition of the DTA. The letter contained much of the content of the Deloitte Memo including the three appendices attached to that Memo. One of these attachments was Meyers's list of "open items" which was a list of questions he needed answered before he could finalize his

conclusion on the DTA. Meyers Dep. 165:17-25, 167:4-15; Pl. Ex.
138 at 16172.

E*TRADE's July 1 letter also stated that it appeared
Deutsche Bank erroneously deducted $1,644,983 for state income
taxes on its 2002 federal tax return. The letter noted that
E*TRADE had requested support for this tax deduction, i.e. "the
DRAFCO state tax returns filed indicating tax was paid," but
Deutsch Bank never provided it. The letter then stated that the
"DTA E*TRADE acquired would be incorrect as the state taxes were
a DTA that E*TRADE would never receive benefit for." Pl. Ex.
138 at 16168. The July 1 letter mistakenly stated that the 2002
return was prepared "subsequent to the sale of DRAFCO equity to
E*TRADE." Ferino, who prepared the return, confirmed that
Deutsche Bank prepared it before the sale. Tr. 1567:20-1658:1
(Ferino).

In a July 8, 2004 letter to E*TRADE, Deutsche Bank
wrote that it had forwarded E*TRADE's July 1 letter to KPMG to
review and would respond to the issues E*TRADE raised in the
July 1 letter. Pl. Ex. 139 at 372.

116

On July 14, 2004, Staffeldt e-mailed Mackay at E*TRADE and wrote that KPMG and Deutsche Bank's tax department disagreed with Deloitte's analysis regarding the DTA. Pl. Ex. 140.

On July 20, 2004, Shearman & Sterling responded to the July 1 letter. Shearman & Sterling did not address the questions that E*TRADE listed in the July 1 letter but "acknowledged" that the state tax deduction was "not appropriate," reported that Deutsche Bank would file an amended tax return, and asserted that the erroneous deduction had no effect on the value of the DTA. Pl. Ex. 141 at 38582.

On August 18, 2004, Robertson e-mailed Ferino asking for copies of DRAFCO's federal and state tax returns for the stub period of January 1, 2003 – October 19, 2003 when Deutsche Bank owned DRAFCO. Ferino asked his superior, Harry Montgomery, what information to provide to Robertson. Pl. Ex. 143.

Harry Montgomery instructed Ferino to send the federal return but told him he should "not mention" that DRAFCO had not filed any state returns and suggested that Ferino tell Robertson that DRAFCO was included in Deutsche Bank's 2003 California unitary return. According to its California unitary return,

117

DRAFCO did not pay any California state taxes in 2003. Ferino
1483:23-1484:1; Pl. Ex. 143.


Under purchase accounting rules, E*TRADE had until the
close of the third quarter of 2004 (September 30, 2004) to
finalize its accounting of the DRAFCO purchase. Tr. 1202:22-
1203:16 (Audette); Pl. Exs. 144, 156. During September 2004,
E*TRADE consulted with Deloitte to determine how to account for
the DTA given the absence of information to justify the
$15,345,000 pre-close valuation of the DTA. See, e.g. Pl. Ex.
144.


In September 2004, Deloitte refused to issue an
independent audit opinion certifying the value of the DTA
because E*TRADE could not substantiate it. Deloitte would not
approve E*TRADE's financial statements if these statements
included the DTA. Tr. 1207:11-1208:8 (Audette).


E*TRADE needed an independent audit opinion certifying
its financials before it could file its SEC Form 10-Q for the
third quarter of 2004 and its SEC Form 10-K for the entire years
of 2004. Because Deloitte refused to approve E*TRADE's
financial statements if they included the DTA, the SEC and
accounting rules required E*TRADE to write down the DTA and move

118

it to goodwill in order to file its SEC forms. Tr. 1207:19-
1208:20 (Audette), 134:8-19 (B. Montgomery).

E*TRADE ultimately determined that it should write off
the entire DTA with the offset to goodwill because while the
parties "had roughly nine months of calls, exchanges, e-mail
exchanges of information," Deutsche Bank had failed to justify
the $15,345,000 valuation. Tr. 1204:3-18, 1206:14-24 (Audette).
Effective September 30, 2004, E*TRADE wrote off the $15,345,000
DTA, with the offset to goodwill. Tr. 1206:22-1207:3 (Audette);
Pl. Ex. 150 at 203043; June 13 Opinion at *18.

E*TRADE's decision to write off the entire DTA to
goodwill was the proper accounting treatment under the
circumstances. The write-off was consistent with the
requirement that when recording an acquisition, the excess of
purchase price over the fair value of identifiable assets (less
liabilities) be recorded as goodwill. Tr. 1204:3-25 (Audette);
Haisch Dep. 69:8-21.

Had the DTA been properly stated, E*TRADE's future tax
liability would have been reduced by $15,345,000 and its
profitability would have increased by $15,345,000. Tr. 1205:24-
1206:13, 1315:19-1316:3, 1329:18-1330:20 (Audette).

119

By October 2004, Harry Montgomery asked KPMG to re-
examine the DTA and its Independent Audit Opinion verifying the
$15.3 million valuation of the DTA and to review Meyers's
analysis of the DTA, and determine "what was the accurate
amount" of the DTA.  Tr. 808:17-809:12 (Ruddell); Schwartz Dep.
50:16-22, 55:4-56:11.

At the time, Forschino was leaving KPMG and could not
work on the assignment.  Barry Ruddell ("Ruddell") and Carol
Schwartz ("Schwartz"), neither of whom had done any work on
DRAFCO or the Audit Opinion, led KPMG's re-examination of the
DTA.  Tr. 1192:17-22 (Audette), 806:12-23, 807:19-21, 808:17-25
(Ruddell); Schwartz Dep. 47:19-48:7; June 13 Opinion at *17.
Ruddell was a CPA with twenty years of accounting experience.
He had recently become the KPMG U.S. tax and audit partner
assigned to Deutsche Bank because the person that previously
held that position, Brigitte Bomm ("Bomm"), had transferred to a
KPMG office in Germany to work with Deutsche Bank.  Tr. 856:18-
22 (Ruddell).  The re-examination of the DTA was one of the
first major assignments Ruddell performed for Deutsche Bank.
Tr. 807:19-24, 808:17-25 (Ruddell).

120

Schwartz was a senior manager at KPMG's Structured Finance Group, which engages primarily in transaction preparation and tax compliance work for structured finance vehicles. These vehicles include securitizations. Schwartz Dep. 9:5-22. She was not a CPA, nor an accounting expert, and did not examine accounting issues but focused on securitization issues because of her experience in securitization tax. Tr. 813:2-7 (Ruddell); Schwartz Dep. 10:15-16, 13:11-15, 63:9-14.

Ruddell and Schwartz considered Harry Montgomery to be the client representative who guided them on who to speak to, what to look for, and what hypotheses to investigate. Tr. 814:13-815:3 (Ruddell).

In addition to Schwartz and Ruddell, KPMG had others assist with the re-examination of the DTA. One of these people was Rozeta Atlas ("Atlas"), an employee in KPMG's New York office. She assisted Ruddell and Schwartz in their investigation of the DTA, primarily by collecting, reviewing, and analyzing documents such as balance sheets and tax returns. Tr. 820:10-15 (Ruddell); Schwartz Dep. 41:6-12; see, e.g., Pl. Exs. 153, 166.

On October 1, 2004, Belinda Montgomery, Audette,

Simpson, Harry Montgomery, Meyers, Ruddell and Schwartz held a

conference call.  On the call, Meyers and Belinda Montgomery

explained why they believed Deutsche Bank had overstated the

DTA, and Meyers explained the open factual issues that he wanted

Deutsche Bank to address.  Meyers Dep. 168:7-12, 168:15-169:16,

287:22-288:22; Schwartz Dep. 63:6-8, 65:21-66:2, 67:18-68:13.


On October 7, 2004, Meyers had another telephone call

with Schwartz, which also was attended by Atlas and another KPMG

partner.  On the call, Meyers again explained his view that the

omission of the Servicing Fee deduction led to an overstatement

of the DTA.  Schwartz agreed to confirm some information for

Meyers, including "whether the servicing expense was factored

into the DTA" calculation.  Meyers Dep. 169:17-25, 172:19-173:2,

284:10-285:23; Pl. Ex. 148.


In early October 2004, Ruddell and Schwartz started

re-examining the DTA and the Audit Opinion.  This required them

to review Forschino's work in auditing the DTA and understand

the reasons that led KPMG to certify the value of the DTA.

Because Schwartz and Ruddell had previously performed no work

for DRAFCO, they were coming into the matter "cold."  From

October 2004 through December 2004, KPMG spent some "very

122

intense period[s] of activity" on the project. Tr. 806:12-14
(Ruddell), 1192:14-1193:1 (Audette); Meyers Dep. 170:24-171:5,
286:14-24; Schwartz Dep. 52:19-22, 197:23-25, 198:8-24; Pl. Ex.
152.

To reconstruct KPMG's Audit, Ruddell and Schwartz
tried to review KPMG's DRAFCO work papers. U.S. GAAP requires
that work papers be sufficiently specific for an auditor
unfamiliar with the audit to look at the work papers and
reconstruct the audit. Tr. 1192:14-1193:13 (Audette), 970:7-
971:4 (Ruddell).

Ruddell and Schwartz initially could not find the work
papers. They ultimately received them after Davidson, the KPMG
partner on the DRAFCO audit, sent them to Schwartz. The work
papers, however, lacked detail and consisted of only a few
inches of paper. Tr. 153:12-16 (B. Montgomery); Schwartz Dep.
43:10-20, 161:8-19; Pl. Ex. 13. Furthermore, the work papers
"were a mess," and Ruddell and Schwartz were unable to
reconstruct the Audit or explain how KPMG had been able verify
the $15.3 million valuation of the DTA in its Audit Opinion.
Tr. 971:5-972:16 (Ruddell); Haisch Dep. 194:4-6 & 10-18.

Ruddell and Schwartz admitted to E*TRADE that the work
papers "were a mess" and they could not reconstruct the Audit.
Ruddell testified that much of the information he needed to
conduct his analysis was not contained in the work papers.
KPMG's inability to reconstruct the DTA through its own work
papers indicated to E*TRADE either the details used to support
the original DRAFCO Audit Opinion never existed, or were
improperly stated and kept.  Tr. 972:17-25 (Ruddell), 1193:14-23
(Audette).


Over the next few months, Ruddell and Schwartz
obtained and examined the DRAFCO Audited Closing Balance Sheet,
the Audit Opinion, DRAFCO's accounting ledgers and income
statements, servicer certificates, DRAFCO's pro forma tax
returns, DRAFCO's Schedule M-1 (which lists the temporary
differences between DRAFCO's book and tax treatment), and
Ganis's pro forma tax returns.  Tr. 154:5-13 (B. Montgomery),
813:13-814:6 (Ruddell); Schwartz Dep. 52:10-22, 59:10-19, 61:3-
8.


Ruddell and Schwartz knew that E*TRADE and Deloitte
believed Deutsche Bank had overstated the DTA because Deutsche
Bank had not deducted the Servicing Fee Expenses.  They spent a
substantial amount of time investigating whether Deutsche Bank

124

deducted the Servicing Fee Expenses and eventually determined

that Deutsche Bank did not deduct the Servicing Fee Expenses

because (a) they did not see this deduction listed on DRAFCO's

tax returns, (b) never saw any evidence that Deutsche Bank

deducted the expense, and (c) Harry Montgomery and Ferino told

them that Deutsche Bank did not take the deduction. Schwartz

Dep. 88:3-90:22, 91:5-21, 104:12-22, 105:14-16; Pl. Exs. 155,

157.

By October 18, 2004, Schwartz's analysis of the

documents led her to believe that the DTA was overstated as

E*TRADE claimed because Deutsche Bank failed to deduct the

Servicing Fee Expenses. In an e-mail to Ruddell and Atlas, she

wrote:

Based on our discussions last week with Harry
Montgomery and Tony Ferino, it does appear that
the servicing expense was not taken by Drafco.
As a result, income was overstated by the
servicing expense and the deferred tax asset
would be reduced.

Pl. Ex. 155; June 13 Opinion at *17.

Ruddell concluded that an overstatement of income by

Deutsche Bank would be a violation of U.S. GAAP. Tr. 821:21-

822:6 (Ruddell).

125

On October 21, 2004, Schwartz again e-mailed Ruddell

and Atlas and wrote that the documents were "leading me to

believe" that "the DTA in DRAFCO was overstated as E*TRADE

claims:"

> The transaction team in a separate memo, noted
> that two assets should have been booked at GANIS,
> one for the float income and the other for an
> excess servicing asset for the number of basis
> points that the servicing fee exceeded a
> "reasonable" market based fee for servicing
> similar assets. Again, leading me to believe
> that the income was booked in Ganis and the DTA
> in DRAFCO was overstated as E*TRADE claims.

Pl. Ex. 157; June 13 Opinion at *17.

Schwartz and Ruddell then began investigating whether

a second error made by Deutsche Bank would offset the mistake in

the DTA, an effort they referred to as the "wash theory." Pl.

Ex. 154. The theory was that if Ganis understated the Servicing

Fee Income, then, because E*TRADE purchased both entities from

Deutsche Bank, E*TRADE overpaid for DRAFCO but underpaid for

Ganis in an equal amount, leading to a financial "wash." Tr.

825:5-8 (Ruddell); Pl. Exs. 153, 154, 158, 163.

As a result of their exploration of the "wash theory,"

KPMG's subsequent requests for information pertained almost

entirely to Ganis. E*TRADE did not understand why KPMG was not

"focused in on DRAFCO since they issued an Audit Opinion on it

126

and that's what we were asking about." E*TRADE thought KPMG was sidestepping the issue of whether the Deutsche Bank had overstated the DTA. Tr. 153:12-154:18 (B. Montgomery); Pl. Exs. 164, 166.

Ganis and DRAFCO were separately incorporated, maintained separate balance sheets, separate pro forma tax returns, and separate books. KPMG issued separate audit opinions for both Ganis and DRAFCO, and KPMG issued the DRAFCO Audit Opinion on a stand-alone basis. Tr. 1794:19-24 (Mangieri), 825:23-826:7, 829:8-17 (Ruddell); Meyers Dep. 191:15-192:10. Although KPMG treated DRAFCO as part of a consolidated group with Ganis when it re-examined the DTA, DRAFCO was a stand-alone company and, according to Meyers, KPMG should have examined DRAFCO's Audited Closing Balance Sheet on a stand alone basis. Meyers Dep. 191:22-25, 229:10-19.

On November 1, 2004, Schwartz e-mailed Ruddell and Atlas stating, "to determine if the deferred tax asset for DRAFCO is inappropriate, we need to know how Ganis treated it." Pl. Ex. 158.

Schwartz learned from her discussions with Deutsche Bank that "[t]he person who would know all the information that

127

we need is Don Haisch, a former KPMG employee who [now] works for E*TRADE." Pl. Ex. 158. Beginning in 2000, Haisch had been responsible for overseeing the booking of the income at Ganis, and he had directed accounting and financial planning for Ganis. Haisch was a Deutsche Bank employee until the Ganis sale closed in December 2002, at which point he became an E*TRADE employee. Before he started at Ganis, Haisch had been employed at KPMG as an accountant. Haisch Dep. 9:20-10:20, 21:25-22:11, 171:10-12, 14-18.

Another person at Ganis with knowledge of whether or not Ganis booked the Servicing Fee Income was Pechulis. From 1999 to 2000, Pechulis was vice president of finance at Ganis; from 2003 through November 2005 he served as Controller for Ganis. While serving as Controller, Pechulis oversaw the accounting staff that actually booked the Servicing Fee Income. Pechulis Dep. 8:16-9:2, 78:10-11, 13-16. From 1999 to 2002, either Haisch or Pechulis personally oversaw Ganis's booking of Servicing Fee Income for the Securitizations. Haisch Dep. 188:18-190:5; Pl. Ex. 174.

In November 2004, Schwartz spoke to Haisch several times about whether Ganis booked the Servicing Fee Income. Haisch Dep. 149:19-150:4; Schwartz Dep. 121:5-10; Pl. Ex. 165.

128

Haisch told Schwartz on each occasion that Ganis received the Servicing Fee Income and included it as income for book purposes:

In the conference call, Don Haisch basically confirmed that the servicing fee was picked up (for book purposes) as current income by Ganis.

Pl. Ex. 165; Schwartz Dep. 137:6-15.

In e-mails in December 2004, Haisch and Pechulis confirmed that Ganis received the Servicing Fee Income and included it as income for book purposes. Haisch provided extracts of Ganis ledger entries showing Servicing Fee Income being booked at Ganis. Haisch Dep. 149:19-150:25, 151:16-25, 181:20-182:22, 183:5-185:2, 205:25-206:7; Pl. Exs. 170, 171, 174.

Between 1999 and 2002, the Securitizations Trust wired the cash Servicing Fees directly to Ganis. Ganis's accounting staff, led by Pechulis and Haisch, would receive the cash off the wire and record it as Servicing Fee Income on Ganis's books as book income. Haisch Dep. 154:9-15, 175:20-177:4, 191:10-192:3; Pechulis Dep. 8:16-9:2, 78:10-16, 82:12-84:24; Pl. Exs. 103, 174, 176. For example, on December 15, 1999, the Trust (JP Morgan) wired $146,807.61 of Servicing Fees for the 1999-3 Securitization. Pl. Ex. 311, at page 206561. A wire receipt

from Ganis's bank showed that on December 15, 1999, Ganis received a wire for $146,807.61 from the Trust, indicating that there was only one payment of Servicing Fees from the Trusts to Ganis. Pl. Ex. 311, at 206565. There is an absence of any entries for any such payments on DRAFCO's trial balances, indicating that none of the funds passed through DRAFCO. See, e.g., Pl. Exs. 315, 322. Between 1999 and 2002, Ganis also recorded the Servicing Fee Income on its tax returns. The Ganis tax returns did not list the Servicing Fee Income on its Schedule M-1, and therefore the Servicing Fee Income was treated the same for book and tax purposes and was part of the Residual and Gain on Sale calculations. Pl. Ex. 176 at 32896; Pl. Exs. 306-308.

On December 13, Ferino sent Harry Montgomery, Ruddell, Schwartz, and Atlas an e-mail containing a spreadsheet that

> highlights the calculation of the original DTA amount of $15.3 million, and then recalculates the DTA after the deduction of servicing fee expense for all four years.

Harry Montgomery asked Ferino to create this spreadsheet. Tr. 1514:17-22, 1562:4-9 (Ferino); Schwartz Dep. 162:3-20; Pl. Ex. 168.

Ferino's spreadsheet added a fifteenth temporary difference, the \$27,501,282 Servicing Fee Expense, which consisted of the Servicing Fees that DRAFCO had paid for all four Securitizations from 1999 to December 2002.  Ferino derived these Servicing Fees by tabulating the amount of Servicing Fees listed on the servicer certificates for each Securitization.  Tr. 1514:23-1515:3, 1516:25-1517:10 (Ferino), 987:12-14 (Ruddell); Pl. Ex. 168 at 12135.  The spreadsheet subtracted the \$27,501,282 in Servicing Fee Expenses from the \$38,800,037 of temporary differences used to calculate the DTA, which led to a temporary difference of \$11,298,755.  Ferino's spreadsheet then multiplied the amount of temporary differences (\$11,298,755) by a tax rate of 39.55%, resulting in a \$4,468,658 DTA.  Pl. Ex. 168 at 12135.

Ruddell and Schwartz adopted Ferino's spreadsheet in their own analysis of  whether the DTA was properly stated.  Ruddell and Schwartz had been planning to conduct the same analysis that Ferino did in his spreadsheet because they believed this to be the proper analysis.  Tr. 1564:9-17 (Ferino), 847:19-848:11 (Ruddell); Schwartz Dep. 164:7-165:7, 165:19-166:24; Pl. Ex. 173 at 1194-95.

On December 17, 2004, Harry Montgomery concluded that:

131

> It is our understanding that on the books of
> Ganis there was recorded as Income the Servicing
> Fee and also any expenses incurred in Servicing
> the loans.
> * * *
> and thus this was an intercompany item for the
> two companies.

Pl. Ex. 180 at 1161. KPMG reviewed the Ganis tax returns and

determined they showed that Ganis picked up the Servicing Fee

Income for tax purposes:

> Also, I spoke to Carol yesterday. Based on the
> returns you provided me last week, Ganis picked
> up the servicing fees in 2001 and 2002, while
> DRAFCO did not deduct the fees in 1998, 1999 and
> 2000. In order to determine which years were
> affected by the double-booking, it would be most
> helpful to see the 1998, 1999 and 2000 returns
> and backup for Ganis, and 2001 and 2002 returns
> and backup for DRAFCO.

Pl. Ex. 166 at 12158.


        By mid-December 2004, Harry Montgomery was pressing

Schwartz and Ruddell to finish their re-examination of the DTA

and reach a conclusion about the validity of the DTA. Schwartz

Dep. 203:2-12. In December 2004, Ruddell and Schwartz had

regular discussions about the DTA, but were unable to reach a

"final conclusion" on whether the DTA was properly stated, and

thus their analysis remained "inconclusive." Tr. 854:7-16,

905:7-10, 906:5-12 (Ruddell); Schwartz Dep. 198:13-24, 199:7-24,

200:5-9.

The open question for Ruddell and Schwartz in December

2004 was whether Ganis recorded the Servicing Fee Income because

they theorized that if Ganis had failed to do so, that error

might offset the $11 million overstatement of the DRAFCO DTA.

Tr. 822:12-19, 827:17-21, 828:16-18, 838:22-25, 839:14-24,

854:7-16, 906:5-12 (Ruddell); Schwartz Dep. 199:7-24, 200:5-9;

Pl. Ex. 155.


On December 15, 2004, Ruddell e-mailed Schwartz:

Based on Tony's analysis in the attachments to
his [December 13, 2004] e-mails, it appears that
the $15M DTA was computed based on all of the
timing differences except the servicing fees.
Once the servicing fees were included, however, a
DTA of about $4M remains, and I see no reason why
this would be considered not to exist.   So, I
think I agree with you if you are saying the DTA
seems to have been overstated . . .

At the end of the day, I am coming around to the
conclusion that the DTA was misstated.

Pl. Ex. 173; Schwartz Dep. 197:9-15; June 13 Opinion at *18.


On December 17, 2004, Bomm sought to determine the

impact of an overstatement of the DTA on the DRAFCO purchase

price.  Bomm asked Ruddell to confirm that her understanding of

the impact was correct.  Tr. 856:18-24, 859:16-18 (Ruddell); Pl.

Ex. 177.  Bomm stated "Let's assume the DTA is overstated by

400.  This would mean the sales price was overstated by 400."

Ruddell replied to the e-mail, and wrote that Bomm's summary "was consistent with my understanding." Tr. 858:7-16 (Ruddell); Pl. Ex. 177.

On December 17, 2004, Ruddell sent another e-mail to Schwartz. This lengthy and detailed e-mail "summarized" KPMG's analysis, stating that "Ganis did report the servicing income in its financials," that "no M-1 appears, so Ganis apparently also reported the income for tax purposes," and that:

> Per Harry and Tony, no servicing expense was reported in DRAFCO's financials or tax returns. Tony Ferino has recomputed the DTA (based in part on estimates), using M-1s for 1999-2002, including and then excluding the servicing fee expense. Tony took his numbers from servicing certificates. Without servicing fee expense, the recomputed DTA corresponded to the reported amount: $15,345,415. With servicing fee expense, the DTA would have been $4,468,658. The difference, $10,876,757, is the potential overstatement of both the DTA and sales price of Ganis/DRAFCO.
>
> If our understanding of the "error" is correct, then the DTA was overstated because the tax deductible servicing fees payable by DRAFCO to Ganis were never deducted.

Pl. Ex. 178; Tr. 859:21-860:3 (Ruddell); Schwartz Dep. 217:6-8, 219:18-24.

Ruddell assumed that Deutsche Bank would recognize its error in failing to deduct the Servicing Fee Expenses, file an amended tax return, receive money from IRS, and, since E*TRADE

134

was entitled to a dollar-for-dollar refund of the amount of the
DTA overstatement, refund the money to E*TRADE, at a cost to
Deutsche Bank of $11 million. Tr. 867:21-868:9 (Ruddell);
Pl. Ex. 178.

From December 17 to December 21, 2004, Schwartz and
Ruddell were in the process of preparing a memorandum (the "KPMG
Memo") to send to E*TRADE that summarized KPMG's findings to
date on the DTA. Harry Montgomery told them he needed their
conclusions because he was expected to share them with others
within Deutsche Bank by a certain date. Tr. 875:16-23
(Ruddell); Schwartz Dep. 238:22-239:16.

During this period, Ruddell and Harry Montgomery had
at least one conversation in which Ruddell gave Harry Montgomery
his tentative conclusions that the DTA was overstated. On
another occasion, Ruddell told Harry Montgomery that "I'm
thinking maybe we have a problem" with the DTA. In response to
Ruddell's statements, Harry Montgomery expressed concern about
Ruddell's conclusions. Tr. 871:20-24, 872:11-20, 881:13-882:13
(Ruddell).

The KPMG Memo did not incorporate any new information
KPMG learned between December 17 and December 21, 2004. Tr.

135

942:12-15, 954:14-955:17 (Ruddell). Other than his conversation with Harry Montgomery between December 17 and 21, Ruddell could not remember any other events or information that affected the content of the KPMG Memo during that period. Tr. 882:1-14 (Ruddell).

As of December 21, 2004, KPMG had not yet received all the pre-sale balance sheets for Ganis and DRAFCO. That afternoon, Belinda Montgomery emailed Schwartz and others, and wrote that E*TRADE had just provided the DRAFCO Balance Sheet, which was "the last item [KPMG] asked for." Pl. Ex. 184. Schwartz forwarded that email to Ruddell, and wrote "[s]ee how incredibly unhelpful this is . . . ." After he received Schwartz's email, Ruddell replied to her and wrote:

> Ha ha ha ha ha! Maybe we should send back an
> email that just says "bite me."

Pl. Ex. 184; Schwartz Dep. 234:11-14 & 21-25.

Later that same day, Ruddell and Schwartz e-mailed the completed KPMG Memo to Harry Montgomery, Belinda Montgomery, Schwartz, Meyers, Staffeldt, and Sieling. Schwartz Dep. 238:4-18; Pl. Ex. 190. The KPMG Memo stated that "we have not seen any evidence" that Ganis booked the Servicing Fee Income, that

136

"the DTA was properly recorded," and that "E*TRADE paid for value" when it purchased the DTA. Therefore, by the time E*TRADE received the KPMG Memo on December 21, 2004, the KPMG Memo no longer concluded that any problems existed with respect to E*TRADE's purchase of the DTA. Tr. 871:20-872:1, 872:11-20, 879:19-880:3, 881:6-25, 881:13-882:14 (Ruddell); Schwartz Dep. 249:6-20; Pl. Ex. 190 at 32911.

Despite the completion of the KPMG Memo, Ruddell and Schwartz never reached a final conclusion as to the accuracy of the DTA and the Audit Opinion. Tr. 872:21-873:20, 906:5-23 (Ruddell); Schwartz Dep. 16:20-17:12.

The KPMG Memo stated that E*TRADE's belief that the DTA was overstated was correct only "if DRAFCO and Ganis were reporting the income" but that "we have not seen any evidence that Ganis included these amounts in income." Pl. Ex. 190.

At trial, however, Ruddell stated that KPMG had seen Ganis tax returns indicating that Ganis included the Servicing Fee Income as book and tax income. KPMG also received evidence that Ganis booked this income by way of statements by Haisch and Pechulis as well as Ganis accounting documents provided by Haisch that indicated that Ganis booked the income. KPMG never

saw any evidence that suggested Ganis did not include the income. Tr. 879:9-14 (Ruddell); Schwartz Dep. 211:8-212:10, 245:17-21 & 24-25; Pl. Exs. 165, 166, 174, 176, 190.

On December 22, 2004, Ruddell, Schwartz, Harry Montgomery, Ferino, B. Montgomery, Robertson, and Meyers held a conference call to discuss the KPMG memorandum. Tr. 156:9-18 (B. Montgomery); Meyers Dep. 302:16-21; Robertson Dep. 225:5-226:22; Schwartz Dep. 275:12-24. The call was "contentious" and "very stressed," and Schwartz spent much of the call defending the Audit Opinion and the quality of KPMG's "technical analysis" of the DTA. Tr. 157:2-9, 157:24-158:3 (B. Montgomery); Meyers Dep. 301:7-303:14; Schwartz Dep. 268:22-24; June 13 Opinion at *18.

When pressed on the quality of KPMG's Audit Opinion, Schwartz stated that KPMG's audit of the DTA was "garbage in, garbage out." After Schwartz made this admission, no one spoke for several seconds. The silence made Schwartz realize that she should have "kept her mouth shut." After the telephone conference, Schwartz told Ruddell that she regretted making this statement. Schwartz Dep. 272:5-10, 273:5-7. Belinda Montgomery wrote an e-mail to her colleagues the day after the conference expressing shock that Schwartz described the audit this way.

Tr. 158:24-159:12, 160:9-161:7 (B. Montgomery); Meyers Dep.
301:7-305:24; Robertson Dep. 226:4-9; Schwartz Dep. 265:23-25,
266:9-17, 271:23-272:4; Pl. Ex. 195; June 13 Opinion at *18.

On January 18, 2005, as part of his continuing efforts
to support the stated value of the DTA, Ruddell prepared an
analysis of the DTA. Based on this analysis, Ruddell wrote that
"the Schedule M-1s recorded by DRAFCO support the deferred tax
asset reported in DRAFCO's 12/23/02 balance sheet." This
analysis did not include servicing fees as a temporary
difference. At trial, Ruddell stated that his failure to factor
in Servicing Fees in calculating the DTA meant that this
analysis could not be correct. Tr. 899:1-16, 900:7-23
(Ruddell); Def. Ex. 244.

Deutsche Bank's omission of the deduction for the
Servicing Fee Expenses on its M-1 was incorporated in Ruddell's
January 2005 report. Tr. 902:3-14 (Ruddell); Def. Ex. 244.

## I. **The Accounting Treatment of the DTA**

### 1. **The Experts**

139

The proper accounting treatment for securitized transactions under the facts found above was considered by three prominent accounting firms, E&Y, Deloitte, and KPMG, two experts, Robert W. Berliner ("Berliner") for E*TRADE, and Gerard A. Mangieri ("Mangieri") for Deutsche Bank, and various executives, accountants and tax preparers of the parties as described above. All considered the appropriate accounting treatment of the Securitizations.

The most credible of the accountants was Meyers as a result of his experience and impartiality. His conclusions were not colored by self interest and at the time they were reached were not necessarily in his client's interest.

E&Y, as found above, had a limited engagement and never dealt with the core accounting issues presented here.

KPMG internally and informally recognized that the DTA was overstated due to the failure to take the Servicing Fee Deduction, but was institutionally committed to not changing its Audit Opinion. Deutsche Bank was a substantial client paying KPMG fees of approximately $50-$60 million annually. Tr. 896:14-897:11, 968:15-969:6, 993:6-11 (Ruddell); Pl. Exs. 327 at 200; 328 at 184-85; 329 at 188; 330 at 210; 331 at 270.

Meyers was the first person associated with E*TRADE to suggest that the DTA might be overstated because of Deutsch Bank's failure to deduct the Servicing Fee Expenses.  Tr. 138:17-139:6 (B. Montgomery); Robertson Dep. 124:18-126:7, 127:21-128:1.  At the time that Meyers informed E*TRADE of his belief that the DTA was overstated, Meyers and E*TRADE did not know with certainty whether Deutsche Bank had deducted the Servicing Fee Expenses.  Meyers requested that E*TRADE contact Deutsche Bank and KPMG for more detailed information about the DTA.  Tr. 139:7-14 (B. Montgomery); Meyers Dep. 73:10-18, 127:17-128:2; Pl. Ex. 98.

On November 24, 2003, Belinda Montgomery requested an "urgent" meeting with E&Y for the following day.  Def. Ex. 189.

On November 25, 2003, there was a call with E&Y which was "tense."  Tr. 1182 (Audette), 1417-18 (O'Mara).  Belinda Montgomery "attacked" Munro for not having determined when the DRAFCO DTA would become realizable.  Def. Ex. 190.  Munro recalled that "Belinda wanted us to say more than what we could say based on the work we had done and was upset that we couldn't" and "wanted us to agree that the deferred tax asset was actually there, that it was 15.3 million or perhaps 18 million."  Munro Dep. 181-82.

On the same day, Audette noted in an e-mail to Moore
that Belinda Montgomery had not expressed any concern with the
recoverability of the tax benefits before E*TRADE Bank acquired
DRAFCO and sought a telephone call on the subject.  Def. Ex.
191.

In November and December 2003, E*TRADE sought
information about the DTA from Deutsche Bank.  Tr. 139:23-140:7,
141:1-4 (B. Montgomery); Meyers Dep. 127:17-128:2; June 13
Opinion at *15.

On early December, Belinda Montgomery asked Harry
Montgomery for additional support for the DTA.  Following that
request, Harry Montgomery discussed E*TRADE's request for
additional information with Forschino.  Forschino sent three
Excel spreadsheets concerning the DTA to Ferino and Harry
Montgomery so that they "could discuss what level of detail we
wanted to give her [B. Montgomery]."  Forschino noted that the
second spreadsheet attached to the e-mail "was not given to
either B. or E&Y."  Tr. 141:24-142:1 (B. Montgomery); Pl. Exs.
90, 92.

102

Robertson had prepared a series of schedules projecting the DTA into the future and included an entry on those schedules for servicing expenses. Robertson Dep. 80-82, 220; Def. Ex. 196 at ET-DB 101369-71, line 34, ET-DB 101378-79, line 20. Robertson first identified a potential issue concerning the treatment of the Servicing Fee Expenses in a November 25, 2003 e-mail to Audette stating, "Tax Question for Deutsche Bank - Has [servicing expense] been included in interest expense on the tax return (I don't see any book/tax differences recorded in the past)?" Pl. Ex. 88 at ET/DB 028668.

Robertson sent his DTA projection schedules (including the reference to servicing expenses) to Belinda Montgomery on December 1, 2003, and informed her that he still could not determine exactly when the DTA would turn, stating "perhaps we can provide the schedules to the securitization specialists and discuss the open items with them." Def. Ex. 196 at ET-DB 101361. He testified that he could not get his arms around the DTA because he did not understand the associated GAAP accounting. Robertson Dep. 133-34; Def. Ex. 195A.

Belinda Montgomery sent Robertson's schedules to Deloitte on December 1, 2003, and asked for Deloitte's

103

"assistance and review" of the DRAFCO DTA. Def. Ex. 196 at ET-DB 101361.

> Robertson wrote Ferino on December 1, 2003:

> In reviewing some future DRAFCO projections regarding interest income, interest expense, bad debts, etc, I noticed a category called "Servicing". It is our understanding that this is the amount of expense to service the loans. Additionally, it is my understanding that the amount is netted against "residual Income" for financial statement purposes. I do not see a separate expense item on the prior year tax returns. Do you know if the amount was included with another expense on the tax return (i.e. interest expense, etc.)?

Def. Ex. 198A.

In his December 2, 2003 e-mail response, Ferino did not answer this question but addressed only Servicing Fee Income, not Servicing Fee Expenses. He wrote that "Interest Income" was reported gross and included the Servicing Fee Income, so there was no "M-1 for service fee income." Tr. 1506:7-12 (Ferino); Pl. Ex. 91 at 11762; June 13 Opinion at *15.

On December 3, 2003, Robertson responded, "Thanks for the quick response," and further inquired, "If DRAFCO is deemed to own the loans and is including gross interest income and gross interest expense in the tax return, it would make sense to

104

me that they could deduct the expenses of servicing the loans. Am I missing something?" Def. Ex. 198A. Robertson noted that a footnote he had read in the prior year's work papers indicated that DRAFCO did not deduct servicing expenses. Def. Ex. 198A; Tr. 1506-07 (Ferino).

On December 3, 2003, Ferino e-mailed Belinda Montgomery the same one page Spreadsheet he previously sent her on September 11, 2003, which showed the amount of temporary differences, tax rate, and $15.3 million DTA. Belinda Montgomery then e-mailed Ferino and Harry Montgomery, stating that Deutsche Bank previously provided E*TRADE with this one page summary schedule, and asked them to provide E*TRADE with a copy of KPMG's tax work papers. Deutsche Bank subsequently provided E*TRADE with a copy of some of KPMG's tax work papers. Tr. 1511:13-15 (Ferino), 144:9-18, 145:5-8 (B. Montgomery); Pl. Exs. 92, 94; June 13 Opinion at *15.

On December 8, 2003, Robertson e-mailed Ferino that E*TRADE had asked Deutsche Bank three questions about the DTA but that Deutsche Bank had not answered these questions and repeated his three questions to Ferino, including the question of how Deutsche Bank treated the Servicing Fee Expenses for tax purposes. Pl. Ex. 95; June 13 Opinion at *15.

105

On December 8, 2003, Ferino replied to Robertson but did not answer Robertson's question about Deutsche Bank's treatment of the Servicing Fees. Tr. 1510:3-15 (Ferino); Pl. Ex. 96; June 13 Opinion at *15.

On December 22, 2003, Belinda Montgomery telephoned Harry Montgomery and asked whether Deutsche Bank had deducted the Servicing Fee Expenses on its tax returns. Harry Montgomery said he was unsure and would investigate further. Tr. 141:6-21 (B. Montgomery); Pl. Ex. 107.

During December 2003, Meyers drafted a preliminary memorandum setting forth his initial analysis on the validity of the DTA. On December 30, 2003, for "Discussion Purposes Only," Mary Boelke ("Boelke") (Deloitte's Tax Partner) e-mailed to Belinda Montgomery and Moore the preliminary memorandum on the DTA ("Deloitte Memo"). Meyers had written "the Deloitte Memo as part of our normal year end review of E*TRADE's financial statements" and Boelke wrote to Belinda Montgomery and Moore that E*TRADE should not distribute the Deloitte Memo "outside of E*TRADE as it is a work in progress." This analysis was preliminary because Deloitte needed additional information from Deutsche Bank before it could reach a final conclusion. Tr.

1185:8-15 (Audette), 146:19-150:1 (B. Montgomery); Meyers Dep.
70:23-71:14, 117:11-20; 118:7-13, 203:23-204:9, 250:14-19,
254:6-10 & 13-16, 315:8-15, 316:14-317:9; Pl. Ex. 110; June 13
Opinion at *16.

Meyers drafted the Deloitte Memo, but other members of
Deloitte's E*TRADE audit team, including Boelke, Irv Bisnov
("Bisnov"), the Deloitte Partner responsible for E*TRADE's
engagement, and Jeffry Baxter ("Baxter"), Deloitte's lead tax
partner, reviewed the Deloitte Memo before sending it to
E*TRADE. The purpose of this peer review process was to ensure
that the Deloitte Memo was as accurate as possible. Meyers Dep.
41:23-42:10, 42:22-43:25, 120:4-23, 123:10-17.

The Deloitte Memo stated Deloitte's preliminary belief
that Deutsche Bank's failure to deduct the $27.5 million
Servicing Fee Expense had caused the DTA to be "substantially
overstated." Pl. Ex. 110. While Deutsche Bank had not
confirmed that it had failed to deduct the Servicing Fee
Expense, Meyers believed this to be the case because this
expense was not listed on the schedules to DRAFCO's pro forma
tax returns and because the $27.5 million Servicing Fee Expense
was a temporary difference that should have reduced the amount

107

of temporary differences used to calculate the DTA by $27.5 million. Id.; Meyers Dep. 131:2-14 & 18-25.

For book purposes, the Securitizations had been characterized as a sale, and DRAFCO deducted all of the Servicing Fee Expenses on the day the Securitizations closed because this expense reduced the value of the Residual - "the traditional practice." Meyers Dep. 225:19-226:9; Pl. Ex. 110 at 82939; Pl. Ex. 239.

For tax purposes, the Securitizations were characterized as a borrowing, and DRAFCO should have deducted the Servicing Fee Expenses for tax purposes as they were incurred over the life of the Securitizations, according to Meyers. Meyers Dep. 132:2-10; Pl. 110 at 82939; Pl. Ex. 239.

In his analysis of the DTA, Meyers analyzed the cash flow projections created by Bearing Point and confirmed that a portion of the Interest Income received by DRAFCO was used to pay the Servicing Fee Expenses. Meyers Dep. 225:19-226:9. Meyers did not subsequently learn of any additional facts that caused him to modify the results of his analysis as set forth in the Deloitte Memo. Meyers Dep. 245:15-25.

108

The preliminary Deloitte Memo caused Audette to
consider whether E*TRADE should change the accounting treatment
of the DTA for the year ended December 31, 2003 - namely,
whether E*TRADE should write down the DTA to goodwill. Tr.
1186:15-1187:5 (Audette); Pl. Ex. 113.

In early January 2004, Audette and Moore at E*TRADE
consulted with Bisnov at Deloitte about whether to write down
the DTA. After these consultations, E*TRADE decided not to
change the accounting treatment of the DTA for year-end 2003
because "Deloitte and Terry Meyers had only been looking at the
deferred tax asset for a few weeks; their conclusions were
preliminary." Moreover, the "best information and best
evidence" E*TRADE had at the time - "the independent audit
opinion of KPMG" and "the representations of Deutsche Bank" -
indicated that the DTA was properly stated. Tr. 1187:6-1189:1
(Audette); Pl. Ex. 113; June 13 Opinion at *16.

E*TRADE determined that it would revisit the issue of
whether it should change the accounting treatment of the DTA
after Deloitte had "more time to complete their analysis" and
E*TRADE had given Deutsche Bank "an opportunity to substantiate
the value they put on the DTA." E*TRADE hoped that Deloitte
ultimately would conclude that the DTA was properly stated

109

because E*TRADE would have preferred to recover the value of the DTA in the ordinary course of business. Tr. 1189:6-21, 1190:1-6 (Audette); June 13 Opinion at *16.

On December 31, 2003, E*TRADE Bank transferred DRAFCO to its parent E*TRADE Financial and recorded this transaction in its books at the sale price paid to Deutsche Bank. Pl. Ex. 142; June 13 Opinion at *15.

In early January 2004, Harry Montgomery, Ferino, Belinda Montgomery, and Meyers participated in a telephone conference. Meyers stated that the DTA seemed to be substantially overstated because it appeared that Deutsche Bank had failed to deduct the Servicing Fee Expenses. Tr. 1520:7-10 (Ferino), 150:13-150:22 (B. Montgomery); Pl. Ex. 225 at 5582; June 13 Opinion at *16. Meyers and Belinda Montgomery asked Deutsche Bank on the call to confirm whether or not it had deducted the Servicing Fee Expenses. Ferino and Harry Montgomery did not do so. Tr. 1487:8-18 (Ferino), 150:13-150:22 (B. Montgomery); June 13 Opinion at *16.

On January 21, 2004, Belinda Montgomery e-mailed Harry Montgomery, and asked him if Deutsche Bank had been able to confirm if "DRAFCO did, or did not, deduct servicing fees prior

110

to 2003." Harry Montgomery responded by stating that he was "still looking at the issue," but that regardless of the answer "we don't think it will have any effect on the DTA." Pl. Ex. 114 at 5613-14.

On February 3, 2004, Belinda Montgomery again e-mailed Harry Montgomery, and wrote "Any luck with the DRAFCO DTA yet." Harry Montgomery wrote that he was still trying to determine the "exact treatment" of the Servicing Fee Expenses, but that regardless of the treatment it should "not effect the DTA." Pl. Ex. 114 at 5613.

On February 6, 2004, Harry Montgomery e-mailed E*TRADE and stated that while Deutsche Bank failed to deduct the Servicing Fee Expenses, this expense was a "permanent difference" that had no effect on the DTA. 1939:20-1940:4 (H. Montgomery); Pl. Ex. 116; June 13 Opinion at *16. Neither Harry Montgomery nor Ferino had any securitization or deferred tax expertise, and Ferino testified at trial that no-one at KPMG or Deloitte ever agreed with this claim. Tr. 1500:17-22, 1544:1-4, 1553:6-8, 1572:21-22 (Ferino), 1941:2-4, 1976:4-5, 1980:2-8 (H. Montgomery).

111

In a February 9, 2004 e-mail, Meyers noted that Harry
Montgomery's February 6, 2004 e-mail indicated that Deutsche
Bank's calculation of the Residual failed to account for the
fact that Servicing Fee Expenses were deducted all at once for
book purposes at the start of the Securitization. Meyers Dep.
130:17-133:5; Pl. Ex. 239.

On February 10, 2004, the parties held a conference
call. Harry Montgomery stated that Deutsche Bank had failed to
deduct the Servicing Fee Expenses for DRAFCO. He also said that
Deutsche Bank would be amending its tax returns to take a
deduction for the missed Servicing Fee Expenses, which would net
Deutsche Bank an $11 million tax refund. Harry Montgomery also
stated that the missing service fee deduction would have no
impact on the DRAFCO DTA. Deutsche Bank ultimately did not
amend its returns to take this deduction. Tr. 1503:12-19
(Ferino), 151:4-13 (B. Montgomery); Meyers Dep. 278:6-19, 280:8-
20; Pl. Ex. 124 at 28497-98; June 13 Opinion at *16.

Following Harry Montgomery's conversations with
Belinda Montgomery, the Deutsche Bank tax department and KPMG
decided DRAFCO could deduct servicing fees from its 2003 "stub
period" tax return. Pl. Ex. 151. Ferino had noticed that
DRAFCO was not deducting servicing fees in or about August 2003,

112

but thought such treatment had been dictated by footnote "a" in the Template. Tr. 1487:8-1488:19, 1494:20-1495:5 (Ferino). Members of the Deutsche Bank tax department and KPMG revisited the issue when E*TRADE brought it up after the DRAFCO closing but determined that it would have been inappropriate to take a servicing fee deduction when DRAFCO and Ganis were part of the same consolidated tax group because there was insufficient evidence that Ganis reported any income related to the inter-company transfers. Tr. 1574:4-7 (Ferino), 1940:13-24 (H. Montgomery). That concern no longer applied after Ganis was sold to E*TRADE Bank. Tr. 1492:5-15, 1574:4-7, 1575:22-25 (Ferino), 1942:7-16 (H. Montgomery).

On March 1, 2004, E*TRADE sent Deutsche Bank a letter stating that Deutsche Bank had breached the SPA. This March 1 letter detailed Meyers's preliminary analysis and stated that the DTA did not comply with U.S. GAAP. Pl. Ex. 121; June 13 Opinion at *17.

Deloitte did not permit E*TRADE to send Deutsche Bank the Deloitte Memo because Deloitte thought that it might compromise its obligation of auditor independence. Under the SEC's Sarbanes-Oxley rules, independent auditors are not permitted to provide litigation assistance in disputes between

113

clients and third parties, and Deloitte was concerned that it would run afoul of these rules if E\*TRADE forwarded the Deloitte Memo to Deutsche Bank. Meyers Dep. 137:4-25, 311:17-312:6; Pl. Ex. 119.

On March 11, 2004, Deutsche Bank responded in detail to E\*TRADE's March 1, 2004, letter. Pl. Ex. 126; June 13 Opinion at \*17.

By March 23, 2004, Simpson told Rooney that E\*TRADE was willing to provide Deutsche Bank with additional support for E\*TRADE's belief that the DTA was invalid and that E\*TRADE wanted to discuss these issues with Deutsche Bank. Pl. Ex. 127. Harry Montgomery observed to Forschino at KPMG that "Deutsche Bank is trying to avoid a sit down" with E\*TRADE on the DTA. Pl. Ex. 127.

On April 19, 2004, E\*TRADE again notified Deutsche Bank of Deutsche Bank's breaches of the SPA and other wrongful conduct. Attached to the letter was a one-page, detailed spreadsheet reflecting Meyers's analysis of the impact that Deutsche Bank's failure to deduct the $27.5 million in Servicing Fee Expenses had on the DTA. E\*TRADE requested that "each of E\*TRADE, Deutsche Bank, KPMG, and Deloitte meet in person at a

114

mutually convenient time in the near future to discuss and resolve the noted discrepancies." Pl. Ex. 128 at 191011; June 13 Opinion at *17.

On April 26, 2004, Staffeldt wrote that Deutsche Bank did not have "sufficient insight into the nature of [E*TRADE's] query" and that Deutsche Bank was unwilling to meet with E*TRADE until E*TRADE provided Deutsche Bank with "detailed back up explanations on the various items referenced in the D&T spreadsheet . . . ." Pl. Ex. 130; June 13 Opinion at *17.

On June 17, 2004, E*TRADE and Deutsche Bank held a conference call, during which time Deutsche Bank reiterated its request for additional information about E*TRADE's belief that the DTA was overstated. Pl. Ex. 138 at 16167; June 13 Opinion at *17.

In response, E*TRADE sent Deutsche Bank a letter on July 1, 2004 describing the composition of the DTA. The letter contained much of the content of the Deloitte Memo including the three appendices attached to that Memo. One of these attachments was Meyers's list of "open items" which was a list of questions he needed answered before he could finalize his

conclusion on the DTA.   Meyers Dep. 165:17-25, 167:4-15; Pl. Ex.
138 at 16172.

E\*TRADE's July 1 letter also stated that it appeared
Deutsche Bank erroneously deducted \$1,644,983 for state income
taxes on its 2002 federal tax return.   The letter noted that
E\*TRADE had requested support for this tax deduction, i.e. "the
DRAFCO state tax returns filed indicating tax was paid," but
Deutsch Bank never provided it.   The letter then stated that the
"DTA E\*TRADE acquired would be incorrect as the state taxes were
a DTA that E\*TRADE would never receive benefit for."   Pl. Ex.
138 at 16168.   The July 1 letter mistakenly stated that the 2002
return was prepared "subsequent to the sale of DRAFCO equity to
E\*TRADE."   Ferino, who prepared the return, confirmed that
Deutsche Bank prepared it before the sale.   Tr. 1567:20-1658:1
(Ferino).

In a July 8, 2004 letter to E\*TRADE, Deutsche Bank
wrote that it had forwarded E\*TRADE's July 1 letter to KPMG to
review and would respond to the issues E\*TRADE raised in the
July 1 letter.   Pl. Ex. 139 at 372.

116

On July 14, 2004, Staffeldt e-mailed Mackay at E*TRADE
and wrote that KPMG and Deutsche Bank's tax department disagreed
with Deloitte's analysis regarding the DTA.  Pl. Ex. 140.

On July 20, 2004, Shearman & Sterling responded to the
July 1 letter.  Shearman & Sterling did not address the
questions that E*TRADE listed in the July 1 letter but
"acknowledged" that the state tax deduction was "not
appropriate," reported that Deutsche Bank would file an amended
tax return, and asserted that the erroneous deduction had no
effect on the value of the DTA.  Pl. Ex. 141 at 38582.

On August 18, 2004, Robertson e-mailed Ferino asking
for copies of DRAFCO's federal and state tax returns for the
stub period of January 1, 2003 - October 19, 2003 when Deutsche
Bank owned DRAFCO.  Ferino asked his superior, Harry Montgomery,
what information to provide to Robertson.  Pl. Ex. 143.

Harry Montgomery instructed Ferino to send the federal
return but told him he should "not mention" that DRAFCO had not
filed any state returns and suggested that Ferino tell Robertson
that DRAFCO was included in Deutsche Bank's 2003 California
unitary return.  According to its California unitary return,

117

DRAFCO did not pay any California state taxes in 2003. Ferino
1483:23-1484:1; Pl. Ex. 143.

Under purchase accounting rules, E*TRADE had until the
close of the third quarter of 2004 (September 30, 2004) to
finalize its accounting of the DRAFCO purchase. Tr. 1202:22-
1203:16 (Audette); Pl. Exs. 144, 156. During September 2004,
E*TRADE consulted with Deloitte to determine how to account for
the DTA given the absence of information to justify the
$15,345,000 pre-close valuation of the DTA. See, e.g. Pl. Ex.
144.

In September 2004, Deloitte refused to issue an
independent audit opinion certifying the value of the DTA
because E*TRADE could not substantiate it. Deloitte would not
approve E*TRADE's financial statements if these statements
included the DTA. Tr. 1207:11-1208:8 (Audette).

E*TRADE needed an independent audit opinion certifying
its financials before it could file its SEC Form 10-Q for the
third quarter of 2004 and its SEC Form 10-K for the entire years
of 2004. Because Deloitte refused to approve E*TRADE's
financial statements if they included the DTA, the SEC and
accounting rules required E*TRADE to write down the DTA and move

118

it to goodwill in order to file its SEC forms. Tr. 1207:19-
1208:20 (Audette), 134:8-19 (B. Montgomery).

E*TRADE ultimately determined that it should write off
the entire DTA with the offset to goodwill because while the
parties "had roughly nine months of calls, exchanges, e-mail
exchanges of information," Deutsche Bank had failed to justify
the $15,345,000 valuation. Tr. 1204:3-18, 1206:14-24 (Audette).
Effective September 30, 2004, E*TRADE wrote off the $15,345,000
DTA, with the offset to goodwill. Tr. 1206:22-1207:3 (Audette);
Pl. Ex. 150 at 203043; June 13 Opinion at *18.

E*TRADE's decision to write off the entire DTA to
goodwill was the proper accounting treatment under the
circumstances. The write-off was consistent with the
requirement that when recording an acquisition, the excess of
purchase price over the fair value of identifiable assets (less
liabilities) be recorded as goodwill. Tr. 1204:3-25 (Audette);
Haisch Dep. 69:8-21.

Had the DTA been properly stated, E*TRADE's future tax
liability would have been reduced by $15,345,000 and its
profitability would have increased by $15,345,000. Tr. 1205:24-
1206:13, 1315:19-1316:3, 1329:18-1330:20 (Audette).

119

By October 2004, Harry Montgomery asked KPMG to re-examine the DTA and its Independent Audit Opinion verifying the $15.3 million valuation of the DTA and to review Meyers's analysis of the DTA, and determine "what was the accurate amount" of the DTA. Tr. 808:17-809:12 (Ruddell); Schwartz Dep. 50:16-22, 55:4-56:11.

At the time, Forschino was leaving KPMG and could not work on the assignment. Barry Ruddell ("Ruddell") and Carol Schwartz ("Schwartz"), neither of whom had done any work on DRAFCO or the Audit Opinion, led KPMG's re-examination of the DTA. Tr. 1192:17-22 (Audette), 806:12-23, 807:19-21, 808:17-25 (Ruddell); Schwartz Dep. 47:19-48:7; June 13 Opinion at *17. Ruddell was a CPA with twenty years of accounting experience. He had recently become the KPMG U.S. tax and audit partner assigned to Deutsche Bank because the person that previously held that position, Brigitte Bomm ("Bomm"), had transferred to a KPMG office in Germany to work with Deutsche Bank. Tr. 856:18-22 (Ruddell). The re-examination of the DTA was one of the first major assignments Ruddell performed for Deutsche Bank. Tr. 807:19-24, 808:17-25 (Ruddell).

120

Schwartz was a senior manager at KPMG's Structured
Finance Group, which engages primarily in transaction
preparation and tax compliance work for structured finance
vehicles.  These vehicles include securitizations.  Schwartz
Dep. 9:5-22.  She was not a CPA, nor an accounting expert, and
did not examine accounting issues but focused on securitization
issues because of her experience in securitization tax.  Tr.
813:2-7 (Ruddell); Schwartz Dep. 10:15-16, 13:11-15, 63:9-14.

Ruddell and Schwartz considered Harry Montgomery to be
the client representative who guided them on who to speak to,
what to look for, and what hypotheses to investigate.  Tr.
814:13-815:3 (Ruddell).

In addition to Schwartz and Ruddell, KPMG had others
assist with the re-examination of the DTA.  One of these people
was Rozeta Atlas ("Atlas"), an employee in KPMG's New York
office.  She assisted Ruddell and Schwartz in their
investigation of the DTA, primarily by collecting, reviewing,
and analyzing documents such as balance sheets and tax returns.
Tr. 820:10-15 (Ruddell); Schwartz Dep. 41:6-12; see, e.g., Pl.
Exs. 153, 166.

On October 1, 2004, Belinda Montgomery, Audette, Simpson, Harry Montgomery, Meyers, Ruddell and Schwartz held a conference call. On the call, Meyers and Belinda Montgomery explained why they believed Deutsche Bank had overstated the DTA, and Meyers explained the open factual issues that he wanted Deutsche Bank to address. Meyers Dep. 168:7-12, 168:15-169:16, 287:22-288:22; Schwartz Dep. 63:6-8, 65:21-66:2, 67:18-68:13.

On October 7, 2004, Meyers had another telephone call with Schwartz, which also was attended by Atlas and another KPMG partner. On the call, Meyers again explained his view that the omission of the Servicing Fee deduction led to an overstatement of the DTA. Schwartz agreed to confirm some information for Meyers, including "whether the servicing expense was factored into the DTA" calculation. Meyers Dep. 169:17-25, 172:19-173:2, 284:10-285:23; Pl. Ex. 148.

In early October 2004, Ruddell and Schwartz started re-examining the DTA and the Audit Opinion. This required them to review Forschino's work in auditing the DTA and understand the reasons that led KPMG to certify the value of the DTA. Because Schwartz and Ruddell had previously performed no work for DRAFCO, they were coming into the matter "cold." From October 2004 through December 2004, KPMG spent some "very

122

intense period[s] of activity" on the project. Tr. 806:12-14
(Ruddell), 1192:14-1193:1 (Audette); Meyers Dep. 170:24-171:5,
286:14-24; Schwartz Dep. 52:19-22, 197:23-25, 198:8-24; Pl. Ex.
152.

To reconstruct KPMG's Audit, Ruddell and Schwartz
tried to review KPMG's DRAFCO work papers. U.S. GAAP requires
that work papers be sufficiently specific for an auditor
unfamiliar with the audit to look at the work papers and
reconstruct the audit. Tr. 1192:14-1193:13 (Audette), 970:7-
971:4 (Ruddell).

Ruddell and Schwartz initially could not find the work
papers. They ultimately received them after Davidson, the KPMG
partner on the DRAFCO audit, sent them to Schwartz. The work
papers, however, lacked detail and consisted of only a few
inches of paper. Tr. 153:12-16 (B. Montgomery); Schwartz Dep.
43:10-20, 161:8-19; Pl. Ex. 13. Furthermore, the work papers
"were a mess," and Ruddell and Schwartz were unable to
reconstruct the Audit or explain how KPMG had been able verify
the $15.3 million valuation of the DTA in its Audit Opinion.
Tr. 971:5-972:16 (Ruddell); Haisch Dep. 194:4-6 & 10-18.

Ruddell and Schwartz admitted to E*TRADE that the work papers "were a mess" and they could not reconstruct the Audit. Ruddell testified that much of the information he needed to conduct his analysis was not contained in the work papers. KPMG's inability to reconstruct the DTA through its own work papers indicated to E*TRADE either the details used to support the original DRAFCO Audit Opinion never existed, or were improperly stated and kept. Tr. 972:17-25 (Ruddell), 1193:14-23 (Audette).

Over the next few months, Ruddell and Schwartz obtained and examined the DRAFCO Audited Closing Balance Sheet, the Audit Opinion, DRAFCO's accounting ledgers and income statements, servicer certificates, DRAFCO's pro forma tax returns, DRAFCO's Schedule M-1 (which lists the temporary differences between DRAFCO's book and tax treatment), and Ganis's pro forma tax returns. Tr. 154:5-13 (B. Montgomery), 813:13-814:6 (Ruddell); Schwartz Dep. 52:10-22, 59:10-19, 61:3-8.

Ruddell and Schwartz knew that E*TRADE and Deloitte believed Deutsche Bank had overstated the DTA because Deutsche Bank had not deducted the Servicing Fee Expenses. They spent a substantial amount of time investigating whether Deutsche Bank

124

deducted the Servicing Fee Expenses and eventually determined

that Deutsche Bank did not deduct the Servicing Fee Expenses

because (a) they did not see this deduction listed on DRAFCO's

tax returns, (b) never saw any evidence that Deutsche Bank

deducted the expense, and (c) Harry Montgomery and Ferino told

them that Deutsche Bank did not take the deduction. Schwartz

Dep. 88:3-90:22, 91:5-21, 104:12-22, 105:14-16; Pl. Exs. 155,

157.

By October 18, 2004, Schwartz's analysis of the

documents led her to believe that the DTA was overstated as

E*TRADE claimed because Deutsche Bank failed to deduct the

Servicing Fee Expenses. In an e-mail to Ruddell and Atlas, she

wrote:

Based on our discussions last week with Harry
Montgomery and Tony Ferino, it does appear that
the servicing expense was not taken by Drafco.
As a result, income was overstated by the
servicing expense and the deferred tax asset
would be reduced.

Pl. Ex. 155; June 13 Opinion at *17.

Ruddell concluded that an overstatement of income by

Deutsche Bank would be a violation of U.S. GAAP. Tr. 821:21-

822:6 (Ruddell).

125

On October 21, 2004, Schwartz again e-mailed Ruddell

and Atlas and wrote that the documents were "leading me to

believe" that "the DTA in DRAFCO was overstated as E*TRADE

claims:"

> The transaction team in a separate memo, noted
> that two assets should have been booked at GANIS,
> one for the float income and the other for an
> excess servicing asset for the number of basis
> points that the servicing fee exceeded a
> "reasonable" market based fee for servicing
> similar assets. Again, leading me to believe
> that the income was booked in Ganis and the DTA
> in DRAFCO was overstated as E*TRADE claims.

Pl. Ex. 157; June 13 Opinion at *17.

Schwartz and Ruddell then began investigating whether

a second error made by Deutsche Bank would offset the mistake in

the DTA, an effort they referred to as the "wash theory." Pl.

Ex. 154. The theory was that if Ganis understated the Servicing

Fee Income, then, because E*TRADE purchased both entities from

Deutsche Bank, E*TRADE overpaid for DRAFCO but underpaid for

Ganis in an equal amount, leading to a financial "wash." Tr.

825:5-8 (Ruddell); Pl. Exs. 153, 154, 158, 163.

As a result of their exploration of the "wash theory,"

KPMG's subsequent requests for information pertained almost

entirely to Ganis. E*TRADE did not understand why KPMG was not

"focused in on DRAFCO since they issued an Audit Opinion on it

126

and that's what we were asking about." E*TRADE thought KPMG was sidestepping the issue of whether the Deutsche Bank had overstated the DTA. Tr. 153:12-154:18 (B. Montgomery); Pl. Exs. 164, 166.

Ganis and DRAFCO were separately incorporated, maintained separate balance sheets, separate pro forma tax returns, and separate books. KPMG issued separate audit opinions for both Ganis and DRAFCO, and KPMG issued the DRAFCO Audit Opinion on a stand-alone basis. Tr. 1794:19-24 (Mangieri), 825:23-826:7, 829:8-17 (Ruddell); Meyers Dep. 191:15-192:10. Although KPMG treated DRAFCO as part of a consolidated group with Ganis when it re-examined the DTA, DRAFCO was a stand-alone company and, according to Meyers, KPMG should have examined DRAFCO's Audited Closing Balance Sheet on a stand alone basis. Meyers Dep. 191:22-25, 229:10-19.

On November 1, 2004, Schwartz e-mailed Ruddell and Atlas stating, "to determine if the deferred tax asset for DRAFCO is inappropriate, we need to know how Ganis treated it." Pl. Ex. 158.

Schwartz learned from her discussions with Deutsche Bank that "[t]he person who would know all the information that

127

we need is Don Haisch, a former KPMG employee who [now] works for E*TRADE." Pl. Ex. 158. Beginning in 2000, Haisch had been responsible for overseeing the booking of the income at Ganis, and he had directed accounting and financial planning for Ganis. Haisch was a Deutsche Bank employee until the Ganis sale closed in December 2002, at which point he became an E*TRADE employee. Before he started at Ganis, Haisch had been employed at KPMG as an accountant. Haisch Dep. 9:20-10:20, 21:25-22:11, 171:10-12, 14-18.

Another person at Ganis with knowledge of whether or not Ganis booked the Servicing Fee Income was Pechulis. From 1999 to 2000, Pechulis was vice president of finance at Ganis; from 2003 through November 2005 he served as Controller for Ganis. While serving as Controller, Pechulis oversaw the accounting staff that actually booked the Servicing Fee Income. Pechulis Dep. 8:16-9:2, 78:10-11, 13-16. From 1999 to 2002, either Haisch or Pechulis personally oversaw Ganis's booking of Servicing Fee Income for the Securitizations. Haisch Dep. 188:18-190:5; Pl. Ex. 174.

In November 2004, Schwartz spoke to Haisch several times about whether Ganis booked the Servicing Fee Income. Haisch Dep. 149:19-150:4; Schwartz Dep. 121:5-10; Pl. Ex. 165.

128

Haisch told Schwartz on each occasion that Ganis received the
Servicing Fee Income and included it as income for book
purposes:

> In the conference call, Don Haisch basically
> confirmed that the servicing fee was picked up
> (for book purposes) as current income by Ganis.

Pl. Ex. 165; Schwartz Dep. 137:6-15.


In e-mails in December 2004, Haisch and Pechulis
confirmed that Ganis received the Servicing Fee Income and
included it as income for book purposes. Haisch provided
extracts of Ganis ledger entries showing Servicing Fee Income
being booked at Ganis. Haisch Dep. 149:19-150:25, 151:16-25,
181:20-182:22, 183:5-185:2, 205:25-206:7; Pl. Exs. 170, 171,
174.


Between 1999 and 2002, the Securitizations Trust wired
the cash Servicing Fees directly to Ganis. Ganis's accounting
staff, led by Pechulis and Haisch, would receive the cash off
the wire and record it as Servicing Fee Income on Ganis's books
as book income. Haisch Dep. 154:9-15, 175:20-177:4, 191:10-
192:3; Pechulis Dep. 8:16-9:2, 78:10-16, 82:12-84:24; Pl. Exs.
103, 174, 176. For example, on December 15, 1999, the Trust (JP
Morgan) wired $146,807.61 of Servicing Fees for the 1999-3
Securitization. Pl. Ex. 311, at page 206561. A wire receipt

129

from Ganis's bank showed that on December 15, 1999, Ganis received a wire for $146,807.61 from the Trust, indicating that there was only one payment of Servicing Fees from the Trusts to Ganis. Pl. Ex. 311, at 206565. There is an absence of any entries for any such payments on DRAFCO's trial balances, indicating that none of the funds passed through DRAFCO. See, e.g., Pl. Exs. 315, 322. Between 1999 and 2002, Ganis also recorded the Servicing Fee Income on its tax returns. The Ganis tax returns did not list the Servicing Fee Income on its Schedule M-1, and therefore the Servicing Fee Income was treated the same for book and tax purposes and was part of the Residual and Gain on Sale calculations. Pl. Ex. 176 at 32896; Pl. Exs. 306-308.

On December 13, Ferino sent Harry Montgomery, Ruddell, Schwartz, and Atlas an e-mail containing a spreadsheet that

highlights the calculation of the original DTA amount of $15.3 million, and then recalculates the DTA after the deduction of servicing fee expense for all four years.

Harry Montgomery asked Ferino to create this spreadsheet. Tr. 1514:17-22, 1562:4-9 (Ferino); Schwartz Dep. 162:3-20; Pl. Ex. 168.

130

Ferino's spreadsheet added a fifteenth temporary

difference, the $27,501,282 Servicing Fee Expense, which

consisted of the Servicing Fees that DRAFCO had paid for all

four Securitizations from 1999 to December 2002.  Ferino derived

these Servicing Fees by tabulating the amount of Servicing Fees

listed on the servicer certificates for each Securitization.

Tr. 1514:23-1515:3, 1516:25-1517:10 (Ferino), 987:12-14

(Ruddell); Pl. Ex. 168 at 12135.  The spreadsheet subtracted the

$27,501,282 in Servicing Fee Expenses from the $38,800,037 of

temporary differences used to calculate the DTA, which led to a

temporary difference of $11,298,755.  Ferino's spreadsheet then

multiplied the amount of temporary differences ($11,298,755) by

a tax rate of 39.55%, resulting in a $4,468,658 DTA.  Pl. Ex.

168 at 12135.


Ruddell and Schwartz adopted Ferino's spreadsheet in

their own analysis of  whether the DTA was properly stated.

Ruddell and Schwartz had been planning to conduct the same

analysis that Ferino did in his spreadsheet because they

believed this to be the proper analysis.  Tr. 1564:9-17

(Ferino), 847:19-848:11 (Ruddell); Schwartz Dep. 164:7-165:7,

165:19-166:24; Pl. Ex. 173 at 1194-95.


On December 17, 2004, Harry Montgomery concluded that:

131

It is our understanding that on the books of
Ganis there was recorded as Income the Servicing
Fee and also any expenses incurred in Servicing
the loans.
* * *
and thus this was an intercompany item for the
two companies.

Pl. Ex. 180 at 1161. KPMG reviewed the Ganis tax returns and
determined they showed that Ganis picked up the Servicing Fee
Income for tax purposes:

Also, I spoke to Carol yesterday. Based on the
returns you provided me last week, Ganis picked
up the servicing fees in 2001 and 2002, while
DRAFCO did not deduct the fees in 1998, 1999 and
2000. In order to determine which years were
affected by the double-booking, it would be most
helpful to see the 1998, 1999 and 2000 returns
and backup for Ganis, and 2001 and 2002 returns
and backup for DRAFCO.

Pl. Ex. 166 at 12158.


By mid-December 2004, Harry Montgomery was pressing
Schwartz and Ruddell to finish their re-examination of the DTA
and reach a conclusion about the validity of the DTA. Schwartz
Dep. 203:2-12. In December 2004, Ruddell and Schwartz had
regular discussions about the DTA, but were unable to reach a
"final conclusion" on whether the DTA was properly stated, and
thus their analysis remained "inconclusive." Tr. 854:7-16,
905:7-10, 906:5-12 (Ruddell); Schwartz Dep. 198:13-24, 199:7-24,
200:5-9.

132

The open question for Ruddell and Schwartz in December 2004 was whether Ganis recorded the Servicing Fee Income because they theorized that if Ganis had failed to do so, that error might offset the $11 million overstatement of the DRAFCO DTA. Tr. 822:12-19, 827:17-21, 828:16-18, 838:22-25, 839:14-24, 854:7-16, 906:5-12 (Ruddell); Schwartz Dep. 199:7-24, 200:5-9; Pl. Ex. 155.

On December 15, 2004, Ruddell e-mailed Schwartz:

Based on Tony's analysis in the attachments to his [December 13, 2004] e-mails, it appears that the $15M DTA was computed based on all of the timing differences except the servicing fees. Once the servicing fees were included, however, a DTA of about $4M remains, and I see no reason why this would be considered not to exist. So, I think I agree with you if you are saying the DTA seems to have been overstated . . .

At the end of the day, I am coming around to the conclusion that the DTA was misstated.

Pl. Ex. 173; Schwartz Dep. 197:9-15; June 13 Opinion at *18.

On December 17, 2004, Bomm sought to determine the impact of an overstatement of the DTA on the DRAFCO purchase price. Bomm asked Ruddell to confirm that her understanding of the impact was correct. Tr. 856:18-24, 859:16-18 (Ruddell); Pl. Ex. 177. Bomm stated "Let's assume the DTA is overstated by 400. This would mean the sales price was overstated by 400."

133

Ruddell replied to the e-mail, and wrote that Bomm's summary "was consistent with my understanding." Tr. 858:7-16 (Ruddell); Pl. Ex. 177.

On December 17, 2004, Ruddell sent another e-mail to Schwartz. This lengthy and detailed e-mail "summarized" KPMG's analysis, stating that "Ganis did report the servicing income in its financials," that "no M-1 appears, so Ganis apparently also reported the income for tax purposes," and that:

> Per Harry and Tony, no servicing expense was reported in DRAFCO's financials or tax returns. Tony Ferino has recomputed the DTA (based in part on estimates), using M-1s for 1999-2002, including and then excluding the servicing fee expense. Tony took his numbers from servicing certificates. Without servicing fee expense, the recomputed DTA corresponded to the reported amount: $15,345,415. With servicing fee expense, the DTA would have been $4,468,658. The difference, $10,876,757, is the potential overstatement of both the DTA and sales price of Ganis/DRAFCO.
>
> If our understanding of the "error" is correct, then the DTA was overstated because the tax deductible servicing fees payable by DRAFCO to Ganis were never deducted.

Pl. Ex. 178; Tr. 859:21-860:3 (Ruddell); Schwartz Dep. 217:6-8, 219:18-24.

Ruddell assumed that Deutsche Bank would recognize its error in failing to deduct the Servicing Fee Expenses, file an amended tax return, receive money from IRS, and, since E*TRADE

was entitled to a dollar-for-dollar refund of the amount of the
DTA overstatement, refund the money to E*TRADE, at a cost to
Deutsche Bank of $11 million. Tr. 867:21-868:9 (Ruddell);
Pl. Ex. 178.

From December 17 to December 21, 2004, Schwartz and
Ruddell were in the process of preparing a memorandum (the "KPMG
Memo") to send to E*TRADE that summarized KPMG's findings to
date on the DTA. Harry Montgomery told them he needed their
conclusions because he was expected to share them with others
within Deutsche Bank by a certain date. Tr. 875:16-23
(Ruddell); Schwartz Dep. 238:22-239:16.

During this period, Ruddell and Harry Montgomery had
at least one conversation in which Ruddell gave Harry Montgomery
his tentative conclusions that the DTA was overstated. On
another occasion, Ruddell told Harry Montgomery that "I'm
thinking maybe we have a problem" with the DTA. In response to
Ruddell's statements, Harry Montgomery expressed concern about
Ruddell's conclusions. Tr. 871:20-24, 872:11-20, 881:13-882:13
(Ruddell).

The KPMG Memo did not incorporate any new information
KPMG learned between December 17 and December 21, 2004. Tr.

135

942:12-15, 954:14-955:17 (Ruddell). Other than his conversation
with Harry Montgomery between December 17 and 21, Ruddell could
not remember any other events or information that affected the
content of the KPMG Memo during that period. Tr. 882:1-14
(Ruddell).

As of December 21, 2004, KPMG had not yet received all
the pre-sale balance sheets for Ganis and DRAFCO. That
afternoon, Belinda Montgomery emailed Schwartz and others, and
wrote that E*TRADE had just provided the DRAFCO Balance Sheet,
which was "the last item [KPMG] asked for." Pl. Ex. 184.
Schwartz forwarded that email to Ruddell, and wrote "[s]ee how
incredibly unhelpful this is . . . ." After he received
Schwartz's email, Ruddell replied to her and wrote:

> Ha ha ha ha ha!  Maybe we should send back an
> email that just says "bite me."

Pl. Ex. 184; Schwartz Dep. 234:11-14 & 21-25.

Later that same day, Ruddell and Schwartz e-mailed the
completed KPMG Memo to Harry Montgomery, Belinda Montgomery,
Schwartz, Meyers, Staffeldt, and Sieling. Schwartz Dep. 238:4-
18; Pl. Ex. 190. The KPMG Memo stated that "we have not seen
any evidence" that Ganis booked the Servicing Fee Income, that

136

"the DTA was properly recorded," and that "E*TRADE paid for value" when it purchased the DTA. Therefore, by the time E*TRADE received the KPMG Memo on December 21, 2004, the KPMG Memo no longer concluded that any problems existed with respect to E*TRADE's purchase of the DTA. Tr. 871:20-872:1, 872:11-20, 879:19-880:3, 881:6-25, 881:13-882:14 (Ruddell); Schwartz Dep. 249:6-20; Pl. Ex. 190 at 32911.

Despite the completion of the KPMG Memo, Ruddell and Schwartz never reached a final conclusion as to the accuracy of the DTA and the Audit Opinion. Tr. 872:21-873:20, 906:5-23 (Ruddell); Schwartz Dep. 16:20-17:12.

The KPMG Memo stated that E*TRADE's belief that the DTA was overstated was correct only "if DRAFCO and Ganis were reporting the income" but that "we have not seen any evidence that Ganis included these amounts in income." Pl. Ex. 190.

At trial, however, Ruddell stated that KPMG had seen Ganis tax returns indicating that Ganis included the Servicing Fee Income as book and tax income. KPMG also received evidence that Ganis booked this income by way of statements by Haisch and Pechulis as well as Ganis accounting documents provided by Haisch that indicated that Ganis booked the income. KPMG never

137

saw any evidence that suggested Ganis did not include the
income. Tr. 879:9-14 (Ruddell); Schwartz Dep. 211:8-212:10,
245:17-21 & 24-25; Pl. Exs. 165, 166, 174, 176, 190.

On December 22, 2004, Ruddell, Schwartz, Harry
Montgomery, Ferino, B. Montgomery, Robertson, and Meyers held a
conference call to discuss the KPMG memorandum. Tr. 156:9-18
(B. Montgomery); Meyers Dep. 302:16-21; Robertson Dep. 225:5-
226:22; Schwartz Dep. 275:12-24. The call was "contentious" and
"very stressed," and Schwartz spent much of the call defending
the Audit Opinion and the quality of KPMG's "technical analysis"
of the DTA. Tr. 157:2-9, 157:24-158:3 (B. Montgomery); Meyers
Dep. 301:7-303:14; Schwartz Dep. 268:22-24; June 13 Opinion at
*18.

When pressed on the quality of KPMG's Audit Opinion,
Schwartz stated that KPMG's audit of the DTA was "garbage in,
garbage out." After Schwartz made this admission, no one spoke
for several seconds. The silence made Schwartz realize that she
should have "kept her mouth shut." After the telephone
conference, Schwartz told Ruddell that she regretted making this
statement. Schwartz Dep. 272:5-10, 273:5-7. Belinda Montgomery
wrote an e-mail to her colleagues the day after the conference
expressing shock that Schwartz described the audit this way.

138

Tr. 158:24-159:12, 160:9-161:7 (B. Montgomery); Meyers Dep.
301:7-305:24; Robertson Dep. 226:4-9; Schwartz Dep. 265:23-25,
266:9-17, 271:23-272:4; Pl. Ex. 195; June 13 Opinion at *18.

On January 18, 2005, as part of his continuing efforts
to support the stated value of the DTA, Ruddell prepared an
analysis of the DTA. Based on this analysis, Ruddell wrote that
"the Schedule M-1s recorded by DRAFCO support the deferred tax
asset reported in DRAFCO's 12/23/02 balance sheet." This
analysis did not include servicing fees as a temporary
difference. At trial, Ruddell stated that his failure to factor
in Servicing Fees in calculating the DTA meant that this
analysis could not be correct. Tr. 899:1-16, 900:7-23
(Ruddell); Def. Ex. 244.

Deutsche Bank's omission of the deduction for the
Servicing Fee Expenses on its M-1 was incorporated in Ruddell's
January 2005 report. Tr. 902:3-14 (Ruddell); Def. Ex. 244.

## I.     The Accounting Treatment of the DTA

### 1.     The Experts

The proper accounting treatment for securitized
transactions under the facts found above was considered by three
prominent accounting firms, E&Y, Deloitte, and KPMG, two
experts, Robert W. Berliner ("Berliner") for E*TRADE, and Gerard
A. Mangieri ("Mangieri") for Deutsche Bank, and various
executives, accountants and tax preparers of the parties as
described above. All considered the appropriate accounting
treatment of the Securitizations.

The most credible of the accountants was Meyers as a
result of his experience and impartiality. His conclusions were
not colored by self interest and at the time they were reached
were not necessarily in his client's interest.

E&Y, as found above, had a limited engagement and
never dealt with the core accounting issues presented here.

KPMG internally and informally recognized that the DTA
was overstated due to the failure to take the Servicing Fee
Deduction, but was institutionally committed to not changing its
Audit Opinion. Deutsche Bank was a substantial client paying
KPMG fees of approximately $50-$60 million annually. Tr.
896:14-897:11, 968:15-969:6, 993:6-11 (Ruddell); Pl. Exs. 327 at
200; 328 at 184-85; 329 at 188; 330 at 210; 331 at 270.

Berliner was less expert in the area of securitization
than Mangieri but his investigation and research were more
thorough. Of the two experts retained by the parties for trial,
Berliner was the more credible expert.

Before drafting his initial expert report, Mangieri
reviewed 1,232 pages of documents. Before he wrote his rebuttal
report he reviewed 224 additional pages. The parties produced
almost 350,000 pages of documents in the case. Tr. 1797:25-
1798:15 (Mangieri).

Deutsche Bank produced a total of 196 servicer
certificates, one each month for each of the four DRAFCO
Securitizations. These certificates contained entries that
became temporary differences. Mangieri reviewed 12 servicer
certificates (one year of certificates for one of the
Securitizations). As a result, Mangieri was unable to tie
certain summary documents to the servicer certificates because
he did not possess the level of detail he needed. Tr. 1799:7-
1800:22 (Mangieri).

In formulating his expert opinion, Mangieri did not review the September 10, 2003 spreadsheet prepared by Ferino calculating the DTA with a 35% tax rate, Pl. Ex. 53; Tr. 1819:10-1820:22 (Mangieri), the October 2, 2003 e-mail from Harry Montgomery in which he wrote "I think the tax benefit on DRAFCO should be at 35%," Pl. Ex. 73; Tr. 1822:21-23 (Mangieri), the October 3, 2003 e-mail in which Ferino wrote that "Brian [Forschino] & I discussed this point last night and agreed that we should not continue to provide the additional 7% State Tax benefit," Pl. Ex. 73; Tr. 1822:21-23 (Mangieri), the October 8, 2003 e-mail from Ferino to Gaertner in which Ferino states that "any DTA" for DRAFCO "should be calculated at 35% federal rate," Pl. Ex. 73; Tr. 1822:21-23 (Mangieri), the October 18, 2004 e-mail from Schwartz to Ruddell and Atlas concluding that the DTA was overstated because of the missed servicing fee deduction, Pl. Ex. 155; Tr. 1785:7-21 (Mangieri), the October 21, 2004 e-mail from Schwartz to Ruddell and Atlas summarizing the analysis that was "leading me to believe that the income was booked in Ganis and the DTA in DRAFCO was overstated as E*TRADE claims," Pl. Ex. 157; Tr. 1787:25-1788:11 (Mangieri), and Ferino's December 13, 2004 email and spreadsheet recalculating the DTA after the deduction of servicing fee expenses, Pl. Ex. 168; Tr. 1788:17-1789:10 (Mangieri).

142

Mangieri also was unaware that on December 15, 2004, six days before KPMG sent the KPMG Memo to E*TRADE, Ruddell had written that "it appears there was a valuable DTA that was just overstated." Pl. Ex. 173; Tr. 1777:14-1778:15 (Mangieri). He was similarly unaware of Ruddell's December 17, 2004 e-mail to Schwartz and Davidson summarizing why Ruddell believed the DTA was overstated. Pl. Ex. 178; Tr. 1774:20-1775:2 (Mangieri). Mangieri admitted that these were relevant facts he would have considered had he known of them. Tr.1778:16-20, 1776:2-17 (Mangieri).

Mangieri reviewed the deposition transcripts of Belinda Montgomery, Haisch, and Harry Montgomery. Tr. 1804:21-1805:19, 1807:1-5 (Mangieri). However, he did not read the deposition transcript of Meyers, did not review any testimony from KPMG, nor did he speak to anyone at KPMG concerning its work on the DTA. Tr. 1770:20-1772:2, 1807:25-1808:10 (Mangieri).

Mangieri was unaware that Ruddell and Schwartz testified in their depositions that KPMG's analysis of the DTA was "inconclusive" and that KPMG could not confirm that the Audit Opinion was correct or that the DTA was properly stated. Mangieri admitted that these were relevant facts he would have

considered had he known of them. Tr. 1773:18-24, 1777:2-1778:4, 1778: 16-25, 1784:19-7785:6 (Mangieri).

Mangieri only spoke to two people in forming his opinions in this case: Harry Montgomery and Ferino. He had two conversations with both of them. The conversations lasted less than one hour in total. The second conversation consisted of them reviewing and discussing Mangieri's draft opinion. Tr. 1806:8-25 (Mangieri).

Mangieri, although knowledgeable and an expert, failed to examine the accounting issues in sufficient depth, to the detriment of his credibility.

## 2. The Servicing Fee Deduction

At the inception of each Securitization, Deutsche Bank recorded a "Servicing Asset" on DRAFCO's books, which reflected the present value of expected profits from servicing the Loans (the difference between the Servicing Fees received and the actual cost to service the Loans). The Servicing Asset differs from the Servicing Fees, which is the cash actually received from servicing the Loans. Tr. 1150:25-1152:14 (Audette); Haisch

Dep. 166:11-167:22; Schwartz Dep. 77:19-78:3; Snow Dep. 151:2-13.

The Servicing Asset should have been recorded on the books of Ganis, not DRAFCO, because Ganis serviced the Loans. Tr. 1153:24-1154:19 (Audette), 933:11-24, 979:16-980:5 (Ruddell); Haisch Dep. 41:21-22; Schwartz Dep. 77:19-79:21; Meyers Dep. 96:5-21.

During the parties' negotiations, Haisch, a Deutsche Bank employee at the time, admitted to E*TRADE that Deutsche Bank made an accounting error because it should have booked the Servicing Asset on Ganis's books as Ganis was the servicer. The parties agreed that Deutsche Bank needed to correct this accounting error by transferring the Servicing Asset from DRAFCO's balance sheet to Ganis's balance sheet. Tr. 1154:8-16 & 20-25, 1160:3-7 (Audette); Haisch Dep. 41:7-12, 210:23-211:8.

Deutsche Bank corrected this accounting error in October 2002 by transferring the Servicing Asset from DRAFCO's balance sheet to Ganis's balance sheet. Deutsche Bank's transfer of the Servicing Asset to Ganis's balance sheet had the effect of removing from DRAFCO's balance sheet all traces of activity that had occurred with respect to the Servicing Asset.

As a result, DRAFCO's balance sheet as of December 23, 2002, the closing date of Ganis, did not reflect or include a Servicing Asset. Tr. 1154:20-1157:13, 1161:17-1162:4 (Audette); Haisch Dep. 49:2-8, 54:19-21, 195:5-11, 210:23-211:8; Meyers Dep. 97:4-16, 263:11-264:9; Pl. Ex. 35 at 23905.

The DRAFCO Reference Balance Sheet was a preliminary balance sheet created by Deutsche Bank that reflected the assets, liabilities and stockholder's equity of DRAFCO as of October 31, 2002. During the negotiation of the SPA, the parties used the Reference Balance Sheet as the basis for the purchase price of DRAFCO because at the time the audited Closing Balance Sheet did not exist. Tr. 1131:18-1132:11 (Audette), 1009:20-1010:4 (Mackay); Pl. Ex. 6 at 1798.

Under the SPA, the purchase price for DRAFCO was based on the Tangible Stockholder's Equity on DRAFCO's Reference Balance Sheet as of October 31, 2002, plus a premium. The purchase price would be adjusted dollar-for-dollar to the extent that the Tangible Stockholder's Equity on the audited Closing Balance Sheet as of December 23, 2002, differed from that on the Reference Balance Sheet. Tr. 395:25-396:7 (Berliner), 1004:12-17, 1008:15-20 (Mackay); Pl. Ex. 5 §§ 2.02, 2.06, 2.07.

146

The Reference Balance Sheet represented that DRAFCO
had three assets totaling approximately $79.6 million as of
October 31, 2002:  (1) a $49.4 million Residual; (2) $23.8
million in cash; and (3) $6.3 million in "Other assets."  The
$6.3 million "Other" asset was DRAFCO's deferred tax asset.  The
Reference Balance Sheet did not contain a Servicing Asset.  Tr.
1135:17-1136:1 (Audette), 428:9-14 (Berliner), 1009:5-13
(Mackay); Pl. Ex. 6 at 1798; June 13 Opinion at *4.

The Reference Balance Sheet represented that DRAFCO
had two liabilities totaling approximately $59.3 million:  (1)
$38.4 million of inter-company payables; and (2) $20.9 million
of "other liabilities."  The DRAFCO Reference Balance Sheet,
including the "other liabilities" category, did not contain or
reflect a deferred tax liability.  Tr. 1137:1-3 (Audette); Pl.
Ex. 6 at 1798.

The Template, as utilized by Deutsche Bank, however,
failed to deduct $27,501,282 in Servicing Fees that DRAFCO had
paid Ganis to service the Loans.  An error in the Template would
lead to an error in the calculation of the value of the DTA and
a misstated Reference Balance Sheet.  Tr. 1073:16-1075:16
(Ferino).

147

The failure to deduct these Servicing Fees inflated the amount of temporary differences used to calculate the DTA by $27,501,282, which in turn overstated the value of the DTA on the Closing Balance Sheet by $10,876,757 (applying a 39.55% tax rate). Tr. 441:11-22 (Berliner), 1510:24-1511:12, 1075:3-16 (Ferino). Where an asset on the Closing Balance Sheet is overstated, that same asset on the Reference Balance Sheet would also be overstated in an identical amount. As a result, the $6,302,000 DTA listed on the Reference Balance Sheet actually was a deferred tax *liability* of $4,574,757 ($6,302,000 minus the $10,876,757 overstatement). This almost $11 million overstatement of the DTA on the Reference Balance Sheet violated U.S. GAAP. Tr. 1136:22-1137:3, 1138:6-12, 1144:12-17 (Audette), 395:12-22 (Berliner), 1074:10-1075:16 (Ferino).

In § 3.07 of the SPA, Deutsche Bank represented and warranted to E*TRADE that there were no liabilities of DRAFCO other than those listed on the Reference Balance Sheet. Pl. Ex. 5 § 3.07.

Deutsche Bank provided the Reference Balance Sheet to E*TRADE before the parties signed the SPA, and it was attached to the SPA as Exhibit 1.01(f). Tr. 1008:3-7 (Mackay); Pl. Ex. 6 at 1797-98.

148

Mackay reviewed the Reference Balance Sheet before the parties signed the SPA. In agreeing to sign the SPA and close the transaction, Mackay relied on the Reference Balance Sheet as being accurate and prepared in accordance with U.S. GAAP. Tr. 1008:3-7 & 13-25, 1009:20-1110:4 (Mackay).

Audette advised E*TRADE senior management on accounting issues concerning the Reference Balance Sheet. He also reviewed the Reference Balance Sheet before the parties signed the SPA. Audette had no reason to believe that the Reference Balance Sheet was overstated. Relying on the Reference Balance Sheet, Audette recommended to his superiors that E*TRADE should sign the SPA and close the transaction. Tr. 1132:12-14, 1137:12-1138:9, 1145:1-10 (Audette).

As set forth above, in § 3.06 of the SPA, Deutsche Bank represented and warranted that the Reference Balance Sheet "presents fairly in all material respects the financial condition" of DRAFCO and that Deutsche Bank had prepared the Reference Balance Sheet "in accordance with U.S. GAAP."

The SPA required Deutsche Bank to deliver to E*TRADE separate closing balance sheets for Ganis and DRAFCO by February

149

21, 2003, sixty days after the Ganis closing date. Tr. 649:17-
650:1 (Gaertner), 1052:15-19 (Mackay); Pl. Ex. 5 § 2.06(a).

The SPA also required the closing balance sheets to be
independently audited in accordance with U.S. GAAP and delivered
with an independent auditor's report:

> The Seller shall use its reasonable best efforts to
> prepare and deliver to the Purchaser, within 45
> calendar days following the Closing Date but in no
> event more than 60 calendar days following the Closing
> Date, an audited balance sheet, of Ganis and the
> Subsidiaries . . . , together with the report thereon
> of the Seller's Accountants. The Closing Balance Sheet
> shall be prepared on the basis of the accounting
> principles set forth on Exhibit 2.06(a) (the
> "Accounting Principles") and in any event in
> accordance with U.S. GAAP and the terms of this
> Agreement. . . .

Pl. Ex. 5 § 2.06(a); Tr. 1052:15-19 (Mackay).

It was the practice of Deutsche Bank's corporate tax
department to take all legally allowable tax deductions as part
of its duty to its shareholders to minimize its tax exposure.
Tr. 1066:21-1067:3, 1067:9-14 (Ferino). Similarly, Deutsche
Bank maintained its financial records as accurately as possible
in the ordinary course of business. Tr. 1067:19-24, 1068:9-14,
1069:7-12 (Ferino).

The Servicing Fees Deutsche Bank incurred between 1999
and 2002, totaling $27,501,282, were legitimate business
expenses of DRAFCO. Tr. 1147:21-1148:4 (Audette), 439:21-440:5
(Berliner), 1496:23-1497:3, 1497:11-13 (Ferino). DRAFCO's pro
forma tax returns prior to 2003 should have reflected a
deduction of the Servicing Fees, but did not, thereby
overstating DRAFCO's taxable income by $27.5 million. Tr.
431:13-23, 433:1-6 (Berliner), 830:17-24, 831:6-8 (Ruddell).

Ferino had known since at least the summer of 2003
that Deutsche Bank had not deducted the Servicing Fee Expenses.
Tr. 1481:4-12, 1503:23-1504:3 (Ferino).

Ferino prepared the 2003 DRAFCO pro forma tax return
for the stub period of January 1, 2003 to October 19, 2003 (when
Deutsche Bank owned DRAFCO). Tr. 1065:22-1066:1, 1490:16-1491:5
(Ferino); Pl. Ex. 151; Pl. Ex. 304. Deutsche Bank deducted the
Servicing Fees on the 2003 DRAFCO Stub Return. In preparing
this Stub Return, Ferino followed the Template in every respect,
except he disregarded the Template's failure to deduct the
Servicing Fee Expenses. Tr. 1488:10-12, 1485:15-1486:1, 1491:7-
14, 1492:1-4 (Ferino); Pl. Ex. 304 at 74658 & 74666.

151

The nature of the Servicing Fees that Deutsche Bank deducted in 2003 was identical to the Servicing Fees Deutsche Bank did not deduct between 1999-2002. There was no reason to treat the Servicing Fees incurred between 1999-2002 any differently than the Servicing Fees incurred in 2003. Tr. 1494:24-1495:9, 1496:19-22 (Ferino).

During KPMG's audit of the 2003 Stub Return, KPMG never objected to the deduction of the Servicing Fees. Tr. 1499:16-23 (Ferino).

The key line item on the spreadsheet prepared by Ferino listing the temporary differences forming the DTA is the first temporary difference listed, "Interest Income." Interest Income is all of the taxable income that DRAFCO received from the borrowers on the Loans underlying the Securitizations. Tr. 1146:24-1147:6 (Audette), 436:16-437:10 (Berliner).

A fixed portion of the borrower's interest payment was used to pay for servicing of the Loans. When DRAFCO received Interest Income from the borrowers, embedded in this Interest Income was Servicing Fee Income. Tr. 1146:21-1147:12 (Audette), 416:9-22, 436:16-437:10 (Berliner); Meyers Dep. 93:16-23, 128:8-129:13.

152

The Interest Income is reported gross of expenses in that it included all of the taxable income from the borrowers on the Loans before DRAFCO paid for any expenses associated with the Loans. Because DRAFCO did not service the Loans and provided for the trustee to pay Ganis on its behalf, DRAFCO allocated the Servicing Fee Income that it received from the borrowers (which was embedded in the Interest Income) to pay Ganis to service the Loans. On the spreadsheet prepared by Ferino, the $27,501,282 in Service Fee Income that DRAFCO received from the borrowers is embedded in the "Interest Income" line. Tr. 1147:7-1148:17 (Audette), 1862:5-25, 1866:24-1867:3 (Mangieri); Meyers Dep. 225:17-226:24; Pl. Exs. 116, 234.

KPMG concluded in its work papers that Interest Income was a gross number and thus Servicing Fee Income was embedded in Interest Income. Mangieri confirmed this:

Q:   You did see a schedule where KPMG said servicing
     income in brackets was included in interest
     income?

A:   I did see that schedule.

Tr. 1857:11-16 (Mangieri); Pl. Ex. 159 at 1384.

Mangieri also concluded that Interest Income was a

gross number and that Servicing Fee Income was embedded in

Interest Income:

- Q. Just so we're clear, is it your testimony that the interest income received is the money that DRAFCO received from the people who had the loans with DRAFCO?

- A. That's my understanding.

- Q. And the interest income received number, the 458 million number is a gross number?

- A. That's my understanding.

- Q. So that means, then, that the money paid out for expenses was not subtracted from this line item, interest income received?

- A. That would be my understanding.

- Q. Isn't it also true that the cash that DRAFCO used to pay the servicing fee expense came out of the interest income received?

- A. The cash that was used to pay the servicing fee expense was paid by the service provider but out of the interest income that's on that line presumably, yes.

                    *    *    *

- Q: Interest Income received includes the money that's used to pay the servicing fees?

- A: It's use to pay expenses.

- Q: Including the servicing fees?

- A: Yes.

Tr. 1859:6-22, 1866:24-1867:3 (Mangieri). Mangieri testified

that the portion of the Interest Income that is used to pay the

154

servicing fees is referred to as "Servicing Fee Income to
DRAFCO." 1862:2-25 (Mangieri).

Because the Servicing Fee Income is included on the
spreadsheet, the Servicing Fee Expenses also should have been
included. If not, the Servicing Fee Income and Servicing Fee
Expenses would not offset each other, resulting in an
overstatement of DRAFCO's taxable income and the amount of
temporary differences. Tr. 441:4-22 (Berliner); Meyers Dep.
71:3-20, 72:25-73:18; Pl. Ex. 168 at 12135.

The spreadsheet supplied by Ferino to Belinda
Montgomery failed to include the $27,501,282 in Servicing Fee
Expenses that Ganis received to service the Loans because the
Template, as interpreted by Hickam and Ferino, did not provide
for a deduction of the Servicing Fee Expenses. The Servicing
Fee Expenses are not listed as a separate temporary difference,
and they are not embedded in the "Interest Expense" line item on
the spreadsheet. Thus, there was no Servicing Fee Income to
offset the Servicing Fee Expenses on the spreadsheet. Tr.
1485:18-1486:18, 1488:4-20, 1510:24-1511:12 (Ferino); Pl. Ex. 92
at 5533.

155

The impact of the spreadsheet's inclusion of the
Servicing Fee Income and the exclusion of the Servicing Fee
Expenses was to overstate the temporary differences by
$27,501,282 - the amount of the Servicing Fee Expenses. The
correct amount of temporary differences was $11,298,755
($38,800,037 minus $27,501,282). Tr. 441:4-22 (Berliner); Pl.
Ex. 168 at 12135; Meyers Dep. 71:3-20, 72:25-73:18.

At no point during their investigation did Ruddell or
Schwartz refer to Servicing Fees as a permanent difference. In
fact, Servicing Fees are not a permanent difference because book
and tax accounting for Servicing Fee Expenses are different in
timing. Ruddell could not imagine thinking otherwise and would
have been "surprised" if he ever had. Neither Ruddell nor
Schwartz saw any documents in which Servicing Fees were referred
to as permanent differences. Ruddell 851:6-9, 851:23-852:2,
855:10-21; Meyers Dep. 131:6-14. Nor did Ferino ever recall
seeing any document authored by KPMG describing the Servicing
Fees as a permanent difference. Tr. 1513:9-1514:2, 1561:13-18
(Ferino).

KPMG's DRAFCO documents, including the tax work
papers, list numerous permanent differences such as
meals/entertainment, political contributions, and non-deductible

premiums on life insurance but do not list the Servicing Fee
Expenses as a permanent difference.  Meyers Dep. 273:15-23; Pl.
Ex. 13.

### 3.  **State Taxes**

The spreadsheet Ferino sent to Belinda Montgomery on
September 11, 2003, used a 35% federal tax rate and a 7% state
tax rate, which led to a blended tax rate of 39.55%.  The total
blended tax rate was calculated to be 39.55% because state tax
is deductible on federal tax returns, and this deduction reduces
the blended tax rate from 42% (the sum of the state and federal
tax rates) to 39.55%.  Tr. 454:7-15 (Berliner); Pl. Ex. 39 at
5881.

The Audit Opinion, which KPMG represented was prepared
in accordance with U.S. GAAP, certified that 39.55% rate
complied with U.S. GAAP and was the proper tax rate for
calculating the DTA.  Pl. Ex. 35 at 23904.  In the note to the
Audit Opinion entitled "Income Taxes," KPMG wrote "DRAFCO files
individual or combined state income tax returns in accordance
with state tax laws."  Tr. 465:12-466:9 (Berliner), 101:4-17,
294:2-9 (B. Montgomery); Pl. Ex. 35 at 23907.

The Audit Opinion led Belinda Montgomery to believe
that DRAFCO had paid state taxes, and E*TRADE relied on the
Audit Opinion in agreeing to purchase the DTA. Tr. 101:4-17,
294:2-9 (B. Montgomery); Ex. 35 at 23907. However, as Ferino
stated in his October 8, 2003 e-mail, Deutsche Bank had "never
paid state taxes" in any state, including California. While
DRAFCO was part of Deutsche Bank's consolidated California Tax
Return, it did not pay any income tax to the State of
California. Ferino failed to disclose to E*TRADE that Deutsche
Bank did not apportion any California state tax to DRAFCO and
thus DRAFCO did not pay any California state taxes. Ferino
1441:13-18, 1444:3-12, 1484:7-17; Pls. Exs. 73, 346, 347, 348.
Deutsche Bank did not reveal to E*TRADE Ferino's internal
September 10, 2003 spreadsheet or the October 6-8 e-mails, and
did not advise E*TRADE that "DRAFCO has never paid state taxes
and therefore any DTA should be calculated at the 35% federal
rate." Tr. 126:2-127:16 (B. Montgomery); Pls. Exs. 53, 69, 70,
73.

The federal tax rules allow a company to deduct taxes
from federal taxable income the amount of state tax paid.
DRAFCO's 2002 pro forma federal tax return deducted $1.6 million
in state taxes that it had allegedly paid, and the 2001 return
deducted $71,053 in state taxes. Deutsche Bank was not entitled

to take, and should not have taken, these deductions for state

tax paid because DRAFCO failed to pay any state tax in 2001 or

2002. Tr. 454:9-10 (Berliner), 1476:8-25, 1572:4-8 (Ferino);

Pl. Exs. 302, 303.

Based on the state tax deductions in the 2001 and 2002

returns, E\*TRADE reasonably believed prior to the DRAFCO closing

that DRAFCO paid more than $1.6 million in state income taxes in

2001 and 2002. These returns supported E\*TRADE's belief that it

was proper for Deutsche Bank to use the 39.55% blended rate

(which included a 7% state tax rate) to calculate the DTA. Tr.

1475:1-1476:13 (Ferino), 294:2-9 (B. Montgomery).

Financial Accounting Standard ("FAS") 5 is the

accounting rule that dictates the proper tax rate to apply in

calculating deferred tax assets and when a contingent liability,

such as state tax, must be accounted for on the books. FAS 5 is

an accounting rule under U.S. GAAP, not a function of state or

federal tax law. Tr. 457:24-458:9, 459:7-10 (Berliner),

1827:17-19 (Mangieri); Pl. Ex. 332.

FAS 5 provides that a company may use a state tax rate

to calculate a deferred tax asset when two conditions are met.

First, it must be "probable" that the company will have state

159

tax liability.  Second, the amount of the state tax payment must
be reasonably "estimable."  Tr. 458:10-19 (Berliner), 1827:20-22
(Mangieri); Pl. Ex. 332.


U.S. GAAP prohibited Deutsche Bank from using a state
tax rate to calculate the DTA because (a) it was not probable
that DRAFCO would have state tax liability and (b) even if it
were probable, the amount of the state tax payment was not
reasonably estimable.  Accordingly, U.S. GAAP required Deutsche
Bank to use the 35% federal rate, and not the 39.55% blended
rate, to calculate the DTA.  Tr. 458:11-19, 459:10-17
(Berliner).


Under U.S. GAAP, state tax liability is "probable" if
it has a greater than 50% probably of occurring.  Tr. 1827:23-25
(Mangieri).  Deutsche Bank's tax department (Ferino and H.
Montgomery), Deutsche Bank's management (Gaertner), KPMG's audit
partner (Davidson), and KPMG's tax auditor (Forschino) were all
aware that "any DTA should be calculated at the 35% federal
rate" because "DRAFCO has never paid state taxes."  Since its
creation in 1999, DRAFCO "has never paid state taxes," and
DRAFCO also has never been assessed any state tax liability by
any state tax authority for the tax years 1999 to December 23,
2002.  Tr. 459:10-17 (Berliner), 1814:20-23, 1817:11-25

160

(Mangieri); Pl. Ex. 73; June 13 Opinion at *13. Deutsche Bank never filed any stand alone state tax returns. While DRAFCO was required by law to be included in Deutsche Bank's Unitary California Tax Return and was included in these unitary returns, DRAFCO did not pay any state tax to California. Tr. 459:10-20 (Berliner), 1441:14-1444:12 (Ferino); Pl. Exs. 346, 347, 348; June 13 Opinion at *13. Furthermore, in determining whether taxes are owed by an entity, states normally look to items such as payroll data and property taxes. Although DRAFCO held the Residual, it was a "paper company" that had no employees, owned no property, had no physically observable business, and did not sell any goods or services. Tr. 459:24-460:8, 460:13-19 (Berliner).

U.S. GAAP requires that before a taxpayer may conclude that the amount of state tax liability is estimable, it must perform an analysis to estimate the amount of state tax liability. This required analysis mandates that the taxpayer determine, among other things, the states in which it will have state tax exposure, the tax rates in each of those states, and how much liability to apportion to each state. Corporate taxpayers, such as Deutsche Bank, typically prepare and retain memoranda, analyses, spreadsheets, and other documents recording

their state tax liability analyses. Tr. 455:9-456:11
(Berliner), 1828:15-20 (Mangieri).

Deutsche Bank did not comply with U.S. GAAP because it
never performed any type of analysis to estimate the amount of
state tax liability that DRAFCO might have. Tr. 457:6-13
(Berliner), 1830:2-24, 1833:24-1834:1 (Mangieri). KPMG also
never performed any type of analysis to estimate or verify the
amount of state tax liability that DRAFCO might have. Tr.
1830:2-24, 1833:20-1834:1 (Mangieri).

KPMG stated in a note in its work papers "Unsure at
this time what states the company is subject to tax in." Pl.
Ex. 13 at 190219.

Deutsche Bank has not shown how it arrived at the 7%
rate (as opposed to any other rate). Tr. 455:9-456:11, 457:6-13
(Berliner), 1828:15-20, 1830:2-24, 1833:20-1834:1 (Mangieri).

## J.   The Liquidation Expense

Deutsche Bank did not deduct $502,825 in Liquidation
Expenses which overstated taxable income by $502,825. Tr.
432:21-25 (Berliner). Deutsche Bank's expert testified that

162

DRAFCO did not deduct Liquidation Expenses on its 1999-2002 tax returns. Tr. 1766:12-16 (Mangieri); Pl. Exs. 300-303.

Deutsche Bank has suggested that the deduction for Liquidation Expenses is reflected in the "bad debts" line item on page 1 of the 1999-2002 tax returns. E*TRADE deducted this expense in DRAFCO's post-2003 tax returns, not in the "bad debts" line item on the tax return, but on Schedule M-1, which contains a line item for "Bad Debt - Recoveries" - a net number that takes into account the Liquidation Expenses. Tr. 1316:14-1318:3 (Audette); Def. Ex. 275 at 202279, 202295. DRAFCO's 1999-2002 tax returns, including Schedule M-1, do not include a line item for "Bad Debt - Recoveries." Deutsche Bank has adduced no evidence to establish that it deducted DRAFCO's Liquidation Expenses on its Schedule M-1.

Liquidation Expenses are temporary differences, not permanent differences. For book purposes, the Liquidation Expenses were accounted for on the day the Securitizations closed because these expenses were part of the Residual and the Gain on Sale. Tr. 416:12-25 (Berliner); Pl. Ex. 312.

## III. CONCLUSIONS OF LAW

**A.      Jurisdiction, Venue and the Applicable
         Law  Have Been Established**

         The present action is between domestic corporations

(E*Trade Financial and E*Trade Bank) and a citizen or subject of

a foreign state (Deutsche Bank AG which is a citizen of

Germany).  There is diversity jurisdiction pursuant to 28 U.S.C.

§ 1332(a)(3) and general personal jurisdiction over Deutsche

Bank because Deutsche Bank transacts significant business within

this district and because Deutsche Bank consented to this

Court's jurisdiction in SPA § 11.12.

         Venue is proper because a substantial part of the

events and omissions giving rise to the claims occurred here.

In addition, SPA § 11.12 provides for all actions arising out of

or relating to the SPA to be heard in a New York State or

federal court sitting in the City of New York.

         The parties agreed in SPA § 11.12 that New York law

governs the obligations in the SPA.

**B.    Deutsche Bank Breached the Contract**

         Count IX of the Amended Complaint asserts claims for

breach of contract under New York law.  To establish this claim

164

E\*TRADE must show, by a fair preponderance of the evidence,
(1) the existence of an agreement; (2) adequate performance of
the contract by E\*TRADE; (3) non-performance by Deutsche Bank;
and (4) damages attributable to the breach.  See RCN Telecom
Svcs., Inc. v. 202 Centre Street Realty LLC, 156 Fed. App'x 349,
350-51 (2d Cir. 2005); Echostar DBS Corp. v. Gemstar-TV Guide
Int'l, Inc., No. 05 Civ. 8510 (DAB), 2007 WL 438088, at \*5
(S.D.N.Y. Feb. 8, 2007); Command Cinema Corp. v. VCA Labs, Inc.,
464 F. Supp. 2d 191, 198 (S.D.N.Y. 2006).

E\*TRADE and Deutsche Bank were parties to the SPA.
E\*TRADE performed all of the conditions precedent and
obligations required by the SPA and therefore became entitled to
expect and demand Deutsche Bank's performance of the SPA.
Deutsche Bank has not asserted that E\*TRADE failed to perform
its obligations under the SPA except insofar as it failed to
employ the dispute resolution provision in § 2.06(b)(1)-(2) of
the SPA following the DRAFCO closing.  Therefore, E\*TRADE need
only demonstrate Deutsche Bank's breach of its contractual
obligations and damages attributable to any such breach.

### 1.    The Failure To Deduct the Service Fee Expense

#### a.    Breach of §§ 2.06

§ 2.06 required Deutsche Bank to provide E\*TRADE with a Closing Balance Sheet for "Ganis and the Subsidiaries" that "shall be prepared . . . in accordance with U.S. GAAP . . . ." As discussed above, Deutsche Bank delivered a Closing Balance Sheet for DRAFCO that overstated the value of the DTA by over \$11 million and was thus not prepared in accordance with U.S. GAAP. Deutsche Bank therefore breached § 2.06 of the SPA.

DRAFCO's spreadsheet balances establish that DRAFCO did not deduct the Servicing Fee Expenses for tax purposes as they were incurred. However, the Servicing Fee Expenses were accounted for when incurred for book purposes in the Residual and the Gain on Sale calculations, and thus represented a temporary difference. The Notes to DRAFCO's Audited Closing Balance Sheet (drafted by Deutsche Bank) stated:

> The calculation of a gain or loss upon the sale of receivables in a securitization includes an estimation of the fair value of residual interest cash flows from receivables after the payment of interest and principal to investors and the servicing fee.

Pl. Ex. 35 at 23907 (emphasis added). The Gain on Sale calculations (which were included in KPMG's work papers) also indicated that the Service Fee Expenses were accounted for when incurred. The deductions for tax purposes, however, were never made.

To counter the effect of its failure to deduct the Servicing Fee Expenses, Deutsche Bank, relying on the testimony of its expert, has asserted that the Servicing Fees were a permanent difference. However, as found above, the experienced tax accountants who examined the issue in 2003 and 2004, Meyers and Ruddell, agreed that the Servicing Fee Expense was a temporary difference. This conclusion is also supported by the testimony of E*TRADE's expert, Berliner, that the Servicing Fee Expense was a temporary difference because it was accounted for up-front for book purposes and over the life of the Securitizations for tax purposes. Tr. 420:10-24 (Berliner).

The testimony of Harry Montgomery and Ferino to the effect that the Servicing Fee Expense was a permanent difference, and therefore had no impact on the valuation of the DTA, is not persuasive. Before the litigation, Ferino did not characterize the Servicing Fee Expense as a permanent difference. Harry Montgomery once said this in an e-mail, but no-one at KPMG or Deloitte ever agreed with this claim. As found above, Ferino treated the Servicing Fee Expense as a temporary difference in the spreadsheet he used to calculate the adjustment to the DTA and in the pro forma tax return for the 2003 stub period.

Deutsche Bank has also asserted that there were two
different payments of Servicing Fees, one from the Trusts to
DRAFCO, and a second from DRAFCO to Ganis, that only the Trusts'
payments of Servicing Fees to DRAFCO were included in the
Residual and Gain on Sale, and that the $28 million in Servicing
Fees received by Ganis were therefore not part of the Residual
and Gain on Sale, and thus were a "period expense" rather than a
temporary difference.

DRAFCO was able to deduct as ordinary business
expenses the Servicing Fees the Trusts paid to Ganis on DRAFCO's
behalf. This does not mean, however, that the Trusts sent any
of the payments for the Servicing Fees to DRAFCO or that DRAFCO
sent any payments to Ganis as Mangieri alleges. In an e-mail to
Belinda Montgomery, Harry Montgomery confirmed that "[a]fter the
Trustee received the Funds they sent the Service Fee to Ganis
which was the Servicer and thus entitled to the amount." Pl.
Ex. 116. Haisch, who had the most knowledge about the cash
flows for the Servicing Fees, also confirmed that Ganis received
the Servicing Fees directly from the Trusts, and did not receive
any payments from DRAFCO. In addition, Pechulis confirmed this
arrangement for the payment of Servicing Fees in both his

deposition and a contemporaneous e-mail explaining how Ganis
received the Servicing Fee:

> We recorded the servicing fee revenue and
> receivable on GCC [Ganis Credit Corp.] and when
> the Trust wires the cash out per the Servicer
> Report, we receive the cash for the servicing fee
> and apply to this receivable on GCC.

Pechulis Dep. 82:15-85:7.

This treatment was also understood by KPMG's second
audit team reviewing the 2003 Audit Opinion. Haisch told
Schwartz that the Trusts paid Ganis directly, and did not "pass
through" DRAFCO. Pl. Ex. 174. Neither Meyers nor the
Ruddell/Schwartz team ever mentioned the existence of two
payments to Ganis for Servicing Expenses. No fact witness
testified that there were two streams of Servicing Fee payments,
or that any Servicing Fees were physically transferred from
DRAFCO to Ganis, and the documentary evidence set forth above in
the Findings of Fact establishes the payment pattern from the
Trusts directly to Ganis.

Finally, documentary evidence introduced at trial
refutes Deutsche Bank's claim that the Servicing Fee Expenses
passed through DRAFCO before reaching Ganis. As described above
in the Findings of Fact, wire receipts demonstrate that payments
of Servicing Fees were sent directly from the Trusts to Ganis,

which then recorded the Servicing Fee Income as book income. In contrast, DRAFCO's trial balances do not contain any entries for such payments that might indicate that Servicing Fees passed through DRAFCO.

Deutsche Bank has also contended that the failure to include the Servicing Fee Expenses on the spreadsheet of temporary differences was "offset" by the absence on the spreadsheet of the Servicing Fee Income. However, evidence adduced at trial demonstrated that the Interest Income Received is reported "gross," meaning that it includes the "Servicing Fee Income." Deutsche Bank's expert Mangieri testified that the "Interest Income Received" line included the Servicing Fee Income, and KPMG's audit work papers also confirmed that the Servicing Fee Income was embedded in the Interest Income Received and was part of the DTA calculation. Schwartz similarly concluded that the "DTA included the amount of the servicing as income." Pl. Ex. 165. Since the Servicing Fee Income was an element of one of the temporary differences, Interest Income, as set forth in the Findings of Fact, it was incorporated in the DTA calculation.

While the Servicing Fee Income was included on the spreadsheet, the Servicing Fee Expenses, as set forth in the

Findings of Fact, were not included. Therefore, the Servicing Fee Income and Servicing Fee Expenses did not offset each other. They only offset each other when the Servicing Fee Expenses were added as the fifteenth temporary difference which reduces the DTA by over $11 million.

Deutsche Bank has also contended that the Servicing Fee Income is not contained in the "Interest Income Received" line on the spreadsheet, but instead is contained in the "Servicing Asset" (which is not listed on the spreadsheet). As a result, according to Deutsche Bank, the Servicing Fee Expense was offset by the Servicing Fee Income contained in the Servicing Asset because both were absent from the spreadsheet. However, as discussed above, the Servicing Fee Income is embedded in the Interest Income Received line on the spreadsheet, a fact KPMG acknowledged and Mangieri admitted at trial.

Moreover, the Servicing Asset could not have affected the DTA because it was not on DRAFCO's books as of December 23, 2002, the snapshot date for the DTA's valuation. Deutsche Bank originally recorded the Servicing Asset on DRAFCO's books, but then recognized the error on October 2002 (before closing) and transferred the Servicing Asset to Ganis's books as of December

23, 2002. Deutsche Bank's transfer of the Servicing Asset from DRAFCO to Ganis removed the effect of the Servicing Asset from DRAFCO's books.

Deutsche Bank also has disputed the effect of the failure to deduct servicing expenses on the DTA, and has asserted that Munro disagreed with Meyers' conclusion that the "servicing expenses should have reduced the DTA" in a December 28, 2003 e-mail. However, during his deposition, Munro confirmed that he had no opinion about Meyers' conclusion:

    Q:   At the time you wrote this, were you
         agreeing with Mr. Meyers's claims?

    A:   I wasn't either agreeing or disagreeing.

    Q:   You were just setting them forth?

    A:   Right.

Munro Dep. 205:16-23.

Deutsche Bank has also urged that Ruddell and Schwartz "found no evidence [the DTA] was overstated" and agreed with Mangieri based upon Plaintiff's Exhibit 190, the KPMG Memo Ruddell authored on December 21, 2004. However, as found above, four days earlier, KPMG had internally concluded that the DTA was overstated based on all of the evidence it had reviewed for three months. As to the "wash theory" to justify the DTA, KPMG

172

had concluded internally it was not supported by the facts.  It
is also appropriate to infer that Harry Montgomery influenced
Ruddell to change his conclusion and write the KPMG Memo.
Finally, as set forth above in the Findings of Fact, Ruddell and
Schwartz both testified that they ultimately never reached a
final conclusion about the Audit Opinion and the $15.3 million
valuation of the DTA.  The preponderance of the evidence cited
above outweighs the conclusions set forth in the December 21
KPMG Memo.

By failing to deduct the Servicing Fee Expenses,
Deutsche Bank breached the provisions of § 2.06 of the SPA
requiring compliance with U.S. GAAP.

### b.   The Breach of §§ 3.06 and 3.07 Arising
Out of the Reference Balance Sheet

Deutsche Bank also breached SPA §§ 3.06 and 3.07.  In
§ 3.06, Deutsche Bank warranted that the Reference Balance Sheet
had "been prepared . . . in accordance with U.S. GAAP."  Pl. Ex.
5 § 3.06.  Deutsche Bank breached SPA § 3.06 by delivering a
Reference Balance Sheet that was not prepared in accordance with
U.S. GAAP.  In § 3.07, Deutsche Bank warranted that "[t]here
[were] no Liabilities of the Business, other than Liabilities

(i) reflected or reserved against on the Reference Balance Sheet, (ii) disclosed in Section 3.07 of the Disclosure Schedule, (iii) that are current and have been incurred in the ordinary course of business or (iv) which do not and would not have a Material Adverse Effect." Deutsche Bank breached SPA § 3.07 by delivering a Reference Balance Sheet that did not reflect or reserve against DRAFCO's deferred tax liability existing at that time.

As set forth in the Findings of Fact, the Closing Balance Sheet violated U.S. GAAP, and it has been found above that the Closing Balance Sheet differed from the Reference Balance Sheet only by an automatic (non-negotiable) adjustment caused by the write-down of the Residual. Because the Closing Balance Sheet violated U.S. GAAP, the Reference Balance Sheet necessarily violated U.S. GAAP as well.

Deutsche Bank has asserted that E*TRADE did not "rely" on the Reference Balance Sheet, and that E*TRADE only paid amounts reflected in the Closing Balance Sheet. However, as found above, Mackay and Audette both testified that in agreeing to sign the SPA and close the transaction, they reviewed the Reference Balance Sheet and relied on its accuracy and conformity with U.S. GAAP. In a footnote, Deutsche Bank

suggests that Audette only reviewed a November draft of the Reference Balance sheet instead of the final Reference Balance Sheet represented in the amended SPA. At trial Audette was shown, and testified about, the Reference Balance Sheet attached to the final, signed version of the SPA. Tr. 1134:24-1135:16 (Audette); Pl. Ex. 6 at 1797. In any case, the November draft and the Reference Balance Sheet attached to the SPA are the same in all material respects because both list the value of the DTA (contained in the column "Other Assets") at $6.3 million. Compare Pl. Ex. 6 at 1797 with Pl. Ex. 10 at 3913; Tr. 1135:17- 1136:1 (Audette). As found above in the Findings of Fact, Audette did not suspect that the Reference Balance Sheet was inaccurate or violated U.S. GAAP, and Audette would not have recommended to the management team that E*TRADE sign the SPA and close the transaction if he knew or suspected the Reference Balance Sheet was overstated.

### c.   The Breach of § 3.14

Pursuant to SPA § 3.14, Deutsche Bank warranted that Ganis and its Subsidiaries had filed all material Tax Returns, and that "all such Tax Returns are true, correct and complete in all material respects." Pl. Ex. 5 § 3.14. Deutsche Bank breached § 3.14 of the SPA by failing to timely file tax returns

175

from 1999 to 2002 that were true, correct, and complete in all material respects because these tax returns failed to deduct $27 million for the Servicing Fee Expenses.

Deutsche Bank also breached § 3.14 by falsely claiming a deduction of $1.6 million in DRAFCO's 2002 pro forma tax for state taxes paid in 2002 when, in fact, DRAFCO paid no state taxes in 2002.

Deutsche Bank has contended that the missed tax deductions do not render the tax return "materially incorrect," since a "[a] taxpayer is not obligated to take any deductions." DB Br. at 54. However, Deutsche Bank has been a public company since at least 1999 and as such has a duty to its shareholders to maximize its profits and to minimize its tax exposure as permitted by law. Included in this duty is an obligation on the part of Deutsche Bank to take all allowable tax deductions. Tr. 1066:21-1067:3, 1067:9-14 (Ferino).

Deutsche Bank has also argued that "no possible recovery" is permitted for its failure to take the tax deductions, pursuant to Article VII of the SPA. DB Br. at 54. However, § 7.01(a)(i) ("Tax Indemnities") requires Deutsche Bank to "hold [E*TRADE] harmless" from all pre-closing taxes if those

taxes are not reflected on the Closing Balance Sheet. The DTA, in essence a tax credit, was not properly reflected on the Closing Balance sheet. Consequently, E\*TRADE is entitled to recover for Deutsche Bank's breach of § 3.14.

## 2. Deutsche Bank Has Not Established an Affirmative Defense to the Contract Claims

### a. Timely Notice

Deutsche Bank has contended that E\*TRADE failed to satisfy the SPA's requirement that E\*TRADE provide notice of its breach of contract claims to Deutsche Bank within eighteen months of closing. See Pl. Ex. 5 § 9.01 ("The representations and warranties set forth in this Agreement . . . shall survive for a period of 18 months following the Closing Date."). This contention was rejected in the June 13 Opinion. June 13 Opinion at \*21. In any case, even if measured from the Ganis closing, eighteen months was June 2, 2004, by which time E\*TRADE had provided notice of its claims to Deutsche Bank in the form of e-mails and telephone conference calls during early 2004 and in its March 11, 2004 letter to Deutsche Bank. Id.

Deutsche Bank has also that contended the notice given in 2004 was insufficient because it did not provide the details of E\*TRADE's claims. However, "unless specified by contract, no particular form of notice is required under New York law for an

177

indemnitee's notice of a claim to his indemnitor." Combustion Eng'g, Inc. v. Imetal, 235 F. Supp. 2d 265, 273 (S.D.N.Y. 2002). E*TRADE was not required to provide a detailed description of the nature of the liability nor "point[] to a specific breach" for which it sought indemnification. Id. at 276. The notice provided by E*TRADE was sufficient.

#### b. Compliance with § 2.06

Deutsche Bank also asserts that E*TRADE's claims of breach of contract relating to the DTA are barred because E*TRADE failed to comply with § 2.06 of the SPA, which Deutsche Bank alleges is the sole dispute resolution procedure as to disputes over the purchase price. However, as this Court has previously found, E*TRADE's breach of contract claims involve numerous breaches unrelated to the preparation of the Closing Balance Sheet, including breaches with respect to the Reference Balance Sheet and other financial statements (§ 3.06), failure to disclose existing liabilities (§ 5.08), failure to retain a reserve for tax liabilities (§ 3.14), and failure to retain its records for seven or eight years and make them available to E*TRADE (§§ 5.02 & 7.05). March 6 Opinion at 285; see also June 13 Opinion at *19-21.

Moreover, § 2.06(b) is not a stand-alone requirement.
§ 11.12 contains the SPA's general dispute-resolution provision,
which permits litigation in this Court over E*TRADE's claims
arising under the SPA. Reading § 2.06 and § 11.12 in
conjunction, § 2.06's arbitration provision pertains to good-
faith disputes between accountants as to the proper accounting
treatment or mathematical disputes regarding numbers set forth
in the balance sheet or, perhaps, other documents readily
available to E*TRADE; a claim for a breach of § 2.06, such as a
claim for violation of U.S. GAAP, must be filed in court,
pursuant to § 11.12. See June 13 Opinion at *20 ("The language
of section 2.06 does not indicate that it was intended to
preclude claims for breach of contract arising from Deutsche
Bank's duties under other sections of the SPA or section 2.06
itself."); Westmoreland Coal Co. v. Entech, Inc., 100 N.Y.2d
352, 357-60 (2003) (holding claims that seller breached
representations and warranties that its closing balance sheet
was prepared in accordance with U.S. GAAP were subject to
resolution by the courts, not arbitration).

The cases cited by Deutsche Bank are not to the
contrary. In contrast to the breach of contract claims at issue
here, the asserted claims in those cases reflect narrow
disagreements over discrete accounting issues susceptible to

resolution by an independent accounting authority.  See,
Gestetner Holdings v. Nashua Corp., 784 F. Supp. 78, 80
(S.D.N.Y. 1992) ("The objections raise numerous technical
accounting issues."); Talegen Holdings, Inc. v. Fremont General
Corp., No. 98 Civ. 0366 (DC), 1998 WL 513066, at *4 n.2
(S.D.N.Y. 1998) (noting that the claims at issue did not involve
allegations that "one party had breached certain covenants,
warranties, and representations"); Advanstar Commc'ns, Inc. v.
Beckley-Cardy, Inc., No. 93 Civ. 4230 (KTD), 1994 WL 176981, at
*3 (S.D.N.Y. May 6, 1994) ("The dispute here appears to be
whether the calculations in the Closing Balance Sheet complied
with GAAP and [a former corporation's] accounting methods.");
Omni Tech Corp. v. MPS Solutions Sales, LLC, 432 F.3d 797, 799
(7th Cir. 2005) (disputing correct calculation of net working
capital); John Hancock Life Ins. Co. v. Fortis, Inc., No. 01
Civ. 2469 (JSM), 2001 WL 767021, at *1 (S.D.N.Y. July 9, 2001)
(objecting that calculation of Reserves did not consider
increases in benefit payments).  Because § 2.06 is inapplicable
to the claims at issue here, neither the 30-day notice
requirement or the arbitration clause serves to bar E*TRADE's
claims.

    **c.    Waiver**

180

Deutsche Bank has also failed to demonstrate that E*TRADE waived its claims by entering into the October 20, 2003 Letter Agreement. Deutsche Bank contends that in the weeks leading up to the September 23-24, 2003 meeting that preceded the Agreement, it invited E*TRADE to inform Deutsche Bank whether open issues existed with respect to the DTA. Deutsche Bank asserts that E*TRADE's silence in response to these inquiries and the parties' understanding that the October 20, 2003 letter agreement would finalize the DRAFCO purchase now bars E*TRADE from bringing claims regarding the valuation of the DTA. See, e.g., Gen. Elec. Capital Corp. v. Eva Armadora, S.A., 37 F.3d 41, 45 (2d Cir. 1994).

Testimony at trial established, however, that Deutsche Bank's inquiries were addressed to E*TRADE's efforts to "tie" the value of the DTA to the KPMG audit work papers and ensure that the calculations for the DTA were correct. In contrast, E*TRADE was unaware of, and did not raise with Deutsche Bank, any issues relating to the underlying basis for the $15.3 million value of the DTA, such as Deutsche Bank's treatment of the Servicing Fee Expenses. Therefore, E*TRADE's silence with respect to the Deutsche Bank's inquiries during this period did not constitute a waiver of its present claims.

Furthermore, the parties understood the October 20, 2003 Letter Agreement to be limited in scope to the specific issues discussed during the September 23-24, 2003 meeting and listed in Schedule A to the October 20 Letter Agreement. As noted above, the List did not address or mention the value of the DTA, nor did the parties discuss the DTA, except to note that any change to the Residual would require a corresponding mathematical adjustment to the DTA.

As this Court has previously concluded, the Letter Agreement is, by its terms, ambiguous and does not contain any general release of "all claims" or "known and unknown claims." June 13 Opinion at *22. Absent a clear and unambiguous statement that it was relinquishing its rights to unknown future claims, E*TRADE cannot be said to have waived its present claims. See Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 354 F. Supp. 2d 293, 299 (S.D.N.Y. 2004) ("New York law does not construe a general release to bar claims for injuries unknown at the time the release was executed, even when the release contains broad language."); Info. Superhighway, Inc. v. Talk Am., Inc., 274 F. Supp. 2d 466, 470 (S.D.N.Y. 2003); Kaminsky v. Gamache, 298 A.D.2d 361, 361-62 (N.Y. App. Div. 2002) (if language shows "release is to be limited to only

particular claims, demands or obligations, the instrument will be operative as to those matters alone").

Since no such statement exists with respect to the claims here, Deutsche Bank has failed to establish its affirmative defense of waiver.

### d.   **Application of Article VII**

Deutsche Bank has also contended that E*TRADE's §
2.06(a) claim is barred by Articles VII and IX of the SPA because the calculation of the DTA related to tax matters.

Article VII of the SPA, however, does not provide any potential indemnification to E*TRADE. Article VII of the SPA provides that "[a]ny Tax refund, credit or similar benefit . . . relating to taxable periods or portions thereof ending on or before the Closing Date . . . if received by the Purchaser, Ganis or the Subsidiaries shall be paid over promptly to the Seller."   Pl. Ex. 5 § 7.02.

However, under the SPA, "Tax" is defined to mean amounts paid to a taxing authority:

any and all income, gross receipts, capital gains,
value added, sales, use, employment, franchise,
profits, property or other taxes, fees, stamp and
stamp duty reserve taxes and duties, assessments or
charges of any kind whatsoever (whether payable
directly or by withholding), together with any
interest and any penalties, additions to tax or
additional amounts imposed by any taxing authority
with respect thereto.

Pl. Ex. 5 § 1.01 at 12. The claim under § 2.06 that the DTA on

the Closing Balance Sheet was not calculated in accordance with

U.S. GAAP does not meet this definition because a DTA is not

imposed by a taxing authority. As set forth above in the

Findings of Fact, the DTA's valuation is a financial accounting

concept governed by U.S. GAAP, not by IRS or state tax laws.

### e.  Estoppel, Laches, and Standing

Deutsche Bank also raises the equitable defenses of

estoppel and laches. Deutsche Bank argues that E*TRADE is

estopped from bringing its breach of contract claims in light of

Deutsche Bank's reliance on E*TRADE's release of all future

claims relating to the value of the DTA. Because E*TRADE is

found not to have waived its right to future claims, Deutsche

Bank's has failed to establish its estoppel defense. Similarly,

E*TRADE's claims have been found to be timely, and Deutsche

Bank's laches defense is therefore rejected.

184

Deutsche Bank's assertion that E*TRADE Financial lacks standing to bring this suit is also dismissed. E*TRADE is a proper plaintiff for the fraud claims because Deutsche Bank's misrepresentations were made to E*TRADE Financial, which took primary responsibility for negotiating the DRAFCO purchase. See FTD Corp. v. Banker's Trust Co., 954 F. Supp. 106, 108-09 (S.D.N.Y. 1997). E*TRADE Financial is also a proper party for the breach of contract claims because § 9.02 explicitly permits affiliates of E*TRADE Bank to bring a breach of contract claim against Deutsche Bank. June 13 Opinion at *27. Finally, as an assignee of DRAFCO, E*TRADE Financial has standing to assert all claims originally accrued to E*TRADE Bank. See Vermont Agency of Natural Res. V. U.S. ex rel. Stevens, 529 U.S. 765, 773 (2000); Sprint Commc'ns Co., L.P. v. APCC Servs., Inc., 128 S. Ct. 2531, 2542 (2008).

### 3. **Deutsche Bank Did Not Breach SPA §§ 5.01 and 5.02**

E*TRADE has also claimed that by failing to take allowable tax deductions, Deutsche Bank breached SPA § 5.01, which provides, inter alia, that "[Deutsche Bank] shall cause Ganis and each Subsidiary to, conduct the Business in the ordinary course and consistent with past practice . . . " and §

185

3.08, which provides that "the Business has been conducted in the ordinary course and consistent with past practice." Pl. Ex. 5 §§ 3.08 and 5.01.

The purpose of these provisions was to prevent Deutsche Bank from changing the companies' business practices in the period before closing. E*TRADE has not shown that DRAFCO's practice with regard to taking deductions for Servicing Fee Expenses or the Liquidation Expense changed during the relevant period.

§ 5.02 of the SPA requires that "from the date [of the SPA] until the Closing, upon reasonable notice, [Deutsche Bank] shall cause Ganis and the Subsidiaries . . . to: (i) afford [E*TRADE] reasonable access, upon reasonable notice . . . to the offices, properties, plants, other facilities, books and records of Ganis and each Subsidiary . . . ." E*TRADE claims that Deutsche Bank breached § 5.02 by refusing to give E*TRADE access to DRAFCO tax records in St. Louis in early 2003. As set forth above in the Findings of Fact, although Belinda Montgomery has asserted that she was denied DRAFCO records, substantial records were produced in the course of the investigation with respect to the Servicing Fee Expenses. E*TRADE has not established the refusal of access by a preponderance of the evidence.

Deutsche Bank was also obligated by the SPA to retain DRAFCO's financial and tax documents and to make those documents available to E*TRADE. Deutsche Bank does not deny this, but has contended that the documents were at a GE facility and, as set forth above in the Findings of Fact, although certain records were turned over to GE, E*TRADE did not complain about any lack of access to documents, and E*TRADE was not damaged as a result of these breaches. E*TRADE has not identified specific documents that were withheld, nor has it demonstrated that access to those documents would have revealed the improper valuation of the DTA.

The record does not establish that Deutsche Bank was aware of any refusal by GE to grant E*TRADE access to documents, and there is no evidence that E*TRADE informed Deutsche Bank of any problem subsequent to the Closing. It also does not appear that any of those concerned with the investigation of the Servicing Fee Expenses were handicapped by the absence of documents held by GE.

For the foregoing reasons, E*TRADE has not established a breach of § 5.02.

187

## C.   **Deutsche Bank Did Not Commit Fraud**

Count I asserts a claim for fraud under New York common law.  To establish such a claim, E\*TRADE must prove by clear and convincing evidence: "(1) a material misrepresentation or omission of fact; (2) made by defendant with knowledge of its falsity; (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." Crigger v. Fahnstock and Co., 443 F.3d 230, 234 (2d Cir. 2006); see also Lama Holding Co. v. Smith Barney Inc., 668 N.E.2d 1370, 1373 (N.Y. 1996).

### 1.   **Deutsche Bank Knowingly Misrepresented the Tax Rate Applicable to the DTA**

E\*TRADE has asserted and established that Deutsche Bank knowingly misrepresented to E\*TRADE that 39% was the correct tax rate for calculating the DTA.

As set forth above in the Findings of Fact, Deutsche Bank represented on more than one document to E\*TRADE that the correct tax rate was the blended 39.55% rate.  In particular, on September 11, 2003, Ferino sent to Belinda Montgomery at E\*TRADE the same spreadsheet that he had sent to Forschino on September 10, 2003, but changed the tax rate to 39.55%, writing on the

cover e-mail "Belinda, Attached is a schedule which details the build-up of DRAFCO's deferred tax asset through 12/2002. The effective rate used is 39% (Federal 35%; State & Local 7%)."

In addition, Ferino knew prior to the DRAFCO Closing on October 20, 2003, that the correct tax rate for the DTA was 35%. Ferino sent to Forschino a spreadsheet utilizing a 35% tax rate to calculate the DTA on September 10, 2003, and on October 9, 2003, prior to the October 20 Letter Agreement, Ferino sent an e-mail to Gaertner stating that "DRAFCO has never paid state taxes and therefore any DTA should be calculated at the 35% federal rate." Pl. Ex. 75.

Deutsche Bank has contended that Ferino's September 10 internal spreadsheet was merely a "what if" calculation. However, Ferino's testimony in that regard was not persuasive. As of the date of Ferino's spreadsheet, E*TRADE had not disputed the 39.55% tax rate, and no reason existed for Ferino to generate a "what if" calculation.

Deutsche Bank has also urged that its internal "any DTA" e-mail was referring only to "any adjustment." DB Brief at 23 n.12. However, the reasons supporting the 35% rate for the adjustment, as to which KPMG and Deutsche Bank agreed, are

189

equally applicable to both the underlying DTA as well as any adjustment, as found above. The KPMG auditors and Ferino knew that the same rate should be used for both. Deutsche Bank's expert admitted "it does not make logical sense" for Deutsche Bank to calculate the DTA and the adjustment to that same DTA at different tax rates because "if you are going to make an adjustment you should make it at the rate that in went in." Tr. 1848:14-21 (Mangieri).

The fact that the adjustment in connection with the Closing was calculated at 35% does not negate the showing that Deutsche Bank knew in advance of the DRAFCO Closing that DRAFCO had paid no state taxes and that the proper tax rate at which to calculate the DTA was therefore 35%, yet failed to inform E\*TRADE of this fact. "The common law has long required that a person who has made a representation must correct that representation if it becomes false and if he knows people are relying on it." Fischer v. Kletz, 266 F. Supp. 180, 188 (S.D.N.Y. 1967). Further, it is certainly plausible that Deutsche Bank's employees, upon realizing that the DTA had been calculated using the wrong tax rate, resolved not to make any further affirmative misrepresentations, but believed they were under no obligation to correct the false statements that had already been made. This is supported by an e-mail from Harry

Montgomery to Gaertner just before the Closing, to the effect that Deutsche Bank was "maintaining" that the DTA was accurate, and noting that E\*TRADE "has not yet given us any suggestion of any adjustment they believe is necessary." Pl. Ex. 63.

## 2. **E\*TRADE reasonably relied upon Deutsche Bank's representations**

Under New York law, E\*TRADE will be found to have reasonably relied upon Deutsche Bank's representations so long as it acted with "ordinary intelligence." See Mallis v. Bankers Trust Co., 615 F.2d 68, 80-81 (2d Cir. 1980); Sterling Nat'l Bank v. Ernst & Young, LLP, No. 121916/2003, 2005 WL 3076341, at \*5 (N.Y. Sup. Ct. Jan. 7, 2005).

According to Deutsche Bank, sophisticated parties such as E\*TRADE are held to a higher standard when determining whether they justifiably relied on the representations of the other party, especially where a sophisticated party is represented by experienced counsel and financial advisors. Deutsche Bank has contended that in light of E\*TRADE's lack of internal expertise to validate the DRAFCO DTA and its failure to hire E&Y to do so, E\*TRADE failed to act with the reasonable diligence required of a buyer in such a circumstance.

191

While the sophistication of the parties is a factor when considering the reasonableness of one party's reliance on the other party's representations, it does not, as Deutsche Bank suggests, by itself impose a heightened standard for "reasonable reliance" by a party. See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003) ("In assessing the reasonable of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity . . . [and] the sophistication of the parties."); Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP, No. 07 Civ. 8663 (GEL), 2008 WL 3166536, at *133 (S.D.N.Y. Aug. 6, 2008) (evaluating reasonable reliance by examining a party's ability to ascertain the truth of a representation through the exercise of ordinary intelligence).

As set forth above in the Findings of Fact, Belinda Montgomery, the point person with respect to tax considerations on the E*TRADE side, relied upon the statements by Ferino, the person put forward by Deutsche Bank with respect to the applicable tax rate, and upon the various schedules presented by Ferino. E*TRADE acted with "ordinary intelligence" in relying upon the representations made by Deutsche Bank, including the Closing Balance Sheet. See, e.g., Merrill Lynch & Co. v. Allegheny Energy, Inc., 500 F.3d 171, 181-82 (2d Cir. 2007)

(sophisticated buyer in a $490 million deal could have been justified in relying upon the seller's financing information); Keywell Corp. v. Weinstein, 33 F.3d 159, 163-64 (2d Cir. 1994) (reasonable for the buyer of an industrial facility to rely on the seller's representations regarding the dumping of hazardous materials).

Significantly, E*TRADE did not rely solely on Deutsche Bank's assurances of the accuracy of its financial statement. Instead, E*TRADE required that Deutsche Bank obtain an opinion from an independent auditor as a condition of the sale. Reliance on a Big Four firm's independent audit opinion is an exercise of "ordinary intelligence," even for highly sophisticated parties. See Sterling Nat'l Bank, 2005 WL 3076341, at *5; see also, In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 671-72 (S.D.N.Y. 2004) (explaining that an underwriter would be entitled to rely on audited financial statements in the absence of red flags); Cromer Fin. Ltd. v. Berger, No. 00 Civ. 2498 (DLC), 2001 WL 1112548, at *2 (S.D.N.Y. Sept. 19, 2001) ("An annual report is the kind of document on which investors are entitled to rely."). E*TRADE examined the KPMG audit confirming the accuracy of the DTA internally and obtained additional information from Deutsche Bank, all of which appeared to support the full $15.3 million value of the DTA.

E*TRADE also undertook an extra layer of scrutiny by having the independent auditing firm Ernst & Young "tie" the Audit Opinion to the underlying work papers. Deutsche Bank has contended that E*TRADE's failure to conduct a better investigation by employing specialists to validate the DTA demonstrates its failure to act with due diligence under the circumstances. However, Deutsche Bank has cited no authority that would require E*TRADE to hire E&Y to repeat the KPMG audit for which E*TRADE had negotiated. The ability to investigate further under these circumstances does not equate a legal mandate to do so. E.g., Alexander v. Evans, No. 88 Civ. 5309 (MFL), 1993 WL 427409, at *17 (S.D.N.Y. Oct. 15, 1993) ("the reliance requirement was not designed to shield perpetrators of fraud by forcing investors to conduct exhaustive research every time they invest money, lest the seller be manipulative or deceptive"). Moreover, the additional efforts to verify the accuracy of Deutsche Bank's representations with respect to the DTA does not vitiate E*TRADE's reliance on the Audit Opinion.

A substantial investigation that turns up no "red flags" constitutes reasonable reliance. In HSA Residential Mortgage Servs. of Texas v. State Bank of Long Island, No. 05 Civ. 3285 (JS/WDW), 2006 WL 2938826 (E.D.N.Y. 2006), the court

upheld the jury's verdict that the plaintiff reasonably relied on the defendant's statements when purchasing a mortgage portfolio. The plaintiff reviewed documents, visited the defendant's offices, and asked other mortgage lenders about their experiences with the defendant. Rejecting the defendant's argument that a sophisticated mortgage investor such as the plaintiff was required to investigate further, the court found that the plaintiff had no reason to doubt the defendant's representations. Id. at *2-*3. Similarly, in Keywell, 33 F.3d at 159, the Second Circuit reversed entry of summary judgment to a defendant based on the lack of reasonable reliance. In purchasing an industrial facility, the plaintiff relied on the defendant's representations that no dumping or release of hazardous materials occurred on site. The defendant claimed – similar to Deutsche Bank here – that the plaintiff should have investigated further, because a third-party inspector hired by the plaintiff conducted some limited tests and recommended further testing. The Second Circuit concluded that the results of the testing were consistent with the defendant's representations, which would permit the finding that no red flags were present and thus reliance was reasonable. Id. at 164. E&Y's investigation turned up no "red flags" that would have made E*TRADE's reliance unreasonable.

Deutsche Bank also has contended that E*TRADE's reliance on Deutsche Bank's representations was not reasonable since E*TRADE failed to take advantage of information in its possession. This contention also does not replace reliance on the KPMG Audit Opinion which was presumed to have examined all of Deutsche Bank's relevant financial information. Moreover, information may be found to not be "reasonably available" to a party if the truth is "buried" in contrary representations. See United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1198-99 (2d Cir. 1992); I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991) (misstatement can be established if "material facts have been . . . presented in such a way as to obscure or distort their significance."). Meyers at Deloitte needed six to eight weeks to conduct his analysis of the DTA, and Ruddell and Schwartz at KPMG required over three months.

Deutsche Bank has contended that E*TRADE should have known Deutsche Bank's representations were false because Deutsche Bank used the lower 35% rate when calculating the $2.4 million adjustment to the DTA just before the DRAFCO closing. However, Deutsche Bank never told E*TRADE that the adjustment would affect the Audit Opinion, which used the 39.55% rate and remained unchanged. Deutsche Bank has noted that the adjustment

should share the same rate as the DTA. There is, however, no evidence that E*TRADE's personnel at the time understood the state tax implications of the Securitizations. Because Deutsche Bank's decision that the adjustment to the DTA should be calculated at 35% rather than 39.55% benefited E*TRADE, it invited less scrutiny from E*TRADE than an adjustment benefiting Deutsche Bank.

Deutsche Bank also has asserted that it should have been obvious to E*TRADE from a review of DRAFCO's 1999-2001 pro forma federal returns that DRAFCO historically paid little, if any, state taxes. However, Deutsche Bank provided E*TRADE with the 2002 pro forma tax return that falsely indicated that DRAFCO had paid $1.6 million in state taxes in 2002 and which Belinda Montgomery relied upon in concluding that DRAFCO paid state taxes sufficient to support the 7% state tax rate. As found above, Deutsche Bank also provided other documents to indicate that DRAFCO paid state taxes.

E*TRADE exercised "ordinary intelligence" and reasonably relied on Deutsche Bank's representation that the 39.55% tax rate was appropriate for the DTA.

197

## 3. Intent to Defraud by Use of the 39.55% State Tax Rate Has Not Been Established

E*TRADE has contended that in making its false representations, Deutsche Bank acted with fraudulent intent based upon circumstantial evidence of conscious misbehavior or recklessness and evidence that Deutsche Bank had both the motive and the opportunity to commit fraud.

Both parties agree that under FAS 5, a state tax component is used only if state taxes were both "probable" and "estimable." As to probability, as found above, DRAFCO had not previously paid state taxes. Although Ganis faced state tax liability in some states, Ganis and DRAFCO were separate businesses, and Ganis paid significant state taxes whereas DRAFCO never did.

Deutsche Bank has contended that state taxes for DRAFCO were estimable because this is the same state tax rate Ganis used. No evidence was adduced that DRAFCO's business was sufficiently the same as Ganis to justify use of the same tax rate.

As set forth above, Ferino's September 11, 2003 email to Belinda Montgomery concerning the effective tax rate was a

198

knowingly false representation. Ferino was a responsible

employee of Deutsche Bank charged with conveying information to

E*TRADE upon which E*TRADE would base its position in connection

with the closing.

Quoting Gaertner's trial reaction to Ferino's October

email, E*TRADE contends that Gaertner, too, believed the base

DTA had been improperly calculated. However, before the quoted

exchange, Gaertner testified that he did not know the tax rate

at which the DTA was calculated and "relied on the expert

opinion and expertise of Deutsche Bank New York tax department."

Tr. 698 (Gaertner). E*TRADE's counsel then represented to

Gaertner that Ferino's email demonstrated that Deutsche Bank's

tax department believed the state tax component should be taken

out of the base DTA calculation:

> Q: You know that you are now being told that the
> state tax component should be taken out.
>
> A. Yes.
>
> Q. So you know that the proper DTA should be less
> than $15.3 million.
>
> A. Yes.

Tr. 699 (Gaertner).

The questions were in the form of present-tense hypotheticals, and Gaertner responded "yes." On redirect, Gaertner noted that Ferino's email only applied to the agreed-upon adjustment to the DTA, Tr. 760-61 (Gaertner), and testified that he played no role in the calculation of the base DTA, did not know how it, or the adjustment, was or should have been calculated, but believed the DTA value on the Closing Balance Sheet was correct and agreed to by all parties. Tr. 761, 775, 793, 794-95 (Gaertner). Gaertner testified that once Deutsche Bank's tax department or its auditors had double-checked their numbers, Gaertner always accepted the accountants' conclusions. Tr. 678-80, 688-89 690, 692, 68-69 (Gaertner). This testimony, taken in its entirety, established that Gaertner, the principal officer responsible for the Deutsche Bank position in the negotiation, did not possess a fraudulent intent.

Lack of fraudulent intent is further demonstrated by the fact that Deutsche Bank placed no limitations on E*Trade Bank's or E&Y's due diligence. See Eurocrafters, Ltd. v. Vicedomine, No. 04 Civ. 866 (GLS), 2005 WL 1260390, at *5 (N.D.N.Y. May 18, 2005), aff'd, 183 Fed. Appx. 70 (2d Cir. 2006) (voluntary disclosure of information "mitigated strongly against the existence of the requisite fraudulent intent"). For example, on September 2, 2003, Snow requested access to KPMG's

200

DRAFCO work papers for E&Y. Gaertner replied the next day that it was "no problem" and that he already had instructed KPMG to make the papers available. KPMG's work papers were made available to E*TRADE Bank and E&Y in New York and in Washington, D.C.

Finally, Deutsche Bank did propose the correct 35% tax rate in connection with the agreed-upon adjustment to the DTA prior to the Closing, constituting evidence which rebuts an intent to defraud. As found above in the Findings of Fact, Harry Montgomery questioned Haisch's use of a 42% rate in calculating the adjustment to the DTA and proposed the use of a 35% rate instead. The E*TRADE representatives agreed to the 35% rate for the adjustment because, as they recognized, it benefited E*TRADE Bank. A fraudulent purpose to "maximize its sales price," as urged by E*TRADE, is countered by the use of a tax rate which diminished that price and as it has turned out, was the correct rate. See, e.g., Conn. Nat'l Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir. 1987) (fraudulent intent not pled where allegedly misleading statement was detrimental, not beneficial, to defendant).

Taken as a whole, the evidence has not established
that Deutsche Bank possessed fraudulent intent with respect to
its representation that 39.55% was the correct state tax rate.

## 4.    Deutsche Bank Did Not Fraudulently Conceal the Failure to Deduct the Servicing Fee Expenses

E*TRADE has also contended that Deutsche Bank
committed fraud by knowingly concealing the DTA overstatement
resulting from the failure to deduct the Servicing Fee Expenses.
In order to prove a claim of fraudulent concealment, E*TRADE was
required to establish (1) concealment of a material fact which
Deutsche Bank was duty-bound to disclose; (2) scienter on the
part of Deutsche Bank; (3) justifiable reliance by E*TRADE; and
(4) injury to E*TRADE. See Mitschele v. Schultz, 36 A.D.3d 249,
254-55 (N.Y. App. Div. 2006).

E*TRADE has argued that KPMG concluded in October 2004
that the DTA was overstated, that KPMG changed its conclusions
under pressure from Deutsche Bank, and that KPMG "admitted"
Deutsche Bank provided it "garbage" information. However, "[i]n
order to show an intent to deceive, plaintiffs must establish
that defendant knew, at the time they were made, that the

representations were false." Abrahami v. UPC Const. Co., 638
N.Y.S.2d 11, 14 (App. Div. 1996).

There is no evidence in the record that anyone at
Deutsche Bank or E*TRADE considered the possibility that the DTA
might be overstated due to a missed Servicing Fee Deduction
until Robertson and Meyers identified the issue weeks after the
DRAFCO Closing on October 20, 2003. The first suggestion that
the DTA was overstated came from Meyers in November 2003. Every
DTA calculation created at Deutsche Bank until four weeks before
E*TRADE filed suit (when E*TRADE had already raised the
Servicing Fee issue and Deutsche Bank needed to understand the
size of E*TRADE's claim) used the same $38.8 million set of
temporary differences without a deduction for Servicing Fees.
Def. Ex. 55; Def. Ex. 81; Def. Ex. 128; Def. Ex. 129; Pl. Ex.
53; Pl. Ex. 55; Tr. 1488 (Ferino), 1939-41, 1991 (H.
Montgomery).

As set forth above in the Findings of Fact, Hickam was
not a securitization expert, and she relied on DFS's auditor,
KPMG, to create the Template to track the items in the deferred
account. Hickam read the Template to indicate that no reduction
should be included based on servicing fees. Harry Montgomery
was surprised by E*TRADE's December 2003 or January 2004

203

suggestion that servicing fees should have been deducted from DRAFCO's taxes and from its DTA calculation. Further, the Deutsche Bank tax department and KPMG decided DRAFCO could deduct servicing fees on its 2003 "stub period" tax return only after Harry Montgomery's conversation with Belinda Montgomery in which she raised the issue.

Similarly, there is no evidence that anyone at either party ever considered the possibility that the DTA might be overstated due to a missed Liquidation Expense Deduction until E*TRADE's expert identified the issue in his expert report dated August 3, 2007, nearly four years after the DRAFCO Closing.

Neither the failure to deduct the Servicing Fee Expenses or the Liquidation Expense was fraudulently concealed by Deutsche Bank and the fraud claim in that regard is dismissed.

## F. **Deutsche Bank Did Not Commit Constructive Fraud**

Constructive fraud requires establishing the same elements as actual fraud, "except that the element of scienter is replaced by a fiduciary or confidential relationship between the parties." Apace Commc'ns, Ltd. v. Burke, 522 F. Supp. 2d

509, 519 (W.D.N.Y. 2007) (quoting @Wireless Enters., Inc. v. AI
Consulting LLC, No. 05 Civ. 6176 (CJS), 2006 WL 3370696, at *8
(W.D.N.Y. Oct. 30, 2006)).[3] This relationship is one "warranting
the trusting party to repose his confidence in the defendant and
therefore relax the care and vigilance that he would normally
exercise in the circumstances." Brown v. Lockwood, 432 N.Y.S.2d
186, 193 (App. Div. 1980)); see also @Wireless Enters., 2006 WL
3370696, at *8 ("Such a relationship requires demonstrating a
high degree of dominance and reliance, and where parties have an
arm's length business relationship, a plaintiff's subjective
claims of reliance on defendant['s] expertise" are
insufficient." (quoting SNS Bank, N.V. v. Citibank, N.A., 777
N.Y.S.2d 62, 65 (App. Div. 2004) (internal quotes omitted)).

        The relationship between E*TRADE and Deutsche Bank
bears none of the characteristics of a "fiduciary or
confidential relationship." Rather, the parties' relationship
was that of two entities engaged in an arm's-length business
negotiation. See Apace Commc'ns, 522 F. Supp. 2d @ 520
(dismissing constructive fraud claim where plaintiff had mere

---

[3] Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57
F.3d 146, 155 (2d Cir. 1995), cited by the Court in its March 6 Opinion at
*290, dealt with a claim of fraudulent concealment, not constructive fraud.
Consequently, we do not apply the "special facts" test stated in Banque Arabe
to E*TRADE's claim of constructive fraud.

arm's-length business relationship with defendant). As a
result, Deutsche Bank did not commit constructive fraud.

## D. Deutsche Bank Did Not Breach Its Duty of Good Faith and Fair Dealing

E*TRADE has alleged that Deutsche Bank breached the
duty of good faith and fair dealing by "overstat[ing] the DTA,
which caused E*TRADE to overpay for it." While New York law
implies a covenant of good faith and fair dealing in all
contracts, "[i]n most circumstances, claims for breach of
contract and the covenant of good faith and fair dealing are
duplicative." Echostar, 2007 WL 438088, at *7; see also Peabody
v. Weider Publ'ns, Inc., 260 Fed. App'x 380, 383 (2d Cir. 2008)
(affirming dismissal of good faith and fair dealing claim that
was "merely duplicative" of contract claim). "[T]he covenant is
violated 'when a party to a contract acts in a manner that,
although not expressly forbidden by any contractual provision,
would deprive the other of the right to receive the benefits
under the contract.'" Echostar, 2007 WL 438088, at *7 (quoting
Don King Prods., Inc. v. Douglas, 742 F. Supp. 741, 767
(S.D.N.Y. 1990)).

It has been determined that Deutsche Bank breached the SPA by overstating the value of the DTA.  The breach of the covenant of good faith and fair dealing claim, relying as it does on the same factual predicate, is duplicative of E*TRADE's breach of contract claim.

The cases cited by E*TRADE are not to the contrary.  In Liberty Envtl. Sys., Inc. v. County of Westchester, No. 94 Civ. 7431 (WK), 2000 WL 1752927 (S.D.N.Y. Nov. 29, 2000), defendant was not required to pay plaintiff or uphold its other contractual obligations until the contract had been approved by a supervisory body.  The defendant, nevertheless, encouraged plaintiff to undertake its contractual obligations in order to meet certain contractual deadlines, representing that approval was a mere formality and concealing information suggesting that approval would be difficult or impossible to obtain.  See id. at *6.  Thus, while there was no actual breach of contract, plaintiff was unfairly deprived of the anticipated benefits of the contract.  In H/R Stone, Inc. v. Phoenix Bus. Sys., Inc., 660 F. Supp. 351 (S.D.N.Y. 1987), the plaintiff software purchaser refused to provide the defendant software programmer information necessary for the defendant to complete the contracted-for programming.  See id. at 359.  While the parties' contract did not specifically call for the plaintiff to supply

the needed information, the court found that requirement implicit, and the plaintiff guilty of breaching the duty of good faith and fair dealing. See id. at 358-59.

No such facts are present in the case at bar, nor does the evidence support E\*TRADE's implication that Deutsche Bank failed to supply critical information to E\*TRADE.

Based on the foregoing conclusions, the claim for breach of the duty of good faith and fair dealing claim is dismissed.

## E.   **E\*TRADE Has Proven Its Damages**

E\*TRADE's direct damages are $11,566,838, the overstated amount of the DTA.  First, E\*TRADE has shown the impact of not considering the Servicing Fee Expenses and Liquidation Expenses.  The damage to E\*TRADE caused by Deutsche Bank's failure to take these tax deductions was foreseeable, and E\*TRADE is entitled to recover for Deutsche Bank's failure to take these deductions.  See Citizens Fed. Bank v. United States, 66 Fed. Cl. 179, 202 (Fed. Cl. 2005) (noting that tax consequences are an element of damages when they are reasonably foreseeable and flow from the breach of contract); Beggs v.

Dougherty Overseas, Inc., 287 F.2d 80, 83 (2d Cir. 1961).

Second, E*TRADE has applied the correct tax rate of 35%. The

calculation is as follows:

|   |   | AS PRESENTED TO E*TRADE | ACTUAL |
|---|---|---|---|
| 1 | 14 Listed Temporary Differences | $38,800,037 | $38,800,037 |
| 2 | Servicing Expenses | | ($27,501,282) |
| 3 | Liquidation Expenses | | ($502,825) |
| 4 | Total Temporary Differences | $38,800,037 | $10,795,930 |
| 5 | Applicable Tax Rate | 39.55% | 35% |
| 6 | Deferred Tax Asset (Line 4 multiplied by Line 5) | $15,345,414 | $3,778,576 |
| | **DAMAGES** | $11,566,838 | |

§§ 9.01 and 9.02 of the SPA deal with indemnification

for breaches of its representations, warranties, covenants and

"other agreements." Deutsche Bank has contended that E*TRADE is

not entitled to indemnification because the SPA set a $3,750,000

floor for indemnifiable damages. As set forth above in the

Findings of Fact, E*TRADE has demonstrated that the DTA was

overstated by more than $11 million.

Deutsche Bank has also contended that Stockholder

Equity was unaffected by the failure to take the servicing

expense deductions because the overstatement of the DTA is offset by a tax refund (a receivable) from the taxing authorities equal to the deductions for the Servicing Fee Expenses. However, pursuant to the SPA, §§ 7.01, 7.02, Deutsche Bank, not E*TRADE, was entitled to file amended tax returns for DRAFCO for periods prior to Closing and to thereby receive the value of the Servicing Expense Deductions.

Deutsche Bank has also contended that E*Trade Bank was not damaged because it sold DRAFCO to E*Trade Financial at full price approximately two months after closing. This contention was rejected in the June 13 Opinion, and Deutsche Bank has presented no new evidence or argument to compel a different conclusion. See June 13 Opinion at *26-27.

Deutsche Bank has urged that E*Trade Bank would be "double counting" the DTA if it receives damages from Deutsche Bank. However, the cases cited by Deutsche Bank all involved sales between two economically independent entities. See Toho Bussan Kaisha, Ltd. v. Am. President Lines, Ltd., 265 F.2d 418, 420-21 (2d Cir. 1959); Carlisle Ventures, Inc. v. Banco Español de Crédito, S.A., 176 F.3d 601, 602-03 (2d Cir. 1999); Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 418-420 (1996). In contrast, E*Trade Bank transferred the DTA to an affiliate,

E*Trade Financial, with which it filed consolidated tax returns. E*Trade Bank enjoys all tax credits that could be taken in those consolidated returns. See Centex Corp. v. United States, 395 F.3d 1283, 1291 (Fed. Cir. 2005); June 13 Opinion at *26-27. E*TRADE Bank did not sell DRAFCO to a completely unrelated third party, where the DTA could never affect E*Trade Bank again.

Deutsche Bank has also contended E*TRADE's claim is one of expectation damages, that E*TRADE never proved the future value of the DTA, and fails to take future uncertainties into account. However, as found above, E*TRADE paid $15.3 million (measured as of December 2002) for an asset worth approximately $4 million. The purchase price did not accurately reflect the value of the purchased asset, and E*TRADE is entitled to recover the difference between the amount it paid for the asset and the actual value of the asset.

## F.  **E\*TRADE Is Entitled to Prejudgment Interest**

New York law, which, in accordance with SPA § 11.12, governs the claims on their merits, also governs the award of pre-judgment interest. Schwimmer v. Allstate Ins. Co., 176 F.3d 648, 650-51 (2d Cir. 1999); Todtman, Nachamie, Spizz & Johns, P.C. v. Ashraf, 241 F.R.D. 451, 456-57 (S.D.N.Y. 2007).

New York law requires pre-judgment interest to accrue on E*TRADE's actual damages at a rate of nine percent per year. N.Y. C.P.L.R. § 5004; Action S.A. v. Marc Rich & Co., 951 F.2d 504, 508 (2d Cir. 1991).

The LIBOR rate in SPA §§ 2.06(c) and 2.07(a), which applies to "payments" made under those two sections, does not apply to E*TRADE's claims here because E*TRADE does not seek or demand a payment under those two sections.

Pre-judgment interest accrues from the date of the sale, that is, October 20, 2003. Reeder v. Mastercraft Elecs. Corp., 363 F. Supp. 574, 581-82 (S.D.N.Y. 1973) (calculating pre-judgment interest from the date investor purchased stock at inflated price); Collier v. Granger, 258 F. Supp. 717, 718-19 (S.D.N.Y. 1966); see also Reno v. Bull, 226 N.Y. 546, 552-53 (1919).

## G. **E*TRADE Is Not Entitled to Punitive Damages**

The SPA states that "[u]nder no circumstances shall any party be liable to the other parties for consequential, incidental or punitive damages." Pl. Ex. 5, § 9.01; Tr. 1598-99

(Rooney).  Acknowledging that provision, this Court has already held that E*TRADE may not recover punitive, consequential or incidental damages on its contract claim.  June 13 Opinion at *27.

Even if established, E*TRADE's fraud claims do not serve as a predicate for punitive damages.  Under New York law "there may be a recovery of exemplary damages in fraud and deceit actions where the fraud, aimed at the public generally, is gross and involves high moral culpability."  Walker v. Sheldon, 179 N.E.2d 497, 499 (N.Y. 1961).  This is because the purpose of punitive damages is "not to remedy private wrongs but to vindicate public rights."  Rocanova v. Equitable Life Assurance Society, 634 N.E.2d 940, 943 (N.Y. 1994).  The rule applies to both contract and tort claims.  See W.S.A., Inc. v. ACA Corp., 94 Civ. 1493 (CSH), 1998 WL 635536, at *2 (S.D.N.Y. Sept. 15, 1998).

The necessary showing has not been made here.  The wrongs committed by the defendant "was no more than a private wrong for which no recovery of punitive damages may be had."  Brook Shopping Ctrs., Inc. v. Bass, 483 N.Y.S.2d 1021, 1022 (App. Div. 1985).

## H.   **E*TRADE Is Entitled to Attorneys' Fees**

E*TRADE has sought and is contractually entitled to an
award of attorneys' fees on its contract claim.  "Under the
general rule in New York, attorneys' fees are the ordinary
incidents of litigation and may not be awarded to the prevailing
party unless authorized by agreement between the parties,
statute, or court rule."  Oscar Gruss & Son, Inc. v. Hollander,
337 F.3d 186, 199 (2d Cir. 2003).

However, parties to a contract may agree to include a
promise by one party to hold the other harmless for a particular
loss or damage, including attorneys' fees.  Hooper Assoc. v. AGS
Computers, Inc., 548 N.E.2d 903, 904 (N.Y. 1989).  However,
because such contracts "run against the grain of the accepted
policy," they "must be strictly construed to avoid inferring
duties that the parties did not intend to create."  Oscar Gruss,
337 F.3d at 199.  Therefore, "the court should not infer a
party's intention to waive the benefit of the rule unless the
intention to do so is unmistakably clear from the language of
the promise."  Hooper Assoc., 548 N.E.2d at 905.

SPA § 9.01 states:

214

The representations and warranties set forth in this Agreement or any certificate delivered pursuant hereto shall survive for a period of 18 months following the Closing Date. Notwithstanding anything herein to the contrary, the representations and warranties set forth in Section 3.01, 3.02, 3.03, 3.21, 4.01, 4.02 and 4.03 shall survive until the expiration of the applicable statute of limitations governing such claims (giving effect to any waiver or extension thereof). The sole and exclusive remedy for any breach of any representation, warranty, covenant or agreement shall be pursuant to Section 9.02, other than for claims relating to fraud by the Seller against the Purchaser or by the Purchaser against the Seller, in either case, relating to this Agreement.

Pl. Ex. 5 § 9.01. SPA § 9.02(a) states, in relevant part:

From and after the Closing, the Purchaser and its Affiliates, officers, directors, employees, agents, successors and assigns (each a "Purchaser Indemnitee") shall be indemnified and held harmless by the Seller from and against all liabilities, costs or expenses (including, without limitation, reasonable attorneys' fees), judgments, fines, losses, claims, damages and amounts paid in settlement actually suffered or incurred by them (collectively, "Losses") arising from or in connection with (i) the breach of any representation or warranty made by the Seller contained in this Agreement, (ii) the breach of any covenant or agreement by the Seller contained in this Agreement or (iii) any and all Excluded Assets or Excluded Liabilities . . . .

Pl. Ex. 5 § 9.02(a).

Deutsche Bank has contended that the language of SPA § 9.02 is not "exclusively or unequivocally referable to the claims between the parties themselves," Hooper Assocs., 548

215

N.E.2d at 905, and that § 9.02 could be read to apply
exclusively to third-party claims.

Read alone, § 9.02 is amenable to Deutsche Bank's
interpretation. However, the Court must construe the contract
so as to "afford[] a fair meaning to all of the language
employed by the parties in the contract and leave[] no provision
without force and effect." Id.; see also Int'l Klafter Co. v.
Cont'l Cas. Co., 869 F.2d 96, 99 (2d Cir. 1989) ("[T]he court
must look to 'all corners of the document' rather than view
sentences or clauses in isolation." (quoting Tougher Heating &
Plumbing Co. v. New York, 423 N.Y.S.2d 289, 290-91 (App. Div.
1979))).

§ 9.01 unambiguously contemplates direct actions
between the parties, and by directing that they may only be
resolved within the framework of § 9.02, establishes that § 9.02
applies not only to third-party claims, but to direct breach of
contract claims as well. Deutsche Bank's reading of § 9.02 to
apply only to indemnification claims for third-party actions,
read together with the "sole and exclusive remedy" clause of §
9.01, would require the absurd result that the parties to the
SPA could not be held liable for breach of contract and
indemnification would be limited only to third party claims.

216

This result is plainly inconsistent with the plain language of §
9.01, which governs the survival of the SPA's various
representations and warranties and makes an explicit exception
for fraud claims between the parties.

Accordingly, under the unmistakably clear language of
the contract, E*TRADE is entitled to attorneys' fees arising out
of the contract breach.

**IV.  CONCLUSION**

On the facts and conclusions set forth above, E*TRADE
is entitled to judgment, prejudgment costs, and damages on its
contract claim, including attorneys' fees.  The parties are
directed to submit a schedule for the submission of proof of the
amount of E*TRADE's costs and fees.

Submit judgment on notice.

So ordered.

**New York, NY**
**June 1, 2009**

ROBERT W. SWEET
U.S.D.J.

217